UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br>Vehicle Carrier Services<br>Antitrust Litigation | Master Docket No.: 13-cv-3306<br>(MDL No. 2471) |
| _____ | CONSOLIDATED AMENDED CLASS<br>ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| *This Document Relates to*<br>*All Direct Purchaser Actions* | |

## TABLE OF CONTENTS

Nature of the Action.................................................................................................... 1

Jurisdiction and Venue................................................................................................ 2

United States Trade and Commerce ............................................................................ 3

Parties .......................................................................................................................... 4

    Plaintiffs ................................................................................................................ 4

    Defendants ............................................................................................................. 4

    Agents and Co-Conspirators ................................................................................. 7

Background on Vehicle Carrier Services...................................................................... 7

    Susceptibility of Vehicle Carrier Services to Collusion ........................................ 9

        Concentration ................................................................................................. 9

        Commodity-Like Services .............................................................................. 9

        Barriers to Entry............................................................................................. 10

        Demand Inelasticity ....................................................................................... 10

        Opportunities for Conspiratorial Communications........................................ 11

Defendants' Anticompetitive Conduct ........................................................................ 12

    Defendants Conspired to Reduce Vehicle Carrier Services Fleet Capacity .................... 13

    Defendants Conspired to Fix, Raise, or Artificially Maintain Prices for Vehicle
    Carriers Services ................................................................................................... 15

    Defendants Agreed Not to Compete for Customers for Vehicle Carrier Services .......... 17

    Current Government Investigations Targeting Defendants ............................................ 20

Defendants' Conspiracy Resulted in Higher Prices for Purchasers of Vehicle Carrier
Services ........................................................................................................................ 22

Equitable Tolling and Fraudulent Concealment .......................................................... 24

Class Action Allegations.............................................................................................. 29

Cause of Action............................................................................................................ 31

Prayer for Relief........................................................................................................... 33

Demand for Jury Trial.................................................................................................. 34

Plaintiffs Cargo Agents, Inc., International Transport Management, Corp., and Manaco International Forwarders, Inc., by their undersigned attorneys, individually and on behalf of all others similarly situated, bring this action under the federal antitrust laws to recover treble damages and the costs of suit, including reasonable attorneys' fees, for their injuries and those of the members of the proposed Class (as defined below) resulting from Defendants' violations of the federal antitrust laws.

## NATURE OF THE ACTION

1.      Defendants are the largest providers of deep sea vehicle transport services ("Vehicle Carrier Services," described more fully below) in the world, including for shipments to and from the United States.  Since at least 2000, Defendants have conspired to allocate customers and markets, to rig bids, to restrict supply, and otherwise to raise, fix, stabilize, or maintain prices for Vehicle Carrier Services for shipments to and from the United States.  Defendants' agreement, combination, or conspiracy unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants' conspiracy and agreements caused Plaintiffs and others who directly purchased Vehicle Carrier Services from Defendants to pay artificially inflated prices.

2.      Competition authorities in the United States, Canada, Japan, and the European Union ("EU") have been actively investigating anticompetitive practices with respect to Vehicle Carrier Services. Additi onally, on or about February 27, 2014, Defendant CSAV (defined below) pleaded guilty to a criminal Information filed by the United States Department of Justice ("DOJ") for conspiring to suppress and eliminate competition by allocating customers and routes, rigging bids, and fixing prices for international Vehicle Carrier Services to and from the United States and elsewhere in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.      Plaintiffs bring this lawsuit on behalf of themselves and all other persons or entities who purchased Vehicle Carrier Services directly from one or more Defendants for shipments to and from the United States between January 1, 2000 and December 31, 2012 (the "Class Period") to recover damages sustained as a result of Defendants' unlawful conduct.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action against Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and the other members of the Class (as defined below) have suffered as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

6.      This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business within the United States, including in this District; (b) directly sold Vehicle Carrier Services within the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) was engaged in an illegal conspiracy directed at, and which had a direct, substantial, reasonably foreseeable, and intended effect of, causing injury to the business or property of persons and entities residing in, located in, or doing business within the United States, including in this District.   Defendants conduct business within the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

7.      Alternatively, there is jurisdiction over foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

8.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; or a substantial portion of the affected interstate trade and commerce discussed in this Consolidated Amended Complaint ("Complaint") was carried out in this District.

## UNITED STATES TRADE AND COMMERCE

9.      During the Class Period, Defendants sold substantial quantities of Vehicle Carrier Services for shipments to and from the United States.

10.      The activities of Defendants in connection with the sale of Vehicle Carrier Services and the conduct of Defendants and their co-conspirators as alleged in this Complaint: (a) constituted United States interstate trade or commerce; (b) constituted United States import trade or import commerce; or (c) were within the flow of and had a direct, substantial, and reasonably foreseeable effect on United States domestic trade or commerce or United States import trade or commerce.  Given the volume of affected commerce, such effects were direct and substantial.  In addition, it was reasonably foreseeable that Defendants' wrongful conduct, as alleged in this Complaint, would raise and artificially inflate prices for Vehicle Carrier Services for shipments to and from the United States, and would have a substantial effect on United States domestic trade or commerce or United States import trade or commerce.

11.      Such effects, including the artificially raised and inflated prices that Plaintiffs and members of the proposed Class paid for Vehicle Carrier Services during the Class Period, caused antitrust injury to Plaintiffs and members of the proposed Class and give rise to their claims under Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on United States commerce. The Defendants' Vehicle Carrier Services are sold in the flow of United States commerce.

## PARTIES

### Plaintiffs

13.     Plaintiff Cargo Agents, Inc., ("Cargo Agents") is a Wyoming corporation with its principal place of business in Flushing, New York. Cargo Agents directly purchased Vehicle Carrier Services from one or more Defendants during the Class Period and was directly injured as a result.

14.     Plaintiff International Transport Management Corp. ("ITM") is a New Jersey corporation with its principal place of business in Whitehouse Station, New Jersey. ITM directly purchased Vehicle Carrier Services from one or more Defendants during the Class Period and was directly injured as a result.

