# UNITED STATES DISTRICT COURT
# THE DISTRICT OF NEW JERSEY
# NEWARK VICINAGE

| | |
|---|---|
| **IN RE: VEHICLE CARRIER SERVICES**<br><br>**ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*All Automobile Dealer Actions* | Master Docket No. 13-cv-3306 (ES) (JAD)<br>(MDL No. 2471)<br><br>CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

I.     NATURE OF ACTION ...................................................................1

II.    JURISDICTION AND VENUE ......................................................5

III.   PARTIES .......................................................................................9

       A.    PLAINTIFFS ........................................................................9

       B.    DEFENDANTS ...................................................................15

IV.    AGENTS AND CO-CONSPIRATORS ........................................22

V.     FACTUAL ALLEGATIONS ........................................................22

       A.    THE VEHICLE CARRIER INDUSTRY .....................................22

       B.    THE MARKET STRUCTURE AND CHARACTERISTICS SUPPORT THE
             EXISTENCE OF A CONSPIRACY ...........................................28

       C.    WITNESSES CONFIRMED EVIDENCE OF COLLUSION IN THE
             VEHICLE CARRIER SERVICES MARKET ................................40

       D.    OTHER EVIDENCE OF COLLUSION IN THE VEHICLE CARRIER
             SERVICE MARKET ............................................................52

VI.    CLASS ACTION ALLEGATIONS ..............................................57

VII.   PLAINTIFFS AND THE AUTO DEALER CLASSES SUFFERED
       ANTITRUST INJURY ................................................................61

VIII.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE
       OF LIMITATIONS ....................................................................65

       A.    THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE
             THE PLAINTIFFS DID NOT AND COULD NOT DISCOVER THEIR
             CLAIMS ..........................................................................65

       B.    FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF
             LIMITATIONS ...................................................................66

FIRST CLAIM FOR RELIEF ...............................................................71

i

SECOND CLAIM FOR RELIEF ............................................................................75

THIRD CLAIM FOR RELIEF ............................................................................103

FOURTH CLAIM FOR RELIEF ........................................................................122

PRAYER FOR RELIEF ......................................................................................123

JURY DEMAND .................................................................................................125

Plaintiff Martens Cars of Washington, Inc. ("Plaintiff Martens"); Hudson Charleston Acquisition, LLC d/b/a Hudson Nissan ("Plaintiff Hudson Nissan"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Hudson Gastonia Acquisition, LLC ("Gastonia Nissan"); HC Acquisition, LLC d/b/a Toyota of Bristol ("Bristol Toyota"); Desert European Motorcars, Ltd ("Plaintiff Desert"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Scotland Car Yard Enterprises d/b/a San Rafael Mitsubishi ("Plaintiff San Rafael"); Hartley Buick/GMC Truck, Inc. d/b/a Hartley Honda ("Plaintiff Hartley"); Panama City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); and Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan")  (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Auto Dealer Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws; state antitrust, unfair competition, and consumer protection laws; and the common law of unjust enrichment, demand a trial by jury, and allege as follows:

## I.   NATURE OF ACTION

1.     This lawsuit is brought as a proposed class action against Defendants Nippon Yusen Kabushiki Kaisha ("NYK"); NYK Line (North America) Inc.

1

("NYK America"); Mitsui O.S.K. Lines, Ltd. ("MOL"); Mitsui O.S.K. Bulk

Shipping (USA), Inc. ("MOL USA"); World Logistics Service (USA) Inc.

("WLS"); Höegh Autoliners AS ("Höegh"); Hoegh Autoliners, Inc. ("Hoegh

Inc."); Kawasaki Kisen Kaisha, Ltd. ("'K' Line"); "K" Line America, Inc. (""K"

Line America"); Wallenius Wilhelmsen Logistics AS ("WWL"); Wallenius

Wilhelmsen Logistics Americas LLC ("WWL Americas"); EUKOR Car Carriers

Inc. ("EUKOR"); Compañía Sud Americana De Vapores S.A. ("CSAV"); and

CSAV Agency North America, LLC ("CSAV North America") (all as defined

below, and collectively the "Defendants"), and unnamed co-conspirators, providers

of Vehicle Carrier Services (defined below) globally and in the United States, for

engaging in at least a conspiracy to fix, raise, maintain, and/or stabilize prices and

allocate the market and customers in the United States for Vehicle Carrier

Services.

    2.    "Vehicle Carriers" transport large numbers of cars, trucks, or other

new, assembled motor vehicles including agriculture and construction equipment

(collectively "Vehicles") across large bodies of water using specialized cargo ships

known as Roll-On/Roll-Off vessels ("RoRos"). As used herein, "Vehicle Carrier

Services" refers to the paid ocean transportation of Vehicles by RoRo.

    3.    Plaintiffs seek to represent all automobile dealers in approximately 30

states who indirectly purchased from any Defendant, or any current or former

subsidiary or affiliate thereof or any co-conspirator, Vehicle Carrier Services incorporated into the price of new Vehicles purchased during the period from and including January1, 2000 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

4.      Defendants provide, market, and/or sell Vehicle Carrier Services throughout the United States.

5.      Defendants, and their co-conspirators (as yet unknown), agreed, combined, and conspired to fix, raise, maintain, and/or stabilize prices and allocate the market and customers for Vehicle Carrier Services in unreasonable restraint of the foreign commerce of the United States.

6.       Competition authorities in the United States, the European Union, Canada, and Japan have been investigating a possible global cartel among Vehicle Carriers since at least September 2012.  Both the United States Department of Justice's Antitrust Division ("DOJ") and Canada's Competition Bureau ("CCB") are investigating unlawful, anticompetitive conduct in the market for ocean shipping of cars, trucks, construction equipment, and other products.  The Japanese Fair Trade Commission ("JFTC") and European Commission Competition Authority ("EC") have also conducted coordinated dawn raids at the Tokyo and European offices of several of the Defendants.

7.     On February 27, 2014, the DOJ announced that Defendant CSAV agreed to plead guilty and pay an $8.9 million criminal fine for price-fixing Vehicle Carrier Services to and from the United States and elsewhere.   On September 26, 2014, the DOJ announced that Defendant "K" Line  agreed to plead guilty and pay a $67.7 million criminal for its involvement in a conspiracy to fix prices, allocate customers, and rig bids for Vehicle Carrier Services to and from the United States.  Plaintiffs, based upon their experience in civil antitrust litigation following from antitrust prosecutions by the DOJ, believe it likely that the one of the defendants is a so-called "amnesty applicant" pursuant to the DOJ's leniency program.  A participant in an antitrust cartel is only eligible for participation in this program if it self-reports its cartel behavior to the DOJ and is only entitled to the reduced damages provisions of the Antitrust Criminal Penalties Enhancement Reform Act if it provides full and timely cooperation to the victims of the cartel.

8.     On March 19, 2014, the JFTC announced it issued cease and desist orders and surcharge payment orders totaling more than $233 million against Defendants NYK, "K" Line, Nissan Motor Car Carrier Co., and WWL for price-fixing Vehicle Carrier Services. NYK and Wilhelmsen Logistics AS control about 70 percent of the global market for carrying cars.

9.     Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the Vehicle Carrier

4

Services market by agreeing to fix, raise, stabilize, and/or maintain the prices of and allocate the market and customers for Vehicle Carrier Services sold to automobile manufacturers in the United States and elsewhere for the import and export of new, assembled motor Vehicles to and from the United States. The combination and conspiracy engaged in by Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; state antitrust, unfair competition, and consumer protection laws; and the common law of unjust enrichment.

10.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Auto Dealer Classes paid artificially inflated prices for Vehicle Carrier Services incorporated into the price of new Vehicles purchased during the Class Period in the United States and have thereby suffered antitrust injury to their business or property. Plaintiffs did not purchase any Vehicles through a foreign-based subsidiary or agent.

## II.      JURISDICTION AND VENUE

11.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair

competition, and consumer protection laws, and the common law of unjust

enrichment, and seek to obtain restitution, recover damages, and secure other relief

against the Defendants for violations of those state laws and common law.

Plaintiffs and the Auto Dealer Classes also seek attorneys' fees, costs, and other

expenses under federal and state law.

12.     This Court has jurisdiction over the subject matter of this action

pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the

Sherman Act (15 U.S.C. § 1), and 28, U.S.C. §§ 1331 and 1337.

13.     This Court has subject matter and supplemental jurisdiction of the

state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that (i) this is a

class action in which the matter or controversy exceeds the sum of $5,000,000,

exclusive of interests and costs, and in which some members of the proposed Auto

Dealer Classes are citizens of a state different from some of the Defendants; and

(ii) Plaintiffs' state law claims form part of the same case or controversy as their

federal claims under Article III of the United States Constitution.

14.     Venue is proper in this district pursuant to Section 12 of the Clayton

Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial

part of the events giving rise to Plaintiffs' claims occurred in this District, a

substantial portion of the affected interstate trade and commerce discussed below

has been carried out in this District, and one or more of the Defendants reside, are

licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

15.     This Court has *in personam* jurisdiction over the Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed Vehicle Carrier Services throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District; and/or (e) engaged in actions in furtherance of an illegal conspiracy in this District either itself or through its co-conspirators.  Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

16.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

7

17.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States.  Defendants' Vehicle Carrier Services are sold in the flow of interstate commerce.

18.     Vehicles, the prices of which include Vehicle Carrier Services, transported from abroad by the Defendants and sold for use within the United States are goods brought into the United States for sale and therefore constitute import commerce.  To the extent any such Vehicles and the related Vehicle Carrier Services are purchased in the United States, and such Vehicles or Vehicle Carrier Services do not constitute import commerce, Defendants' unlawful activities during the Class Period with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Auto Dealer Classes in the United States.

19.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Auto Dealer Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain, and/or stabilize prices, and allocate the market and customers in the

8

United States for Vehicle Carrier Services, which conspiracy unreasonably restrained trade and adversely affected the market for Vehicle Carrier Services.

20.     Defendants' conspiracy and unlawful conduct described herein adversely affected automobile dealers in the United States who purchased new Vehicles for resale, including Plaintiffs and the members of the Auto Dealer Classes.

## III.   PARTIES

### A.   Plaintiffs

21.     Plaintiff Martens is a Maryland corporation whose principal place of business was in the District of Columbia.  Plaintiff Martens was, at all times during the Class Period, an authorized Volvo and Volkswagen dealer that bought and then sold Volvo- and Volkswagen-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

22.     During the Class Period, Plaintiff Martens purchased Vehicles shipped by one or more of the Defendants or their co-conspirators.  Plaintiff Martens purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in the District of Columbia.  Plaintiff Martens also displayed, sold, serviced, and advertised its Vehicles in the District of Columbia during the Class Period.