15.     Plaintiff Manaco International Forwarders, Inc., ("Manaco") is a Florida corporation with its principal place of business in Ft. Lauderdale, Florida. Manaco directly purchased Vehicle Carrier Services from one or more Defendants during the Class Period and was directly injured as a result.

### Defendants

16.     Defendant Nippon Yusen Kabushiki Kaisha ("NYK Japan") is a Japanese company with its principal place of business in Tokyo, Japan. Defendant NYK Line (North America) Inc. ("NYK America") is a wholly-owned subsidiary of NYK Japan with its principal place of business in Secaucus, New Jersey. During the Class Period, NYK Japan and NYK America (collectively, "NYK Line"), directly or through their wholly-owned and controlled subsidiaries, provided,

4

marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

17.     Defendant Mitsui O.S.K. Lines, Ltd., ("MOL Japan") is a Japanese company with its principal place of business in Tokyo, Japan.  Defendant Mitsui O.S.K. Bulk Shipping (USA), Inc., ("MOBUSA") is a subsidiary of MOL Japan with its principal place of business in Jersey City, New Jersey.  Defendant World Logistic Service (U.S.A.) Inc. ("WLS") is a subsidiary of MOL Japan with its principal place of business in Long Beach, California.  Defendant Nissan Motor Car Carrier Co., Ltd., ("NMCC") is a Japanese company with its principal place of business in Tokyo, Japan.  Since 2009, NMCC has been owned 70% by MOL Japan, 20% by HAL (defined below), and 10% by Nissan Motor Co., Ltd. ("Nissan").  From 1998 to 2009, NMCC was owned 40% by MOL Japan and 60% by Nissan.  During the Class Period, MOL Japan, MOBUSA, WLS, and NMCC (collectively, "MOL"), directly or through their wholly-owned and controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

18.     Defendant Kawasaki Kisen Kaisha, Ltd., ("'K' Line Japan") is a Japanese company with its principal place of business in Tokyo, Japan.  Defendant "K" Line America, Inc., ("'K' Line America") is a wholly-owned subsidiary of "K" Line Japan with its principal place of business in Richmond, Virginia.  During the Class Period, "K" Line Japan and "K" Line America (collectively, "'K' Line"), directly or through their wholly-owned and controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

19.     Defendant EUKOR Car Carriers Inc. ("EUKOR") is a South Korean company with its principal place of business in Seoul, South Korea.   EUKOR is a  joint venture:   Wilh.

Wilhelmsen ASA owns 40%, Wallenius Lines AB owns 40%, and Hyundai Motor Company and Kia Motors Corporation own 20%.  During the Class Period, EUKOR, directly or through its wholly-owned and controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

20.     Defendant Wallenius Wilhelmsen Logistics AS ("WWL Norway") is a Norwegian company with its principal place of business in Lysaker, Norway.   Defendant Wallenius Wilhelmsen Logistics Americas LLC ("WWL America") is a wholly-owned subsidiary of WWL Norway with its principal place of business in Woodcliff Lake, New Jersey.  During the Class Period, WWL Norway and WWL America (collectively, "WWL"), directly or through their wholly-owned and controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

21.     Defendant Compañia Sud Americana de Vapores S.A. ("CSAV Chile") is a Chilean company with its principal place of business in Valparaiso, Chile.  Defendant CSAV Agency North America, LLC ("CSAV Agency") is a wholly-owned subsidiary of CSAV Chile, with its principal place of business located in Iselin, New Jersey. D uring the Class Period, CSAV Chile and CSAV Agency (collectively, "CSAV"), directly or through their wholly-owned and controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

22.     Defendant Höegh Autoliners Holdings AS ("HAL Holdings") is a Norwegian company with its principal place of business in Oslo, Norway.  Defendant Höegh Autoliners AS ("HAL AS") is a wholly-owned subsidiary of HAL Holdings with its principal place of business in Oslo, Norway.  Defendant AUTOTRANS AS ("AUTOTRANS") is a wholly-owned subsidiary of HAL Holdings with its principal place of business in Gennevilliers, France.  Defendant Höegh

Autoliners, Inc. ("HAL Inc.") is a wholly-owned subsidiary of HAL Holdings with its principal place of business in Jacksonville, Florida. Defendant Alliance Navigation LLC ("Alliance") is a wholly-owned affiliate of HAL Inc. with its principal place of business in Jacksonville, Florida. During the Class Period, HAL Holdings, HAL AS, AUTOTRANS, HAL Inc., and Alliance (collectively, "HAL"), directly or through their wholly-owned and controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

### Agents and Co-Conspirators

23.    Various other individuals, firms, and corporations, not named as defendants in this Complaint, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Plaintiffs reserve the right to name some or all of these individuals, firms, and corporations as defendants.

24.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

### BACKGROUND ON VEHICLE CARRIER SERVICES

25.    Vehicle Carrier Services involve transporting any type of wheeled freight on large, ocean-shipping vessels on deep-sea routes. The freight shipped includes all types of vehicles, including cars, trucks, construction vehicles, tracked vehicles and machines (such as excavators or bulldozers), tractors, trailers, capital equipment vehicles used in construction, agriculture, and mining, and other types of wheeled freight.

26.     Vehicle Carrier Services involve the use of specialized vessels equipped with ramps such that wheeled freight can be rolled on or rolled off of the vessels.  The term "RoRo" is often used to refer to these vessels ("RoRo Vessels") or to the transport of vehicles on such vessels ("RoRo Shipping").

27.     There are two types of RoRo vessels:  Pure Car Carriers ("PCCs") and Pure Car and Truck Carriers ("PCTCs").  PCCs were designed exclusively for the movement of passenger cars (and possibly small trucks).  They can be thought of as movable parking garages with up to 10 to 12 levels (or decks).  PCTCs were designed to carry cars and trucks.  The main distinguishing feature between PCTCs and PCCs is that PCTCs are equipped with hydraulics that can move the decks within the vessel to enable the vessel to carry vehicles of varying sizes.