23.     Plaintiff Hudson Nissan is a South Carolina limited liability company with its principal place of business in North Charleston, South Carolina.  Plaintiff Hudson Nissan is an authorized Nissan dealer that buys and then sells Nissan-brand cars that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

24.     During the Class Period, Plaintiff Hudson Nissan purchased Vehicles shipped by one or more of the Defendants or their co-conspirators.  Plaintiff Hudson Nissan purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in South Carolina.  Plaintiff Hudson Nissan has also displayed, sold, serviced, and advertised its Vehicles in South Carolina during the Class Period.

25.     Plaintiff Gastonia Nissan is a North Carolina limited liability company with its principal place of business in Gastonia, North Carolina.  Plaintiff Gastonia Nissan an authorized Nissan dealer who buys and then sells Nissan-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

26.     During the Class Period, Plaintiff Gastonia Nissan purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Gastonia Nissan purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in North Carolina.  Plaintiff Johnson has also displayed,

sold, serviced, and advertised its Vehicles in North Carolina during the Class Period.

27.     Plaintiff Johnson is a Mississippi limited liability company with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer who buys and then sells Toyota-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

28.     During the Class Period, Plaintiff Johnson purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Johnson purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its Vehicles in Mississippi during the Class Period.

29.     Plaintiff Bristol is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee.  Plaintiff Bristol is an authorized Toyota dealer, who buys and then sells Toyota-brand cars that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

30.     During the Class Period, Plaintiff Bristol purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Bristol purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier

11

Services in Tennessee.  Plaintiff Bristol has also displayed, sold, serviced, and advertised its Vehicles in Tennessee during the Class Period.

31.    Plaintiff Desert is a California company with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus, and Spyker dealer who buys and then sells Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus-, and Spyker-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

32.    During the Class Period, Plaintiff Desert purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Desert purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in California.  Plaintiff Desert has also displayed, sold, serviced, and advertised its Vehicles in California during the Class Period.

33.    Plaintiff Hodges Subaru is a Michigan corporation with its principal place of business in Ferndale, Michigan.  Plaintiff Hodges is an authorized dealer of Subaru-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

34.     During the Class Period, Plaintiff Hodges purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Hodges purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in Michigan.  Plaintiff Hodges has also displayed, sold, serviced, and advertised its Vehicles in Michigan during the Class Period.

35.     Plaintiff San Rafael is a California corporation with its principal place of business in San Rafael, California.  Plaintiff San Rafael is an authorized dealer of Mitsubishi-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

36.     During the Class Period, Plaintiff San Rafael purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff San Rafael purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in California.  Plaintiff San Rafael has also displayed, sold, serviced, and advertised its Vehicles in California during the Class Period.

37.     Plaintiff Hartley is a New York corporation with its principal place of business in Jamestown, New York.  Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who sold Honda-, Buick-, Pontiac-, and GM-brand Vehicles that were shipped via RoRo by one or more of the Defendants

13

or their co-conspirators from the Vehicles' country of origin to the United States during the Class Period.

38.     During the Class Period, Plaintiff Hartley purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Hartley purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in New York.  Plaintiff Hartley has also displayed, sold, serviced, and advertised its Vehicles in New York during the Class Period.

39.     Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida.  Plaintiff John Lee is an authorized dealer of Nissan-brand Vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

40.     During the Class Period, Plaintiff John Lee purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff John Lee purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in Florida.  Plaintiff John Lee has also displayed, sold, serviced, and advertised its Vehicles in Florida during the Class Period.

41.     Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized dealer of Nissan-brand Vehicles that were shipped via RoRo by one

or more of the Defendants or their co-conspirators from the Vehicles' country of origin to the United States.

42.     During the Class Period, Plaintiff Empire Nissan purchased Vehicles shipped by one or more Defendants or their co-conspirators.  Plaintiff Empire Nissan purchased and received the afore-mentioned Vehicles and paid for the Vehicle Carrier Services in California.  Plaintiff Empire Nissan has also displayed, sold, serviced, and advertised its Vehicles in California during the Class Period.

43.     The majority of Plaintiffs described above sell Vehicles to customers who employ said Vehicles for personal use.

**B.     Defendants**

**1.  NYK Defendants**

44.     Defendant NYK is a Japanese company.  NYK has subsidiaries acting as its agents in the United States, including in Secaucus, New Jersey.  NYK – directly and/or through its subsidiaries and joint ventures, which it wholly owned and/or controlled – shipped Vehicles into the United States, including to and from this District, during the Class Period.  NYK – directly and/or through its subsidiaries and joint ventures, which it wholly owned and/or controlled – also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

45.     Defendant NYK America is a wholly owned subsidiary of NYK.  It is headquartered in Secaucus, New Jersey and acts as Defendant NYK's agent in the United States.  At all times during the Class Period, its activities in the United States were under the control and direction of NYK, which controlled its policies, sales, and finances.  NYK America shipped Vehicles into the United States, including to and from this District, during the Class Period.  NYK America also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

### 2.  MOL Defendants

46.     Defendant MOL is a Japanese company.  MOL has subsidiaries acting as its agents in the United States and has offices throughout the country, including headquarters in Lombard, Illinois.  MOL – directly and/or through its subsidiaries, which it wholly owned and/or controlled – shipped Vehicles into the United States, including in this District, during the Class Period.  MOL – directly and/or through its subsidiaries, which it wholly owned and/or controlled – also provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

47.     Defendant MOL USA is a wholly owned subsidiary of MOL and a New Jersey corporation.  It acts as Defendant MOL's agent in the United States.  At all times during the Class Period, its activities in the United States were under the

16

control and direction of MOL, which controlled its policies, sales, and finances. MOL USA shipped Vehicles into the United States, including to and from this District, during the Class Period.  MOL USA also provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

48.     Defendant WLS is a wholly owned subsidiary of MOL and a California corporation.  It is headquartered in Long Beach, California and acts as Defendant MOL's agent in the United States.  At all times during the Class Period, its activities in the United States were under the control and direction of MOL, which controlled its policies, sales, and finances.  WLS shipped Vehicles into the United States, including to and from this District, during the Class Period.  WLS also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

### 3.  Höegh Defendants

49.     Defendant Höegh is a Norwegian company.   Höegh has subsidiaries acting as its agents in the United States.  Höegh – directly and/or through its subsidiaries and joint ventures, which it wholly owned and/or controlled – shipped Vehicles into the United States, including to and from this District, during the Class Period.    Höegh – directly and/or through its subsidiaries, which it wholly owned and/or controlled – also provided, marketed, and/or sold Vehicle Carrier

17

Services throughout the United States, including in this District, during the Class Period.

50.     Defendant Höegh Inc. is a wholly owned subsidiary of Höegh and a New York corporation.  It is headquartered in Jericho, New York and acts as Defendant Höegh's agent in the United States.  At all times during the Class Period, its activities in the United States were under the control and direction of Höegh, which controlled its policies, sales, and finances.  Höegh Inc. shipped Vehicles into the United States, including to and from this District, during the Class Period. Höegh Inc. also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

### 4.  "K" Line Defendants

51.     Defendant "K" Line is a Japanese company.  "K" Line has subsidiaries acting as its agents in the United States.  "K" Line – directly and/or through its subsidiaries and joint ventures, which it wholly owned and/or controlled – shipped Vehicles into the United States, including to and from this District, during the Class Period.    "K" Line – directly and/or through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

52.     Defendant "K" Line America is a wholly owned subsidiary of "K"
Line and a Virginia corporation.  It is headquartered in Richmond Virginia and acts
as "K" Line's agent in the United States.  At all times during the Class Period, its
activities in the United States were under the control and direction of "K" Line,
which controlled its policies, sales, and finances.  "K" Line America shipped
Vehicles into the United States, including to and from this District, during the
Class Period.  "K" Line America also provided, marketed, and/or sold Vehicle
Carrier Services throughout the United States, including in this District, during the
Class Period.

### 5.  WWL Defendants

53.     Defendant WWL is a Norwegian-Swedish company.  It is a joint
venture between Wallenius Lines AB and Wilh.Wilhelmsen ASA that operates
most of those companies' vessels and is the contracting party in customer contracts
with OEMs for RoRo services.  WWL has offices throughout the United States,
including in New Jersey and has subsidiaries acting as its agents in the United
States, including in New Jersey.  WWL – directly and/or through its subsidiaries
and joint ventures, which it wholly owned and/or controlled – shipped Vehicles
into the United States, including to and from this District, during the Class Period.
WWL – directly and/or through its subsidiaries, which it wholly owned and/or

controlled – also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

54.     Defendant WWL Americas is a New Jersey limited liability company.  It is headquartered in Woodcliff Lake, New Jersey and acts as WWL's agent in the United States.  At all times during the Class Period, its activities in the United States were under the control and direction of WWL, which controlled its policies, sales, and finances.  WWL Americas shipped Vehicles into the United States, including to and from this District, during the Class Period.  WWL Americas – directly and/or through its subsidiaries, which it wholly owned and/or controlled – also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

55.     Defendant EUKOR is a South Korean company.  Eukor has offices throughout the United States, including in Fort Lee, New Jersey and has subsidiaries acting as its agents in the United States, including in New Jersey.  Eukor shipped Vehicles into the United States, including to and from this District, during the Class Period.  EUKOR – directly and/or through its subsidiaries, which it wholly owned and/or controlled – also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

20

### 6. CSAV Defendants

56.     Defendant CSAV is a Chilean company.  Eukor  has offices throughout the United States, including in Iselin, New Jersey and has subsidiaries acting as its agents in the United States, including in New Jersey.  CSAV shipped Vehicles into the United States, including to and from this District, during the Class Period. CSAV – directly and/or through its subsidiaries, which it wholly owned and/or controlled – also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

57.     Defendant CSAV North America is a wholly owned subsidiary of CSAV and is a New Jersey limited liability company.  It is headquartered in Iselin, New Jersey and acts as CSAV's agent in the United States.  At all times during the Class Period, its activities in the United States were under the control and direction of CSAV, which controlled its policies, sales, and finances.  It is the exclusive maritime agent for Defendant CSAV in the United States.  CSAV North America shipped Vehicles into the United States, including to and from this District, during the Class Period.  CSAV North America also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

IV.    **AGENTS AND CO-CONSPIRATORS**

58.    Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

59.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

60.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

V.    **FACTUAL ALLEGATIONS**

A.    **The Vehicle Carrier Industry**

61.    The ocean shipping industry is comprised of multiple sectors and multiple types of vessels, including bulk carriers, tankers, and vehicle carriers. The

conduct at issue occurred in the Vehicle Carriers industry. In addition to shipping Vehicles, Vehicle Carriers ship "high and heavy cargo"—cargo bigger and heavier than a vehicle and requiring special arrangements—and small, ancillary, non-moveable cargo, such as a plow blade for a plow truck.