28.     Although some smaller-wheeled freight conceivably can be put into containers and loaded by crane onto a container ship, transporting such vehicles on RoRo vessels is the preferred method because:

a.      To transport a vehicle inside a container, special inserts are typically placed inside the container to maximize the number of vehicles that can fit inside;

b.      Once a vehicle is driven into a container, it needs to be secured within the container and then transported to a port to be loaded by crane onto a vessel;

c.      The steps outlined above take considerably more time than rolling vehicles onto RoRo vessels and are associated with additional costs;

d.      The cost of shipping a vehicle in a container is typically higher than, and can be as much as two to three times the cost of, shipping that same vehicle via a RoRo vessel;

e.   Vehicles may be damaged when they are driven in and out of containers, and their close proximity during shipping can also cause damage; and

f.   If multiple vehicles are placed inside a container in a stacked fashion, there is a risk that oil or other fluids from one car can leak on other cars, also causing damage.

29.   There are no reasonable substitutes for Vehicle Carrier Services for shipping wheeled freight over deep seas.

30.   Plaintiffs and members of the proposed Class (collectively, "Direct Purchasers") include companies that arrange for the international ocean transportation of vehicles and other individuals or entities purchasing directly from any Defendant (or from any current or former subsidiary or affiliate of any Defendant) Vehicle Carrier Services for shipments to and from the United States.

## SUSCEPTIBILITY OF VEHICLE CARRIER SERVICES TO COLLUSION

31.   Vehicle Carrier Services are particularly susceptible to collusion because of high concentration, the commodity-like nature of the services at issue, high barriers to entry, inelasticity of demand, and ample opportunities for the Defendants to meet and collude.

### Concentration

32.   During the Class Period, Defendants accounted for roughly two-thirds or more of the global capacity of Vehicle Carrier Services.

### Commodity-Like Services

33.   Vehicle Carrier Services are homogeneous, commodity-like services.  Purchasers of Vehicle Carrier Services choose providers almost exclusively based on price, because the qualitative differences between each provider are negligible.   Thus, from the purchasers' perspective, providers of Vehicle Carrier Servicers are essentially interchangeable.

34.     The homogenous and interchangeable nature of Vehicle Carrier Services makes it easier to create and maintain an unlawful conspiracy, agreement, or cartel because coordinating conduct and prices, as well as policing those collusively set prices, is less difficult than if Defendants had distinctive services that could be differentiated based upon features other than price.

### Barriers to Entry

35.     There are substantial entry barriers that a new provider of Vehicle Carrier Services would face.  A new entrant would encounter significant hurdles, including multi-million dollar start-up costs associated with acquiring ships and equipment, distribution infrastructure, and hiring skilled labor and a sales force.

36.     Additionally, the lack of reputation and customer relationships can be problematic for a new entrant; at least one Defendant has publicly stated that the strong relationships that vehicle carriers forge with their customers create high barriers to entry.

### Demand Inelasticity

37.     Demand for Vehicle Carrier Services is highly inelastic because there are no close substitutes.  A RoRo vessel is built specifically to transport the large, irregular shapes of wheeled vehicles and to enable those vehicles to be quickly and efficiently loaded and unloaded from the vessel.

38.     Therefore, a price increase in Vehicle Carrier Services does not induce purchasers into using other types of cargo vessels or services.  By allowing producers to raise prices without triggering customer substitution and lost sales revenue, inelastic demand facilitates collusion.

## Opportunities for Conspiratorial Communications

39.     The shipping industry has been characterized as a small world where many of the key figures know each other.  Many employees of the Defendants have spent their entire careers in the shipping industry.  Key employees have also transferred between the Defendant companies, fostering familiarity and connections between professed competitors and facilitating high-level coordination for the conspiracy.

40.     Defendants are members of several trade associations that provide opportunities to meet under the auspices of legitimate business.  For example, several Defendants are members of the ASF Shipping Economics Review Committee.  The Committee had meetings, including one in Tokyo on March 2, 2010, that was attended by representatives of several Defendants, including REDACTED (of "K" Line) and REDACTED (of NYK Line).

41.      Defendants CSAV (through its subsidiary CSAV Group North America), NYK America, "K" Line America, MOL (through its subsidiary, MOL (America), Inc.), and WWL America are members of the United States Maritime Alliance, Ltd.

42.     Defendants "K" Line, MOL, NYK America, and WWL America are members of the New York Shipping Association, Inc.

43.     Defendants "K" Line, MOL (through its subsidiary, MOL (America) Inc.), NYK Line, and WWL are members of the Pacific Maritime Association.

44.     Defendants CSAV, "K" Line, MOL, NYK Line, and WWL are members of the World Shipping Council.

45.     Defendants CSAV, "K" Line, MOL, and NYK Line were members of the European Liner Affairs Association, which was later absorbed by the World Shipping Council.

46.     Defendants NYK Line, "K" Line, and MOL are members of the Japan Shipowners' Association, a trade association based in Japan.

47.     These associations—and the meetings, trade shows, and other industry events that stem from them—provided Defendants with ample opportunities to meet and conspire, as well as to perform affirmative acts in furtherance of the conspiracy.

48.     Defendants also routinely enter into vessel-sharing agreements whereby they reserve space on each other's ships.  These sharing or chartering agreements are very common in the international maritime shipping industry.

49.     A "space charter" occurs when a shipping carrier charters space on another shipping carrier's vessel.  The opportunity for a space charter arises when a shipping carrier has less than full capacity on its ship and another shipping carrier needs additional capacity.

50.     A "time charter" occurs when a shipping carrier fully charters another vehicle carrier's vessel.  The opportunity for a time charter arises when a vehicle carrier would otherwise send a vessel home empty and another vehicle carrier needs space.