62.    The Vehicle Carriers industry consists of RoRo ships.  A RoRo ship is a special type of ocean vessel that allows wheeled Vehicles to be driven and parked on its decks for long voyages.  These ships, also known as Vehicle Carriers, have special ramps to permit easy access, high sides to protect the cargo during transport, and numerous decks to allow storage of a large number and variety of Vehicles.

63.    There are different types of RoRo ships.  A Pure Vehicle Carrier ("PCC") can be thought of as a parking garage and transports only Vehicles. The layout is designed to purely carry Vehicles and is fixed. Generally, there are multiple levels of parking forVehicles, and often the levels are movable for high and heavy cargo.  A Pure Car and Truck Carrier ("PCTC") transports cars, trucks, and other four-wheeled vehicles and has a slightly different configuration..



WW ASA's MV Tønsberg RoRo vessel

Side View of Pure Car Carrier (PCC)

**1**  **Pure Car Carrier**

Inside of PCC

Roll-on and Roll-off way

Appendix

Source: http://www.jftc.go.jp/en/pressreleases/yearly-2014/March/140318.files/Appendix.pdf

64.     In the Vehicle Carriers market, there is a distinction between deep sea services and short sea services. Deep sea vessels are large and transport thousands of Vehicles or rolling equipment between continents. Short sea vessels are smaller and transport fewer Vehicles or rolling equipment over shorter distances. Short sea vessels can enter smaller ports and shallower waters.

65.     The vast majority of demand for deep sea service relates toVehicles. Consequently, the main ocean routes connect major vehicle manufacturing countries with major import markets for Vehicles. Different countries have several ports of call, and vessels generally sail in rotation visiting a sequence of ports.

66.     Vehicle Carriers are a defined submarket of the larger bulk shipping market.  World trade exploded after the proliferation of container ships. These ships allow a large range of goods, such as food and consumer electronics, to be packed in standard-sized containers for quick loading and delivery.  However, cars, trucks, and heavy machinery, due to their larger and more irregular shapes, are not easily shipped in containers.  Furthermore, there are no reasonable substitutes for the shipment of Vehicles by sea because any alternatives, such as air transportation, would be too costly.

67.     Defendants and their co-conspirators provide Vehicle Carrier Services to original equipment manufacturers ("OEMs") – mostly large automotive, construction, and agricultural manufacturers – for transportation of Vehicles from

their country of origin to the country where they will be sold, including to the United States, at which point the Vehicles are delivered to Plaintiffs and the Auto Dealer Classes.

68.     Defendants' customers include: Honda, Daimler, Mercedes-Benz, BMW, Ford, Subaru, Mazda, Suzuki, Mitsubishi, Nissan, Kia, Hyundai, and Volvo, among others.  These OEMs directly purchase Vehicle Carrier Services from Defendants, usually pursuant to shipping contracts they have entered into with Defendants.  Plaintiffs and the Auto Dealer Classes are then billed in full and pay in full for the Vehicle Carrier Services when they purchase Vehicles from OEMs.  Thus, Plaintiffs and members of the proposed Auto Dealer Classes purchase Vehicle Carrier Services indirectly from Defendants and their co-conspirators by virtue of their purchase of new Vehicles during the Class Period.

69.     Defendants engage in three different types of pricing negotiations with OEMs:  (1) Bilateral negotiations whereby OEMs renew carriage contracts with Defendants; (2) Price reduction requests whereby OEMs request lower freight rates from Defendants; and (3) Tenders whereby multiple Defendants are invited to bid for a new or renewed contract award.  Tenders involve an initial bid followed by a second round bid.

70.     The contract period between a non-Japanese OEM and a Defendant vehicle carrier is typically two or three years.  The contract period between a Japanese OEM and a Defendant Vehicle Carrier is typically one year.

71.     In Japan, OEMs typically negotiate with an incumbent vehicle carrier when a contract expires, rather than engage in an open bidding, or tender process.  Contracts are renewed in April of each year.  Contract renewal negotiations often begin in December of the previous year.

72.     American OEMs often rely on tenders to award business to a Defendant vehicle carrier.

73.     Contracts, whether negotiated bilaterally or awarded by tender, generally cover global requirements, but rates are often negotiated for each individual route separately.

74.     Contract freight rates for Vehicle Carrier Services are set on a per-unit basis.  For instance, rates for Vehicles are typically set by a "per-car" price.  However, rates for "high and heavy cargo," are based on weight or cubic meter.

75.     Defendants also charge surcharges in addition to rates for Vehicle Carrier Services.  The primary surcharges are (1) the Bunker Adjustment Factor ("BAF"), which relates to fuel; and (2) the Currency Adjustment Factor ("CAF"), which relates to the fluctuation of currency exchange rates.

76.     Defendants and their co-conspirators provided Vehicle Carrier Services to OEMs for transportation of Vehicles to and from United States and elsewhere.  Defendants and their co-conspirators provided Vehicle Carrier Services (a) in the United States for the transportation of Vehicles manufactured elsewhere for export to and sale in the United States, and (b) in other countries for the transportation of Vehicles manufactured elsewhere for export to and sale in the United States.

77.     The annual market for Vehicle Carrier Services in the United States is nearly a billion dollars.  Specifically, for the transportation of new, imported motor Vehicles manufactured elsewhere for export to and sale in the United States, the market is between $600 and $800 million each year.

**B.    The Market Structure and Characteristics Support the Existence of a Conspiracy**

78.     The structure and other characteristics of the market for Vehicle Carrier Services are conducive to a price-fixing agreement and have made collusion particularly attractive.  Specifically, the Vehicle Carrier Services market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; (4) is highly homogenized; (5) is rife with opportunities to meet and conspire; and (6) has excess capacity.

### 1. The Market for Vehicle Carrier Services Has High Barriers to Entry

79.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

80.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Vehicle Carrier Services market.  Transporting Vehicles without damage across oceans requires highly specialized and sophisticated equipment, resources, and industry knowledge.  The ships that make such transport possible are highly specialized.  Such ships are purposely built to an unusual design that includes high sides, multiple interior decks, and no container cargo space. These characteristics restrict the use of the ships to the Vehicle Carrier Services market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing or acquiring a fleet of Vehicle Carriers and other equipment, energy,

transportation, distribution infrastructure, and skilled labor.  It is estimated that the capital cost of a RoRo is at least $95 million.[1]

81.    Additionally, the nature of the Vehicle Carrier Services industry requires the establishment of a network of routes to serve a particular set of customers with whom Defendants establish long-term relationships.  The existence of these established routes and long-term contracts increase switching costs for shippers and present an additional barrier to entry.

82.    The Vehicle Carrier Services market also involves economies of scale and scope, which present additional barriers to entry.

a.    Economies of scale exist where firms can lower the average cost per unit through increased production, since fixed costs are shared over a larger number of units.  Vehicle Carriers are less sensitive to fuel prices than other modes of transportation, providing opportunities to exploit economies of scale.  As fuel prices increased in the last five to ten years, market participants were incentivized to increase the average size of vessels.  This reflects the presence of economies of scale, because fuel costs did not increase proportionally as vessel size grew.

---

[1] Asaf Ashar, *Marine Highways' New Direction*, J. OF COM. 38 (Nov. 21, 2011).

b.      Economies of scope exist where firms achieve a cost advantage from providing a wide variety of products or services.  The major Vehicle Carriers, including Defendants, own related shipping or transportation businesses they can utilize to provide additional services to clients, such as the operation of dedicated shipping terminals and inland transportation of Vehicles.

### 2. There is Inelasticity of Demand for Vehicle Carrier Services

83.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality and so continue to purchase despite a price increase.

84.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

85.     Demand for Vehicle Carrier Services is highly inelastic. This is because there are no close substitutes for this service.  A Vehicle Carrier is the

only ocean vessel that has the carrying capacity for a large number of Vehicles.  A

Vehicle Carrier is also more versatile than other substitutes because it is built to

adjust to various shapes and sizes.  Because a container ship functions based on the

uniformity of the cargo—everything must fit within the standardized containers—it

is not conducive to transporting larger and more irregularly-shaped goods, such as

cars, trucks, and agricultural and construction equipment.  Foreign OEMs must

employ Vehicle Carrier Services to facilitate the sale of their Vehicles in North

America, regardless of whether prices are kept at supra-competitive levels.  There

is simply no alternative for high volume transoceanic transportation of Vehicles to

the United States.

### 3.  The Market for Vehicle Carriers Is Highly Concentrated

86.    A concentrated market is more susceptible to collusion and other

anticompetitive practices.

87.    Defendants dominate the global Vehicle Carrier Services market,

controlling over 70 percent of the Vehicle Carrier Services market during the Class

Period.[2]

---

[2] Source: Hesnes Shipping AS, The Car Carrier Market 2010

### 4. The Services Provided by Vehicle Carriers Are Highly Homogeneous

88.    Vehicle Carrier Services are a commodity-like service, which is interchangeable among Vehicle Carriers.

89.    When products or services offered by different suppliers are viewed as interchangeable by purchasers, it is easier for suppliers to unlawfully agree on the price for the product or service in question, and it is easier to effectively police the collusively set prices.  This makes it easier to form and sustain an unlawful cartel.

90.    Vehicle Carrier Services are qualitatively the same across different carriers.  Each Defendant has the capability to provide the same or similar Vehicle Carrier Services and Vehicle Carrier Service customers make purchase decisions based primarily on price.  The core considerations for a purchaser will be where, when, and how much.  This commoditization and interchangeability of Vehicle Carrier Services facilitated Defendants' conspiracy by making coordination on price much simpler than if Defendants had numerous distinct products or services with varying features.