51.     While ostensibly entered into to optimize utilization and increase efficiency, such sharing and chartering agreements also provide opportunities for Defendants to discuss Vehicle Carrier Services market shares, routes, and rates and to engage in illegal conspiracies to fix prices, rig bids, and allocate customers and markets.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

52.     Since at least 2000, Defendants have engaged in a continuous and wide-ranging conspiracy to restrain competition for the sale of Vehicle Carrier Services.   Defendants have conspired to fix, and have fixed, prices for Vehicle Carrier Services, allocate customers for Vehicle

Carrier Services, and restrict the supply of Vehicle Carrier Services. Defendants' conspiracy has resulted in higher prices of Vehicle Carriers Services for shipments to and from the United States.

53.     Plaintiffs plead the following known anticompetitive acts as exemplars of Defendants' conduct in the provision of Vehicle Carrier Services; Defendants' persistent and pervasive acts restrained trade and caused prices to be artificially inflated in the sale of Vehicle Carrier Services for shipments to and from the United States.

54.     Because Defendants' conspiracy was secret in nature, and because Defendants took steps to conceal their anticompetitive agreements, Plaintiffs cannot yet know all the ways that Defendants conspired. On information and belief, Plaintiffs allege that Defendants engaged in acts in furtherance of their conspiracy in addition to those specifically alleged in this Complaint, and that such additional acts also restrained trade in the sale of Vehicle Carrier Services for shipments to and from the United States.

### Defendants Conspired to Reduce Vehicle Carrier Services Fleet Capacity

55.     During the Class Period, Defendants' executives had frequent communications regarding reducing Vehicle Carrier Services capacity, and they reached agreements concerning the capacity reduction. These capacity reductions, and the higher prices that resulted from them, were an effect of Defendants' conspiracy and were not caused by natural market forces.

56.     Defendants reduced capacity by agreeing to scrap and "layup" vessels. Scrapping refers to destroying a vessel by breaking it up and selling the pieces for scrap. A layup occurs when a vessel is taken out of commission but not scrapped. In a "cold layup," the vessel sits idle without a crew and is not maintained. In a "hot layup," the vessel is staffed and maintained but not put into service. The costs for putting a vessel back into service are higher after a cold layup than after a hot layup.

57.     During the Class Period, the Defendants discussed scrapping vessels, vessel layups, and plans for building new vessels.  In connection with those discussions, Defendants reached agreements to control or reduce capacity, which resulted in artificially inflated prices for Vehicle Carrier Services for shipments to and from the United States.

58.     For instance, from the late 1990s through 2002, executives from MOL, "K" Line, NYK Line, HAL, and WWL met twice a year—once in Japan and once in Europe—to discuss and agree on vessel scrapping and building plans and to exchange data.  They also discussed Vehicle Carrier Services pricing for routes where they believed prices were particularly low.   These Defendants continued their data exchange into 2003.

59.     In 2008, demand for Vehicle Carrier Services fell dramatically as a result of the worldwide financial crisis, leaving Defendants with excess capacity.   In response, Defendants conspired to reduce the supply of Vehicle Carrier Services by engaging in a number of acts, including the following:

a.     In late 2008 or early 2009, executives from MOL and NYK Line met and agreed to reduce their respective fleet sizes by scrapping RoRo vessels.  They also agreed to resist price reduction requests from customers;

b.     "K" Line likewise agreed to scrap some of its vessels after being approached by MOL or NYK Line;

c.     During late 2008 to early 2009, MOL also discussed fleet reductions and reached understandings concerning such reductions, with WWL, HAL, and EUKOR;

d.     In or around 2009, WWL, HAL, and "K" Line agreed to layup RoRo vessels to reduce capacity;

e.   Mr. REDACTED of MOL, Mr. REDACTED of NYK Line, Mr. REDACTED of WWL, Mr. REDACTED of HAL, and Mr. REDACTED of "K" Line were involved in these discussions and ensuing agreements to scrap or layup vessels;

f.   As a result of Defendants' agreements, MOL scrapped approximately 40 vessels, NYK Line scrapped approximately 40 vessels, "K" Line scrapped approximately 25 vessels, and HAL scrapped approximately 10 vessels. In total, the Defendants scrapped at least 20% of the vessels across the industry and placed an additional 15% of PCTCs in layups;

g.   Almost no orders for new vessels were placed between 2009 and 2011.

60.   In addition to scrapping and layups, Defendants controlled excess capacity by "slow steaming" their RoRo vessels to create artificial supply shortages. This practice lowers the speed of the vessels and increases sailing time, which in turn decreases capacity. As a result of the Defendants' agreements to slow-steam their vessels, by mid-2011, NYK Line, "K" Line, and MOL had reduced speeds on nearly every vessel, and NYK Line reduced PCTC speeds from 18-20 to 12-15 knots.

61.   The Defendants' agreements to control or reduce capacity through vessel scrapping, layups, and slow-steaming reduced capacity and resulted in artificially high prices paid by Class Members for Vehicle Carrier Services on shipments to and from the United States during the Class Period.

### Defendants Conspired to Fix, Raise, or Artificially Maintain
### Prices for Vehicle Carriers Services

62.   In addition to their communications and agreements to control or reduce capacity, Defendants met periodically throughout the Class Period and agreed on the prices to charge for Vehicle Carrier Services. The following are some examples:

a.  Beginning in February 1997, MOL, NYK Line, and "K" Line met multiple times at MOL's office in Tokyo to discuss the upcoming renewal of a customer's contract for Vehicle Carrier Services.  Participants at these meetings included Messrs. REDACTED and REDACTED of NYK Line and Messrs. REDACTED and REDACTED of "K" Line. Representatives from MOL, NYK Line, and "K" Line agreed that each would ask customers for a price increase for the shipment of vehicles from Japan to the United States and from the United States to Japan;

b.  Around 2002 or 2003, MOL and "K" Line were both shipping vehicles from Europe to North America and agreed to each request a 3% to 5% price increase;