### 5. Defendants Had Ample Opportunities to Meet and Conspire

91.    The shipping industry has been characterized as a small world where many of the key figures know each other. Among the key figures are NYK's

33

███████████ MOL's ██████████ and "K" Line's ████████

██████████████████

92.      Defendants attended industry events where they had the opportunity

to meet, have improper discussions under the guise of legitimate business contacts,

and perform acts necessary for the operation and furtherance of the conspiracy.

For example, there are frequent trade shows for shipping companies around the

globe, such as the Breakbulk conferences[3] and the biennial RoRo trade show in

Europe.

93.      Many employees of Defendants have spent their entire careers in the

shipping industry. In several instances, key employees have transferred between

the Defendant companies. This is not unusual and is true of many industries. But in

the shipping industry it fostered familiarity and connections between professed

competitors and facilitated high-level coordination for the conspiracy. For

---

[3] Breakbulk Magazine provides its readers with project cargo, heavy lift, and RoRo
logistics intelligence including news, trending, data, and metrics.  Breakbulk
Magazine's global events include Breakbulk Transportation Conferences &
Exhibitions, which "are the largest international events focused on traditional
breakbulk logistics, heavy-lift transportation and project cargo trade issues."  The
conferences provide opportunities to "meet with specialized cargo carriers, ports,
terminals, freight forwarders, heavy equipment transportation companies and
packers."  Source:  http://www.breakbulk.com/breakbulk-global-events/.

example, ███████████████████████████████

████████████████████████████████████████

████████████████████████

94.     Defendants are members of several trade associations that provide

opportunities to meet under the auspices of legitimate business. For example,

several Defendants are members of the ASF Shipping Economics Review

Committee. The Committee had meetings, including one in Tokyo on March 2,

2010 that was led by ███████████ (of NYK) and attended by ███████████ (of

"K" Line), ███████████ (of MOL), and ███████████ (of NYK).

95.     Defendants CSAV (through its subsidiary CSAV Group North

America), NYK America, "K" Line America, MOL (through its subsidiary, MOL

(America), Inc.), and WWL America are members of the United States Maritime

Alliance, Ltd.

96.     Defendants "K" Line, MOL, NYK America, and WWL America are

members of the New York Shipping Association, Inc.

97.     Defendants "K" Line, MOL (through its subsidiary, MOL (America)

Inc.), NYK Line, and WWL are members of the Pacific Maritime Association.

98.     Defendants CSAV (through its subsidiary CSAV Group North

America), NYK America, "K" Line America, MOL (through its subsidiary, MOL

(America), Inc.), and WWL America are members of the United States Maritime Alliance, Ltd.

99.   Defendants "K" Line, MOL, NYK America, and WWL America are members of the New York Shipping Association, Inc.

100.   Defendants "K" Line, MOL (through its subsidiary, MOL (America) Inc.), NYK Line, and WWL are members of the Pacific Maritime Association.

101.   Defendants CSAV, "K" Line, MOL, NYK Line, and WWL are members of the World Shipping Council.

102.   Defendants CSAV, "K" Line, MOL, and NYK Line were members of the European Liner Affairs Association, which was later absorbed by the World Shipping Council.

103.   Defendants NYK Line, "K" Line, and MOL are members of the Japan Shipowners' Association, a trade association based in Japan.

104.   These associations—and the meetings, trade shows, and other industry events that stem from them—provided Defendants with ample opportunities to meet and conspire, as well as to perform affirmative acts in furtherance of the conspiracy.

105.   Defendants routinely enter into vessel-sharing agreements whereby they reserve space on each other's ships.  These sharing or chartering agreements are very common in the international maritime shipping industry.

106.   A "space charter" occurs when a shipping carrier charters space on another shipping carrier's vessel.  The opportunity for a space charter arises when a shipping carrier has less than full capacity on its ship and another shipping carrier needs additional capacity.

107.   A "time charter" occurs when a shipping carrier fully charters another vehicle carrier's vessel.  The opportunity for a time charter arises when a vehicle carrier would otherwise send a vessel home empty and another vehicle carrier needs space.

108.   While ostensibly entered into to optimize utilization capacity and increase efficiency, such sharing and chartering agreements also provide opportunities for Defendants to discuss Vehicle Carrier Services market shares, routes, and rates and to engage in illegal conspiracies to fix prices, rig bids, and allocate customers and markets.

109.   The very nature of the negotiations between Vehicle Carriers and OEMs also facilitates collusion among Vehicle Carriers.  ███████████ ███████████████████ WWL █████ has explained, using Japan as an example,

> [T]he manufacturers there, in order to get the right frequency, the right market coverage and the right ports, have often called in two, three, sometimes four shipping lines around the table and said that

they would spread their volumes between them, depending on how competitive they were.  The shipping lines have to work together to find ways of not having ships in the same position and ways of having one line deliver at the beginning of the month and another mid-month.[4]

### 6.  The Market for Vehicle Carrier Services Has Experienced Excess Capacity

110.   Excess capacity occurs when a market is capable of supplying more of a product or service than is needed.  This often means that demand is less than the output the market has the capability to produce.  Academic literature suggests, and courts have found, that the presence of excess capacity can facilitate collusion.[5]  Significantly, the market for Vehicle Carrier Services has operated in a state of excess capacity since 2008.  The tables below demonstrate that while the capacity of Vehicle Carriers to transport Vehicles has increased since 2007, the utilization rate of Vehicle Carriers has fallen, and remained stable at a rate of approximately 83 percent since 2010.

---

[4] *Profitability the key issue for RoRo carriers*, AUTO. SUPPLY CHAIN (Oct. 4, 2012), *available at* http://www.automotivesupplychain.org/features/133/77/Profitability-the-key-issue-for-RoRo-carriers/

[5] *See* Benoit, J. and V. Krishna, *Dynamic Duopoly: Prices and Quantities*, REV. OF ECON. STUDIES, 54, 23-36 (1987); Davidson, Carl & Raymond Deneckere, *Excess Capacity and Collusion*, INT'L ECON. REV., 31(3), 521-41 (1990); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 657 (7th Cir. 2002).



Source: The Car Carrier Market, 2004-2012; Hesnes Shipping AS



Source: The Platou Report 2004-2012

111.   In the face of such excess capacity, Defendants agreed to reduce capacity and increase prices through fleet reduction, also known as "scrapping" or "lay-ups." Scrapping involves taking a ship out of commission, and rendering the

vessel non-usable.  A "hot lay-up" involves taking a ship out of service while still retaining its crew to perform maintenance.  A "cold lay-up" involves taking a vessel out of service and dismissing its crew.  A ship that is "laid-up" may be re-commissioned.  However, certain start-up costs are involved in order to do so.  A cold lay-up requires higher start-up costs to re-commission a vessel than a hot lay-up.

112.   Defendants' concerted, collusive efforts to reduce their fleets via scrapping and lay-ups decreased the availability of Vehicle Carrier Services in the market and caused prices to artificially rise during the Class Period.

## C.   Witnesses Confirmed Evidence of Collusion in the Vehicle Carrier Services Market

### 1. Defendants Conspired to Artificially Inflate Prices of Vehicle Carrier Services

#### a.  Coordination of Price Increases

113.   Defendants discussed vehicle carrier services pricing from as early as February 1997. Specifically, in February 1997, Defendants "K" Line, MOL, and NYK Line met several times in Tokyo to discuss Honda's upcoming renewal for the Japan to the United States route. Representatives included ██████████ ██████ "K" Line and ████████████████████ NYK at one or more of these meetings.

114.   Generally, one vehicle carrier is the "lead" service provider for an OEM, such as Honda, though multiple vehicle carriers may provide services to an OEM. In 1997, MOL had an existing business relationship with Honda. In connection with Defendants' meeting in February 1997, "K" Line, MOL, and NYK agreed to separately request a price increase from Honda on the Japan to the United States route.  Defendants also collectively agreed to specifically request a price increase for Honda Accords, which were manufactured in the United States at the time, on the United States to Japan route.

115.   In 2002, Defendants "K" Line and MOL shared approximately 50 percent of Volkswagen's business on routes to the United States. In or around that same time, "K" Line and MOL agreed to seek a price increase of 3 to 5 percent from Volkswagen.

116.   In late 2007, Volkswagen issued a tender for the Europe to the United States route.  "K" Line and MOL discussed the tender and agreed to seek a price increase from Volkswagen.

117.   In late 2007 or early 2008, executives from Defendants "K" Line, MOL, and NYK met on several occasions to discuss a 10-percent price increase for 2008 on the Japan to United States route.

a.   In November 2007, ███████████████████

MOL ████████████ and ██████████ NYK agreed to increase prices

in 2008 and to persuade "K" Line to do the same.

b.   In December 2007, ███████████████████

████████ MOL ███████████████ and ████████ NYK had a dinner

meeting in Tokyo to discuss increased costs and the need for a corresponding

collective price increase in 2008.

c.   On January 11, 2008, █████████████████ had a lunch

meeting, which included ████████████ "K" Line. At this meeting, MOL, NYK,

and "K" Line agreed that their objective would be at least a 5-percent price

increase with a potential maximum increase of up to 7.25 percent.  "K" Line,

MOL, and NYK then had a follow-up meeting in which they discussed how to

implement the coordinated price increases.  They agreed that each Defendant

would take the lead to increase prices with those OEMs with whom it had the

strongest business relationship.

d.   On January 28, 2008, ███████████████ "K" Line,

██████████ MOL, and ████████████ NYK Line met to discuss the 2008 price

increase further and agreed on a target increase of 10 percent. ██████████████

██ "K" Line, ████████ and ████████ then met the following month in

furtherance of the agreement.



118.    In November 2011, Höegh and MOL executives had a dinner meeting in which they discussed pricing for the United States to West Africa routes, which both Defendants serviced.

### b.  Coordination of Responses to Price Reduction Requests

119.    In the fall of 2008, ███████████ MOL, ████████ NYK, and ███████ K Line communicated about price increases and price negotiations with Mitsubishi. They agreed on the price increase that each would seek from Mitsubishi.

120.    In 2009, Mitsubishi requested a price reduction from "K" Line, MOL, and NYK Line equal to the price increase in 2008 and retroactive application of this reduction. Defendants discussed Mitsubishi's request and collusively agreed to limit the amount of the price reduction and respond with identical reductions of 50 percent of the 2008 price increases.

121.    In 2009, Suzuki sought a price reduction from, MOL, NYK, and "K" Line. ████████████████████ MOL's ████████ ███████████ NYK; and ████████ "K" Line met to discuss the request, and each company collusively agreed to limit the amount of the price reduction and reduce prices by the same amount. Similar collusive price reduction discussions occurred in 2010.