c.  In late 2007, a customer issued a tender for shipments of vehicles from Europe to the United States; executives from MOL and "K" Line discussed the tender and agreed to request a price increase from the customer;

d.  In late 2007 and early 2008, executives from MOL, NYK Line, and "K" Line met multiple times to try to obtain a 10% price increase for Vehicle Carrier Services. For example, Mr. REDACTED of NYK Line and Mr. REDACTED of MOL met in November 2007 and agreed to increase pricing for Vehicle Carrier Services in 2008. They also agreed to convince "K" Line to increase its rates.  The following month, Mr. REDACTED of MOL and Mr. REDACTED of NYK Line had dinner in a restaurant in Tokyo and discussed seeking price increases in 2008.  On or about January 11, 2008, Mr. REDACTED and Mr. REDACTED had lunch with Mr. REDACTED of "K" Line and agreed to a goal of a 5% increase in 2008.  On or about January 22, 2008, Mr. REDACTED (of MOL), Mr. REDACTED (of NYK Line), and Mr. REDACTED (of "K" Line) agreed on a target of a 10% price increase for 2008; they further agreed that

16

each of the three companies would approach its principal customers and initially ask for a 10% price increase for Vehicle Carrier Services.  In March 2008, Mr. REDACTED (of MOL), Mr. REDACTED (of NYK Line), and Mr. REDACTED (of "K" Line) met and discussed the 2008 price increase.  MOL, NYK Line, and "K" Line then proceeded to approach their customers as agreed, and they obtained price increases;

e.  In fall 2008, Mr. REDACTED (of MOL), Mr. REDACTED (of NYK Line), and Mr. REDACTED (of "K" Line) communicated and agreed to seek a certain price increase for Vehicle Carriers Services.  These executives further agreed that NYK Line and "K" Line would share a customer's business from Japan to the west coast of the United States, and that NYK Line, "K" Line, and MOL would share the customer's business from Japan to the east coast of the United States; and

f.  In November 2011, executives from MOL and HAL met for dinner and discussed and agreed upon Vehicle Carrier Services rates from New York to West Africa, a route on which they both offered service.

63.  Defendants' agreements to fix, raise, or artificially maintain the price of Vehicle Carrier Services resulted in artificially high prices paid by Class Members for Vehicle Carrier Services on shipments to and from the United States during the Class Period.

**<u>Defendants Agreed Not to Compete for Customers for Vehicle Carrier Services</u>**

64.  In addition to their communications and agreements to control or reduce capacity and to fix, raise, or artificially maintain the price of Vehicle Carrier Services, throughout the Class Period, Defendants met periodically and agreed not to compete for customers for Vehicle Carrier Services.  The following are some examples:

a.  In 2001, MOL and HAL agreed to allocate the transportation of vehicles from the United States to the Middle East.  MOL was not the incumbent and wanted this business.  Executives from MOL and HAL discussed and agreed that HAL would not bid in exchange for MOL agreeing to use HAL vessels on the route if it won the business. MO L won the business and then used HAL's vessels, as agreed;

b.  In 2001 or 2002, MOL, WWL, and NYK Line agreed to not compete to transport a customer's vehicles from the United States to Japan.  At the time, MOL was the incumbent, and MOL asked WWL to not compete with MOL when the customer issued a tender.  MOL told NYK Line what it planned to bid for the business and asked NYK Line to bid a higher amount.  Both WWL and NYK Line agreed to do as MOL requested;

c.  In 2002 or 2003, MOL, WWL, and HAL agreed to allocate a customer's business. After the customer issued a tender for transporting its vehicles from Europe to the United States, executives from MOL approached executives from WWL about the customer's business from Thailand to Europe.  WWL was the incumbent on the route from Europe to the United States, and MOL wanted to obtain the business from Thailand to Europe.  MOL and WWL agreed that MOL would not compete for WWL's route from Europe to the United States, and in exchange, WWL would not compete with MOL in MOL's attempt to obtain the Thailand to Europe business.  In furtherance of this agreement, WWL gave MOL a price to bid as part of the tender for Europe to the United States.  Similarly, MOL and Mr.<sup>REDACTED</sup> of HAL agreed that HAL would not compete with MOL in MOL's attempt to obtain

18

the Thailand to Europe business, and in exchange MOL would not compete for HAL's business on routes from the United States to Africa and the Middle East;

d.   In 2004, MOL and WWL agreed to not compete for each other's business with respect to two customers.  MOL and WWL agreed that WWL would not compete with MOL for MOL business in the transport of one of the customer's vehicles from South Africa to the United States, and in exchange MOL would not compete for WWL's business in the transport of both customers' vehicles from Europe to the United States;

e.   In 2008 or 2009, MOL and "K" Line agreed to not compete for a customer's business.  MOL was the incumbent for transporting that customer's vehicles from the United States to South Africa.  Mr. REDACTED of "K" Line agreed that "K" Line would bid a higher rate than MOL did for this business, and in exchange Mr. REDACTED of MOL agreed to not compete for "K" Line's business from the United States to Brazil and Argentina;

f.   In 2010, CSAV and MOL agreed that MOL would not compete for CSAV's business to transport a customer's vehicles from the United States to Colombia from 2010 to 2012; in furtherance of this agreement, CSAV gave MOL a price to bid;

g.   In February or March of 2012, Mr. REDACTED (of MOL) and Mr. REDACTED (of WWL) met in person and agreed that MOL would not compete for WWL's business transporting vehicles from the United States to China, and in exchange, WWL would not pursue business transporting a customer's vehicles from the United States to Korea.  In furtherance of this agreement, WWL gave MOL a price to bid

19

on the United States to China route, and MOL gave WWL a price to bid on the United States to Korea route; and

h.     In August 2011, MOL, NYK Line, and "K" Line agreed to allocate the shipment of a customer's trucks and buses from Japan to the United States.  All three companies were incumbent carriers on the route, with NYK Line having the largest share. They agreed what amount of business each company would seek and at what rates. They further agreed that if any of the three companies did not obtain the specified business, the others would share some of the business that they won.  NYK Line coordinated the agreement between the companies and provided each with the rates to bid.