122.   In September 2011, Toyota informed MOL that MOL's BAF and CAF surcharges were higher than its competitors and requested a price reduction.

 MOL ████ ████ discussed its pricing for Toyota with ████ NYK Line and ████ "K" Line.  MOL subsequently agreed to Toyota's request.

123.   In 2012, Subaru sought a price reduction from MOL and NYK. Historically, NYK was the lead Vehicle Carrier Services provider for Subaru. ████ ████ MOL and ████ NYK Line collusively agreed to limit the amount of their price reduction and bid their existing prices.

### 2. Defendants Conspired to Allocate Customers and Routes for Vehicle Carrier Services

124.   In or around 2001, MOL and Höegh discussed American Honda business from the United States to the Middle East.  MOL told Höegh that, while MOL was not the incumbent for this particular route, MOL wanted the business. Thus, MOL requested that Höegh refrain from bidding on the route, and in return, MOL promised to use certain of Höegh's vessels on the route if MOL was awarded

the business.  Höegh agreed, and MOL won the bid.  As promised, MOL chartered Höegh vessels for the route.

125.   In response to a tender issued by General Motors ("GM") in 2001 or 2002, MOL asked WWL not to submit a competitive bid out of "respect"[6] for MOL's incumbent business with GM. WWL agreed. MOL likewise asked NYK to submit a bid higher than MOL's and gave NYK a rate to bid. NYK agreed and submitted MOL's preferred bid.

126.   In 2002 or 2003, MOL spoke with WWL about a Ford tender.  WWL was the incumbent for Ford business from Europe to the United States, and MOL wanted to secure Ford's business from Thailand to the United States. WWL and MOL agreed not to compete with each other for the Ford business, and WWL gave MOL a rate to bid on the Europe to the United States route, which MOL submitted. At the same time, MOL spoke with Höegh, and Höegh agreed not to compete with MOL for Ford's business on the Thailand to the United States route, and MOL agreed to "respect" Höegh for Ford's business on routes from Africa to the Middle East.

---

[6] "Respect" is a term of art in Japanese business culture, which in this context may mean not bidding at all, or bidding a higher price.

45

127.   In 2004, WWL agreed to respect MOL's Daimler and BMW businesses for the route from South Africa to the United States.  In return, MOL agreed to "respect" WWL's portion of the Daimler and BMW business from Europe to the United States.

128.   In the fall of 2008, ██████████████ MOL, ████████ NYK, and ██████████ K Line had discussions about an upcoming Mitsubishi tender. The parties agreed on the routes each would seek.  NYK and K Line sought business to the West Coast of the United States, and the three companies shared Mitsubishi's East Coast business.

129.   In 2008 or 2009, MOL asked "K" Line to respect its incumbent status for Chrysler business from the United States to South America.  K Line agreed in return for respect from MOL on K Line's routes from Brazil to the United States and Argentina.

130.   In 2008 or 2009, MOL and WWL agreed to respect rather than compete for each other's Daimler and BMW business.  Specifically, WWL agreed not to compete for MOL's Daimler business from the Europe to the United States. In return, MOL agreed not to compete for WWL's BMW business from Europe to the United States.

131.   In 2010, CSAV asked MOL to respect its GM business on routes from the United States to Columbia.  MOL agreed and submitted a bid at a non-

competitive price provided by CSAV.   This tender covered business for the years 2010 to 2012.

132.   In February and/or March 2012, ████████████ MOL and ████████ WWL met to discuss their companies' American Honda contracts. MOL and WWL agreed not to compete on certain routes from the U.S. to China and from the United States to Korea for American Honda.  WWL gave MOL a price to bid on the United States-China route and retained that business with American Honda.  In exchange, MOL gave WWL a price to bid on the United States-Korea route.

### 3. Defendants Conspired to Restrict Capacity for Vehicle Carrier Services

133.   Defendants MOL, NYK, "K" Line, WWL, and/or Eukor also agreed to manipulate capacity and restrict the supply of Vehicle Carrier Services via fleet reductions.

134.   From at least the late 1990s through 2002, Defendants MOL, "K" Line, NYK, Höegh, and WWL executives met twice a year in Europe and Japan where fleet reductions via ship scrapping and lay-ups were discussed.

135.   In or around 2008 or 2009, demand for Vehicle Carrier Services fell as result of the worldwide financial crisis.  Thereafter, ████████████ MOL, ████████ NYK, and ████████████ "K" Line met to discuss fleet reductions. MOL, NYK, and "K" Line agreed to scrap vessels, and as a general matter, they

also discussed and agreed on the need to resist price reduction requests from

OEMs. █████████████████ WWL, and █████████ Höegh also spoke about

the need for fleet reductions.  As a result of these agreements:

136.   MOL scrapped approximately 40 vessels.

137.   NYK scrapped approximately 40 vessels.

138.   "K" Line scrapped approximately 25 vessels.

139.   WWL engaged in cold lay-ups.

140.   Höegh engaged in cold lay-ups.

### 4.  Guilty Pleas in the Vehicle Carrier Services Industry

141.   On February 27, 2014, the DOJ announced that Defendant CSAV had

agreed to pay a $8.9 million criminal fine and to plead guilty to a one-count

criminal information charging it with engaging in a conspiracy to suppress and

eliminate competition by allocating customers and routes, rigging bids, and fixing

prices for the sale of international Vehicle Carrier Services of RoRo cargo to and

from the United States and elsewhere from at least January 2000 to September

2012 in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.   On September 26, 2014, the DOJ announced that Defendant "K" Line

had agreed to pay a $67.7 million criminal fine and to plead guilty to  engaging in

a conspiracy to suppress and eliminate competition by allocating customers and

routes, rigging bids, and fixing prices for the sale of international Vehicle Carrier

Services of RoRo cargo to and from the United States and elsewhere from at least February 1997 to September 2012 in violation of the Sherman Act.

143.   According to the criminal Information filed, to form and carry out the Vehicle Carrier Services conspiracy, Defendant CSAV and its co-conspirators:

a.   attended meetings or otherwise engaged in communications regarding certain bids and tenders for international Vehicle Carrier Services for RoRo cargo;

b.   agreed during those meetings and other communications to allocate customers by not competing for each other's existing business for certain customers on certain routes;

c.   agreed during those meetings and other communications not to compete against each other on certain tenders by refraining from bidding or by agreeing on the prices they would bid on those tenders;

d.   discussed and exchanged prices for certain customer tenders so as not to under each other's prices; submitted bids in accordance with the agreements reached; and

e.   provided international Vehicle Carrier Services for certain roll-on, roll-off cargo to and from the United States and elsewhere at collusive and non-competitive prices.

144.   This is the first charge in an ongoing federal antitrust investigation into price-fixing, bid-rigging, and other anticompetitive conduct in the international ocean shipping industry conducted by the DOJ Antitrust Division's National Criminal Enforcement Section and the FBI's Baltimore Field Office, along with assistance from the United States Customs and Border Protection, Office of Internal Affairs, and Washington Field Office/Special Investigations Unit. Bill Baer, Assistant Attorney General in charge of the DOJ's Antitrust Division, stated, "Because of the growth in the automobile ocean shipping industry over the past 40 years, the conspiracy substantially affected interstate and foreign commerce.  Prosecuting international price-fixing conspiracies remains a top priority for the division."

### 5.  Government Fines in the Vehicle Carrier Services Industry

145.   On March 19, 2014, the JFTC announced cease and desist orders and surcharge payment orders against four Defendants under Articles 7(2) and 7-2(1) of the Antimonopoly Act ("AMA") for price-fixing Vehicle Carrier Services from at least as early as around mid-January 2008 until September 6, 2012. The JFTC fined Tokyo-based Defendants NYK $128.4 million, "K" Line $55.9 million, and Nissan Motor Car Carrier Co. Ltd. $4.1 million. It also fined WWL $34.3 million. NYK Line and WWL control about 70 percent of the global market for carrying cars.  The JFTC illustrated the violations in the figure below.

50



146.    According to the JFTC, in accordance with the agreements,

Defendants:

        a.      fixed freight rates and/or colluded freight rate quotations to

submit to consignors among the companies who have trade with the same

consignors at negotiating with the consignors; and

        b.      refrained from bidding against one another for the purpose of

securing incumbent trades.

147.    The JFTC found that NYK Line, K Line, WWL, and Mitsui OSK

Lines Ltd. ("MOL") price-fixed Vehicle Carrier Services on the "North American

route," which comprises of routes between ports in Japan and ports in the United

States (including Puerto Rico), Canada, or Mexico. The JFTC investigated but did not fine MOL because it had stopped participating in the alleged conduct prior to a 2012 investigation of its offices and the JFTC granted its application for leniency.

148.   The EC and CCB are also part of the Vehicle Carrier antitrust probe. On September 6, 2012, EC officials carried out unannounced inspections at the premises of several vehicle carriers in several European Union member countries in coordination with the United States and Japan competition authorities. The EC had reasons to believe that the companies concerned may have violated Article 101 of the Treaty on the Functioning of the European Union, which prohibits cartels and restrictive business practices. On September 7, 2012, Defendant WWL confirmed that it had received requests for information from United States, Japan, European, and Canada competition authorities.  WWL stated, "The purpose of these requests is to ascertain whether there is evidence of any infringement of competition law related to possible price cooperation between carriers and allocation of customers."

**D.   Other Evidence of Collusion in the Vehicle Carrier Service Market**

**1.  Defendants Raised Prices at a Rate that Far Exceeded Demand**

149.   Prices for Vehicle Carrier Services have been generally increasing since 2006.



150.    As the graph above demonstrates, pricing for Vehicle Carrier Services (per vehicle) remained relatively flat from 2001 to 2006.  In 2001, the per-vehicle price was approximately $301.30, while in 2006 the per vehicle price was $305.79, an increase of less than 2 percent.

151.    Beginning just prior to the Class Period, the price of Vehicle Carrier Services has increased by 23 percent.

152.    The increase in the price of Vehicle Carrier Services far outpaced any increase in demand during the Class Period.

153.    In the absence of an unlawful price-fixing conspiracy, according to the laws of supply and demand, prices would not increase at a rate greater than the rate of demand, yet that is exactly what happened in the Vehicle Carrier Services market during the Class Period.

## 2.  Defendants Previously Colluded in Different Markets

154.   The affiliates and subsidiaries of certain Defendants have recently pled guilty and agreed to pay millions of dollars in fines for violating the antitrust laws in other markets.