65.    Defendants' agreements to not compete for customers' business resulted in artificially high prices paid by Class Members for Vehicle Carrier Services on shipments to and from the United States during the Class Period.

## Current Government Investigations Targeting Defendants

66.    United States, Canadian, Japanese, and EU competition authorities have initiated a global, coordinated antitrust investigation concerning the unlawful conspiracy alleged in this Complaint.

67.    A grand jury has been convened in Baltimore, Maryland to investigate alleged anticompetitive conduct involving Vehicle Carrier Services and has issued subpoenas to certain of the Defendants.

68.    In early September 2012, the Japan Fair Trade Commission ("JFTC"), the European Commission, and the DOJ carried out raids and unannounced inspections at the offices of a number of the Defendants, including NYK Line, MOL, "K" Line, WWL, EUKOR, and HAL; news

organizations have reported that NMCC was also being investigated for the same unlawful conduct.

69.     On or about February 27, 2014, the DOJ filed a criminal Information charging that, from as early as January 2000 through at least September 2012, CSAV conspired to suppress and eliminate competition by allocating customers and routes, rigging bids, and fixing prices for Vehicle Carrier Services to and from the United States and elsewhere in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  CSAV pleaded guilty to the criminal Information on or about February 27, 2014.

70.     The criminal Information against CSAV further states that, during the relevant period, CSAV and its co-conspirators attended meetings and engaged in communications regarding bids and tenders in which they agreed to allocate customers by not competing for each other's existing business for certain customers on certain routes; they agreed to not compete against each other on certain tenders by not bidding or agreeing to the prices they would bid on such tenders; they discussed and exchanged prices so as to not undercut each other's pricing on certain tenders; they submitted bids in accordance with agreements reached; and they provided RoRo services at collusive and non-competitive prices.

71.     On or about March 18, 2014, the JFTC issued cease and desist orders and fines against NYK Line, "K" Line, WWL, and NMCC.

72.     The anticompetitive agreements described in this Complaint were not filed with the Federal Maritime Commission ("FMC").

73.     The anticompetitive agreements described in this Complaint violate the antitrust laws and relate to conduct that is not protected under the Shipping Act of 1984, 46 U.S.C. §§ 40101

- 41309; as a result, the Defendants could not have had a reasonable expectation that agreements encompassing such conduct were filed with the FMC and in effect during the Class Period.

74.     During the Class Period, the FMC did not approve, modify, or amend the rates charged by Defendants for Vehicle Carrier Services for shipments to and from the United States.

## DEFENDANTS' CONSPIRACY RESULTED IN HIGHER PRICES FOR PURCHASERS OF VEHICLE CARRIER SERVICES

75.     As a result of their unlawful contract, combination, or conspiracy, Defendants succeeded in restricting output and fixing, raising, maintaining, or stabilizing prices for Vehicle Carrier Services charged throughout the world, including shipments to and from the United States.

76.     Defendants' agreements to reduce capacity and increase prices in 2008 affected all direct purchasers of Vehicle Carrier Services, including for shipments to or from the United States.

77.     By agreeing to fix, raise, or artificially maintain prices of Vehicle Carriers Services, Defendants fixed, raised, maintained, or stabilized prices charged to all direct purchasers, including for shipments to and from the United States, even where a particular agreement may have been made with respect to some customers.

78.     Plaintiffs and the other Class Members have been injured in their business and property because they have paid more for Vehicle Carrier Services than they would have paid in a competitive market.  Such injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

79.     Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

a.     Competition for Vehicle Carrier Services has been restrained;

b.     Prices paid by Plaintiffs and the members of the Class for Vehicle Carrier Services were fixed, stabilized, or maintained at supra-competitive levels throughout the

22

world, including prices paid for Vehicle Carrier Services to and from the United States;

c.      Customers and markets for Vehicle Carrier Services were allocated among Defendants and their co-conspirators;

d.      Price competition regarding the sale of Vehicle Carrier Services was restrained, suppressed, or eliminated throughout the world, including for shipments to and from the United States, thus raising the prices of Vehicle Carrier Services above what they would have been absent Defendants' actions; as a result, Plaintiffs and the other members of the Class paid more for Vehicle Carrier Services than they would have paid in a competitive marketplace;

e.      Direct purchasers of Vehicle Carrier Services have been deprived of the benefits of free and open competition; and

f.      As a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

80.     The effects of Defendants' unlawful conduct are supported by economic data. Pricing for Vehicle Carrier Services is correlated with time charter rates and time charter rates can serve as a rough proxy for contemporaneous Vehicle Carrier Service rates charged by Defendants and their co-conspirators.  An examination of time charter rates published by broker R.S. Platou shows that after a decade of relatively flat PCTC charter rates from 1990-2000, rates began to increase substantially in 2001.  Between 2001 and 2008, R.S. Platou data show that rates increased by approximately 150%.  This rate increase cannot be explained by normal market forces such as increased demand or increased costs:

a.  Demand for Vehicle Carrier Services increased only modestly during this time period.  According to the United States International Trade Commission, U.S. imports and exports of automobiles increased by 24% from 2001 to 2008 (3% a year on average), far less than the 150% reported increase in PCTC charter rates (almost 20% a year on average); and

b.  Increases in prices for Vehicle Carrier Services far outpaced any increases in expenses during the same period.

81.  As explained in paragraph 59, *supra*, demand for Vehicle Carrier Services fell dramatically in late 2008 as a result of the worldwide financial crisis, and Defendants jointly responded to this drop in demand by agreeing to scrap and lay up a substantial number of vessels, and then implementing those agreements.  In addition, Defendants continued to conspire to allocate customers and markets, rig bids, and fix, raise, or artificially maintain prices for Vehicle Carrier Services.  As a result of these various anticompetitive acts, prices for Vehicle Carrier Services began rising steadily starting in 2009 at a rate that cannot be explained or justified by fuel costs or demand.