155.   In 2007, the DOJ and EC launched an investigation into price fixing among international air freight forwarders, including certain affiliates and subsidiaries of Defendants.  On October 10 of that year, the EC launched unannounced inspections at the premises of various international air freight forwarding companies with the help and coordination of various other nations' antitrust enforcement groups.

156.   On March 19, 2009, the JFTC ordered 12 companies to pay $94.7 million in fines for violations of the Japanese Antimonopoly Act ("AMA"). Included among the 12 companies were "K" Line Logistics, Ltd., a subsidiary of Defendant "K" Line; Yusen Air & Sea Services Co., Ltd., a subsidiary of Defendant NYK Line; and MOL Logistics (Japan) Co., Ltd., a subsidiary of Defendant MOL.

157.   The JFTC concluded that the companies had, over a five-year period, met and agreed to, among other things, the amount of fuel surcharges, security charges, and explosive inspection charges that they would charge their

international air freight forwarding customers.  The agreements were, according to the JFTC, negotiated at meetings of the Japan Aircargo Forwarders Association.

158.   Yusen Logistics Co., Ltd.[7] filed a complaint in April 2009 requesting a hearing to review the JFTC's orders.   The Tokyo High Court upheld the JFTC orders on November 9, 2012.

159.   On September 30, 2011, MOL Logistics (Japan) Co., Ltd. pleaded guilty to a Criminal Information in the United States District Court for the District of Columbia charging it with Sherman Act violations related to price fixing.  MOL is one of 16 companies that agreed to plead guilty or have pled guilty as a result of the DOJ's freight forwarding investigation, which has resulted in more than $120 million in criminal fines to date.  According to the Criminal Information filed against MOL Logistics (Japan) Co. Ltd., it and its co-conspirators accomplished their conspiracy by:

      a.      Participating in meetings, conversations, and communications to discuss certain components of freight forwarding service fees to be charged on air cargo shipments from Japan to the United States;

_____

[7] On October 1, 2010, Yusen Air & Sea Services Co., Ltd. and NYK Logistics merged under the name Yusen Logistics Co., Ltd..

b.      Agreeing, during those meetings, conversations, and communications, on one or more components of the freight forwarding service fees to be charged on air cargo shipments from Japan to the United States;

c.      Levying freight forwarding service fees, and accepting payments for services provided for, air cargo shipments from Japan to the United States, in accordance with the agreements reached; and

d.      Engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon freight forwarding service fees.

160.   On March 28, 2012, the EC fined 14 international groups of companies, including Yusen Shenda Air & Sea Service (Shanghai) Ltd., a subsidiary of Defendant NYK Line, a total of $219 million for their participation in the air cargo cartels and violating European Union antitrust rules.  According to the EC, "[i]n four distinct cartels, the cartelists established and coordinated four different surcharges and charging mechanisms, which are component elements of the final price billed to customers for these services."

161.   On March 8, 2013, the DOJ announced that "K" Line Logistics, Ltd. and Yusen Logistics Co., Ltd., a subsidiary of Defendant NYK Line, agreed to pay criminal fines of $3,507,246 and $15,428,207, respectively, for their roles in a conspiracy to fix certain freight-forwarding fees for cargo shipped by air from the

United States to Japan.  As with MOL Logistics (Japan) Co. Ltd., "K" Line

Logistics, Ltd. and Yusen Logistics Co., Ltd. pleaded guilty to meeting with co-

conspirators, agreeing to what freight forwarding service fees should be charged on

air cargo shipments, and actually levying those fees on its customers from about

September 2002 until at least November 2007.

## VI.    CLASS ACTION ALLEGATIONS

162.   Plaintiffs brings this action on behalf of themselves and as a class

action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking

equitable and injunctive relief on behalf of the following class (the "Nationwide

Class"):

> All automobile dealers that purchased new Vehicles shipped during
> the Class Period as to which one or more Defendants or any current or
> former subsidiary or affiliate thereof or any co-conspirator provided
> Vehicle Carrier Services.

163.   Plaintiffs also bring this action on behalf of themselves and as a class

action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking

damages pursuant to the common law of unjust enrichment and the state antitrust,

unfair competition, and consumer protection laws of the states listed in the Second

and Third Claims for Relief (the "Indirect Purchaser States") on behalf of the

following class (the "Damages Class"):

> All automobile dealers doing business in the Indirect Purchaser States
> that purchased new Vehicles shipped during the Class Period as to
> which one of the Defendants or any current or former subsidiary or

affiliate thereof or any co-conspirator provided Vehicle Carrier Services.

164.   The Nationwide Class and the Damages Class are referred to herein as the "Auto Dealer Classes."  Excluded from the Auto Dealer Classes are Defendants; their parent companies, subsidiaries, and affiliates; any co-conspirators; federal governmental entities; and instrumentalities of the federal government, states, and their subdivisions, agencies, and instrumentalities; and any judge assigned to hear this matter at either the district or appellate level and any employees or agents of those judges.

165.   While Plaintiffs do not know the exact number of the members of the Auto Dealer Classes, Plaintiffs have reason to believe there are thousands of members in each Auto Dealer Class.

166.   Common questions of law and fact exist as to all members of the Auto Dealer Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Auto Dealer Classes, thereby making appropriate relief with respect to the Auto Dealer Classes as a whole.  Such questions of law and fact common to the Auto Dealer Classes include, but are not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Vehicle Carrier Services;

58

b.      The identity of the participants of the alleged conspiracy;

c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

e.      Whether the alleged conspiracy violated state antitrust, unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

f.      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Auto Dealer Classes, thereby entitling Plaintiffs and the members of the Auto Dealer Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

g.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Auto Dealer Classes;

h.      The effect of the alleged conspiracy on the prices of Vehicle Carrier Services sold in the United States during the Class Period;

i.      Whether Plaintiffs and members of the Auto Dealer Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

j.      Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Auto Dealer Classes;

k.      The appropriate injunctive and related equitable relief for the Nationwide Class; and

l.      The appropriate class-wide measure of damages for the Damages Class.

167.   Plaintiffs' claims are typical of the claims of the members of the Auto Dealer Classes, and Plaintiffs will fairly and adequately protect the interests of the Auto Dealer Classes.  Plaintiffs and all members of the Auto Dealer Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Vehicle Carrier Services purchased indirectly from the Defendants and/or their co-conspirators.

168.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Auto Dealer Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Auto Dealer Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

169.   The questions of law and fact common to the members of the Auto Dealer Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

170.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

171.   The prosecution of separate actions by individual members of the Auto Dealer Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**VII.   PLAINTIFFS AND THE AUTO DEALER CLASSES SUFFERED ANTITRUST INJURY**

172.   Defendants' price-fixing, bid-rigging, customer-allocution, and capacity-reduction conspiracies had the following effects, among others:

a.     Price competition has been restrained or eliminated with respect to Vehicle Carrier Services;

       b.     The prices of Vehicle Carrier Services have been fixed, raised, maintained, or stabilized at artificially inflated levels;

       c.     Defendants charged artificially inflated Vehicle Carrier prices to purchasers of their Vehicle Carrier Services; and

       d.     Having paid higher prices for shipment of the Vehicles they sold to Plaintiffs and the Auto Dealer Classes, firms who sold Vehicles to Plaintiffs and the Auto Dealer Classes passed Defendants' Vehicle Carrier overcharges on to them in full;

       e.     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Auto Dealer Classes; and

       f.     Plaintiffs and the Auto Dealer Classes paid Defendants' artificially inflated prices for Vehicle Carrier Services, during the Class Period, as a result of the Defendants' conspiracy and have been deprived of free and open competition.

173.   During the Class Period, Plaintiffs and the members of the Auto Dealer Classes paid supra-competitive prices for Vehicle Carrier Services.

174.   The market for Vehicle Carrier Services and the market for Vehicles are inextricably linked and intertwined because the market for Vehicle Carrier Services exists to serve the Vehicle market.  Without the Vehicles, the Vehicle

Carrier Services have little to no value because they have no independent utility. Indeed, the demand for Vehicles creates the demand for Vehicle Carrier Services.

175.   Vehicle Carrier Services are identifiable, discrete services that remain essentially unchanged when incorporated into the cost of Vehicles sold to Plaintiffs and the members of the Auto Dealer Classes.  As a result, the cost of Vehicle Carrier Services follow a traceable chain from the Defendants to Plaintiffs and the members of the Auto Dealer Classes, and any costs attributable to Vehicle Carrier Services can be traced through the chain of Vehicle distribution to Plaintiffs and the members of the Auto Dealer Classes.

176.   Hence, the inflated prices of Vehicle Carrier Services in new Vehicles resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Auto Dealer Classes by OEMs.  Those overcharges have unjustly enriched Defendants.

177.   The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Vehicle Carrier Services and, as a direct and foreseeable result, the price of new Vehicles shipped by Vehicle Carriers.

178.   By reason of the alleged violations of the antitrust laws and other laws alleged herein, Plaintiffs and the members of the Auto Dealer Classes have sustained injury to their businesses or property, having paid higher prices for

Vehicle Carrier Services than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

179.   The common and consistent impact of Defendants' conspiracy on Plaintiffs' businesses was substantial.  Plaintiffs and the members of the Auto Dealer Classes were substantially injured by higher but for prices for Vehicle Carrier Services regardless of the pass on of some portion of such prices to end users.

180.   Given the nature of their business, Plaintiffs and similarly situated members of the Auto Dealer Classes had to and did absorb a significant portion of the overcharges that they paid due to Defendants' illegal activities.  Plaintiffs and similarly situated member of the Auto Dealer Classes did not "pass on" all of the overcharges or higher but for prices caused by Defendants' illegal activities.

181.   Plaintiffs have standing, and have suffered damage, in the states where they reside, compensable by indirect purchaser laws, and they and members of the Auto Dealer Classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy and unlawful and unfair trade practices.

## VIII.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.   The Statute of Limitations Did Not Begin to Run Because The Plaintiffs Did Not and Could Not Discover Their Claims

182.   Plaintiffs repeat and re-allege the allegations set forth above.

183.   Plaintiffs and members of the Auto Dealer Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the filing of this Complaint.

184.   Plaintiffs and members of the Auto Dealer Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the very earliest, September 6, 2012, the date the JFTC announced raids of certain Defendants' offices for their role in the criminal price-fixing conspiracy alleged herein.

185.   Plaintiffs and members of the Auto Dealer Classes are automobile dealers that indirectly purchased Vehicle Carrier Services.  They had no direct contact or interaction with the Defendants and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the September 6, 2012 raids alleged above.