82.  Defendants' conduct throughout the Class Period resulted in artificially high prices for Vehicle Carrier Services charged throughout the world, including shipments to and from the United States, and as a result Class Members paid more for Vehicle Carriers Services than they would have absent Defendants' unlawful conduct.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

83.  Before September 6, 2012, when the global investigation of Defendants' misconduct was first publicly reported, a reasonable person under the circumstances would have believed the Vehicle Carrier Services to be a competitive industry and, thus, would not have been

alerted to begin to investigate the legitimacy of Defendants' prices for Vehicle Carrier Services before that time.

84.     Conspiracies to fix prices, rig bids, and allocate customers and markets are, by their very nature, inherently self-concealing.  If a conspiracy is to be successful at fixing prices, the participants must ensure that customers do not discover the existence of the conspiracy.

85.     Defendants' acts in furtherance of the conspiracy were concealed and carried out in a manner specifically designed to avoid detection.  Plaintiffs and members of the Class did not discover and could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

86.     Because Defendants' agreements, understandings, or conspiracies were kept secret until September 6, 2012, Plaintiffs and members of the Class before that time were unaware of Defendants' unlawful conduct alleged in this Complaint, and they did not know before that time that they were paying supra-competitive prices for Vehicle Carrier Services during the Class Period.

87.     None of the facts or information available to Plaintiffs and members of the Class, if investigated with reasonable diligence, would have led to the discovery of the conspiracy alleged in this Complaint prior to September 6, 2012.

88.     Moreover, Defendants affirmatively concealed their conspiracy by falsely claiming that the Vehicle Carrier Services market was competitive and creating the illusion that prices were rising as a result of increased demand and tight supply.  For example, Defendants stated:

   a.     "For our customers, quality services at a competitive cost are the essence of excellence."  Mitsui O.S.K. Lines, Ltd. Annual Report 2000, at 9.

b.  "Market prospects for 2003 are characterised by a high degree of both political and economic uncertainty.  The year as a whole is expected to show relatively weak economic growth and reduced demand for vehicles in some of the world's principal regions."  Wilh. Wilhelmsen ASA Annual Report 2002, at 11.

c.  "Developments in the car carrier and ro-ro markets are of major importance to both Wallenius Wilhelmsen Lines and EUKOR.  This business will continue to make the biggest contribution to the group's results. Both liner and car carrier operations . . . are affected by general trends in the world economy."  Wilh. Wilhelmsen ASA Annual Report 2002, at 15.

d.  "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity."  CSAV Annual Report 2003, at 10.

e.  "CSAV participates in a very competitive market in which variations in global economic growth directly affect demand for cargo transport."  *Id.* at 23.

f.  "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity."  CSAV Annual Report 2005, at 19.

g.  "CSAV participates in a very competitive market in which variations in global economic growth directly affect demand for cargo transport."  *Id.* at 42.

h.  "Car sales and demand for vehicle transport are expected to remain buoyant.  The tight market for car shipments is accordingly expected to continue in 2005, even with the relatively large number of new car carriers due to be delivered during the year."  Wilh. Wilhelmsen ASA Annual Report 2004, at 9.

i.  "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity."  CSAV Annual Report 2006, at 15.

j.  "CSAV participates in a highly competitive market in which demand for cargo transport is directly affected by fluctuations in global economic growth." *Id.* at 149.

k.  "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2007, at 15.

l.  "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport." *Id.* at 39.

m.  "The 'K' Line Group is doing business in all international markets, and is involved in competition with many shipping companies at home and abroad." "K" Line Annual Report 2008, at 55.

n.  "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2008, at 17.

o.  "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport." *Id.* at 35.

p.  "The 'K Line Group promises to comply with applicable laws, ordinances, rules and spirit of the international community and conduct its corporate activities through fair, transparent and free competition." "K" Line Annual Report 2009, at 1.

q.  "Global automobile marine transport volume was robust through the middle of 2008, resulting in a severe shortage of vessels in the marine transport market, a market in which prices are based on the relationship between supply and demand. As a result, shipping rates were on the increase." NYK Annual Report 2009, at 8.

r.   "Demand for ocean transportation of ro-ro cargo to Oceania remained at low levels through the year, while car volumes rose in the latter half of the year.   Trades involving emerging markets such as China, South America, India and Africa offered relatively healthy volumes through most of the year, although fierce competition put significant pressure on rates."   Wilh. Wilhelmsen ASA Annual Report 2009, at 11.

s.   "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity."  CSAV Annual Report 2009, at 17.

t.   "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport."  *Id.* at 36.

u.   "Through its capital intensity and cyclical nature, the shipping segment has historically represented higher volatility and financial risk than maritime services. The car/ro-ro shipping has during the recent history also represented the single largest investment area and exposure for the group and its shareholders . . . . Demand for transportation of cars and other cargo has improved significantly, primarily during the second half of the year, and combined with better mix of cargo types this has positively affected the profitability of the fleet." Wilh. Wilhelmsen ASA Annual Report 2010, at 19-20.

v.   "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity."  CSAV Annual Report 2010, at 15.

w.   "CSAV works in a very competitive market, in which variations in global economic growth directly affect the demand for cargo transport."  *Id.* at 35.

x.   "The results of the car-carrying services were severely affected by the fall in global demand seen in 2011 . . . [a]dded to the weak global demand for car carriers and the consequent under-utilization of ships was a sharp rise in oil prices."  CSAV Annual Report 2011, at 22.

y.   "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity."  CSAV Annual Report 2011, at 15.

z.   "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." *Id* . at 19.

aa.   "In addition to Japanese marine transport operators, the NYK Group competes with international shipping companies operating throughout the globe, and the competitive situation is growing more intense." NYK Annual Report 2012, at 102.

89.   Thus, Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Vehicle Carrier Services, which they affirmatively concealed.