186.   No information in the public domain was available to Plaintiffs and members of the Auto Dealer Classes prior to the public announcement of raids on

September 6, 2012 that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to fix the prices charged for Vehicle Carrier Services.  Plaintiffs and members of the Auto Dealer Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

187.   For these reasons, the statute of limitations as to Plaintiffs and the Auto Dealer Classes' claims did not begin to run and has been tolled with respect to the claims that Plaintiffs and members of the Auto Dealer Classes have alleged in this Complaint.

### B.   Fraudulent Concealment Tolled the Statute of Limitations

188.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted herein by Plaintiffs and the Auto Dealer Classes.  Plaintiffs and members of the Auto Dealer Classes did not know, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy and unlawful combination alleged herein until, at the earliest, the September 6, 2012 public announcement of the government investigations into price fixing of Vehicle Carrier charges and the JFTC raids of certain Defendants' offices for their role in the criminal price-fixing conspiracy alleged herein.

189.   Because Defendants' agreements, understandings, and conspiracy were kept secret until September 6, 2012, Plaintiffs and members of the Auto Dealer Classes were unaware before that time of Defendants' unlawful conduct, and they did not know before then that they were paying supra-competitive prices for Vehicle Carrier Services throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Auto Dealer Classes that even hinted to Plaintiffs and the members of the Auto Dealer Classes that they were being injured by Defendants' unlawful conduct.

190.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

191.   By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.  Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

192.   Plaintiffs and members of the Auto Dealer Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of

secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

193.   Defendants affirmatively concealed their conspiracy by falsely claiming that the Vehicle Carrier Services market was competitive and creating the illusion that prices were rising as a result of increased demand and tight supply. For example, Defendants stated:

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2003, at pg. 10.

- "CSAV participates in a very competitive market in which variations in global economic growth directly affect demand for cargo transport." *Id.* at pg. 23.

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2005, at pg. 19.

- "CSAV participates in a very competitive market in which variations in global economic growth directly affect demand for cargo transport." *Id.* at pg. 42.

- "CSAV participates in a highly competitive market in which cargo volumes are directly affected by the fluctuations in the global economic growth." *Id*. at pg. 152.

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2006, at pg. 15.

- "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport." *Id*. at pg. 38.

- "CSAV participates in a highly competitive market in which demand for cargo transport is directly affected by fluctuations in global economic growth." *Id*. at pg. 149.

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2007, at pg. 15.

- "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport." *Id*. at pg. 39.

- "The 'K' Line Group is doing business in all international markets, and is involved in competition with many shipping companies at home and abroad." "K" Line Annual Report 2008, at g. 55.

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2008, at pg. 17.

- "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport." *Id*. at pg. 35.

- "The 'K Line Group promises to comply with applicable laws, ordinances, rules and spirit of the international community and conduct its corporate activities through fair, transparent and free competition." "K" Line Annual Report 2009, at pg. 1.

- "Global automobile marine transport volume was robust through the middle of 2008, resulting in a severe shortage of vessels in the marine transport market, a market in which prices are based on the relationship between supply and demand. As a result, shipping rates were on the increase." NYK Annual Report 2009, at pg. 8.

- "Demand for ocean transportation of ro-ro cargo to Oceania remained at low levels through the year, while car volumes rose in the latter half of the year. Trades involving emerging markets such as China, South America, India and Africa offered

relatively healthy volumes through most of the year, although fierce competition put significant pressure on rates." Wil. Wilhelmsen ASA Annual Report 2009, at pg. 11.

- The shipping business is very competitive and is noted for its sensitivity to changes in economic activity. CSAV Annual Report 2009, at pg. 17.

- "CSAV works in a very competitive environment, in which variations in global economic growth directly affect the demand for cargo transport." *Id*. at pg. 36.

- "Through its capital intensity and cyclical nature, the shipping segment has historically represented higher volatility and financial risk than maritime services. The car/ro-ro shipping has during the recent history also represented the single largest investment area and exposure for the group and its shareholders....Demand for transportation of cars and other cargo has improved significantly, primarily during the second half of the year, and combined with better mix of cargo types this has positively affected the profitability of the fleet." Wil. Wilhelmsen ASA Annual Report 2010, at pg. 19-20.

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2010, at pg. 15.

- "CSAV works in a very competitive market, in which variations in global economic growth directly affect the demand for cargo transport." *Id*. at pg. 35.

- "The results of the car-carrying services were severely affected by the fall in global demand seen in 2011...[a]dded to the weak global demand for car carriers and the consequent under-utilization of ships was a sharp rise in oil prices." CSAV Annual Report 2011, at pg. 22.

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2011, at pg. 15.

70

- "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." *Id*. at pg. 19.

- "In addition to Japanese marine transport operators, the NYK Group competes with international shipping companies operating throughout the globe, and the competitive situation is growing more intense." NYK Annual Report 2012, at pg. 102.

194.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Auto Dealer Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 6, 2012, when the JFTC announced raids of certain Defendants' offices for their role in the criminal price-fixing conspiracy alleged herein.

195.   For these reasons, the statute of limitations applicable to Plaintiffs' and the Auto Dealer Classes' claims was tolled and did not begin to run until September 6, 2012.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

196.   Plaintiffs repeat and re-allege the allegations set forth above.

197.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

198.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

199.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Vehicle Carrier Services, thereby creating anticompetitive effects.

200.   The anticompetitive acts were intentionally directed at the United States market for Vehicle Carrier Services and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Vehicle Carrier Services throughout the United States.

201.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Vehicle Carrier Services.

202.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Vehicle Carrier Services have been harmed by being forced to pay inflated, supra-competitive prices for Vehicle Carrier Services.

203.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they

combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

204.   Defendants' conspiracy had the following effects, among others:

a.     Price competition in the market for Vehicle Carrier Services has been restrained, suppressed, and/or eliminated in the United States;

b.     Prices for Vehicle Carrier Services provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States;

c.     Prices for Vehicles purchased by Plaintiffs and the members of the Nationwide Class and shipped by Defendants and their coconspirators were inflated; and

d.     Plaintiffs and members of the Nationwide Class who purchased Vehicles shipped by Defendants and indirectly paid Defendants and their co-conspirators for Vehicle Carrier Services have been deprived of the benefits of free and open competition.

205.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Vehicle Carrier Services than they would have paid and will pay in the absence of the conspiracy.

206.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Vehicle Carrier Services.

207.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Vehicle Carrier Services because they are required to purchase Vehicles that are imported on RoRos owned and operated by Defendants and their co-conspirators to continue to operate their businesses.

208.    Plaintiffs and members of the Nationwide Class continue to purchase Vehicles that are imported on RoRos owned and operated by Defendants and their co-conspirators, on a regular basis, and to pay fees for Vehicle Carrier Services.

209.    Defendants and their co-conspirators continue to charge fees for their Vehicle Carrier Services that are inflated, fixed, and maintained by their conspiracy.

210.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

211.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

212.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

213.    Plaintiffs repeat and re-allege the allegations set forth above.

214.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the provision of Vehicle Carrier Services in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

215.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Vehicle Carrier Services, to rig bids for Vehicle Carrier Services, and to allocate customers for Vehicle Carrier Services in the United States.

216.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a.      participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Vehicle

Carrier Services at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class, with respect to Vehicle Carrier Services provided in the United States;

b.    allocating customers and markets for Vehicle Carrier Services provided in the United States in furtherance of their agreements; and

c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

217.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices and to allocate customers with respect to Vehicle Carrier Services.

218.   Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

219.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

a.    Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Vehicle Carrier Services prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

a.     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code.  Defendants, each of them, have acted in violation

77

of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Vehicle Carrier Services at supra-competitive levels.

b.      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Vehicle Carrier Services.

c.      For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Vehicle Carrier Services; and (2) Allocating among themselves the provision of Vehicle Carrier Services.

d.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects:  (1) Price competition in the provision of Vehicle Carrier Services has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Vehicle Carrier Services sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States;

and (3) Those who purchased Vehicle Carrier Services from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Vehicle Carrier Services than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

221.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Vehicles in the District of Columbia that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District

79

of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Vehicles in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in the District of Columbia.

b.      During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

222.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

a.      Defendants' unlawful conduct had the following effects: (1) Vehicle Carrier price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Vehicle Carrier Services prices were raised, fixed,

80

maintained, and stabilized at artificially high levels throughout Hawaii; (3)

Plaintiff and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiff and members of the Damages Class paid supra-

competitive, artificially inflated prices for Vehicle Carrier Services.

      b.      During the Class Period, Defendants' illegal conduct

substantially affected Hawaii commerce.

      c.      As a direct and proximate result of Defendants' unlawful

conduct, Plaintiff and members of the Damages Class have been injured in their

business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated

§§ 480-4, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek

all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et*

*seq*.

223.   Defendants have entered into an unlawful agreement in restraint of

trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1,

*et seq*.

      a.      Defendants' combinations or conspiracies had the following

effects: (1) Vehicle Carrier price competition was restrained, suppressed, and

eliminated throughout Illinois; (2) Vehicle Carrier Services prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3)

Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct

substantially affected Illinois commerce.

c.      As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1,

*et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms

of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

224.   Defendants have entered into an unlawful agreement in restraint of

trade in violation of the Iowa Code §§ 553.1, *et seq.*

a.      Defendants' combinations or conspiracies had the following

effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed,

and eliminated throughout Iowa; (2) Vehicle Carrier Services prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Iowa; (3)

Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*.

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

226.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Maine; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

227.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

85

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

228.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

86

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

229.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Vehicles in Mississippi that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Vehicles in Mississippi that were shipped by Defendants or their co-conspirators,

87

paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in Mississippi.

b.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

230.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

88

b.      During the Class Period, Defendants' illegal conduct

substantially affected Nebraska commerce.

c.      As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-

801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

231.   Defendants have entered into an unlawful agreement in restraint of

trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.      Defendants' combinations or conspiracies had the following

effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed,

and eliminated throughout Nevada; (2) Vehicle Carrier Services prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Nevada; (3)

Plaintiffs and members of the Damages Class, including those who resided in

Nevada and/or purchased Vehicles in Nevada that were shipped by Defendants or

their co-conspirators, were deprived of free and open competition, including in

Nevada; and (4) Plaintiffs and members of the Damages, including those who

resided in Nevada and/or purchased Vehicles in Nevada that were shipped by

89

Defendants or their co-conspirators, Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in Nevada.

b.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

232.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

a.    Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

90

Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

233. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

a. Defendants' combinations or conspiracies had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

91

b.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

234.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout New York; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Vehicles in New York that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Vehicles in New York

that were shipped by Defendants or their co-conspirators, paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in New York when they purchased Vehicles transported by Vehicle Carrier Services, or purchased products that were otherwise of lower quality, than would have been absent the Defendants' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

b.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

235.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed,

93

and eliminated throughout North Carolina; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Vehicles in North Carolina that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Vehicles in North Carolina that were shipped by Defendants or their co-conspirators, paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in North Carolina

b.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

94

236.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

a.   Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

237.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

95

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

238.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.