90.   By reason of the foregoing, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and members of the Class have alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

91.   Plaintiffs brings this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that purchased Vehicle Carrier Services for shipments to or from the United States directly from any of the Defendants or any current or former predecessor, subsidiary, or affiliate of each, at any time during the period from January 1, 2000 to December 31, 2012.   This Class excludes all federal, state, governmental, and national entities and Defendants and their respective predecessors, subsidiaries, affiliates, and business partners.

29

92.     Plaintiffs believe that there are thousands of Class members located throughout the entire United States, the exact number, location, and identities of which are known by Defendants, making the Class so numerous and geo graphically dispersed that joinder of all members is impracticable.

93.     There are numerous questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to reduce capacity, allocate markets for, or fix, raise, maintain, or stabilize the prices of, Vehicle Carrier Services for shipments to and from the United States;

b.      The identity of the participants of the conspiracy;

c.      The duration of the conspiracy and the nature and character of the acts performed by Defendants and their agents and co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

f.      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the other members of the Class;

g.      The effect of the conspiracy on the prices of Vehicle Carrier Services for shipments to and from the United States during the Class Period; and

h.      The appropriate class-wide measure of damages.

94.     Plaintiffs are direct purchasers of Vehicle Carrier Services and their interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiffs are members of the Class, have claims that are typical of the claims of the Class Members, and will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

95.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

96.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily identifiable through the files of Defendants, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

**CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

31

98.  Defendants and their agents and co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

99.  Defendants' acts in furtherance of their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

100.  Beginning at least as early as January 1, 2000 and continuing through at least December 31, 2012, Defendants and their agents entered into an agreement in restraint of trade to reduce capacity, allocate customers and routes, rig bids, and otherwise to raise, fix, stabilize, or maintain prices for Vehicle Carrier Services for shipments to and from the United States, thereby creating anticompetitive effects.

101.  Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on United States commerce by raising and fixing prices for Vehicle Carrier Services for shipments to and from the United States.

102.  The conspiratorial acts and combinations have caused unreasonable restraints with respect to Vehicle Carrier Services.

103.  As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for Vehicle Carrier Services.

104.  In formulating and carrying out the alleged agreement, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

105.   Defendants' conspiracy had the following effects, among others:

a.   Price competition for Vehicle Carrier Services for shipments to and from the United States has been restrained, suppressed, or eliminated for shipments to and from the United States;

b.   Prices for Vehicle Carrier Services sold by Defendants, their divisions, subsidiaries, and affiliates have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels for shipments to and from the United States;

c.   Plaintiffs and members of the Class who purchased Vehicle Carrier Services from Defendants, their divisions, subsidiaries, and affiliates have been deprived of the benefits of free and open competition.

106.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property by paying more for Vehicle Carrier Services than they would have paid in the absence of the conspiracy.

107.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a)   That the Court certify this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and that Plaintiffs be deemed adequate representatives of the Class;

b)   That the Court declare Defendants' contract, combination, or conspiracy to have violated Section 1 of the Sherman Act, which violations injured Plaintiffs and the Class members in their business and property;

c)   That Plaintiffs and the Class members recover damages, as provided under the federal antitrust laws, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled in accordance with such laws;

d)   That Plaintiffs and the Class members recover their costs of the suit, including reasonable attorneys' fees, as provided by law; and

e)   That the Court direct further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: June 2, 2014

/s/ *Robert P. Donovan*
Robert P. Donovan
Lewis H. Goldfarb
McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
Telephone: (973) 241-4224
rdonovan@mdmc-law.com
lgoldfarb@mdmc-law.com

*Direct Purchaser Liaison Counsel*

/s/ Kit A. Pierson
Kit A. Pierson
David A. Young
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW
Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
dyoung@cohenmilstein.com

/s/ Steven A. Kanner
Steven A. Kanner
Michael J. Freed
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
mmoskovitz@fklmlaw.com

/s/ Robert N. Kaplan
Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Lauren I. Dubick
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com
ldubick@kaplanfox.com

*Direct Purchaser Interim Co-Lead Counsel*

35

Solomon B. Cera
C. Andrew Dirksen
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@gbcslaw.com
cdirksen@gbcslaw.com

Joseph C. Kohn
Douglas A. Abrahams
William E. Hoese
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
dabrahams@kohnswift.com
whoese@kohnswift.com

Lee Albert
Gregory B. Linkh
GLANCY BINKOW & GOLDBERG, LLC
122 East 42nd Street – Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
lalbert@glancylaw.com
glinkh@glancylaw.com

W. Joseph Bruckner
Heidi M. Silton
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wbruckner@locklaw.com
hmsilton@locklaw.com

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN  55403
Telephone: (612) 338-4605
Fax: (612) 338-4692
VEsades@heinsmills.com

Gregory P. Hansel
Randall B. Weill
Michael Kaplan
Jonathan G. Mermin
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU &
PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
mkaplan@preti.com
jmermin@preti.com
msmith@preti.com

Eugene A. Spector
Jeffrey J. Corrigan
Jay S. Cohen
Rachel E. Kopp
SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
jcorrigan@srkw-law.com
jcohen@srkw-law.com
rkopp@srkw-law.com

Edward D. Greenberg
David K. Monroe
GKG LAW, P.C.
Canal Square, 1054 Thirty-First Street,
N.W., Suite 200
Washington, D.C. 20007-4492
Telephone: (202) 342-5200
egreenberg@gkglaw.com
dmonroe@gkglaw.com

36

Joseph J. DePalma
Katrina Carroll
Steven J. Greenfogel
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000
jdepalma@litedepalma.com
kcarroll@litedepalma.com
sgreenfogel@litedepalma.com

Benjamin Bianco
Gregory A. Frank
FRANK & BIANCO LLP
275 Madison Avenue, Suite 705
New York, NY 10016
Telephone: (212) 682-1853
bbianco@frankandbianco.com
gfrank@frankandbianco.com

*Additional Direct Purchaser Counsel*