96

a.    Defendants' combinations or conspiracies had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Vehicle Carrier Services.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.C. Code Ann. §§ 39-5-10, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under S.C. Code Ann. §§ 39-5-10, *et seq.*

239.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

a.    Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed,

and eliminated throughout South Dakota; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Vehicles in South Dakota that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Vehicles in South Dakota that were shipped by Defendants or their co-conspirators, paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in South Dakota.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

240.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq*.

a.   Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Utah; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

241.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq*.

99

a.      Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq*.  Plaintiffs are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq*.

242.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

100

a.     Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Vehicles in West Virginia that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages, including those who resided in West Virginia and/or purchased Vehicles in West Virginia that were shipped by Defendants or their co-conspirators, Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services, including in West Virginia.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et*

*seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

243.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

 a.   Defendants' combinations or conspiracies had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

 b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

 c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

 d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

244.   Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Damages Class have paid more for Vehicle Carrier Services than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

245.   In addition, Defendants have profited significantly from the aforesaid conspiracy.   Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

246.   Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

247.   Plaintiffs repeat and re-allege the allegations set forth above.

248.   Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

249.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

a.     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Vehicle Carrier Services were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.     Defendants' unlawful conduct had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) p Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

104

d.      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e.      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

250.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of California Business and Professions Code §§ 17200, *et seq*.

a.      During the Class Period, Defendants marketed, sold, or distributed Vehicle Carrier Services in California and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.      During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

c.      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d.      Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above;

e.      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

f.      Defendants' acts or practices are unfair to purchasers of Vehicle Carrier Services (or Vehicles transported by them) in the State of

106

California within the meaning of Section 17200, California Business and Professions Code; and

g.    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h.    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

i.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for Vehicle Carrier Services (or Vehicles transported by them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

l.      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

251.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

a.      Defendants' unlawful conduct had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Florida; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

252.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1 et seq.

a.     Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Vehicle Carrier Services were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.     The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices

in the conduct of any trade or commerce," in violation of Massachusetts Gen.

Laws, Ch 93A, § 2, 11.

    c.  Defendants' unlawful conduct had the following effects: (1)

Vehicle Carrier Services price competition was restrained, suppressed, and

eliminated throughout Massachusetts; (2) Vehicle Carrier Services prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout

Massachusetts; (3) Plaintiffs and the members of the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and the members of the Damages

Class paid supra-competitive, artificially inflated prices for Vehicle Carrier

Services.

    d.  During the Class Period, Defendants' illegal conduct

substantially affected Massachusetts commerce and consumers.

    e.  As a direct and proximate result of the unlawful conduct of the

Defendants, Plaintiffs and the members of the Damages Class have been injured in

their business and property and are threatened with further injury.

    f.  Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2,

11, that were knowing or willful, and, accordingly, Plaintiffs and the members of

the Damages Class seek all relief available under that statute, including multiple

damages.

253.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-201, *et. seq*.

a.   Defendants' unlawful conduct had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Montana; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.   During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

111

254.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Vehicle Carrier Services were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.   The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Vehicle Carrier Services as set forth in N.M.S.A., § 57-12-2E. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Vehicle Carrier Services.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Vehicle Carrier Services because they were unaware of the unlawful overcharge and there was no

112

alternative source of supply through which Plaintiffs could avoid the overcharges. Defendants' conduct with regard to sales of Vehicle Carrier Services, including their illegal conspiracy to secretly fix the price of Vehicle Carrier Services at supra-competitive levels and overcharge Plaintiffs and the Damages Class, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.

c.     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for the Vehicle Carrier Services as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Damages Class members for the Vehicles and the Vehicle Carrier Services.

d.     Defendants' unlawful conduct had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages

Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

        e.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

        f.      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

        g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

    255.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

        a.      Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Vehicle Carrier Services were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.      Defendants and their co-conspirators made public statements about the prices of Vehicle Carrier Services that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Vehicle Carrier Services, and Defendants alone possessed material information that was relevant to Plaintiffs and the Damages Classes but failed to provide the information.

c.      Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased Vehicle Carrier Services were misled to believe that they were paying a fair price for Vehicle Carrier Services or the price increases for Vehicle Carrier Services were for valid business reasons, and similarly situated class members were potentially affected by Defendants' conspiracy.

d.      Defendants knew that their unlawful trade practices with respect to pricing Vehicle Carrier Services would have an impact on New York class members and not just the Defendants' direct customers.

e.      Defendants knew that their unlawful trade practices with respect to pricing Vehicle Carrier Services would have a broad impact, causing class members who indirectly purchased Vehicle Carrier Services to be injured by paying more for Vehicle Carrier Services than they would have paid in the absence of Defendants' unlawful trade acts and practices.

115

f.     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.     Defendants' unlawful conduct had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout New York; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

h.     During the Class Period, Defendants marketed, sold, or distributed Vehicle Carrier Services in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i.     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Vehicle Carrier Services in New York.

j.     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

116

256.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

a.   Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Vehicle Carrier Services were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.   Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases.  Defendants' public statements concerning the price of Vehicle Carrier Services created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.

117

c.      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina Plaintiffs and the Damages Classes in an honest marketplace in which economic activity is conducted in a competitive manner.

d.      Defendants' unlawful conduct had the following effects:  (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

e.      During the Class Period, Defendants marketed, sold, or distributed Vehicle Carrier Services in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Vehicle Carrier Services in North Carolina.

118

g.      Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

257.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.

a.      Defendants' combinations or conspiracies had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.     As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and,

accordingly, Plaintiffs and the members of the Damages Class seek all relief

available under that statute.

258.   Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et

seq.*

a.     Defendants agreed to, and did in fact, act in restraint of trade or

commerce in a market that includes Vermont, by affecting, fixing, controlling,

and/or maintaining, at artificial and non-competitive levels, the prices at which

Vehicle Carrier Services were sold, distributed, or obtained in Vermont.

b.     Defendants deliberately failed to disclose material facts to

Plaintiffs and members of the Damages Class concerning Defendants' unlawful

activities and artificially inflated prices for Vehicle Carrier Services.  Defendants

owed a duty to disclose such facts, and Defendants breached that duty by their

silence. Defendants misrepresented to all purchasers during the Class Period that

Defendants' Vehicle Carrier Services prices were competitive and fair.

c. Defendants' unlawful conduct had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Vehicle Carrier Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

d. As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

e. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Vehicle Carrier Services, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Vehicle Carrier Services at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

121

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

259.   Plaintiffs repeat and reallege the allegations set forth above.

260.   Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*.

261.   As a result of their unlawful conduct described above and their violations of the antitrust and consumer protection laws set forth above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Vehicle Carrier Services.

262.   Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for Vehicle Carrier Services.

263.   Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

264.   Pursuit of any remedies against the firms from whom Plaintiffs and the Damages Class members purchased Vehicles shipped by Defendants subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

1.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Auto Dealer Classes;

2.   The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

     a.   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

     b.   A *per se* violation of Section 1 of the Sherman Act;

     c.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

     d.   Acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiffs and the members of the Auto Dealer Classes be awarded pre- and post- judgment interest as provided by law and that such interest be

awarded at the highest legal rate from and after the date of service of this

Complaint;

8.    Plaintiffs and the members of the Auto Dealer Classes recover their

costs of suit, including reasonable attorneys' fees, as provided by law; and

9.    Plaintiffs and members of the Auto Dealer Classes have such other

and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules

of Civil Procedure, of all issues so triable.

DATED:  October 6, 2014                     Respectfully submitted,

                                            */s/ Peter S. Pearlman*
                                            Peter S. Pearlman
                                            COHN LIFLAND PEARLMAN
                                            HERRMANN & KNOPF LLP
                                            Park 80 Plaza West-One
                                            250 Pehle Ave., Suite 401
                                            Saddle Brook, NJ 07663
                                            Telephone:  (201) 845-9600
                                            psp@njlawfirm.com

                                            *Automobile Dealer Liaison Counsel*

Jonathan W. Cuneo              Don Barrett
Joel Davidow                   David McMullan
Katherine Van Dyck             Brian Herrington
Daniel Cohen                   Sterling Starns
CUNEO GILBERT & LADUCA,        BARRETT LAW GROUP, P.A.
LLP                            404 Court Square
507 C Street NE                P.O. Box 927
Washington, D.C. 20002         Lexington, Mississippi 39095

Telephone:  (202) 789-3960
jcuneo@cuneolaw.com
joel@cuneolaw.com
kvandyck@cuneolaw.com
danielc@cuneolaw.com

Shawn M. Raiter
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota  55101
Telephone:  (651) 312-6500
sraiter@larsonking.com

*Automobile Dealer Interim Co-Lead Counsel*

Dewitt Lovelace
Valerie Nettles
LOVELACE & ASSOCIATES, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, Florida  32550
Telephone:  (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Gerard V. Mantese
David Hansma
Brendan Frey
MANTESE HONIGMAN ROSSMAN
& WILLIAMSON, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone:  (248) 457-9200
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com

Ben F. Pierce Gore
PRATT & ASSOCIATES

Telephone:  (662) 834-2488
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
bherrington@barrettlawgroup.com
SStarns@barrettlawgroup.com

Charles Barrett
CHARLES BARRETT, P.C.
6518 Highway 100, Suite 210
Nashville, Tennessee 37205
Telephone:  (615) 515-3393
charles@cfbfirm.com

Thomas P. Thrash
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, Arkansas 72201
Telephone:  (501) 374-1058
tomthrash@sbcglobal.net

Armand Derfner, Esq.
DERFNER, ALTMAN & WILBORN
575 King Street, Suite B
Charleston, South Carolina 29403
Telephone:  (843) 723-9804
aderfner@dawlegal.com

126

1871 The Alameda, Suite 425
San Jose, California 95126
Telephone:  (408) 369-0800
gore@prattattorneys.com

*Additional Automobile Dealer Counsel*