## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| In Re: | : | |
| Vehicle Carrier Services | : | Master Docket No.: 13-cv-3306 |
| Antitrust Litigation | : | (MDL No. 2471) |
| | : | |
| *This Document Relates to All Actions* | : | |
| | : | |

## INDIRECT PURCHASER PLAINTIFFS RESPONSE TO CONSOLIDATED BRIEF OF DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS THE INDIRECT PURCHASERS' COMPLAINTS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................v

I.     INTRODUCTION ...........................................................................................1

II.    ARGUMENT ...................................................................................................2

    A.    IPPs Properly Plead Constitutional Standing............................................2

    B.    Plaintiffs Have Sustained Antitrust Injury ...............................................7

        1.    An Indirect Purchaser Sustains Antitrust Injury When it
              Purchases a Finished Product Containing a Price-Fixed
              Component or Accompanied by a Service Charge .....................................8

        2.    IPPs' Harm is Inextricably Intertwined with the Harm Caused
              by Defendants' Conspiracy under Federal Law.........................................12

        3.    IPPs Have Pleaded Antitrust Injury under Relevant State Laws ..............16

        4.    The IPPs' Injuries Are Not Too Remote, and the *AGC* Factors
              Do Not Apply to the State Law Claims ....................................................18

             (a)    Defendants' Reliance on Harmonization Provisions is
                     Misplaced............................................................................................18

             (b)    A State-by-State Analysis Establishes that *AGC* Does
                     Not Apply to the IPP Claims in This Case....................................20

             (c)    To the Extent *AGC* Applies, the IPPs' Claims Readily
                     Survive Scrutiny................................................................................31

                  (1)    Causal Connection and Intent to Cause Harm ...................32

                  (2)    IPPs Suffered Injury that the State Indirect
                         Purchaser Laws Were Designed to Redress......................33

                  (3)    Directness of the Injury.......................................................34

                  (4)    The Existence of More Direct Victims ..............................36

                  (5)    The Potential for Duplicative Recovery or
                         Complex Apportionment of Damages ...............................36

    C.    This Court Should Not Dismiss IPPs' State Law Claims Based on the
          Place of Certain Plaintiffs' Residence......................................................37

         1.    The IPPs May Bring Claims under the Laws of Various States

Where No Named Plaintiff Resides ........................................................37

    (a)    Class Certification Is "Logically Antecedent" to Questions of Article III Standing under State Laws ....................37

    (b)    Most of the State Statutes Cited by Defendants Do Not Require In-State Residency...........................................................39

2.    The Truck and Equipment Dealer Named Plaintiffs Who Do Not Assert a Violation of Their Home State's Antitrust or Consumer Protection Laws Have Standing to Assert Claims for Injunctive Relief and Damages.................................................................42

D.    IPPs Properly Allege Unjust Enrichment................................................43

1.    End-Payors' Have Adequately Pleaded Claims for Unjust Enrichment...................................................................................43

    (a)    End-Payors' Allegations are Sufficiently Specific under *Twombly* and *Iqbal* ......................................................43

    (b)    IPPs' Unjust Enrichment Claims Are Not "End-Runs" to Pursue Relief not Otherwise Available ...........................45

    (c)    IPPs Are Not Required to Confer a Direct Benefit on Defendants to State an Unjust Enrichment Claim ........................46

2.    The Auto Dealers and the Truck Centers Have Adequately Pleaded Unjust Enrichment.........................................................48

    (a)    Unjust Enrichment Does Not Require Conferral of Direct Benefits from IPPs to Defendants........................................48

    (b)    IPPs' Injuries are Not Too Remote to State an Unjust Enrichment Claim ..........................................................50

    (c)    Futility Obviates the Requirement for Plaintiffs to Exhaust All Remedies under Tennessee Law ...............................51

    (d)    IPPs Adequately Plead Unjust Enrichment Under California Law ....................................................................52

    (e)    *Illinois Brick* Does Not Bar Unjust Enrichment Claims...............52

E.    The Shipping Act Does Not Preempt IPPs' State-Law Claims............................53

1.    The Shipping Act Does Not Preempt IPPs' State Antitrust

Damage Claims .................................................................................... 53

    (a)    Congress Knew How to Preempt State Antitrust Law at the Time it Drafted the Shipping Act—the Implication is that Congress Chose Not to Preempt ............................................... 57

    (b)    The Act's Enforcement Scheme is Not Comprehensive ............... 61

    (c)    State Antitrust Laws Do Not Undermine the Shipping Act's Aims ....................................................................................... 62

    (d)    CSAV and "K" Line—at a Minimum—Should Be Estopped from Invoking Preemption ........................................... 63

F.    The IPPs' State Claims Under Certain State Antitrust and Consumer Protection Acts Should Not Be Dismissed ............................................ 64

    1.    State Regulatory Antitrust Exemptions Do Not Bar IPPs' Claims under Iowa, Michigan, Minnesota, Nevada, and New Hampshire Antitrust Law and the Unfair Trade Practices Act of Massachusetts ................................................................................. 64

    2.    Under *Shady Grove*, the Consumer Protection Acts of Montana and South Carolina Do Not Bar Class Action Suits ................................. 66

    3.    The IPPs' Complaints Comply with the Requirements of the Massachusetts Consumer Protection Act ...................................... 67

        (a)    Under the Massachusetts Consumer Protection Act, Defendants Are Not Entitled to a Pre-suit Letter Because They Do Not Maintain Places of Business or Keep Assets Within Massachusetts ........................................................... 67

        (b)    Massachusetts Consumer Protection Act Allows Indirect Purchaser Claims like Those Advanced by Auto Dealer and Truck Equipment Dealer Plaintiffs ........................................... 68

    4.    Price-Fixing Gives Rise to a Consumer Protection Claim in Arkansas, Hawaii, New York, and Rhode Island ....................................... 69

    5.    IPPs Have Alleged Sufficient In-State Injury to Sustain Claims under the North Carolina Consumer Protection Act ................................. 71

    6.    The Shipping Act Does Not Bar IPPs' Injunctive and Damages Claims ...................................................................................... 72

        (a)    The Shipping Act Does Not Bar Injunctive Claims under

the Sherman and Clayton Act .........................................................72

(b)   IPPs' State Law Damages Claims Are Not Barred by the
Shipping Act.................................................................................73

7.   IPPs Withdraw their Tennessee Antitrust Act Claim ................................73

8.   The Oregon and South Carolina Laws Permit End-Payors'
Claims ........................................................................................73

G.   IPPs Have Properly Alleged Facts Supporting Injunctive Relief .........................74

III.   CONCLUSION.................................................................................................76

iv

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Academy, Inc., v. Hoover Universal, Inc.*,
   666 S.E2d 247 (2008), ................................................................................ 73

*Accord Connecticut Nat. Bank v. Germain*,
   503 U.S. 249 (1992)..................................................................................... 56

*Aceto Corp. v. TherapeuticsMD, Inc.*,
   953 F.Supp.2d 1269 (S.D.Fla.2013) ........................................................... 46

*Animal Sci. Products, Inc. v. China Minmetals Corp.*,
   2014 WL 3695329 (D.N.J. July 24, 2014)..................................................... 2

*Ark. Carpenters' & Welfare Fund v. Phillip Morris Inc.*,
   75 F. Supp. 2d 936 (E.D. Ark. 1999) ......................................................... 50

*Arthur v. Microsoft Corp.*,
   676 N.W.2d 29 (Neb. 2004)....................................................................... 26

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)............................... 44

*Associated Gen. Contractors of California, Inc. v. California State Council of*
   *Carpenters*,
   459 U.S. 519 (1983)............................................................. 2, 16, 18, 31

*Automotive Parts Antitrust Litigation (In re: Bearings Cases)*,
   No. 12-00502 and 12-00503, (E.D. Mich. Sept. 25, 2014)............................ 10

*Automotive Parts Antitrust Litigation (In re: Fuel Sender Cases)*,
   No. 12-00302 and 12-00303, (E.D. Mich. July 3, 2014) ..................... 10, 48, 49

*Automotive Parts Antitrust Litigation (In re: Heater Control Panel Cases)*,
   No. 12-00402 and 12-00403, (E.D. Mich. July 3, 2014) ................................ 10

*Automotive Parts Antitrust Litigation (In re: Instrument Panel Cluster Cases)*,
   12-00202 and 12-00203, (E.D. Mich. July 3, 2014) ...................................... 10

*Automotive Parts Antitrust Litigation (In re: Occupant Safety System Cases)*,
   No. 12-00602 and 12-00603, (E.D. Mich. Sept. 25, 2014)............................ 10

*Automotive Parts Antitrust Litigation (In re: Wire Harness Cases)*,
   12-00102 and 12-00103 (E.D. Mich. June 6, 2013) ................................. passim

v

*Baptist Health v. Murphy*,
    365 Ark. 115 (2006) ........................................................................................ 68

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005) ........................................................................................ 55

*Beckler v. Visa U.S.A., Inc.*,
    No. 09-04-C-0030, 2004 WL 2475100 (N.D. Dist. Sept. 21, 2004) ............... 28

*Bell Atlantic Co. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 44

*Ben's Auto Body v. Teitelbaum*,
    2008 WL 5224420 (D. N.H. Dec. 15, 2008) ................................................... 65

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................................... 2

*Bergstrom v. Noah*,
    974 P.2d 520 (Kan. 1999) ............................................................................... 24

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) .......................................................................................... 7

*Blunt v. Lower Merion Sch. Dist.*,
    767 F.3d 247 (3d Cir. 2014) ............................................................................. 3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1989) .................................................................................... 7, 13

*Bunker's Glass v. Pilkington PLC*,
    75 P.3d 99 (Ariz. 2003) .................................................................................. 21

*Byers v. Intuit, Inc.*,
    564 F.Supp.2d 385 (E.D. Pa. 2008) ................................................................. 5

*Cal. v. Infineon Techs. AG*,
    531 F. Supp. 2d 1124 (N.D. Cal. 2007) .......................................................... 68

*California v. ARC America Corp.*,
    490 U.S. 93 (1989) ................................................................................... passim

*Carnation Co. v. Pac. Westbound Conference*,
    383 U.S. 213 (1966) ........................................................................................ 61

*Carpet Group International v. Oriental Rug Importers Association, Inc.*,
    227 F.3d 62 (3d Cir. 2000) ............................................................................... 8

*Cellular Plus, Inc. v. Superior Court,*
     14 Cal. App. 4th 1811 (1995) ........................................................ 22

*Ciampi v. Zulzek,*
     598 F. Supp. 2d 257 (D.R.I., 2009) .............................................. 46

*Ciardi v. F. Hoffmann La Roche, Ltd.,*
     762 N.E.2d 303 (Mass. 2002) ................................................. 52, 67

*Cipollone v. Liggett Group Inc.,*
     505 U.S. 504 (1992) ...................................................................... 57

*City of Charleston, S.C. v A Fisherman's Best, Inc.,*
     310 F.3d 155 (4th Cir. 2002) ................................................. 53, 60

*Clayworth v. Pfizer, Inc.,*
     49 Cal. 4th 758 (Cal. App. 2010) ........................................... 21, 22

*Cox v. Microsoft Corp.,*
     8 A.D.3d 39 (N.Y. App. Div. 2004) .............................................. 70

*D.R. Ward Constr. Co. v. Rohm & Haas Co.,*
     470 F. Supp. 2d 485 (E.D. Pa. 2006) .................................... passim

*Danvers Motor Co. v. Ford Motor Co.,*
     432 F.3d 286 (3d Cir. 2005) ........................................................... 3

*Davis v. Four Seasons Hotel Ltd.,*
     228 P.4d 303 (Haw. 2010) ............................................................ 23

*Davis v. Four Seasons Hotel Ltd.,*
     122 Haw. 423 (2010) ..................................................................... 69

*Durette v. Aloha Plastic Recycling Inc.,*
     100 P.3d 60 (Haw. Oct. 29, 2004) ............................................... 46

*E. & J. Gallo Winery v. EnCana Corp.,*
     503 F.3d 1027 (9th Cir. 2007) ........................................... 54, 56, 61

*Elkins v. Microsoft Corp.,*
     817 A.2d 9 (Vt. 2002) ................................................................... 29

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,*
     No. 09-cv-852-LA, (E.D. Wis. Sept. 5, 2012) ......................... 47, 68

*Four B. Corp. v. Daicel Chemical Ind., Ltd.,*
     235 F. Supp. 2d 1147 (D. Kan. 2003) .......................................... 24

*Franklin County. Sheriff's Office v. St. Albans City Police Department.*,
192 Vt. 188, 58 A.3d 207 (2012) ...................................................... 17

*Freeman Indus. v. Eastman Chem. Co.*,
172 S.W.3d 512 (Tenn. 2005) ................................................... 28, 51

*Fucile v. Visa, U.S.A., Inc.*,
No. S1560-03, (Vt. Super. Ct. Dec. 27, 2004) ................................. 29

*Gares v. Willingboro Twp.*,
90 F.3d 720 (3d Cir. 1996) ...................................................... 16

*Ghirardo v. Antonioli*,
924 P.2d 996 (Cal. 1996)......................................................... 51

*Glenwood Farms, Inc. v. Ivey*,
228 F.R.D. 47 (D. Me. 2005) ..................................................... 46

*Growth Horizons, Inc. v. Delaware Cnty.*,
983 F.2d 1277 (3d Cir. 1993) .................................................... 43

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
995 F.2d 425 (3d Cir. 1993) ................................................ 7, 13

*Gutnayer v. Cendant Corp.*,
116 Fed. Appx. 758 (7th Cir. 2004) ............................................. 23

*Hanover Shoe, Inc. v. United Shoe Machinery Corp*,
392 U.S. 481 (1968)............................................................... 18

*Hawaii v. Standard Oil Co. of California*,
405 U.S. 251 (1972).............................................................. 74

*Ho v. Visa U.S.A., Inc.*,
793 N.Y.S.2d 8 (App. Div. 2005)................................................. 27

*Holder v. Archer Daniels Midland Co.*,
No. 96-2975, 1998 WL 1469620 (D.C. Super. Ct. Nov. 4, 1998).................... 22

*Holk v. Snapple Beverage Corp.*,
575 F.3d 329 (3rd Cir. 2009).............................................. 54, 55

*Hovering v. Transnation Title Ins. Co.*,
545 F. Supp. 2d 662 (E.D. Mich. 2008)......................................... 37

*Hoving v. Lawyers Title Ins. Co.*,
256 F. R. D. 555 (E. D. Mich. 2009)........................................... 44

*Howe v. Microsoft Corp.*,
   656 N.W.2d 285 (N.D. 2003) ....................................................................... 27

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ........................................................................... passim

*In re Aftermarket Filters Antitrust Litig.*,
   Case No. 08-C-4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................ 37, 68

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   697 F.3d 154 (2d Cir. 2012) ....................................................................... 57

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) ....................................................... passim

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944, 2013 U.S. Dist. LEXIS 119598 (N.D. Cal. 2013) ................................ 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ....................................................... passim

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL 1917, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013) ......................................... 67

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F. Supp. 2d 538, (M.D. Pa. 2009) .................................................. 37, 38, 68, 70

*In re Chocolate Confectionary Antitrust Litig.*,
   749 F. Supp. 2d at 242 (M.D. Pa. 2010) ......................................................... 51

*In re DDAVP*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) ............................................................ 46

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) ............................................................ 67

*In re Ditropan XL*,
   529 F. Supp. 2d 1098(N.D. Cal. 2007), the court ................................................ 43

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litigation*,
   2013 WL 5503308 (D.N.J. Oct. 2, 2013) ....................................................... passim

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................... 26, 68, 69

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   536 F. Supp. 2d 1129 (N.D. Cal. 2008) ......................................................... 69, 70

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009)...................................................................... passim

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) ............................................................ 44, 45, 46, 67

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007).................................................................... 69

*In re Graphics Processing Units Antitrust Litig.*,
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ................................................................ passim

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
    299 F.R.D. 648 (S.D. Cal. 2014)............................................................................ 66

*In re Hypodermic Prods. Antitrust Litig.*,
    MDL No. 1730, 2007 WL 1959225 (D.N.J. June 29, 2007)................................... 37, 38

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007) ...................................................................... 36

*In re Linerboard Antitrust Litig. Winoff Indus., Inc.*,
    305 F.3d 145 (3d Cir. 2002) ................................................................................ 36

*In re Magnesium Oxide Antitrust Litig.*,
    No. 10-5943, 2011 WL 5008090 (D. N.J. Oct. 20, 2011)........................................ 39, 40

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004).......................................................................... 68

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) .................................................................................... 24

*In re Optical Disk Drive Antitrust Litig.*,
    No. 3:10-MD-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012).......................... 66

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E. D. Mich. 2010) ...................................................................... 44

*In re Polyurethane Foam Antitrust Litig.*,
    799 F. Supp. 2d 777 (N.D. Ohio 2011) ...................................................................... 69

*In re Potash Antitrust Litig.*,
    667 F. Supp. 2d 907 (N.D. Ill. 2009) .................................................................... 19, 25

*In re Processed Egg Products Antitrust Litigation*,
    851 F.Supp.2d 867 (E.D. Pa. 2012) ........................................................................ passim

x

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   593 F. Supp. 2d 29 (D.D.C. 2008) *aff'd sub nom* ............................................................. 8

*In re Refrigerant Compressors Antitrust Litig.*,
   No. 2:0o9-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ...................... 30, 71

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 .......................................................................................................... 37

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   No. 1:12-md-2343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013)................................ 45

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F.Supp.2d 896 (N.D.Cal.2008) .......................................................................... 43

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   No. 07-md-1819, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) ...................................... 69

*In re Static Random Access Memory Antitrust Litig.*,
   No. 07-md-1819-CW, 2008 WL 2610549 (N.D. Cal. Feb. 14, 2008) ............................. 70

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2011 WL 4345435 (N.D. Cal. Sept. 15, 2011)................................................................. 51

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008)................................................................... passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   787 F. Supp. 2d 1036 (N.D. Cal. 2011)........................................................................... 69

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) ................................. 48

*In re TFT-LCD Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009)................................................................. 48, 49, 51

*In re TJX Cos. Retail Sec. Breach Litig.*,
   564 F.3d 489 (1st Cir. 2009) ........................................................................................ 67

*In re Warfarin Sodium Antitrust Litig.*,
   214 F.3d 395 (3d Cir. 2000) ....................................................................... 7, 13, 21, 33

*In re: Automotive Parts Antitrust Litigation*,
   Master No. 12-md-02311 (E.D. Mich.) (Battani, J.)........................................................ 9

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
   196 F.3d 818 (7th Cir. 1999) ......................................................................................... 23

*Johnson v. Reliant Energy*,
    289 P.3d 1186 (Nev. 2012) ........................................................................ 55, 56

*Kanne v.  Visa U.S.A. Inc.*,
    723 N.W.2d 293 (Neb. 2006) ...................................................................... 14, 26

*K-Dur Antitrust Litig.*,
    338 F. Supp. 2d at 545 ................................................................................ 47, 49

*Klein v. Stahl GMBH & Co. Maschinefabrik*,
    185 F.3d 98 (3d Cir.1999) ................................................................................ 62

*Knevelbaard Daries v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ............................................................................. 22

*Knowles v. Visa U.S.A., Inc.*,
    No. Civ. A. CV-03-70, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004) ...................... 25

*LaChance v. US Smokeless Tobacco Co.*,
    931 A.2d 571 (N.H. 2007) ................................................................................ 26

*Laughlin v. Evanston Hosp.*,
    550 N.E.2d 986 (Ill. 1990) ............................................................................... 23

*Leggett v. Duke Energy Corp.*,
    308 S.W. 3d 843 (Tenn. 2010) ..................................................................... 55, 56

*Lithium Ion Batteries Antitrust Litig.*,
    No., 13-MD-2420, 2014 U.S. Dist. LEXIS 141 (N.D. Cal. October 2, 2014) ...... 16, 17, 35

*Lorix v. Crompton Corp.*,
    736 N.W. 2d 619 (Minn. 2007) ............................................................ 14, 15, 25, 36

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*
    No. 13-CV-01180-BLF, 2014 WL 4774611, at *8 (N.D. Cal. Sept. 22, 2014) ........... 15, 25

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ...................................................................................... 2, 5

*Luscher v. Bayer*,
    CV 2004-014835, 2005 WL 6959406 (Ariz. Super. Ct. Sept. 14, 2005) ......................... 21

*Luxama v. Ironbound Exp., Inc.*,
    No. 11-cv-2224, 2013 WL 3286081 (D.N.J. June 27, 2013) .............................................. 6

*Mack v. Bristol–Myers Squibb Co.*,
    673 So.2d 100 ................................................................................................... 45

*Maryland v. Louisiana*,
    451 U.S. 725 (1981)..................................................................................... 52

*McKenna v. Pacific Rail Serv.*,
    32 F.3d 820 (3d Cir. 1994) ...................................................................... 16

*McKinnon v. Honeywell Int'l, Inc.*,
    977 A.2d 420 (Me. 2009)........................................................................... 24

*Merck & Co., Inc. v. Lyon*,
    941 F.Supp. 1443 (M.D.N.C. 1996).......................................................... 71

*Miles v. Apex Marine Corp.*,
    498 U.S. 19 (1990).................................................................................... 57

*Minnesota–Iowa Television v. Watonwan Television Improvement Ass'n*,
    294 N.W.2d 297 (Minn.1980) ................................................................... 64

*Mueller v. Wellmark, Inc.*,
    2012, 818 N.W.2d 244 (Iowa 2012).......................................................... 64

*Nass-Romero v. Visa U.S.A., Inc.*,
    279 P.3d 772 (N.M. App. 2012) ............................................................... 27

*National ATM Council, Inc. v. Visa Inc.*,
    922 F.Supp.2d 73 (D.D.C. 2013) ............................................................... 7

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995).......................................................................... 53, 56

*New York v. Daicel Chem. Indus. Ltd.*,
    42 A.D. 3d 301 (N.Y. App. Div. 2007)...................................................... 50

*O'Regan v. Arbitration Forums, Inc.*,
    121 F.3d 1060 (7th Cir. 1997).................................................................. 23

*Orr v. Beamon*,
    77 F. Supp. 2d 1208 (D.Kan. 1999) ......................................................... 24

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).................................................................................. 38

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973).......................................................................... 53, 59

*Oxbow Carbon and Minerals LLC v. Union Pacific R.R. Co.*,
    926 F.Supp.2d 36 (D.D.C. 2013) ............................................................... 7

*Pacific Merchant Shipping Ass'n v. Goldstene,*
    639 F.3d 1154(9th Cir. 2011), ....................................................... 54

*Pacific Merchant Shipping Association v. Aubry,*
    918 F.2d 1409 (9th Cir. 1990) ...................................................... 54

*Payton v. Cnty. of Kane,*
    308 F.3d 673 (7th Cir. 2002) ........................................................ 37

*Pirozzi v. Apple Inc.,*
    913 F. Supp. 2d 840 (N. D. Cal. 2012) ........................................ 44

*PPL Energyplus, LLC v. Solomon,*
    766 F.3d 241 (3d Cir. 2014) ......................................................... 53

*Princeton Insurance Agency Inc. v. Erie Insurance Co.,*
    225 W. Va. 178, 690 S.E.2d 587 (2009)...................................... 17

*Rolick v. Collins Pine Co.,*
    925 F.2d 661 (3d Cir. 1991) ......................................................... 16

*Romano v. Motorola, Inc.,*
    No. 07–cv–60517, 2007 WL 4199781 (S.D.Fla. Nov. 26, 2007) ................................... 46

*Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,*
    81 F.3d 355 (3d Cir.1996) ........................................................... 62

*Schwan v. CNH Am. LLC,*
    No. 4:04CV3384, 2006 WL 1215395 (D. Neb. May 4, 2006) ........................................ 48

*Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc.,*
    61 F. Supp. 2d 1092 (D. Haw. 1999)............................................ 8

*Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010)................................................................ 65, 66

*Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.,*
    Case No. 07-5205, 2008 WL 3833577 –9 (D.N.J. Aug. 13, 2008)........................... 37, 38

*Sherwood v. Microsoft Corp.,*
    2003 WL 21780975 (Tenn. Ct. App. 2003) .................................. 72

*Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC,*
    650 F.Supp.2d 1213 (S.D.Fla.2009) ............................................. 46

*Small v. Badenhop,*
    701 P.2d 647 (Haw. 1985).............................................................. 46

*Soule v. Hilton Worldwide, Inc.,*
    No. CIV. 13-00652 ACK-RL, 2014 WL 794801 at *8 (D. Haw. Feb. 26, 2014)............. 69

*Southard v. Visa U.S.A. Inc.*,
    734 N.W.2d 192 (Iowa 2007)......................................................................... 14, 15, 23, 50

*Stark v. Visa U.S.A. Inc.*,
    No. 03-055030, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004)................................. 25

*Stermer v. SCK Solutions, LLC*,
    No. 08–cv–61751, 2009 WL 1849955 (S.D.Fla. June 26, 2009)..................................... 46

*Strang v. Visa U.S.A., Inc.*,
    03-CV-011323, (Wis. Cir. Ct. Feb. 8, 2005) ....................................................... 16, 17, 34

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009)........................................................................................................ 75

*Sweeney v. DeLuca*,
    20 Mass. L. Rptr. 628 (Mass. Super., 2006)................................................................... 46

*Teague v. Bayer AG*,
    671 S.E.2d 550 (N.C. Ct. App. 2009) ............................................................................ 27

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*,
    663 F.Supp. 494 (M.D.N.C. 1987).................................................................................. 71

*Topaz Mut. Co., Inc. v. Marsh*,
    108 Nev. 845, 839 P.2d 606 (1992)................................................................................ 48

*U.S. v. Gosselin World Wide Moving N.V.*,
    411 F.3d 502 (4th Cir. 2005) .......................................................................................... 58

*U.S. v. Locke*,
    529 U.S. 89 (2000)..................................................................................................... 53, 54

*Union Carbide Corporation v. Superior Court*,
    36 Cal.3d 15 (Cal. 1984)................................................................................................ 21

*US v. Philadelphia National Bank*,
    374 U.S. 321 (1992)........................................................................................................ 53

*Vinci v. Waste Mgmt. Inc.*,
    36 Cal. App. 4th 1811 (Cal. Ct. App. 1995)................................................................... 22

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ...................................................................................... 7, 9, 13

xv

*Wavecom Solutions Corp. v. Verizon Haw. Int'l Inc.*,
    No. CV. 11-00337 DAE-KSC, 2011 WL 5374428 (D. Haw. Nov. 7, 2011) ..................... 48

*Williams v. Perrault*,
    2011 Mass. App. Div. 180 (Dist. Ct. 2011) ........................................................................ 66

*Williams v. Wells Fargo Bank N.A.*,
    No. 11-21233-CIV, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011) ............................. 47, 49

*Williams v. Wells Fargo Bank, N.A.*,
    No. 11–cv–21233, 2011 WL 4901346 (S.D.Fla. Oct. 14, 2011) ....................................... 46

*Wyeth v. Levine*,
    555 U.S. 555 ................................................................................................................ 54, 59

*Wylie v. Foss Maritime Co.*,
    No. C 06-07228 MHP, 2008 WL 4104304 (N.D. Cal. Sept. 4, 2008) ............................. 53

## **STATUTES**

15 U.S.C. § 1 ....................................................................................................................... 58

15 U.S.C. § 37(b) ................................................................................................................ 58

15 U.S.C. § 4002(a)(7) ........................................................................................................ 57

15 U.S.C. § 4302 ................................................................................................................. 57

46 U.S. Code § 40307(b)(4) ................................................................................................ 61

46 U.S. Code § 40307(d) ..................................................................................................... 60

46 U.S.C. § 40307(d) .......................................................................................................... 56

46 U.S.C.A. § 40101 ........................................................................................................... 61

49 U.S.C. § 41713(b)(1) ...................................................................................................... 57

740 Ill. Comp. Stat. 10/7 ............................................................................................... 23, 52

Ariz. Rev. Stat. § 44-1408 .................................................................................................. 39

Ark. Code Ann. § 4 ............................................................................................................. 68

Ark. Code Ann. § 4-75-315 ................................................................................................ 52

Ark. Code Ann. § 4-88-113(f) ............................................................................................ 41

Ark. Deceptive Trade Practices Act .......................................................................... 68

D.C. Code § 28-4503 ............................................................................................... 40

D.C. Code § 28-4509(a) ........................................................................................... 22

Haw. Rev. Stat. § 480-13(a)(1), (2) ........................................................................ 39

Haw. Rev. Stat. § 480-13(c)(2) (West) ................................................................... 23

Haw. Rev. Stat. Ann. § 480-3 ................................................................................. 72

Iowa Code § 553.12 ................................................................................................. 40

Iowa Code §553.6(4) ............................................................................................... 64

Kan. Stat. Ann. § 50-161(b) .................................................................................... 39

Mass. Gen. Laws ch. 93A (MCPA), § 9 and 11 ..................................................... 67

Mass. Gen. Laws ch. 93A, § 9(1) ........................................................................... 41

Me. Rev. Stat. tit. 10, § 1104 .................................................................................. 24

Me. Rev. Stat. tit. 10, § 1104(1) ............................................................................. 39

Mich .Gen. Law ch. 93A, § 9(3) ............................................................................. 66

Mich. Comp. Laws § 445.774(5) ............................................................................ 65

Mich. Comp. Laws § 445.778(2) ............................................................................ 39

Mich. Comp. Laws. Ann § 445.784(2) ................................................................... 72

Minn. Stat. Ann. § 325D.57 .................................................................................... 40

N.C. Gen. Stat. § 75-1.1 ......................................................................................... 70

N.D. Cent. Code § 51-08.1-08(2) ........................................................................... 40

N.H. Rev. Stat. § 356:8-a ........................................................................................ 64

N.M. Stat. Ann. § 57-12-10(B) ............................................................................... 41

N.M. Stat. Ann. § 57-1-3 ........................................................................................ 40

N.Y. Gen. Bus. Law § 340(5) .................................................................................. 40

N.Y. Gen. Bus. Law § 349 .................................................................................... 69, 70

N.Y. Gen. Bus. Law. § 349(h) ...................................................................................... 41

Neb. Rev. Stat. § 59-828 ............................................................................................... 40

Nev. Rev. Stat. § 598A.040(3)(a) ................................................................................. 65

Nev. Rev. Stat. § 598A.210 .......................................................................................... 40

Or. Rev. Stat. § 646.780 .......................................................................................... 40, 73

Or. Rev. Stat. § 646.780(1)(a) ...................................................................................... 73

Ports and Waterways Safety Act (1972) ....................................................................... 53

R.I. Gen. Laws § 6-13.1-5.2(a) ..................................................................................... 41

R.I. Gen. Laws § 6-36-12(g) ......................................................................................... 52

S.C. Code Ann. § 39-3-30 ............................................................................................. 41

S.D. Codified Laws § 37-1-14.3 .................................................................................... 40

Sherman Antitrust Act (1890) ................................................................................. passim

Tenn. Code Ann. $ 47-25-106 (2001) ........................................................................... 28

U.S. Shipping Act (1984) ....................................................................................... passim

Utah Code Ann. 76-10-3109(7) ..................................................................................... 29

Utah Code Ann. 76-10-3109(8) ..................................................................................... 29

Vt. Stat. Ann. tit. 9, § 2461(b) ...................................................................................... 41

W. Va. Code § 47-18-9 .................................................................................................. 40

## **OTHER AUTHORITIES**

13A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3531.4
    (3d ed.) ...................................................................................................................... 3

Daniel R. Karon, Undoing the Otherwise Perfect Crime, 108 W. Va. L.Rev. 395 ....... 46

Restatement (Third) of Restitution and Unjust Enrichmant § 3 (2011) ......................... 49

Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) ......................... 44

xix

## I.    INTRODUCTION

End-Payor, Automobile Dealer, and Truck and Equipment Dealer Plaintiffs (collectively, "Indirect Purchaser Plaintiffs" or "IPPs") submit this response in opposition to Defendants' consolidated brief in support of their motion to dismiss the IPPs' complaints (the "Complaints"). IPPs brought this litigation to vindicate the rights of those American businesses and consumers who paid artificially inflated prices for international "Vehicle Carrier Services."

Each of the Complaints brought by the IPPs identifies numerous instances of Defendants' unlawful activities. For example, Defendants collusively coordinated price increases. End-Plaintiffs' Second Consolidated Amended Class Action Complaint ("EP-CAC") ¶¶ 125-30; Automobile Dealers Consolidated Second Amended Class Action Complaint ("AD-CAC") ¶¶ 113-40; Truck and Equipment Dealers Class Action Complaint ("TD-CAC") ¶¶ 113. The Complaints similarly detail Defendants' coordinated responses to various customer requests for price reductions. EP-CAC ¶¶ 131-35; TD-CAC ¶¶ 119-23; AD-CAC ¶¶ 119-23 (detailing specific instances). IPPs also allege specific instances whereby Defendants conspired to allocate customers and routes for Vehicle Carrier Services. EP-CAC ¶¶ 136-45; TD-CAC ¶¶ 124-32; AD-CAC ¶¶ 124-32 (detailing specific instances). Additionally, the Complaints detail occasions where Defendants conspired to restrict capacity for Vehicle Carrier Services to drive up prices. EP-CAC ¶¶ 146-48; TD-CAC ¶¶ 133-40; AD-CAC ¶¶ 133-40. Separately, each of the activities is a violation of federal and state antitrust laws, and taken together, these activities demonstrate concerted efforts on the part of Defendants to unlawfully manipulate prices resulting in damages to the Plaintiffs. Finally, to date, two Defendants—CSAV and "K" Line—have pleaded guilty to a global, coordinated antitrust conspiracy spanning over a decade, to fix the prices of international ocean shipping services for roll-on, roll-off ("RoRo") cargo, to and from the United

States, including by allocating customers and routes, and rigging bids.  EP-CAC ¶¶ 7, 149; TD-CAC ¶ 5; AD-CAC ¶ 7

Notwithstanding these numerous, well-pleaded facts, Defendants move this Court to deny American consumers and businesses the ability to pursue their claims under applicable state and federal laws. Dismissing these claims at this stage not only denies IPPs their day in court—it denies IPPs efforts to obtain damages incurred at the hands of alleged conspirators. Respectfully, this Court should deny Defendants' motion for the reasons that follow.

## II.    ARGUMENT

### A.    IPPs Properly Plead Constitutional Standing

"Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*"). *See also Animal Sci. Prods, Inc. v. China Minmetals Corp.*, 2014 WL 3695329, at *16 (D.N.J. July 24, 2014) (quoting *AGC).* In the overwhelming majority of instances when courts consider the constitutional standing of antitrust plaintiffs, the mere existence of harm, and not—contrary to Defendants' claim—the level of detail with which it is alleged, is sufficient to confer constitutional standing.

The pleading standards necessary to allege this harm are lenient "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)

(quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).[1] Moreover, the Third Circuit recently emphasized that those standards are particularly lenient in this Circuit noting that, "[i]n the context of a motion to dismiss, we have held that the '[i]njury-in-fact element is not Mount Everest. The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege [ ] some specific, identifiable trifle of injury.'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278-79 (3d Cir. 2014) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005)) (additional citation omitted).

"Monetary harm is a classic form of injury-in-fact. Indeed, it is often assumed without discussion." *Danvers*, 432 F.3d at 293. *See also* Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.) ("Standing always should exist to claim damages, unless perhaps the theory of damages is totally fanciful."), *quoted in Danvers,* 432 F.3d at 291. IPPs' theory of damages in this case is not even marginally fanciful; rather, it is plain common sense.

> The OEMs [who purchase Vehicle Carrier Services directly from Defendants] and dealers have thin net margins, and are therefore at the mercy of their input costs, such that increases in the price of Vehicle Carrier Services lead to corresponding increases in prices for new, assembled motor vehicles at the OEM and dealer levels. When downstream distribution markets are highly competitive, as they are in the case of new, assembled motor vehicles shipped by Vehicle Carrier, overcharges are passed through to … indirect-purchaser Plaintiffs and the members of the Classes.

EP-CAC ¶ 182; *see also* TC-CAC ¶ 157; AD-CAC ¶ 172 (alleging pass through).

Defendants' claim that "[t]he [EPPs'] complaint alleges *only* that each of them "purchased Vehicle Carrier Services indirectly from one or more Defendants' is patently wrong.

---

[1] *See also Bennett v. Spear*, 520 U.S. 154, 168 (1997) ("[I]t is easy to presume specific facts under which petitioners will be injured" where they allege amount of water available to them will be reduced) (citing *Lujan,* 504 U.S. at 561).

3

*See* Def. Mem. at 8 (emphasis added).[2]   So too are Defendants' claims that the Automobile Dealers and Truck and Equipment Dealers complaints are wholly lacking in necessary detail. As detailed above, the IPPs sufficiently alleged that they have suffered damages, and thereby demonstrated constitutional standing.

The fact that constitutional standing "is often assumed without discussion" when plaintiffs allege monetary damages explains in part why Defendants cite no cases in which plaintiffs alleging details remotely comparable to those IPPs allege were denied standing. Indeed, courts in this Circuit and others have repeatedly found that plaintiffs who alleged minimal details as to antitrust damages satisfied constitutional standing. *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases)* is particularly instructive. *See* No. 12–md–02311, 2013 WL 2456612, (E.D. Mich. June 6, 2013) ("*In re Wire Harness*") The *Wire Harness* defendants, like those here, proffered a laundry list of details they claimed indirect plaintiffs were required to allege. *See* Def. Mem. at 8. The court disagreed:

> Indirect Purchaser Plaintiffs have alleged that Wire Harness Systems "follow a traceable physical chain of distribution" from Defendants to Plaintiffs and "any costs attributable to wire harness systems can be traced through the chain of distribution to Plaintiffs and members of the Classes." They have met their pleading obligations. The shortcomings identified in Collective Defendants' laundry list of missing allegations are allegations addressing how OEMs price their vehicles and how the price of component parts affects the price of the finished vehicle: including, how estimated demand impacts price; whether OEMs simply absorb the overcharges by reduced profit margin on each vehicle; and whether OEMs sometimes sell cars below cost of production because of

---

[2] *See also* EP-CAC ¶¶ 185-87 (explaining how economists can quantify EPPs' damages), 188 ("[EPPs] and [others] have sustained injury to their businesses or property, having paid higher prices for Vehicle Carrier Services than they would have paid in the absence of the Defendants' . . . conspiracy, and, as a result, have suffered damages"); TD-CAC 179-88 (alleging similar facts); AD-CAC ¶¶ 172-81 (same). *Cf.* Def. Mem. at 8 (EPPs "do not specify . . . how [their] purchase[s of new vehicles are] linked to defendants' sale of vehicle carrier services, or the form their harm took") & 10-11 (claiming, erroneously, similar shortcomings with respect to Automobile Dealer and Truck and Equipment Dealer complaints).

> competition. The shortcomings may provide a basis for Collective Defendants to prevail on a motion for summary judgment, but do not provide a basis for dismissal under Rule 12(b)(6).

*In re Wire Harness*, 2013 WL 2456612, at *9 (citations omitted).

The court added: "Because . . . EPPs are indirect purchasers, their complaints must include two allegations: (1) Collective Defendants overcharged the direct purchasers; and (2) some or all of the overcharge was passed on to them through each of the various intermediate levels of the distribution chain." *Id.*, at *8. IPPs in this case have more than complied with this requirement. Further, Defendants here, as in *Wire Harness*, "have cited no authority requiring an indirect purchaser to allege the detailed mechanics of the pass-through process to plead injury-in-fact and causation for purposes of constitutional standing to survive a Rule 12(b)(6) motion." *In re Wire Harness*, 2013 WL 2456612, at *8.

In this Circuit, the plaintiffs in *Byers v. Intuit, Inc.*, alleged only a single sentence as to their purchases and a single sentence as their damages in support of their antitrust claims. 564 F.Supp.2d 385, 400-01 (E.D. Pa. 2008). That was all that was necessary:

> Despite their lack of specificity, the above-quoted paragraphs of the First Amended Complaint show that Plaintiffs have adequately alleged that they have suffered injuries in fact (i.e., the fees that Defendants charged them and the proposed class, and the higher prices they had to pay because of Defendants' allegedly anticompetitive conduct), that Defendants caused their injuries, and that their injuries likely are redressable by a judgment in their favor in the form of damages and/ or injunctive relief. Since I must accept these allegations as true, Plaintiffs have met their burden with respect to the three prongs of the Lujan test, and have established constitutional standing for both of their claims at this early stage of their action. The Corporate Defendants' facial challenge to Plaintiffs' constitutional standing therefore fails.

*Id.* at 401 (citing *Lujan,* 504 U.S. at 560-61).

5

Finally, the court in *In re Processed Egg Products Antitrust Litig.* (*"Eggs"*) found that indirect purchaser plaintiffs established constitutional standing based on allegations substantially indistinguishable from IPPs' allegations here:

> [T]he Article III constitutional standing criterion is met here as to the [state] antitrust claims. The [pending complaint] alleges that the named Plaintiffs paid artificially inflated prices for eggs because of the Defendants' conspiracy. That is, the named Plaintiffs allegedly personally purchased eggs at artificially inflated prices—a monetary injury—which constitutes actual harm. After all, "[m]onetary harm is a classic form of injury in fact. Indeed, it is often assumed without discussion." Furthermore, this injury purportedly was caused by the Defendants' alleged conspiratorial conduct which named Plaintiffs complain violated the four states' laws.

> This injury can be redressed, if granted, by the relief sought by named Plaintiffs, which includes, inter alia, monetary damages to compensate for their financial harm as a result of conspiracy.

851 F.Supp.2d 867, 887 (E.D. Pa. 2012) (citations omitted) (footnote omitted). So it is in this case.

In the few cases Defendants cite in this context, the plaintiffs relied on allegations that were far less detailed than IPPs'. For example, after the Court dismissed their initial complaint, the plaintiffs in *Luxama v. Ironbound Exp., Inc.*, charged defendants with violating federal truth-in-leasing regulations, and then simply failed to respond when defendants claimed they lacked constitutional standing. No. 11-cv-2224, 2013 WL 3286081, at *1, *8-*9 (D.N.J. June 27, 2013). The Court dismissed the claim because the plaintiffs were silent as to "how they sustained actual damages as a result of the alleged violations," claiming damages in fragments of two sentences which failed to connect those damages to the alleged violations. *Id.* at *10.

The sole indirect purchaser plaintiff whose claim was dismissed in *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litigation* did not allege or could not document having purchased the defendants' products, directly or indirectly, during the period in which the

6

conspiracy transpired.[3] 2013 WL 5503308 (D.N.J. Oct. 2, 2013). By comparison, IPPs' extensive allegations in this case sufficiently demonstrate constitutional standing.[4]  The Court should reject Defendants' constitutional standing argument.

### B.    Plaintiffs Have Sustained Antitrust Injury

Defendants do not, and can not, challenge whether IPPs have sustained an "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1989). IPPs allege a classic horizontal price-fixing conspiracy that caused economic harm in the form of higher prices they paid for the exact service which was illegally fixed and/or raised due to bid rigging. *See, e.g.,* EP-CAC ¶¶ 1, 5, 9, 10, 188; TD-CAC ¶¶ 1, 8, 9, 10, 164; AD-CAC ¶¶ 1, 5, 9, 10, 178.

Defendants challenge whether IPPs have sufficiently pleaded antitrust injury, *i.e.*, whether IPPs' injury "flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. But this requirement is always met when under state indirect purchaser laws the plaintiff in the chain of distribution pays an inflated price for a good or service. Alternatively, the pleading is adequate if it indicates that "there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy.'" *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d

---

[3] *Id.*, 2013 WL 5503308, at *21; Ex. 6, Rule 12(b)(6) Br. of Def. McWane and Sigma, *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litigation*, No. 12-169 (D.N.J.) (filed June 17, 2013), at 12-13; Ex. 7, Rule 12(b)(6) Br. of Def. Star Pipe, *n re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litigation*, No. 12-169 (D.N.J.) (filed June 17, 2013), at 5.

[4] *See also Oxbow Carbon and Minerals LLC v. Union Pacific R.R. Co.*, 926 F.Supp.2d 36, 43 (D.D.C. 2013) (plaintiffs failed to allege which of them paid overcharges); *National ATM Council, Inc. v. Visa Inc.*, 922 F.Supp.2d 73 (D.D.C. 2013) (plaintiffs drew "absolutely no connection between" defendants' violation and harm to plaintiffs).

Cir. 1993) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)). *See also Warfarin*, 214 F.3d at 399 (with respect to the alleged "injury," the plaintiff need only be "a foreseeable victim of the antitrust violations") (citing *McCready*, 457 U.S. at 475); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010).

Defendants devote several pages insisting that because IPPs are not consumers in the same market as Defendants, IPPs could not possibly have sustained antitrust injury. *See* Def. Mem. at 13-19. But, as Defendants themselves acknowledge, IPPs need not, and normally will not, be in the same market as Defendants but sustain injury as consumers who had to pay the illegally caused overcharge.[5] Def. Mem. at 19-20. Alternatively, as long as the harm to IPPs is "inextricably intertwined" with the conspiratorial conduct, IPPs may claim antitrust injury. That is precisely what IPPs have pleaded here.

> **1.    An Indirect Purchaser Sustains Antitrust Injury When it Purchases a Finished Product Containing a Price-Fixed Component or Accompanied by a Service Charge**

A number of courts have recognized antitrust injury in cases where the IPPs have purchased a finished product containing a price-fixed component part. These cases are directly analogous to the instant case, where IPPs "paid artificially inflated prices for Vehicle Carrier Services incorporated into the price of new Vehicles." TD-CAC ¶ 10; AD-CAC ¶ 10; EP-CAC ¶ 10. Nor are services analyzed any differently. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 43 (D.D.C. 2008) *aff'd sub nom. Fayus Enterprises v. BNSF Ry. Co.*,

---

[5] In *Carpet Group International v. Oriental Rug Importers Assoc., Inc.*, the Third Circuit found that the plaintiff carpet brokers had suffered antitrust injury at the hands of an association of importers/wholesalers of oriental rugs. 227 F.3d 62 (3d Cir. 2000) *See also D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 491 (E.D. Pa. 2006) (indirect purchaser plaintiffs found to have antitrust standing where defendants fixed price of plastic additives, and plaintiffs had purchased products containing plastic additives).

602 F.3d 444 (D.C. Cir. 2010) (holding that indirect purchasers of rail freight services had standing to pursue injunctive relief for antitrust violations, and rejecting damages claims on the basis of preemption, not indirect purchaser status); *Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc.*, 61 F. Supp. 2d 1092, 1097 (D. Haw. 1999) (construing Hawaii's antitrust law to allow claims by an indirect purchaser of container costs incorporated in shipping costs). "Vehicle Carrier Services are identifiable, discrete services that remain essentially unchanged when incorporated into the cost of Vehicles sold to Plaintiffs and the members of the Auto Dealer Classes." AD-CAC ¶ 175. *See also* TD-CAC ¶ 161; EP-CAC ¶¶ 180-88. Plaintiffs have paid the inflated price for vehicle carrier services, which are directly traceable because Defendants charged shippers on a per-car basis. EP-CAC ¶¶ 82, 88; AD-CAC ¶ 74; TD-CAC ¶ 73. Defendants' Vehicle Carrier Services are a component of the vehicle cost, as are wire harnesses and other auto parts.

In previous component-part cases, indirect purchaser plaintiffs pleaded – and the courts found adequate – that the markets for the component and the finished product are inextricably intertwined, that the demand for the finished product creates the demand for the component; that the component market exists to serve the finished product market; the component has little to no value outside of the finished product; and that the conduct affects the finished product in a traceable way. *See D.R. Ward Constr. Co.*, 470 F. Supp. 2d at 491 (indirect purchasers found to have antitrust standing where they alleged "that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives"). *Compare* AD-CAC ¶¶ 174-76; TD-CAC ¶¶ 158-62; EP-CAC ¶¶ 180-88.

For example, a recent spate of decisions in *In re: Automotive Parts Antitrust Litigation*

involve claims brought by indirect purchasers, both end-users and automobile dealers, against defendant manufacturers for fixing the price of various component parts of automobiles. *In re: Automotive Parts Antitrust Litigation*, Master No. 12-md-02311 (E.D. Mich.) (Battani, J.). *See In re: Wire Harness* 2013 WL2456612; *In re: Instrument Panel Clusters*, 2:12-cv-00202 and 203, 2014 U.S. Dist. LEXIS 90724 (E.D. Mich. July 3, 2014); *In re: Fuel Senders*, No. 12-cv-00302 and 303, 2014 U.S. Dist. LEXIS 90738 (E.D. Mich. July 3, 2014); *In re: Heater Control Panels*, No. 2:12-cv-00402 and 403, 2014 U.S. Dist. LEXIS 90746 (E.D. Mich. July 3, 2014); *In re: Bearings*, No. 12-cv-00502 and 503, 2014 U.S. Dist. LEXIS 136404 (E.D. Mich. Sept. 25, 2014); *In re: Occupant Safety Systems*, No. 12-cv-00602 and 603, U.S. Dist. LEXIS 136403 (E.D. Mich. Sept. 25, 2014).  The plaintiffs in each of these cases purchased the component parts indirectly from defendants as part of their purchase or lease of a new vehicle and allege that they were injured because a portion of the overcharge resulting from a bid-rigging conspiracy was passed through the distribution chain to them. *See, e.g., In re Wire Harness*, 2013 U.S. Dist. LEXIS 80338 at *30-31.

In support of their claims, the *Auto Parts* plaintiffs alleged that the market for the component part and the market for vehicles are "inextricably intertwined and interlinked" because the market for the component exists to serve the vehicle market; without vehicles, the component "would have little to no value because they have no independent utility;" the demand for vehicles creates the demand for the component; and the component remains unchanged after incorporation into the vehicle[6]. *See, e.g., Wire Harness*, 2013 U.S. Dist. LEXIS 80338 at *66. The plaintiffs alleged that they were injured because a portion of the overcharge resulting from a conspiracy was passed through the distribution chain to them. *See id.* at *31. Taking these

---

[6] The allegations are substantially the same in each *Auto Parts* case.

allegations together, the court concluded that "[t]hese allegations sufficiently allege the existence of an antitrust injury." *Id.*

Similarly, in *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, one of the earliest component part cases, the indirect purchaser plaintiffs alleged that the defendants fixed prices for LCDs. 586 F. Supp. 2d 1109 (N.D. Cal. 2008)  The plaintiffs, who purchased finished products containing the price-fixed LCDs, asserted antitrust and various state law claims against defendants. *Id.* at 1113-1114. The court rejected the defendants' antitrust injury argument given plaintiffs' allegations that the markets for LCDs and LCD products were "'inextricably linked and intertwined because the LCD panel market exists to serve the LCD products market.'" *Id.* at 1123 (citing complaint). Plaintiffs also alleged that LCDs "'have no independent utility, and have value only as components of other products…. The demand for LCD panels thus derives from the demand for such products.'" *Id.* (citing complaint). Whether or not the plaintiffs participated in the LCD market through their purchases of LCD products, or whether the plaintiffs participated in a distinct market for finished products, "the Court found that plaintiffs' allegations were sufficient at this stage to weigh in favor of standing under the first factor [antirust injury] of *AGC*." *Id.*

In *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, indirect purchaser plaintiffs alleged that the defendants engaged in a conspiracy to fix the prices of CRTs. No. C-07-5944, 2013 U.S. Dist. LEXIS 119598, at *71 (N.D. Cal. 2013). Like the plaintiffs in *Flat Panel*, the *CRT* plaintiffs claimed that they sustained injury when they purchased finished products containing CRTs. In support of their allegations, the plaintiffs averred that the market for CRTs and the market for CRT products were inextricably intertwined. *Id.* Further, the plaintiffs alleged that "CRTs are discrete, identifiable parts of the CRT Product's supply chain, such that any CRT-

related prices and overcharges can be traced along with the physical CRT down a chain of causation from allegedly anticompetitive conduct to antitrust injury." *Id.*

> The Court f[ound] that where a product like a CRT itself is virtually valueless on its own, and the markets for CRTs themselves and CRT products are plausibly pled to be inextricably intertwined, a plaintiff adequately pleads an antitrust injury when the alleged anti-competitive activity surrounding a component affects the market for a finished product in a traceable way.

*Id.*

### 2. IPPs' Harm is Inextricably Intertwined with the Harm Caused by Defendants' Conspiracy under Federal Law

The similarities between the foregoing cases and the instant litigation are striking. First, IPPs allege that the purpose of Defendants' conduct was to fix, raise, maintain and/or stabilize prices of, and to allocate the market and customers for, Vehicle Carrier Services (the component "part"). *See, e.g.,* EP-CAC ¶¶ 1, 5, 9; TD-CAC ¶¶ 1, 8, 9; AD-CAC ¶¶ 1, 5, 9. As a direct and foreseeable result of such conspiratorial conduct, the price of new, assembled motor vehicles (the finished product) shipped by Vehicle Carriers was similarly affected. *See, e.g.,* EP-CAC ¶¶ 10, 15, 17, 184, 188, 203-207; TD-CAC ¶¶ 10; 164-66; AD-CAC ¶¶ 18, 178-181. These are precisely the type of allegations made by the indirect purchaser plaintiffs in *Flat Panel*, *CRT,* and *Auto Parts*. Moreover, IPPs are end-users and automotive and truck and equipment dealers, just like the plaintiffs who were found to have sustained antitrust injury in *Auto Parts*.

Second, the market for Vehicle Carrier Services and the market for new, assembled motor vehicles are "inextricably linked and intertwined" because the market for Vehicle Carrier Services "exists to serve the vehicle market." EP-CAC ¶ 181; TD-CAC ¶ 160; AD-CAC ¶ 174. That is, the demand for the finished product, new, assembled motor vehicles creates the demand for the component, Vehicle Carrier Services; without such demand, Vehicle Carrier Services have

12

little to no value. EP-CAC ¶ 181; TD-CAC ¶ 160; AD-CAC ¶ 174. Moreover, without the motor vehicles, the Vehicle Carrier Services "have little to no value because they have no independent utility."  EP-CAC ¶ 181; TD-CAC ¶ 160; AD-CAC ¶ 174. *See, e.g., CRT*, 2013 U.S. Dist. LEXIS at *71.

Finally, the price increases can be traced. *See, e.g., id.* Defendants provided Vehicle Carrier Services – at supra-competitive rates – to original equipment manufacturers ("OEMs") for the transportation of new, assembled motor vehicles. EP-CAC ¶ 90; TD-CAC ¶ 162; AD-CAC ¶¶ 67, 176. The rates for Vehicle Carrier Services were set on a per unit basis (*e.g.,* rates for newly assembled motor vehicles are typically set by a "per car" price). EP-CAC ¶ 88; TD-CAC ¶ 73; AD-CAC ¶ 74.  Because of thin net margins in the motor vehicle industry, any increase in price of Vehicle Carrier Services leads to a corresponding increase in prices for new, assembled motor vehicles at the OEM and dealer levels. EP-CAC ¶ 182.

The supra-competitive rates charged by Defendants to OEMs for Vehicle Carrier Services inflate the price paid at each stage of the distribution chain, including those paid by dealers, and purchasers, and lessees of new, assembled motor vehicles. EP-CAC ¶¶ 180, 182; TD-CAC ¶¶ 162, 165; AD-CAC ¶¶ 68, 175-176.  The precise amount of the overcharge impacting the prices of new, assembled motor vehicles shipped by Vehicle Carrier can be measured and quantified using well-accepted econometric models. EP-CAC ¶ 187.

Based on these allegations, IPPs have stated claims for antitrust injury. IPPs' injury "flows from that which makes the [D]efendants' acts unlawful," *Brunswick*, 429 U.S. at 489, and Plaintiffs' allegations establish the necessary causal link between the conspiratorial behavior of

Defendants and the harm suffered by Plaintiffs.[7]  The fact that the component "part" here is not a physical good but a discrete service changes nothing in the analysis. *Cf* Def. Mem. at 17-18 (contending that Vehicle Carrier Services are not true component parts because they have already been sold and consumed by others). The critical point is not whether the component is a physical good or a specific service but, rather, *whether the component is traceable so that a causal connection between the conspiracy and the anti-competitive behavior is satisfied. Lorix v. Crompton Corp.*, 736 N.W. 2d 619, 633-34 (Minn. 2007).

Nor is IPPs' harm derivative. *Cf* Def. Mem. at 14-17 and 15 n.9 (contending that IPPs' harm is derivative and does not flow from the purchase of Vehicle Carrier Services).[8] Defendants rely upon *Southard v. VISA U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007), and other VISA cases, all of which are extremely factually and legally different from this case. In *Southard*, the plaintiffs accused VISA and MasterCard of a tying arrangement whereby the defendants required all merchants who accepted their credit cards to also accept their debit cards.

---

[7] Defendants' heavy reliance on the *West Penn* formulation of antitrust injury, particularly the statement restricting recovery in part to "those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends," 627 F.3d at 102, elevates semantics over substance. Whether one uses the *West Penn* formulation, the *Gulfstream III* formulation ("if there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy"), 995 F.2d at 429, or the *Warfarin* formulation (plaintiff need only be "a foreseeable victim of the antitrust violations"), 214 F.3d at 399, the inquiry boils down to a simple question of whether IPPs' injury is so causally related to the conspiratorial acts that it requires compensation under the antitrust laws. Here, given the intertwined nature of the markets and the other facts alleged, *supra*, there should be no question, particularly at this early stage of the litigation, that IPPs have satisfied the injury requirement.

[8] Defendants raise this argument in the context of addressing whether Plaintiffs are consumers in the same market as Defendants. *See* Def. Mem. § III.B.1.(a). As noted above, Plaintiffs need not be participants in the same market as Defendants in order to demonstrate antitrust injury. *Supra* at Section II.B and n.5. However, because Defendants' argument touches upon whether the harm sustained by Plaintiffs was causally related to Defendants' conspiratorial acts, Plaintiffs address it herein.

14

Merchants had to pay inflated fees for processing debit transactions, with the increased fees being passed along to all consumers in the form of higher prices for goods sold (regardless of whether that consumer used credit cards at the merchants' stores). *Id* at *194. Unlike this case, the *Southard* plaintiffs "did  not purchase, directly or indirectly, the product that is the subject of anticompetitive activity by  Visa and MasterCard." *Id.* at 196-99 (plaintiffs are not indirect purchasers because they are "not in the chain of distribution"); *Kanne v.  Visa U.S.A. Inc.,* 723 N.W.2d 293, 298-99 (Neb. 2006) (same). Here, the IPPs indirectly purchased the product, the service to ship the purchased vehicle, which is the subject of the anticompetitive activity by Defendants when they purchased the vehicle subject to the overcharge.

Moreover, the traceability of the damages in *Southard* and the VISA cases was an enormous problem. As observed by the Minnesota Supreme Court in *Lorix*, "overcharges from Visa and Mastercard would need to be traced through _every_ merchant to _every_ good purchased by _every_ consumer in the state of Minnesota." 736 N.W.2d at 632 (emphasis added). Similarly, the plaintiffs in *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co*. "defined the relevant market to include *every product in the United States that contains titanium dioxide*." No. 13-CV-01180-BLF, 2014 WL 4774611, at *8 (N.D. Cal. Sept. 22, 2014). And in *In re Refrigerant Compressors Antitrust Litig.*, the plaintiffs failed to make any allegations regarding whether direct purchasers passed on the defendants' overcharges. No. 2:09-md-02042, 2013 WL 1431756, at *14 (E.D. Mich. Apr. 9, 2013). Here, the traceability of the overcharge is much simpler. In this case, Vehicle Carrier Service charges affect a single, discrete set of products (automobiles, trucks, and certain heavy equipment), shipped by vehicle carriers operated by Defendants and purchased by the IPPs–not every good purchased with a Visa or Mastercard.

Accordingly, Plaintiffs have stated an antitrust injury under the Sherman Act.

15

### 3.    IPPs Have Pleaded Antitrust Injury under Relevant State Laws

The prudential standing requirements for state antitrust claims asserted in federal court are governed by state law. *D.R. Ward*, 470 F. Supp. 2d at 494 (courts look to the relevant state antitrust statute to evaluate prudential standing concerns). Evaluation of the standing limitations, which includes the requirement of antitrust injury, "requires an inquiry into the text of the relevant state antitrust statute, the judicial decisions determining who may sue under these statutes, including the treatment of federal precedent regarding standing for violations of the Sherman Act and the Clayton Act, and the reasoning behind these decisions." *Id.*

Federal courts are bound by the decisions of a state's highest court when deciding questions of federal law. *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir. 1996). In the absence of such guidance, federal courts are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Id.* (citing *McKenna v. Pacific Rail Serv.*, 32 F.3d 820, 825 (3d Cir. 1994)); *Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991).

Here, with regard to those states which explicitly adopt the *AGC* standing requirements in connection with state antitrust claims, IPPs have satisfied the antitrust injury component of such claims. IPPs have pleaded a *per se*, horizontal price-fixing conspiracy. EP-CAC ¶¶ 1, 5, 9, 10, 188; TD-CAC ¶¶ 1, 8, 10, 163-64; AD-CAC ¶¶ 1, 5, 9, 10, 178.  IPPs have also alleged sufficient facts consistent with a component part theory of antitrust injury at this early stage of the litigation. *See generally* EP-CAC ¶¶ 179-188; TD-CAC ¶¶ 157-66; AD-CAC ¶¶ 172-181.

However, not every state has adopted *AGC. Infra* at Section B.4.(b). Moreover, not every state has adopted an antitrust injury requirement, or an antitrust injury requirement that is co-extensive with federal law. *Accord In re: Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420,

2014 U.S. Dist. LEXIS 141, *75-76 (N.D. Cal. October 2, 2014) ("It is one thing for a court to observe the existence of *some* limit to indirect-purchaser standing; it is quite another to say that a state has affirmatively adopted the particular calibration of limits embodied in *AGC*."). The fact that a state court may look to federal law for guidance does not mean that the state court is adopting federal law wholesale and without modification. *Id.* at *77 (citing *Strang v. Visa U.S.A., Inc.*, 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005)).

> Such modification may consist of, for example, a loosening of requirements of directness, *a greater tolerance for the existence of other parties who may bring suit*, or lessened concern over duplicative recoveries (the risk of "a little slopover on the shoulders of the wrongdoers" that *Illinois Brick* famously found unacceptable.

*Id.* at *77 (emphasis added) (quoting 431 U.S. at 731 n.11). If anything, state antitrust requirements are likely to be more lax than federal requirements because, unlike federal law, they permit indirect purchaser plaintiffs to recover economic damages for their injuries in contrast to federal antitrust law.

Defendants also errantly cite to state high court decisions (Ex. A to Def. Mem.) as well as lower court decisions and other authorities (Ex. B. to Def. Mem.) to support their argument that IPPs' alleged inability to satisfy the federal antitrust injury requirement is likewise fatal to their state antitrust claims.[9]   Def. Mem. at 21. Plaintiffs respond to Defendants' largely inapplicable

---

[9] Some of the authority cited by Defendants is particularly inapt. For example, Defendants cite *Franklin County. Sheriff's Office v. St. Albans City Police Department.*, 192 Vt. 188, 58 A.3d 207 (2012), for the proposition that a plaintiff must prove antitrust injury. Def. Mem. Ex. A at 3. But a close reading of that case indicates that the court never reached that issue:  "Because we conclude that the [plaintiff] does not have constitutional standing, *we need not reach the issue of whether the [plaintiff] is required to prove so-called antitrust standing*." *Id.* at 194, 58 F.3d at 212 (emphasis added). *Princeton Insurance Agency Inc. v. Erie Insurance Co.*, 225 W. Va. 178, 690 S.E.2d 587 (2009), cited by Defendants (Def. Mem. Ex. A at 3), merely states the "unremarkable principle that personal economic injury without injury to competition does not suffice as 'antitrust injury'"" *Lithium Batteries*, 2014 U.S. Dist. LEXIS 141348, at *77 (quoting

authority in Exhibit 1 to IPPs' Response. *See Lithium Batteries,* 2014 U.S. Dist. LEXIS 141348 at *83 (concluding that, except for Nebraska, New Mexico, and Nevada, "authority is too uncertain to conclude that they would apply *AGC* without any modification, making indirect-purchaser standing more readily available").

### 4. The IPPs' Injuries Are Not Too Remote, and the *AGC* Factors Do Not Apply to the State Law Claims

Defendants' argument that the IPPs' injuries are "too remote" to confer antitrust standing under federal and state law under *AGC*, is legally and factually flawed. First, *AGC* addressed direct purchaser claims under federal antitrust law and does not directly address standing under state laws specifically designed to permit indirect purchaser recovery. Second, assuming *AGC* applies, Defendants distort the IPPs' allegations in an attempt to demonstrate that the *AGC* factors require dismissal. The actual, factual allegations demonstrate that Defendants' supra-competitive per-unit shipping prices were directly incorporated dollar-for-dollar into the new vehicle prices paid by the IPPs.

#### (a) Defendants' Reliance on Harmonization Provisions is Misplaced

Defendants' argument—that *AGC* implicitly applies to state law indirect purchaser claims—would defeat the specific intent of the state legislatures enacting *Illinois Brick* repealer statutes and other consumer protection laws. The Supreme Court has cautioned,

> It is one thing to consider the congressional policies identified in *Illinois Brick* and *Hanover Shoe, Inc. v. United Shoe Machinery Corp*, 392 U.S. 481 (1968), in defining what sort of recovery federal antitrust law authorizes; it is something

---

*Princeton Ins. Agency Inc.*, 225 W. Va. at 189-90). It does not, however, assist in identifying the proper plaintiff for claiming such injury; indeed, it "does not engage meaningfully with the question of antitrust standing at all." *Id.*

18

altogether different, and in our view inappropriate, to consider them as defining
what federal law allows States to do under their own antitrust law.

*California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989) ("*ARC*"). Likewise, it would be

inappropriate to apply the federal *AGC* concepts to state indirect purchaser claims at issue here.

Doing so would be contrary to the Supreme Court's admonition that federal law does not

abrogate the states' ability "to allow indirect purchasers to recover under their own antitrust

laws." *Id.*

Ignoring how the state courts have interpreted their own indirect purchaser laws,

Defendants argue that harmonization provisions in the various state laws mandate application of

the *AGC* factors. *See* Def. Mem. at 26-29, Ex. D (citing mandatory harmonization provisions),

Ex. F (citing permissive harmonization provisions). Such a simplistic approach is contrary to the

Supreme Court's admonition that federal law does not define what states can do under their own

antitrust law. *ARC,* 490 U.S. at 103.

Several courts, moreover, have repeatedly rejected this type of argument, holding that

harmonization provisions alone do not mandate *AGC*'s application to state indirect purchaser

claims. *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009)

("**Flash Memory**") ("This Court, however, is reticent to adopt an across-the-board rule that a

state's harmonization provision, whether created by statute or common law, is an appropriate

means of predicting how a state's highest court would rule regarding the applicability of *AGC* to

state law antitrust claims"). As these courts have noted, a state-by-state analysis is necessary. *See*,

*e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal.

2010) ("**CRT**") (finding that *AGC* factors did not apply to the antitrust laws of Arizona, Kansas,

Michigan, Minnesota, Mississippi, Nevada, New Mexico, North Carolina, North Dakota, South

Dakota, Tennessee, Vermont, West Virginia, and Wisconsin); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009) (declining to find *AGC* applicable to plaintiffs' Kansas and Michigan antitrust claims). Tellingly, Defendants' brief omits a state-by-state analysis.[10]   IPPs respond to Defendants' Exhibits D, E, and F in Exhibit 2 to IPPs' Response.

> **(b)      A State-by-State Analysis Establishes that *AGC* Does Not Apply to the IPP Claims in This Case**

As noted above, "[t]he prudential standing requirements for state antitrust claims asserted in federal court are governed by state law." *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. CIV. 12-169, 2013 WL 5503308, at *14 (D.N.J. Oct. 2, 2013) (**"DIPF"**) (citing *D.R. Ward Constr. Co. v. Rohm and Haas Co.,* 470 F.Supp.2d at 494).

> [B]ecause the concept of prudential standing in the antitrust context is intertwined with the substantive content of and intent behind the particular statute authorizing the cause of action, the standing requirements of [state] antitrust statutes, which recognize indirect purchaser claims, should be a guide for determining whether prudential considerations permit a plaintiff to sue under those statutes, *as opposed to those requirements engrafted by federal case law onto federal antitrust statutes, which do not recognize indirect purchaser claims*.

*Id.* (citations and internal quotations omitted) (emphasis added). Because prudential standing requirements are based upon state law, "[t]he Court must evaluate the standing limitations associated with each state antitrust statute." *Id.* (citations and internal quotations omitted). This evaluation "requires an inquiry into the text of the relevant state antitrust statute, the judicial decisions determining who may sue under these statutes, including the treatment of federal precedent regarding standing for violations of the Sherman Act and the Clayton Act, and the

---

[10]   Rather than conducting a state-by-state analysis in their brief, Defendants simply attach exhibits with case cites and cursory parentheticals that they contend support application of the *AGC* factors to a given state's indirect purchaser claims. *See* Def. Mem. at 27 n. 16 (referring to Ex. C); *id.* at 29 n. 22 (referring to Ex. G); *id.* at 29 n. 23 (referring to Ex. H). IPPs respond to Defendants' Exhibits C, G, and H in Exhibits 3 and 4 to IPPs' Response.

reasoning behind these decisions." *Id.* (citations and internal quotations omitted).

Here, Defendants selectively discuss cases from Nebraska and Iowa, asserting that these two decisions provide "useful guidance" for all of the "other states." This argument is unavailing. Def. Mem. at 25. The Iowa and Nebraska decisions are inapposite, as are the other state court decisions cited in cursory fashion in Defendants' appendices. *See* Def. Mem. at Exs. C, G, and H (citing cases that purportedly applied *AGC* to state law claims). As explained below, *AGC* is contrary to the plain text of several of the statutes governing the indirect purchaser claims, and several state and federal courts applying state law have expressly or impliedly rejected the proposition that *AGC* governs the standing inquiry under the state's indirect purchaser laws.

*__Arizona__*. Defendants have not established that *AGC* applies to Arizona indirect purchaser claims, nor can they. In *Bunker's Glass v. Pilkington PLC*, 75 P.3d 99, 106 (Ariz. 2003), the Arizona Supreme Court rejected application of *AGC,* holding that the harmonization provision in the state's indirect purchaser statute was *not* meant to apply to "procedural matters such as who may bring action for injuries." Indeed, the court critized the dissent's attempt to engraft the "antitrust injury" analysis set forth in *Illinois Brick* and *AGC* onto the state law claims. *Id. See also In re G-Fees Antitrust Litig.*, 484 F. Supp. 2d 26, 38 (D.D.C. 2008) (acknowledging *Bunkers' Glass*); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (**"GPU"**) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (**"TFT-LCD"**) (same).[11] Accordingly, *AGC* does not apply to the Arizona indirect purchaser claims.

---

[11] Defendants cite *Luscher v. Bayer*, CV 2004-014835, 2005 WL 6959406, at *1-2 (Ariz. Super. Ct. Sept. 14, 2005), but fail to explain how that trial court decision supersedes the Arizona Supreme Court decision in *Bunker's Glass*.

*__California__*. Contrary to Defendants' argument, *AGC* does not apply to California indirect purchaser claims. In *Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15, 20 (Cal. 1984), the California Supreme Court recognized that its repealer statute "incorporates . . . the view of the dissenting opinion in *Illinois Brick* . . . that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution."  Likewise, in *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 782 (Cal. App. 2010), the California appellate court noted that its repealer statute "fully embraced the *Illinois Brick* dissent," which stated that "the brunt of antitrust injuries is borne by indirect purchasers, often ultimate consumers of a product, as increased costs are passed along the chain of distribution." *See also Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1811 (1995) (determining antitrust standing without reference to *AGC*); *id.* at 1223 (scope of "antitrust injury" under Cartwright Act is broader than federal law); *Knevelbaard Daries v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000) ("[T]he more restrictive definition of 'antitrust injury' under federal law does not apply to [Cartwright Act] section 16750.").[12] Accordingly, *AGC* does not apply to the California indirect purchaser claims.

*__District of Columbia__*. Defendants' argument that *AGC* applies is particularly dubious with respect to the District of Columbia's indirect purchaser statute. It provides, "[a]ny indirect purchaser in the chain of . . . distribution . . . upon proof of payment of . . . any . . . overcharge . . . shall be deemed to be injured" D.C. Code § 28-4509(a). Applying the *AGC* factors

---

[12] Defendants' reliance on *Vinci v. Waste Mgmt. Inc.*, 36 Cal. App. 4th 1811, 1814 (Cal. Ct. App. 1995), is misplaced because that case did not involve a downstream consumer's claim. Downstream indirect purchaser claims are allowed under the Cartwright Act. *See Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) ("The inferences we draw from the Legislature's actions and responses to developments in federal antitrust law, as well as its actions in enacting and amending the Cartwright Act over the years, all point in the same direction: For state antitrust purposes, the *Hanover Shoe* rule should apply even as indirect purchasers are allowed to sue.").

notwithstanding proof of payment of an overcharge would be contrary to this directive. *See Holder v. Archer Daniels Midland Co.*, No. 96-2975, 1998 WL 1469620, at *2 (D.C. Super. Ct. Nov. 4, 1998) ("The language of this provision, referring to "any" indirect purchaser, does not distinguish among indirect purchasers based on the number of hands through which the product has passed."). Accordingly, *AGC* does not apply to the District of Columbia indirect purchaser claims.

*__Hawaii__*. Defendants do not cite any authority for the proposition that *AGC* applies to Hawaii indirect purchaser claims. Indeed, the Hawaii Supreme Court has declared that it has never "expressly applied the *AGC* analysis to unfair methods of competition claims arising under HRS chapter 480." *Davis v. Four Seasons Hotel Ltd.*, 228 P.4d 303, 324 n. 33 (Haw. 2010). Moreover, Hawaii's antitrust laws specifically account for recovery by multiple classes of indirect purchasers:

> In class actions . . . where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on . . . to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages.

Haw. Rev. Stat. § 480-13(c)(2). Accordingly, *AGC* does not apply to the Hawaii indirect purchaser claims.

*__Illinois__*. Illinois' statute provides, "No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. 10/7. Several courts have analyzed Illinois indirect purchaser claims without reference to *AGC*. *See Gutnayer v. Cendant Corp.*, 116 Fed. Appx. 758, 761 (7th Cir. 2004); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818, 827-28 (7th Cir. 1999); *O'Regan v.*

23

*Arbitration Forums, Inc.*, 121 F.3d 1060, 1065-66 (7th Cir. 1997); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 992 (Ill. 1990). Defendants ignore this when they cite the general harmonization provision, which, as noted above, cannot be used to bar indirect purchaser claims. Accordingly, *AGC* does not apply to the Illinois indirect purchaser claims.

**_Iowa_.** Defendants' cite *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007), for the proposition that the *AGC* analysis applies to claims under Iowa's antitrust statute. But the plaintiffs in *Southard* were not indirect purchasers of the defendants' services. Rather they alleged a generic "price inflation" claim stemming from others' antitrust injuries. *Id.* at 196-97. Here, by contrast, IPPs allege that they indirectly purchased Defendants' Vehicle Carrier Services, and further that Defendants' fixed per-unit prices were incorporated directly and dollar-for-dollar into the prices new vehicles. Given this sharp factual contrast, *Southard* is of little, if any, relevance. Accordingly, *AGC* does not apply to the Iowa direct purchaser claims in this case.

**_Kansas_**. In *Bergstrom v. Noah*, 974 P.2d 520, 531 (Kan. 1999), the Kansas Supreme Court held that Kansas courts are not bound by federal decisions interpreting federal antitrust law. In *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211-12 (D.Kan. 1999), the court acknowledged that Kansas courts have not directly addressed whether the *AGC* analysis applies to Kansas' antitrust statute. Federal courts, however, have held that the *AGC* analysis does not apply to claims under the Kansas antitrust statute. *See e.g. TFT-LCD*, 586 F. Supp. 2d at 1123; *GPU*, 540 F. Supp. 2d at 1097. And even where courts have applied *AGC* to Kansas' antitrust statute, the courts have still allowed indirect purchaser recovery. *See*, *e.g.*, *Four B. Corp. v. Daicel Chemical Ind., Ltd.*, 235 F. Supp. 2d 1147, 1151 (D. Kan. 2003). Accordingly, *AGC* does not require dismissal of IPPs' claims under the Kansas antitrust statute.

**_Maine_.** Maine's antitrust statute provides that "[a]ny person . . . injured directly or

24

indirectly in its business or property by any other person or corporation by reason of [an antitrust violation] may sue for the injury in a civil action." Me. Rev. Stat. tit. 10, § 1104. Thus, downstream, indirect purchasers may recover damages, as long as they are in the chain of distribution.

> Such damages may be proved in the aggregate by demonstrating that [defendant], through its anti-competitive practices, charged more for its [goods or services] than it could have charged in a fully competitive market, and that those higher prices were passed on through the retail outlets to indirect purchasers such as [plaintiff].

*McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 427 (Me. 2009); *see also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 22 (1st Cir. 2008) (finding that "the Maine antitrust statute explicitly permits recovery for indirect injury" without referencing *AGC*).[13] Accordingly, *AGC* does not apply to Maine indirect purchaser claims.

**_Michigan._** A number of courts in cases involving indirect purchaser claims have held that Michigan's harmonization statute does not require application of the *AGC* factors. *See, e.g.*, *Flash Memory*, 643 F. Supp. 2d at 1152-53; *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943 (N.D. Ill. 2009); *GPU*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007).[14] Accordingly, *AGC* does not apply to Michigan indirect purchaser claims.

**_Minnesota_**. In *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007), the

---

[13] Defendants cite a single Maine trial court decision, *Knowles v. Visa U.S.A., Inc.*, No. Civ. A. CV-03-70, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004). This case is inapposite because it involved a plaintiff who did not even indirectly purchase defendant's debit card services and therefore was not in the chain of distribution.

[14] Defendants' reliance on the trial court decision in *Stark v. Visa U.S.A. Inc.*, No. 03-055030, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004), is misplaced because it did not involve indirect purchaser claims and is contrary to the subsequent federal decisions cited above which have held that the *AGC* analysis does not apply. Moreover, in *Potash*, 667 F. Supp. 2d at 943-944, the court rejected *Stark* as indicating that Michigan's Supreme Court would apply *AGC*.

25

Minnesota Supreme Court expressly held that, "application of the *AGC* factors in Minnesota would contravene the plain language of the statute and in some cases thwart the intent of the legislature by barring indirect purchaser suits for the reasons articulated in *Illinois Brick*."  This directly contradicts Defendants' argument that harmonization statutes require the application of *AGC* factors to state indirect purchaser claims, and *AGC* does not apply to the Minnesota indirect purchaser claims.

**_Mississippi._**  Courts routinely refuse to apply *AGC* to claims under Mississippi's antitrust statute.[15]. *See Los Gatos Mercantile, Inc.*, 2014 WL 4774611, at *6, *GPU*, 540 F. Supp. 2d at 1097, and *TFT-LCD*, 586 F. Supp. 2d at 1123. Defendants present no authority to the contrary. Accordingly, *AGC* does not apply to Mississippi's antitrust statute.

**_Nebraska._**  In *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004), Nebraska's Supreme Court did not apply the *AGC* analysis to the indirect purchaser claims, but instead stated, "To deny the indirect purchaser, who in this case is the ultimate purchaser, the right to seek relief from unlawful conduct would essentially remove the word 'consumer' from the Consumer Protection Act." Although the Nebraska Supreme Court subsequently applied *AGC* in *Kanne v. Visa U.S.A., Inc.*, 723 N.W. 2d 293, 300-01 (Neb. 2006), that case does not support dismissal here. Unlike the plaintiff in *Arthur*, the plaintiff in *Kanne* was not an indirect purchaser. *See* 723 N.W. 2d at 301 ("Here, appellants did not purchase the debit card services, either directly or indirectly; rather, they claim to have paid higher prices for goods resulting from the merchants' purchase of Visa's and MasterCard's debit card services.").

---

[15] Defendants' reliance on *Owens Corning v. RJ Reynolds Tobacco Co.*, 868 So. 2d 331, 334 (Miss. 2004), is misplaced. That case involved an attempt by an employer to recover from tobacco companies for the health effects of tobacco suffered by employees, and it neither endorses nor applies the *AGC* factors.

***Nevada.*** In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010), the district court did not apply *AGC* to plaintiffs' Nevada claims.[16] Defendants present no authority to the contrary, and *AGC* does not apply to the New Mexico claims.

***New Hampshire.*** Defendants do not cite any New Hampshire case that has applied *AGC* to indirect purchaser claims. In *LaChance v. US Smokeless Tobacco Co.*, 931 A.2d 571, 576-81 (N.H. 2007), the New Hampshire Supreme Court held that indirect purchasers of smokeless tobacco could assert claims for anti-competitive conduct, rejected defendants' argument that their claims were too remote and risked duplicative recovery, and did not discuss or apply *AGC*. Accordingly, *AGC* does not apply to the New Hampshire claims.

***New Mexico.*** In *GPU*, 540 F. Supp. 2d at 1097, the court concluded that no New Mexico state court had reached the question of whether *AGC* applies and declined to extend it to the New Mexico claims. *See also CRT*, 738 F. Supp. 2d at 1023.[17] Defendants present no authority to the contrary, and *AGC* does not apply to the New Mexico claims.

***New York.*** Defendants fail to establish that *AGC* applies to New York indirect purchaser claims. Although Defendants cite the trial court decision in *Ho v. Visa U.S.A., Inc.*, another case alleging that plaintiffs paid too much for retail goods as a result of Visa's supra-competitive charges to merchants for debit card services, the appellate court did not even mention *AGC*, and simply held that "[w]hatever damages [plaintiffs] suffered are barely in the zone of injury." 793

---

[16] Defendants' reliance on *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007), is misplaced as evidenced by the subsequent decision in *CRT*.

[17] Defendants' reliance on *Nass-Romero v. Visa U.S.A., Inc.,* 279 P.3d 772 (N.M. App. 2012), another Visa case involving allegations that plaintiffs paid inflated prices for retail goods as a result of Visa's supra-competitive pricing for merchant debit card services, is misplaced because, in that case, plaintiff was nowhere in the chain of distribution, and the appellate court "reject[ed] Plaintiff's claim that she is an indirect purchaser." *Id.* at 780.

N.Y.S.2d 8, 8-9 (App. Div. 2005). Accordingly, *AGC* does not apply to the New York claims.

**_North Carolina_**. In *Teague v. Bayer AG*, 671 S.E.2d 550, 557 (N.C. Ct. App. 2009), the court expressly stated that, "the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes." The court also acknowledged prior rulings holding that "indirect purchasers have standing . . . to sue under the antitrust laws of North Carolina." *Id.* at 555. For their part, Defendants cite no case law, instead resting on their inapt harmonization argument, and *AGC* does not apply to the North Carolina claims.

**_North Dakota_**. In *Howe v. Microsoft Corp.*, 656 N.W.2d 285 (N.D. 2003), the Supreme Court of North Dakota upheld certification of an indirect purchaser class without reference to the *AGC* factors. In *CRT*, 738 F. Supp. 2d at 1023, the court did not apply *AGC* to the North Dakota indirect purchaser claims.[18]   Accordingly, *AGC* does not apply to North Dakota indirect purchaser claims.

**_Oregon_**. Defendants do not cite any decision that has applied the *AGC* factors to Oregon indirect purchaser claims, and their reliance on harmonization provisions alone is insufficient. *See Flash Memory*, 643 F. Supp. 2d at 1153. According, *AGC* does not apply to Oregon claims.

**_South Dakota_**. Defendants do not cite any South Dakota decision applying *AGC* to indirect purchaser claims.[19] As discussed above, Defendants' reliance on harmonization

---

[18] Defendants' argument to the contrary relies on *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-0030, 2004 WL 2475100 (N.D. Dist. Sept. 21, 2004). There, as in the other cases, plaintiffs were not indirect purchasers of defendant's debit card services.

[19] Defendants' reliance on a hearing transcript in *Cornelison v. Visa U.S.A. Inc.*, No. Civ. 03-1350, Hrng. Tr., at 54 (S.D. Cir. Ct. 2004), is misplaced. That decision arose from yet another inapposite Visa case where the plaintiff was not an indirect purchaser of defendant's debit card services.

provisions alone is insufficient. Accordingly, *AGC* does not apply to the South Dakota claims.

**_Tennessee._** Defendants do not cite any Tennessee decisions applying *AGC* to indirect purchaser claims. In *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 518-20 (Tenn. 2005), the Supreme Court stated that, "[b]y construing Tenn. Code Ann. $ 47-25-106 (2001) as permitting indirect purchaser suits, we are affording a remedy to the ultimate victims of the antitrust conduct," and rejected defendants' position that would "leave such victims of illegal activity with no redress, a result that hardly comports with notions of fair play." Subsequently, in *D.R. Ward Const. Co.*, 470 F. Supp. 2d at 499-50, the court held that "the Supreme Court of Tennessee, based on the *Freeman* decision, would apply traditional standing requirements rather than the *AGC* analysis to determine whether the injuries suffered by an indirect purchaser are too remote to confer standing." Accordingly, *AGC* does not apply to Tennessee indirect purchaser claims.

**_Utah_.** As discussed above, Defendants' arguments based on the state's harmonization provision are misplaced. Moreover, Utah's statute contains specific provisions expressly providing for recovery by indirect purchasers in the chain of distribution: "It shall also be presumed, in the absence of proof to the contrary, that the injured persons who dealt indirectly with the defendant incurred at least 1/3 of the damages." Utah Code Ann. 76-10-3109(7). The statute continues with "a presumption . . . that each level in a product's or service's distribution chain passed on any and all increments in its cost due to an increase in the cost of . . . a component product or service that was caused by a violation of this chapter," and this "amount will be presumed, in the absence of evidence to the contrary, to be equal to the change in the cost, in dollars and cents, of the … component product, or service to its first purchaser." Utah Code Ann. 76-10-3109(8). *AGC* cannot be reconciled with these provisions and does not apply to

29

Utah indirect purchaser claims.

**_Vermont._** In _Elkins v. Microsoft Corp._, 817 A.2d 9, 17 (Vt. 2002), the Vermont Supreme

Court expressly rejected the argument that "who may sue under the [VCFA] must be consistent

with the definition of who may sue under federal antitrust law." Defendants cite only an

inapposite VISA decision, _Fucile v. Visa, U.S.A., Inc._, No. S1560-03, 2004 WL 3030036 (Vt.

Super. Ct. Dec. 27, 2004), where the plaintiff was not even an indirect purchaser of Visa's debit

card services to the merchants. The court in _D.R. Ward Const. Co._, 470 F. Supp. 2d at 501,

rejected the argument that _Fucile_ was relevant to the question of Vermont's adoption of the _AGC_

factors. That court. declined to hold that "the Vermont Supreme Court would adopt the _AGC_

factors for determining standing under the VCFA," because doing so "would undermin[e] the

VCFA's overarching remedial goal of reaching as broadly as possible to best protect consumers

against antitrust violations."  Other courts have also refused to apply _AGC_ to Vermont indirect

purchaser claims. _See_, _e.g._, _CRT_, 738 F. Supp. 2d at 1023.

**_West Virginia._**. West Virginia's repealer statute expressly states that it is to be "liberally

construed to effectuate the beneficial purposes of the West Virginia Antitrust Act." W.Va. Code §

142-9.16. Heeding this directive, several federal courts have refused to apply _AGC_ to West

Virginia indirect purchaser claims. _See_, _e.g._, _GPU_, 540 F. Supp. 2d at 1097 (no state court in

West Virginia has reached the question of whether _AGC_ applies and rejecting defendant's

harmonization argument); _In re TFT-LCD_, 586 F. Supp. 2d at 1122-23 (agreeing with _GPU_ on

this issue); _In re CRT_, 738 F. Supp. 2d at 1023 (not applying _AGC_ to West Virginia indirect

purchaser claims).[20]  Defendants present no authority to the contrary, and _AGC_ does not apply to

---

[20] The lone authority on which Defendants rely, _In re Refrigerant Compressors Antitrust Litig._,
No. 2:0o9-MD-02042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013), is readily

the West Virginia claims.

**_Wisconsin._** Defendants do not cite any Wisconsin Supreme Court or appellate court decisions applying *AGC* to indirect purchaser claims.[21]   Several federal decisions have, however, refused to apply *AGC* to Wisconsin indirect purchaser claims, and this Court should do the same. *See*, *e.g.*, *Flash Memory*, 643 F. Supp. 2d at 1152-53; *TFT-LCD*, 586 F. Supp. 2d at 1123 (holding that it is "inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws [including Wisconsin] in the absence of a clear directive from those states' legislatures or highest courts"); *CRT*, 738 F. Supp. 2d at 1023 (not applying *AGC* to Wisconsin indirect purchaser claims).

> **(c)**     **To the Extent *AGC* Applies, the IPPs' Claims Readily Survive Scrutiny**

In *AGC*, the Supreme Court identified several factors that must be balanced to determine antitrust standing, which the Third Circuit has synthesized into the following formulation:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997) (citing *AGC*, 459 U.S. at 540-44). A plaintiff need not prevail on every factor. *See*, *e.g.*, *DIPF*, 2013 WL

---

distinguishable. That decision was predicated on the harmonization provision which has been rejected by other courts and is contrary to the "liberal construction" required elsewhere in the West Virginia repealer statute.

[21] Instead, Defendants rely on *Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005), which is inapposite because, like the other Visa cases, it involved plaintiffs who were not even indirect purchasers of defendant's debit card services to merchants.

5503308, at *16-18 (plaintiffs prevailed on some, but not all factors in establishing standing under *AGC* factors).

### (1)     Causal Connection and Intent to Cause Harm

IPPs allege a "causal connection between the antitrust violation and the harm to plaintiff" and "the intent by the defendant to cause that harm." *Barton & Pittinos, Inc.*, 118 F.3d at 181. Defendants fixed the prices of Vehicle Carrier Services to OEMs, which "are set on a per unit basis," *i.e.*, a "per car price." EP-CAC ¶¶ 82, 88; AD-CAC ¶ 74; TD-CAC ¶ 73. OEMs passed on the inflated charges to purchasers and lessees of new, assembled motor vehicles. EP-CAC ¶180; AD-CAC ¶ 176; TD-CAC ¶ 162. As a result of Defendants' price-fixing, Plaintiffs "paid supra-competitive prices for Vehicle Carrier Services." EP-CAC ¶180; AD-CAC ¶ 173; TD-CAC ¶ 158. "Vehicle Carrier Services are identifiable, discrete services that remain essentially unchanged when incorporated into the cost of Vehicles sold to [IPPs]."  AD-CAC ¶ 175.  "As a result, the cost of Vehicle Carrier Services follow a traceable chain from the Defendants to [IPPs] . . . , and any costs attributable to Vehicle Carrier Services can be traced through the chain of Vehicle distribution."  *Id.* "Hence, the inflated prices of Vehicle Carrier Services in new Vehicles resulting from Defendants' price-fixing conspiracy have been passed on to [IPPs]."  *Id.* ¶ 176. The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Vehicle Carrier Services and, as a direct and foreseeable result, the price of new, assembled motor vehicles shipped by Vehicle Carriers. EP-CAC ¶ 184; AD-CAC ¶ 177; TD-CAC ¶ 163.[22]

These allegations more than suffice to show a causal connection between Defendants'

---

[22] Defendants argue that "The IPPs . . . tellingly, allege nothing about defendants' intent." Def. Br. at 31. This is simply not true, as demonstrated by the allegations in EP-CAC ¶ 184, AD-CAC ¶ 177, and TD-CAC ¶ 163.

unlawful conduct and the IPP's injury, as well as Defendants' intent to harm the IPPs. *See DIPF*, 2013 WL 5503308, at *16, (explaining that plaintiffs' allegations that they paid inflated prices "are sufficient to show a causal connection between the alleged antitrust violation and the harm to Water System Project Plaintiffs."). Accordingly, the first factor weighs in favor of antitrust standing.

### (2)     IPPs Suffered Injury that the State Indirect Purchaser Laws Were Designed to Redress

The IPPs' complaints allege the type of injury "for which the antitrust laws were intended to provide redress." *Barton & Pittinos, Inc.*, 118 F.3d at 181. Here, the IPPs allege the supra-competitive prices for Vehicle Carrier Services were "incorporated into the price of a new Vehicle." EP-CAC ¶ 169; AD-CAC ¶ 175; TD-CAC ¶ 161. As a direct result of the anticompetitive conduct, the IPPs paid artificially inflated prices for Vehicle Carrier Services incorporated into the price of vehicles and equipment. EP-CAC ¶ 10; AD-CAC ¶ 10; TD-CAC ¶ 10.

"Courts typically agree that end users who pay inflated prices for a good suffer precisely the type of injury that antitrust laws seek to remedy." *DIPF*, 2013 WL 5503308, at *16 (citing *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 400 (3d Cir.2000)). "It is difficult to imagine a more formidable demonstration of antitrust injury where consumers paid inflated prices for a medication subject to an anticompetitive scheme suffered antitrust injury, [r]egardless of the existence of various links of middlemen." *Id.* (internal quotations omitted). Accordingly, the second factor weighs in favor of antitrust standing.

Moreover, Defendants' argument that the IPPs did not participate in the Vehicle Carrier Services Market, Def. Mem. at 31-32, is deeply flawed. As alleged and discussed in detail *supra*,

33

> [t]he market for Vehicle Carrier Services and the market for new, assembled
> motor vehicles are inextricably linked and intertwined because the market for
> Vehicle Carrier Services exists to serve the Vehicle market. Without the new,
> assembled motor vehicles, the Vehicle Carrier Services have little to no value
> because they have no independent utility. Indeed the demand for new, assembled
> motor vehicles creates the demand for Vehicle Carrier Services.

EP-CAC ¶ 181; AD-CAC ¶ 174; TD-CAC ¶ 160. Such allegations satisfy the second factor. *See*

*Auto Parts-Wire Harness*, 2013 WL 2456612, at *16 (rejecting separate market argument where

vehicle component has "no independent utility" and "demand for the vehicles created the

demand for" the component). Under these circumstances, the IPPs' allegations suffice and should

not be considered as arising from a separate, unrelated market. *See DIPF*, 2013 WL 5503308, at

*17 (plaintiffs who "purchased DIPF as a component of water systems project contracts and

consequently paid a higher price for those contracts . . . suffered injury of the type the antitrust

laws are intended to redress").[23] Accordingly, the second factor weighs in favor of IPPs' antitrust

standing.

### (3)   Directness of the Injury

The Complaint alleges a sufficiently "direct injury" that will not produce "speculative

claims." *Barton & Pittinos, Inc.*, 118 F.3d at 181. Again, the IPPs allege that Defendants

conspired to fix the per-unit prices of Vehicle Carrier Services which directly led to IPPs paying

higher per-unit prices for new vehicles, EP-CAC ¶180; AD-CAC ¶ 173; TD-CAC ¶ 158, and that

a regression analysis can "isolate and identify only the impact of an increase in the price of

---

[23] In *DIPF*, the court noted that, while some cases have held that plaintiffs proceeding under a component theory of standing participate in a "secondary market" and not in the "relevant market," *id.* (citing *In re Dynamic Random Access Memory Antitrust Litig.*, 536 F. Supp. 2d 1129, 1137-38, 141), more courts have "rejected this strict market participant test and permitted indirect purchasers to bring claims arising out of the purchase of finished products that incorporate parts subject to an anticompetitive scheme." *Id.* (citing *TFT-LCD,* 586 F.Supp.2d at 491; *Auto. Parts*, 2013 WL 2456612, at *15–16; *Flash Memory,* 643 F.Supp.2d at 1154; *CRT,* 738 F.Supp.2d at 1023–24; *GPU,* 540 F.Supp.2d at 1098).

Vehicle Carrier Services on prices for new purchased or leased new, assembled motor vehicles even though such products contain a number of other inputs whose prices may be changing over time." EP-CAC ¶ 186. "The precise amount of the overcharge impacting the prices of new, assembled motor vehicles shipped by Vehicle Carrier[s] can be measured and quantified" through "[c]ommonly used and well-accepted economic models." EP-CAC ¶ 187. "Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified." *Id.* Such allegations have been held sufficient in the context of indirect purchaser claims in the vehicle market. *See Auto Parts-Wire Harness*, 2013 WL 2456612, at *17 ("Because IPPs have alleged that they can trace overcharges [for a component part] through the distribution chain, they have satisfied this AGC factor."). Other courts have similarly held that "discrete injuries traceable through a distribution chain tilt this factor in favor of antitrust standing." *Lithium Batteries*, 2014 WL 4955377, at *14 (citing TFT–LCD I, 586 F.Supp.2d at 1123; GPU II, 540 F.Supp.2d at 1098; Flash, 643 F.Supp.2d at 1155). *See also DIPF*, 2013 WL 5503308, at *17 (D.N.Y. Oct. 2, 2013) (finding the directness of injury factor is satisfied by "alleging that the cost of the component was traceable through the product distribution chain."). Moreover, courts have rejected arguments similar to Defendants' proposition, Def. Mem. at 33-34, that the IPPs' injury is speculative given the "sheer number of components in a finished vehicle" or the "many other factors that play into the cost of the vehicle." *Auto Parts*, 2013 WL 2456612, at *17. Where, as here, the IPPs allege "that the component parts remain separate and traceable," and the injuries "substantial," this factor weighs in favor of standing notwithstanding defendants' invocation of potential hurdles. *Id.*[24] Accordingly, the third factor weighs in favor of antitrust standing.

_____

[24] Defendants' argument that a number of steps exist from their ships to the dealerships and end-users, Def. Br. at 32, is non-dispositive in these indirect purchaser cases. To the extent

**(4)    The Existence of** More **Direct Victims**

Because the IPPs are, by definition, indirect purchasers, the fourth factor, "the directness

of injury," *Barton & Pittinos, Inc.*, 118 F.3d at 181, is not dispositive. "This factor … does not

alone mandate dismissal at this [pleading] stage in the litigation." *DIPF*, 2013 WL 5503308, at

*18.

**(5)    The Potential for Duplicative Recovery or Complex
        Apportionment of Damages**

The risk of duplicative recovery "is inherent in the dual system of private antitrust

enforcement created by *Illinois Brick* and *California v. ARC America Corp*." *Lorix,* 736 N.W.2d

at 628. "[I]t is not a risk that [this Court] may remedy by restricting [repealer states'] antitrust

law in ways that [the] legislature has not." *Id. See also In re Auto Parts*, 2013 WL 2456612, *18

(E.D. Mich. 2013); *D.R. Ward*, 470 F. Supp. 2d at 504; *Intel*, 469 F. Supp. 2d at 410; *Lorix,* 736

N.W.2d at 628; *Flash*, 643 F. Supp. 2d at 1155; *In re Intel Corp. Microprocessor Antitrust Litig.*,

496 F. Supp. 2d 404, 410 (D. Del. 2007) ("*Intel*"). "Furthermore, the Third Circuit has suggested

that 'while there will be some additional complications underlying the damage claims' in

component cases, purchases of products containing restrained components do not bar antitrust

claims." *DIPF*, 2013 WL 5503308, at *17 citing *In re Linerboard Antitrust Litig.,* 305 F.3d 145,

159 (3d Cir. 2002)). As long as plaintiffs "can trace overcharges through the distribution chain,"

this factor weighs in favor of standing. *Id.* (citing *Auto. Parts,* 2013 WL 2456612, at *18; *Flash*

---

Defendants take shipping terminals and inland shipping into account when making their
"remoteness" argument, the complaint alleges, "[t]he major Vehicle Carriers, including
Defendants, own related shipping or transportation businesses they can utilize to provide
additional services to clients, such as the operation of dedicated shipping terminals and inland
transportation of new, assembled motor vehicles." ¶97(b). Defendants' argument that OEMs do
not resell Vehicle Carrier Services, Def. Br. at 33, is equally unavailing: the only way for
vehicles to arrive from Japan is through such services, which are incorporated on a per-unit basis
into the price of new vehicles paid by dealerships and end users.

*Memory,* 643 F. Supp. 2d at 1155). Finally, it is of no moment that there are OEMs who purchased directly from Defendants, especially where the OEMs have not brought antitrust claims. *Auto Parts*, 2014 WL 2999269, at *13. Accordingly, the fifth factor weighs in favor of antitrust standing.

As a result, even if the Court were to apply the *AGC* factors to the IPPs' claims, none should be dismissed because the factors overwhelmingly weigh in favor of antitrust standing.

### C.    This Court Should Not Dismiss IPPs' State Law Claims Based on the Place of Certain Plaintiffs' Residence

#### 1.    The IPPs May Bring Claims under the Laws of Various States Where No Named Plaintiff Resides[25]

##### (a)    Class Certification Is "Logically Antecedent" to Questions of Article III Standing under State Laws

Contrary to Defendants' assertion, the case law on this issue is far from "overwhelming and consistent." Indeed, many courts have ruled that Article III standing relating to claims brought under the laws of states in which class representatives do not reside should not be resolved at the pleadings stage because class certification is "logically antecedent" to such issues. *See, e.g., Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*, Case No. 07-5205, 2008 WL 3833577, at *8–9 (D.N.J. Aug. 13, 2008) ("*Sheet Metal*"); *In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959225, at *15 (D.N.J. June 29, 2007) ("*Hypodermic*"); *In re*

---

[25] Defendants have challenged the Truck and Equipment Dealer Plaintiffs' standing to bring claims under the laws of Arkansas, Washington, D.C., Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, South Carolina, South Dakota, Vermont, West Virginia, and Wisconsin. Defendants also challenge the Automobile Dealer Plaintiffs' standing to bring claims under the laws of Arizona, Arkansas, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, South Dakota, Utah, Vermont, West Virginia, and Wisconsin. Finally, Defendants challenge the End-Payor Plaintiffs' standing to bring claims under the laws of Illinois and Rhode Island. *See* Def. Mem. at 37–39; Def. Mem., Ex. I.

*Chocolate Confectionary Antitrust Litig.,* 602 F. Supp. 2d 538, 579–80 (M.D. Pa. 2009) ("*Chocolate*"); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 267–70 (D. Mass. 2004); *Auto Parts-Wire Harness*, 2013 WL 2456612, at *9–11 (E.D. Mich. June 6, 2013); *Hovering v. Transnation Title Ins. Co.*, 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008); *Payton v. Cnty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002); *In re Aftermarket Filters Antitrust Litig.*, Case No. 08-C-4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5, 2009). "Whether the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010). Their "capacity to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law antitrust claims on behalf of class members in these states." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 579 (M.D. Pa. 2009) ("*Chocolate*"). This is what makes standing "logically antecedent" to class certification.

The Third Circuit has not directly ruled on this question in the context of an indirect purchaser antitrust class action. However, district courts within the Third Circuit, including courts in this District, have concluded that class certification is "logically antecedent" to a determination of whether class representatives have standing to assert claims under state laws.

In *Sheet Metal*, the plaintiff brought antitrust claims under California law and the laws of twenty-seven other states, on behalf of a proposed class. *Sheet Metal*, 2008 WL 3833577, at *8. The defendant moved to dismiss, arguing that the plaintiff lacked standing for the claims brought under state laws other than California. *Id.* Relying on *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), the court found that the "decision on class certification is logically antecedent to the

38

determination of standing." *Sheet Metal*, 2008 WL 3833577, at *8. In *Hypodermic*, another court confronted with this issue reached the same conclusion. 2007 WL 1959225, at *15. This Court should follow suit.

**(b)     Most of the State Statutes Cited by Defendants Do Not Require In-State Residency**

If this Court disagrees that class certification is logically antecedent to issues of Article III standing under state law claims, then Defendants' arguments are still unavailing for the numerous claims derived from statutes that do not require in-state residency.

Courts have held that persons may bring claims under the antitrust statutes of Iowa, Mississippi, New Hampshire, North Dakota, South Dakota, Vermont, and Wisconsin without in-state residency. *See, e.g., Eggs*, 851 F. Supp. 2d at 885–91 (Iowa, North Dakota, South Dakota, and Mississippi); *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *10 n.10 (D. N.J. Oct. 20, 2011) ("*Magnesium Oxide*") (Mississippi, New Hampshire, Vermont, and Wisconsin).

Likewise, the antitrust statutes of Arizona, Hawaii, Kansas, Maine, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, Oregon, Washington D.C., and West Virginia do not require in-state residency. The Arizona antitrust statute allows "a person threatened with injury or injured" by a violation of the statute to "bring an action for. . . damages sustained." Ariz. Rev. Stat. § 44-1408. The Hawaii antitrust statute states: "[A]ny person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter . . . [m]ay sue for damages sustained by the person . . . and [m]ay bring proceedings to enjoin the unlawful practices." Haw. Rev. Stat. § 480-13(a)(1), (2). The Kansas antitrust act provides a cause of action to "any person who may be damaged or injured" by an unlawful restraint of

39

trade. Kan. Stat. Ann. § 50-161(b). Similarly, the Maine antitrust statute states: "Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action." Me. Rev. Stat. tit. 10, § 1104(1). The Michigan Antitrust Reform Act allows "any other person [in addition to the state, political subdivisions, and public agencies] threatened with injury or injured. . . by a violation" to bring an action. Mich. Comp. Laws § 445.778(2). The Minnesota Antitrust Law provides a cause of action to for damages to "[a]ny person . . . injured directly or indirectly by a violation . . ." thereof. Minn. Stat. Ann. § 325D.57. The Nebraska antitrust law permits "any person to institute proceedings" for a violation. Neb. Rev. Stat. § 59-828. The Nevada Unfair Trade Practice Act permits "[a]ny person injured or damaged" to bring an action for damages. Nev. Rev. Stat. § 598A.210. New Mexico's Antitrust Act allows "any person threatened with injury or injured" by a violation to bring an action. N.M. Stat. Ann. § 57-1-3. The New York antitrust law allows "any person who shall sustain damages by reason of any violation" to bring an action to recover damages. N.Y. Gen. Bus. Law § 340(5). Oregon's antitrust statute allows "[a] person" to bring suit for injury sustained from a violation. Or. Rev. Stat. § 646.780. The District of Columbia statute states: "[a]ny person who is injured in that person's business or property by reason of anything forbidden by this chapter may bring a civil action for damages, for appropriate injunctive or other equitable relief, or for both." D.C. Code § 28-4503. The West Virginia Antitrust Act allows "[a]ny person who shall be injured in his business or property" by a violation of the act to bring an action for damages. W. Va. Code § 47-18-9.

As the *Eggs* and *Magnesium Oxide* courts noted in analyzing several similarly worded

antitrust statutes, none of the language in the above statutes requires state residency to bring an antitrust claim.[26] *Eggs*, 851 F. Supp. 2d at 889–95; *Magnesium Oxide*, 2011 WL 5008090, at *10 n.10. Like in *Eggs*, this Court too should hold it is unnecessary to have a named Plaintiff residing in Arizona, Hawaii, Kansas, Maine, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, Oregon, Washington D.C., or West Virginia in order to state a claim under these states' antitrust statutes.

The Arkansas, Massachusetts, New Mexico, New York, Rhode Island, South Carolina, and Vermont consumer protection laws likewise have no in-state residency requirement. The Arkansas consumer protection statute affords a cause of action to "[a]ny person who suffers actual damage or injury as a result of an offense or violation. . . ." Ark. Code Ann. § 4-88-113(f). Massachusetts' consumer protection statute provides a cause of action to "[a]ny person . . . who has been injured by another person's use or employment of any method . . . declared to be unlawful" thereunder. Mass. Gen. Laws ch. 93A, § 9(1). New Mexico's Unfair Practices Act allows "[a]ny person who suffers any loss of money or property" as a result of a violation to bring an action to recover damages. N.M. Stat. Ann. § 57-12-10(B). New York's consumer protection statute allows "any person who has been injured" by a violation thereof to bring an action for damages. N.Y. Gen. Bus. Law § 349(h). The Rhode Island consumer protection law allows "[a]ny person who . . . suffers any ascertainable loss of money" due to a violation of the statute to bring an action for damages. R.I. Gen. Laws § 6-13.1-5.2(a). The South Carolina consumer protection statute states "[a]ny person who may be injured or damaged by any such arrangement, contract, agreement, trust or combination described in § 39-3-10 may sue. . . ."

---

[26] *See, e.g.,* Iowa Code § 553.12 ("a person who is injured. . . may bring suit"); N.D. Cent. Code § 51-08.1-08(2) ("A person. . . injured. . . may bring an action); S.D. Codified Laws § 37-1-14.3 ("A person injured . . . may bring an action").

S.C. Code Ann. § 39-3-30. Finally, Vermont's consumer protection statute allows "[a]ny consumer" who sustains damages from a violation of the law to bring an action for damages. Vt. Stat. Ann. tit. 9, § 2461(b).

None of these state statutes require in-state residency for purposes of stating a claim. As the court held in *Eggs*, in the "absence of definitive legal authority as to whether *vel non* an extraterritorial injury that might be traced to an antitrust violation is cognizable" under the state statutes, motions to dismiss based on Article III standing should be rejected. *Eggs*, 851 F. Supp. 2d at 891.

Accordingly, it would be improper to dismiss the antitrust and consumer protection claims under the laws of Arizona, Arkansas, Iowa, Hawaii, Illinois, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Vermont, Washington D.C., West Virginia, and Wisconsin because none of these laws require in-state residency for the plaintiff.

> **2.  The Truck and Equipment Dealer Named Plaintiffs Who Do Not Assert a Violation of Their Home State's Antitrust or Consumer Protection Laws Have Standing to Assert Claims for Injunctive Relief and Damages**

Finally, the Truck and Equipment Dealer named plaintiffs that do not assert a violation of the laws of the state in which they reside nonetheless have Article III and statutory standing to represent the nationwide and damages classes.

First, as described in section II.A *supra*, all of the indirect purchaser plaintiffs have Article III and statutory standing to assert claims under the Sherman Act. Defendants do not suggest that standing to raise a Sherman Act claim is dependent upon bringing a state law claim

42

for damages, and such a requirement would make no sense. Therefore, the six Truck and Equipment Dealer plaintiffs who do not assert a violation of their home states' laws indisputably have standing to bring a Sherman Act claim for injunctive relief, and for that reason alone should not be dismissed from this lawsuit.

Second, Defendants' argument depends upon the unsupported assumption that the Truck and Equipment Dealer plaintiffs cannot have standing to assert violations of antitrust statutes in states other than where they reside. That assumption is incorrect, as discussed in detail in section IIC.1, *supra*. Thus, the Truck and Equipment Dealer plaintiffs' claims under these laws "cannot be deemed foreclosed by case law, or otherwise completely devoid of merit," such that they would lack standing. *Id.* at 891 (citing *Growth Horizons, Inc. v. Delaware Cnty.*, 983 F.2d 1277, 1280-81 (3d Cir. 1993) ("Dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decision of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.").

### D.  IPPs Properly Allege Unjust Enrichment

#### 1.  End-Payors' Have Adequately Pleaded Claims for Unjust Enrichment

##### (a)  End-Payors' Allegations are Sufficiently Specific under *Twombly* and *Iqbal*

The End-Payor complaint is not the type of generic pleading that the court dismissed in *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, CIV. 12-169, 2013 WL 5503308, *8 (D. N. J. Oct. 2, 2013) (dismissing unjust enrichment claims for failing to identify specific state laws). End-Payors (in fact, all IPPs) detail the relevant laws of 32 states,

43

from which End-Payors' unjust enrichment claims stem.[27] End-Payors further detail the damages

they seek by demanding "restitution, including disgorgement of profits Defendants obtained as a

result of their acts of unfair competition and acts of unjust enrichment," and the recovery of

"damages, to the maximum extent allowed by such laws, in the form of restitution and/or

disgorgement of profits  unlawfully gained from them."   EP-CAC at 99 (¶¶ 4 & 6). These

allegations are sufficient to put Defendants on notice of End-Payors' unjust enrichment claims.

Moreover, Defendants' argument that End-Payors have failed to allege the conferral of a

benefit is mistaken. End Payors allege that they conferred a benefit on Defendants, "having paid

higher prices for Vehicle Carrier Services than they would have paid in the absence of the

Defendants' illegal contract, combination, or conspiracy," and that "it would be inequitable for

Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments

made by [IPPs]."[28] EP-CAC ¶¶ 188, 288. This "provide[s] Defendants with fair notice of [IPPs']

claims and the grounds on which they are based, such that these Defendants will know how to

---

[27]  Cases cited by Defendants for the contention that End Payors' unjust enrichment claims are
insufficiently pled are largely distinguishable. In both *In re Static Random Access Memory
(SRAM) Antitrust Litig.*, 580 F.Supp.2d 896, 910 (N.D.Cal.2008), and *In re TFT–LCD (Flat
Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1124 (N.D.Cal.2008), plaintiffs brought claims for
unjust enrichment on behalf of a nation-wide class. In *In re Ditropan XL*, 529 F. Supp. 2d 1098,
1099 (N.D. Cal. 2007), the court denied an unjust enrichment claim because "Direct Purchaser
Plaintiff admitted it is not yet aware of which state or states' laws it is moving under."

[28] To state a claim for unjust enrichment, plaintiffs must generally allege as follows:
> (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had an
> appreciation or knowledge of the benefit; and (3) the defendant accepted or
> retained the benefit under circumstances making it inequitable for the defendant
> to retain the benefit without payment of its value.

Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011), *cited by Pirozzi v. Apple
Inc.*, 913 F. Supp. 2d 840, 852 (N. D. Cal. 2012). *See Hoving v. Lawyers Title Ins. Co.*, 256 F. R.
D. 555, 568 (E. D. Mich. 2009) (finding "few real differences" among states' laws on unjust
enrichment).

respond" and satisfies the requirements of *Twombly*[29] and *Iqbal*[30]. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1017 (E. D. Mich. 2010) (analyzing *Twombly* and *Iqbal*).

> **(b)   IPPs' Unjust Enrichment Claims Are Not "End-Runs" to Pursue Relief not Otherwise Available**

IPPs' claims for disgorgement and restitution based on a theory of unjust enrichment are brought for indirect purchasers in states that permit recovery of antitrust or consumer damages, based on those states' laws. They are not "end-runs" to pursue relief not otherwise available, as Defendants erroneously argue.[31] *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524 (E.D. Pa. 2010) does not support Defendants' argument that IPPs are barred from pursuing unjust enrichment claims or restitution. Instead, *Flonase* permits unjust enrichment claims to the extent that, as here, the plaintiffs' claims emanate from states that permit recovery of antitrust or consumer damages. *See Id.* at 542-42. "[C]ourts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000). For example, while IPPs may not sue under Florida's antitrust act, they may state claims under the FDUTPA. *See Mack v. Bristol–Myers Squibb Co.*, 673 So.2d 100, 103, 107–08 (Fla.Dist.Ct.App.1996) (reversing the trial court's dismissal of indirect purchaser plaintiffs' FDUTPA claim). "Because the court found that indirect purchasers could sue under Florida statutory law, there is no reason to bar all indirect purchaser plaintiffs from stating a claim for unjust enrichment." *Flonase*, 692 F. Supp. 2d at 544.  Similarly, "[a]n unjust

---

[29] *Bell Atlantic Co. v. Twombly*, 550 U.S. 544 (2007).

[30] *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[31] In their motion to dismiss, Defendants do not list any states utilized in End-Payors' complaint in which relief is not otherwise available under state antitrust or consumer-protection laws.

enrichment claim under North Carolina law is not barred by Illinois Brick's policy, because indirect purchasers may state a claim under the NCUDTPA." *Id.* The relief for IPPs is available in these states and the unjust enrichment claim is therefore not an "end-run."

Moreover, a plaintiff's ability to succeed on its statutory claims does not determine its ability to succeed on its unjust enrichment claims. "Rather than allegations and proof of the elements necessary for its antitrust claims, Plaintiffs' common law claims for unjust enrichment depend upon allegations and proof that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cardizem* at 669. This issue was examined in *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-md-2343, 2013 WL 2181185, at *24-25 (E.D. Tenn. May 20, 2013), which held that the availability of recovery under state unjust enrichment laws is not dictated by the availability of recovery under state statutes.

### (c)   IPPs Are Not Required to Confer a Direct Benefit on Defendants to State an Unjust Enrichment Claim

"[A] s a general matter, unjust enrichment does not require that the benefit conferred be done so directly." *Flonase* 692 F. Supp. 2d 544 (citing Daniel R. Karon, *Undoing the Otherwise Perfect Crime,* 108 W. Va. L.Rev. 395, 421–22 (2005).[32]

---

[32] Exhibit J to Def. Mem. lists several states as requiring a direct benefit element for an unjust enrichment claim. IPPs' respond in detail to Defendants' Exhibit J in Exhibit 5 to IPPs' Response. An examination of the case law quoted in Exhibit J indicates that this information is not accurate. For example, in *Glenwood Farms, Inc. v. Ivey*, 228 F.R.D. 47 (D. Me. 2005), cited by Defendants for the proposition that Maine rejected an unjust enrichment claim because there was "no direct benefit on the defendant," the word "direct" does not appear anywhere in the opinion and, in fact, the court was concerned instead with the problem that the plaintiffs had not been the source of the "fees" at issue in the claim. Similarly, the *Sweeney v. DeLuca*, 20 Mass. L. Rptr. 628 (Mass. Super., 2006) case cited by Defendants in Exhibit J concerned the determination of *who* benefitted from the wrong and did not address issues of directness. Likewise, there is nothing in either *Durette v. Aloha Plastic Recycling Inc.*, 100 P.3d 60, 64

46

"Whether or not the benefit is directly conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow from the challenged conduct." *Cardizem*, 105 F. Supp. 2d at 671. *See also Fond du Lac*, 2012 WL 3841397 at *5 (accepting allegations "that, as the consumers of AM parts, [plaintiffs] drive demand for such parts and that defendants profit from the sale of AM parts as a direct result of their purchases"). "It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the "benefit" passed through an intermediary before being conferred on a defendant." *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *9 (S.D. Fla. Sept. 19, 2011). *See also K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 545 n.35 ("[T]he essence of the doctrine of unjust enrichment is that there is no direct relationship

---

(Haw. Oct. 29, 2004), or *Small v. Badenhop*, 701 P.2d 647,654 (Haw. 1985), both cited by Defendants in Exhibit J, to suggest that Hawaii unjust enrichment has a "direct benefit" element. Moreover, the Rhode Island case cited by Defendants, *Ciampi v. Zulzek*, 598 F. Supp. 2d 257 (D.R.I., 2009), was decided on the "unjust" element and did not address any issues of directness. Similar problems exist with case law asserted in Exhibit J regarding South Carolina, South Dakota, Utah, and Wisconsin.

Defendants also indicate in this chart that, under Florida law, IPPs must allege that they directly conferred a benefit upon defendants in order to state an unjust enrichment claim. Courts interpreting Florida law have ruled inconsistently on this issue. Compare *In re Flonase*, 692 F.Supp.2d at 544 (dismissing Florida unjust-enrichment claims for failure to allege a direct benefit), with *In re DDAVP*, 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012) (denying the defendants' motion to dismiss a Florida unjust-enrichment claim on the ground that the "[p]laintiffs [had] plausibly conferred some benefit on Defendants, albeit indirectly, by purchasing DDAVP at elevated prices"). However, several recent cases have allowed Florida unjust enrichment claims to stand "where the benefit is conferred through an intermediary." *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F.Supp.2d 1269, 1288 (S.D.Fla.2013); *see also Williams v. Wells Fargo Bank, N.A.*, No. 11–cv–21233, 2011 WL 4901346, at *5 (S.D.Fla. Oct. 14, 2011) (reasoning that "[i]t would not serve the principles of justice and equity to bring an unjust enrichment claim merely because the 'benefit' based through an intermediary before being conferred on a defendant"); *Romano v. Motorola, Inc.*, No. 07–cv–60517, 2007 WL 4199781, at *2 (S.D.Fla. Nov. 26, 2007); *Stermer v. SCK Solutions, LLC*, No. 08–cv–61751, 2009 WL 1849955, at *6 (S.D.Fla. June 26, 2009); *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F.Supp.2d 1213, 1229 (S.D.Fla.2009).

47

between the parties.").

IPPs allege that they conferred a benefit, in the form of overpayments, on Defendants, that Defendants accepted that benefit, and that it would be unjust and inequitable under the alleged circumstances for Defendants to retain that benefit. End-Payor SAC ¶¶ 180, 288. These allegations were sufficient in *Cardizem*, and they are sufficient here.

### 2. The Auto Dealers and the Truck Centers Have Adequately Pleaded Unjust Enrichment

#### (a) Unjust Enrichment Does Not Require Conferral of Direct Benefits from IPPs to Defendants

Defendants argue that IPPs may not bring unjust enrichment claims in Florida, the District of Columbia, Hawaii, Kansas, Maine, Massachusetts, Michigan, Nebraska, Nevada, New Hampshire, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, and Wisconsin, because IPPs have not directly conferred a benefit on Defendants; because they had no substantial relationship with Defendants; or because Defendants were unaware of the benefit conferred. Def. Mem. at 49 and Exhibit J. However, Defendants' analysis of relevant state law is in error, *see* Exhibit 5 (responding to Defendants' Exhibit J), and numerous courts considering this argument have upheld unjust enrichment claims by indirect purchasers for price-fixed products or components under analogous circumstances. *See, e.g., In re Auto. Parts Antitrust Litig.* ("*Fuel Senders*"), No. 12-MD-02311, ___ F. Supp. 2d ___, 2014 WL 2993742 (E.D. Mich. July 3, 2014) (allowing unjust enrichment claims to proceed without direct benefit in Florida, District of Columbia, Kansas, Massachusetts, Michigan, New Hampshire, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, and Utah); *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1189-90 (N.D. Cal. 2009); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618, 668-71 (E.D. Mich. 2000) (no

direct benefit required in Alabama, California, District of Columbia, Illinois, Michigan, Minnesota, New York, North Carolina, Tennessee and Wisconsin); *Wavecom Solutions Corp. v. Verizon Haw. Int'l Inc.*, No. CV. 11-00337 DAE-KSC, 2011 WL 5374428, at *5 (D. Haw. Nov. 7, 2011); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 4501223, at *11 (N.D. Cal. Sept. 28, 2011) (examining Maine law and finding it allows indirect purchaser claims under unjust enrichment); *Schwan v. CNH Am. LLC*, No. 4:04CV3384, 2006 WL 1215395, at *34 (D. Neb. May 4, 2006) ("T]here is some direct Nebraska authority for allowing restitution in the absence of a pre-existing relationship."); *Topaz Mut. Co., Inc. v. Marsh*, 108 Nev. 845, 839 P.2d 606, 613 (1992) (recognizing an actionable unjust enrichment claim where there was an indirect benefit conferred upon the defendant).

Defendants misunderstand the "directness" aspect of unjust enrichment. It does not refer to the relationship between the parties, but to a relationship between conduct and benefit that is not "incidental." *In re Processed Eggs Products Antitrust Litig.*, 851 F. Supp. 2d 867, 934 (E.D. Pa. 2012). *Cardizem*, 105 F. Supp. 2d at 671. Defendants' unduly narrow understanding of unjust enrichment has been repeatedly rejected. *See also K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 545 n.35 ("[T]he essence of the doctrine of unjust enrichment is that there is no direct relationship between the parties.").

Defendants intended to benefit from the sale of their products to IPPs through their price-fixing conspiracy, proving both the nexus between the conduct and the benefit, and that the Defendants were aware of the benefit. *See Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *9 (S.D. Fla. Sept. 19, 2011) (holding that paying allegedly excessive premiums through a third-party constitutes a direct benefit and gives rise to a claim for unjust enrichment); *Fuel Senders,* , 2014 WL 2993742, at *42 (E.D. Mich. July 3, 2014) (same). The

fact that that the benefit conferred by IPPs on Defendants did not pass directly from IPPs to Defendants—but instead passed through third-parties—does not preclude IPPs' unjust enrichment claims.

Neither can Defendants plead ignorance of the benefits they retained through their conspiracy as a defense to unjust enrichment, as—the purpose of their conspiracy was to capture illegal profits. No court has held that price-fixers are shielded from indirect purchaser claims based on failure to "appreciate" their ill-gotten gains, in the sense the Defendant urges on this Court. *E.g.*, *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1189-90 (N.D. Cal. 2009); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618, 668-71 (E.D. Mich. 2000); Restatement (Third) of Restitution § 3 (2011) ("A person who interferes with the legally protected rights of another, acting without justification and in conscious disregard of the other's rights, is liable to the other for any profit realized by such interference.").

### (b)   IPPs' Injuries are Not Too Remote to State an Unjust Enrichment Claim

Defendants argue that IPPs' claim for unjust enrichment must fail in Arkansas, Iowa and New York because injuries there would be deemed too remote to sustain an action for unjust enrichment. Def. Memo, at 50. Defendants cite cases completely unrelated to indirect purchasers' payment of prices inflated by antitrust violators in the manner alleged here. *Contra Ark. Carpenters' & Welfare Fund v. Phillip Morris Inc.*, 75 F. Supp. 2d 936, 946 (E.D. Ark. 1999) (union trust fund suing tobacco for funds spent on beneficiaries due to use of tobacco products), *Southard v. VISA U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007) (consumer class including credit card and *cash* consumers suing for credit card antitrust violations, where ill-gotten profits had already been disgorged); *New York v. Daicel Chem. Indus. Ltd.*, 42 A.D. 3d 301, 304 (N.Y. App. Div.

2007).[33]  These cases are readily distinguishable because they do not address, as we have here, a discrete chain of distribution where the harm can be directly traced to the Plaintiffs. This case is more analogous to *In re Auto. Parts Antitrust Litig.*, where the court allowed the indirect purchaser plaintiffs' unjust enrichment claims to go forward because IPPs' damages resulting from Defendants' auto parts conspiracy could be easily identified and calculated. 2014 WL 2993742, at *36 (E.D. Mich. July 3, 2014). By any standard, Defendants' retained their illegally inflated profits from price fixing Vehicle Carrier Services, and thus IPPs have a viable claim for unjust enrichment.

**(c)      Futility Obviates the Requirement for Plaintiffs to Exhaust All Remedies under Tennessee Law**

To maintain an unjust enrichment claim under Tennessee law, "a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile." *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W. 3d 512, 526 (Tenn. 2005); *see also*, *Chocolate*, 749 F. Supp. 2d at 242 (M.S. Pa. 2010) (construing Tennessee law and holding same). Here, the IPPs have been damaged as a result of Defendants' price fixing and have no right of recovery against the automobile manufacturers because they were not involved in Defendants' price fixing conspiracy. Since no cognizable remedy exists against IPPs' contracting parties, futility is self-evident. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1192-93 (N.D. Cal. 2009); *In re Processed Egg Products Antitrust Litig.*, 851 F. Supp. 2d 867, 919-20 (E.D. Pa. 2012) (same). Defendants' can only point to a single case to

---

[33] This case does not reflect a universal rule stating indirect purchasers' unjust enrichment claims are too attenuated in New York. The *Cox* "plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment." *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40, 778 N.Y.S.2d 147, 149 (App. Div. 2004).

support their contention, *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 509 (E.D. Pa. 2006). But that case was decided purely on the basis that plaintiffs did not *address* futility in their complaint or brief. Here, plaintiffs have fully alleged futility, and their claims for unjust enrichment should not be dismissed.

### (d)    IPPs Adequately Plead Unjust Enrichment Under California Law

"California courts, including the Supreme Court of California, have acknowledged that parties may pursue causes of action arising from an unjust enrichment claim." *In re Processed Egg Products Antitrust Litig.*, No. 08-2002-2012 WL 93566, *33 (E.D. Pa. Mar. 20, 2012) (citing *Ghirardo v. Antonioli*, 924 P.2d 996, 1002-03 (Cal. 1996)). Though a minority of courts have found otherwise, "the weight of authority indicates that California law recognizes a cause of action for unjust enrichment/restitution." *Wilder v. JP Morgan Chase Bank, N.A.*, No. 09-834 (C.D. Cal. Nov. 25, 2009) (citing multiple cases); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 4345435, at *3 (N.D. Cal. Sept. 15, 2011) (allowing unjust enrichment claim to proceed in similar price-fixing case).

### (e)    *Illinois Brick* Does Not Bar Unjust Enrichment Claims

Defendants advance a novel proposition that unjust enrichment claims must fail in states that do not permit indirect purchasers to recover under the antitrust laws. However, they cannot cite one case from any state court supporting this view. Of the seven states cited by Defendant that apply the *Illinois Brick* rule to bar actions by indirect purchasers, four of those states have enacted "*Illinois Brick* Repealer Statutes" allowing actions for indirect purchasers.[34]

It is incorrect to assume that any state prevents an unjust enrichment claim because

---

[34] *See* Arkansas (Ark. Code Ann. § 4-75-315); Illinois (740 ILL. COMP. STAT. 10/7); Oregon (OR. REV. STAT. § 646.780(1)(a); Rhode Island (R.I. Gen. Laws § 6-36-12(g).

different state policies underlie different causes of action. *See Ciardi v. F. Hoffmann La Roche, Ltd.*, 762 N.E.2d 303, 309-10 (Mass. 2002) (permitting a cause of action under Massachusetts consumer protection law, but not under its antitrust law). Unlike "antitrust claims, Plaintiffs' common law claims for unjust enrichment depend upon allegations and proof that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Cardizem*, 105 F. Supp. 2d at 669 (citations omitted). In the absence of authority from state courts precluding the indirect purchaser unjust enrichment claims, there is no reason to believe that the *Illinois Brick* rule applies.

### E.    The Shipping Act Does Not Preempt IPPs' State-Law Claims

#### 1.    The Shipping Act Does Not Preempt IPPs' State Antitrust Damage Claims

Defendants cannot overcome "the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "Only a clear and manifest conflict with federal law, or clear and manifest Congressional intent to override state choices, will overcome the presumption against preemption." *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 250 (3d Cir. 2014). Defendants must show a "clear and manifest purpose of Congress" to preempt Plaintiffs' claims. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995).

Federal statutes preempt a field only when the Congressionally mandated scheme is "so pervasive that Congress must have intended to leave no room for the states to supplement." *City of Charleston, S.C. v A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002). Defendants' preemption argument is especially dubious given the "long history of state common-law and

statutory remedies against monopolies and unfair business practices, [from which] it is plain that this is an area traditionally regulated by the States." *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); *see also*, *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973) ("Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.") (quoting *US v. Philadelphia National Bank*, 374 U.S. 321, 350-51 (1992)).

Defendants cite *U.S. v. Locke*, 529 U.S. 89, 99 (2000) to suggest that no presumption against preemption should apply here. *Locke* involved the Ports and Waterways Safety Act of 1972, and preemption of the State of Washington's maritime-specific legislation regarding oil-tanker operation and design that exceeded federal maritime regulations. Courts have repeatedly rejected arguments that the Shipping Act is a comprehensive regulatory scheme that occupies the field. *See, e.g., Wylie v. Foss Maritime Co.*, No. C 06-07228 MHP, 2008 WL 4104304, at *11 (N.D. Cal. Sept. 4, 2008) (addressing whether state meal and rest break provisions were preempted by "manning" and other labor-related provisions of the Shipping Act; holding that defendant's "'field preemption' argument fails . . . because defendant cites to no case finding that the Shipping Act is a comprehensive regulatory scheme;" and noting that the Ninth Circuit, "[i]n finding that state regulation of overtime wages can coexist alongside provisions of the Shipping Act, . . . implicitly rejected a 'field preemption' argument) (*citing  Pacific Merchant Shipping Association v. Aubry*, 918 F.2d 1409 (9th Cir. 1990). Courts continue to apply the presumption against preemption in the maritime context. *See e.g., Pacific Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1166-67 (9th Cir. 2011), cert denied, 133 S.Ct. 22 (2012) (noting that the Supreme Court, post-*Locke*, "explained the proper scope of the presumption against preemption in *Wyeth v. Levine*, 555 U.S. 555 . . . (2009);" denying defendant's field preemption

claim). This case is more akin to *Holk v. Snapple Beverage Corp.,* 575 F.3d 329 (3rd Cir. 2009) (regarding state-law false advertising claims on bottled drinks subject to Food and Drug Administration regulation) than to *Locke* because Plaintiffs' claims arise under generally applicable state laws (*Holk*), not maritime-specific legislation (*Locke*). *See E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1046 (9th Cir. 2007) ("We ordinarily do not deem Congress to preempt laws of general applicability.").

*Holk* found that:  1) state-law false-advertising were traditional state health and safety regulations; 2) federal regulation of food labeling did not defeat the presumption against preemption; and 3) allowing the suit to proceed was not incompatible with FDA regulations. 575 F.3d at 336-39. The same analysis applies here, and leads to the same conclusion of no implied preemption.

The generally applicable antitrust and consumer protection statutes at issue here are a legitimate exercise of the States' power to protect their citizens from economic harm. *See ARC America*, 490 U.S. at 101 ("Given the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States."). This tradition heightens the "presumption against preemption. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'").

The FMC's jurisdiction over anticompetitive conduct is neither comprehensive nor exclusive. Even if it were comprehensive, as the *Holk* court observed:  "we are reluctant to find field preemption predicated solely on the comprehensiveness of federal regulations. The Supreme Court has repeatedly stated that 'the mere existence of a federal regulatory scheme,'

even a particularly detailed one, 'does not by itself imply pre-emption of state remedies.'"  575

F.3d at 339 (internal citations omitted). The FMC's actions in the Vehicle Carrier Services market

provide no answer to the question of whether state-law causes of action for anti-competitive

conduct have been ousted.

Defendants rest their preemption argument on a supposed parade of horribles they

speculate would arise if every state-law antitrust and consumer protection statute is not barred.

They cite *Johnson v. Reliant Energy*, 289 P.3d 1186 (Nev. 2012), and *Leggett v. Duke Energy

Corp.*, 308 S.W. 3d 843 (Tenn. 2010) – where the highest courts of Nevada and Tennessee held

that state-law antitrust claims against natural gas brokers were preempted by operation of the

Natural Gas Act, the Natural Gas Policy Act, and the Natural Gas Wellhead Decontrol Act. These

cases, drawn from the "long and entangled history of natural gas regulation in this country,"

*Johnson*, 289 P.3d at 1193, are irrelevant. In *Johnson*, the Nevada Supreme Court never even

considered the "presumption against preemption."   *See Cipollone*, 505 U.S. at 516; *Holk*, 575

F.3d at 334. In *Leggett*, the Tennessee Supreme Court decided that operation of the state's

antitrust laws would undermine the uniformity and freedom from government interference

created by the patchwork of applicable federal legislation. 308 S.W.2d at 871; *see also Johnson*,

289 P.3d at 1193 (same).

*Gallo* held that such claims were not preempted. *Gallo*, 503 F.3d at 1048. *Gallo* rested its

conclusion on well-accepted principles of preemption analysis: first, "Congress's decision not to

expressly preempt such damages claims indicate[d] a lack of intent to do so."  503 F.3d at 1046.

And second, "[a]lthough Congress[] . . . inten[ded] to move toward a less regulated natural gas

market, state and federal antitrust and unfair competition laws complement rather than

undermine such a goal, because they support fair competition."  *Id.*  (internal citations omitted).

56

In construing the text of a statute, courts "begin with the text of the provision in question, and move on, *as need be,* to the structure and purpose of the Act in which it occurs." *NY State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co*., 514 U.S. 645, 655 (1995) (emphasis added). When the statute shows Congressional intent, it controls and the analysis ends. *Accord Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Defendants flatly assert the "Shipping Act preempts IPPs' state law claims." *Id.* Defendants cite no case for the proposition, nor does the language of the Shipping Act support the argument. The Act's sole reference to claim preclusion, at 46 U.S.C. § 40307(d), speaks only and explicitly in terms of claims asserted under the Clayton Act (for violations of exclusively *federal* antitrust law).[35] But, there is no reference to state law claims in the Shipping Act. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are *not* pre-empted." *Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 517 (1992) (emphasis added).

> **(a)  Congress Knew How to Preempt State Antitrust Law at the Time it Drafted the Shipping Act—the Implication is that Congress Chose Not to Preempt**

*Cipollone* is especially relevant because at the time Congress drafted the Shipping Act in 1984, state-law antitrust and consumer-protection causes of action long existed. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). Well before the Supreme Court endorsed concurrent state and

---

[35] Defendants' ignore this provision in their field preemption arguments. Indeed, had Congress intended to occupy the field of maritime regulation so as to impliedly preempt all antitrust claims, there would have been no need to include this provision in the Shipping Act.

federal antitrust regimes *California v. ARC America Corp.*, 490 U.S. 93, 105 (1989), Congress had been considering these laws in enacting federal statues. When Congress amended the Federal Aviation Act in 1978, it added a provision expressly barring state law claims. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 160 (2d Cir. 2012). The Federal Aviation Act states:  "[A] State … may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier …." 49 U.S.C. § 41713(b)(1).

When Congress passed the Export Trading Company Act of 1982, Pub. L. 97-290, codified at 15 U.S.C. § 4002(a)(7), it swept state law into the definition of "antitrust laws:" . "Antitrust laws," as used in the act, refers to the Clayton Act, the Federal Trade Commission Act, "*and any State antitrust or unfair competition law*." *Id.* (emphasis added).

The 98th Congress – which enacted the Shipping Act – also enacted the National Cooperative Research Act of 1984, to limit the antitrust liability of certain joint venture and standards-setting organizations. Pub. L. 98-462, codified at 15 U.S.C. § 4302. To accomplish this, the legislation specified that its provisions applied to"[i]n any action under the antitrust laws, *or under any State law similar to the antitrust laws . . .*" *Id.* (emphasis added).

This practice has continued into recent times, such as when Congress passed the "Antitrust Criminal Penalty Enhancement and Reform Act of 2004," a statute which can limit a defendant's antitrust liability from private suits by cooperating with a government investigation. Pub. L. 108-237, codified at 15 U.S.C. § 1 note. State law is explicitly included within its ambit:  ". . . in any civil action alleging a violation of section 1 or 3 of the Sherman Act, *or alleging a violation of any similar State law*, based on conduct covered by a currently effective antitrust leniency agreement . . ." *Id.* (emphasis added)  *See also* "Charitable Gift Annuity

58

Antitrust Relief Act of 1995," Pub. L. 104-63, codified at 15 U.S.C. § 37(b) ("any person subjected to any legal proceeding for damages, injunction, penalties, or other relief of any under the antitrust laws, *or any State law similar to any of the antitrust laws . . .*" (emphasis added)).

The Shipping Act's limited preclusion of certain federal Clayton Act antitrust claims does not employ the explicit language Congress has used in other statutes that modify antitrust liability. And this is not surprising – the Shipping Act's competition regulatory scheme is hardly comprehensive, or even self-contained within the FMC. *See U.S. v. Gosselin World Wide Moving N.V.*, 411 F.3d 502 (4th Cir. 2005) (rejecting Shipping Act-immunity challenges to Sherman Act criminal prosecution by Antitrust Division). Indeed, the fact that the DOJ's ongoing antitrust investigation has yielded multiple guilty pleas from Defendants establishes that the Defendants' assertion that the Shipping Act "vest[s] in the FMC exclusive jurisdiction over anticompetitive or collusive agreements" (Motion at 60) (emphasis added) is untrue.[36]

Defendants argue, that Plaintiffs' claims are *impliedly* preempted. But Defendants' flawed analysis does not satisfy the heavy burden the law places on them – "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored," *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973) – and therefore, their implied preemption argument fails. The Act's bar on private Clayton Act actions creates a strong negative implication that state

---

[36] Plaintiffs request that the Court take judicial notice of the criminal information, press releases, plea agreements, and sentencing transcripts from the criminal proceedings against Defendants CSAV and K Line, which have pleaded guilty and agreed to pay criminal fines of $8.9 million and $67.7 million, respectively, for their violations of the Sherman Act. *See* Request For Judicial Notice (filed concurrently), Ex. F, *K Line* Criminal Action Press Release (DOJ announcement of plea agreement with K Line, noting that "Today's charge is the result of an ongoing federal antitrust investigation into price fixing, bid rigging, and other anticompetitive conduct in the international roll-on, roll-off ocean shipping industry, which is being conducted by the Antitrust Division's Washington Criminal I Section and the FBI's Baltimore Field Office, along with assistance from the U.S. Customs and Border Protection Office of Internal Affairs, Washington Field Office/Special Investigations Unit.").

indirect purchaser antitrust claims are not preempted under a central canon of statutory construction.[37] In *Wyeth v. Levine*, the Supreme Court rejected the argument that the FDCA preempted state tort suits, because Congress knew of, and declined to bar, state torts actions:

> If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history. . . . Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness. As Justice O'Connor explained in her opinion for a unanimous Court: "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them."

555 U.S. 555, 574-75 (2009) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–167 (1989)).

*California v. ARC Am. Corp.* ("*ARC*"), reaffirmed the longstanding principle that states have the right to enforce their own statutory schemes regarding economic regulation, including those addressing price fixing schemes like those present in this case. *ARC* held that "state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law…" *ARC,* 490 U.S. 93, 105 (1989). The Supreme Court found no conflict between state law and federal law when the state remedies "cannot and do not purport to affect remedies available under federal law." *Id.* at 103.

There is no conflict with supplemental state antitrust remedies. When the Shipping Act

---

[37] *See* Antonin Scalia & Bryan A. Garner, READING LAW, 108 (2012) (quoting J.A. Corry, *Administrative Law and the Interpretation of Statutes*, 1 U. TORONTO L.J. 286, 298 (1936) ("The particular which is omitted from the particulars is the *casus omissus*, which the judge cannot supply because that would amount to legislation.").

was drafted, numerous states allowed indirect purchaser recovery for antitrust violations.[38]  By the time Congress revisited the Act in 1998, the Supreme Court had sanctioned state indirect purchaser antitrust claims in *ARC* and other states had passed statutes permitting indirect purchaser claims.[39]

### (b)      The Act's Enforcement Scheme is Not Comprehensive

The Act's regulatory scheme is not comprehensive: it relies on both the FMC and traditional antitrust law. To imply preemption, the regulatory scheme must be "so pervasive that Congress must have intended to leave no room for the states to supplement." *City of Charleston, S.C. v A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002);

Defendants argue the FMC's enforcement jurisdiction occupies the field. Def. MTD at 58-60.[40]  But the FMC's jurisdiction is not exclusive. For unfiled agreements, the DOJ may pursue Sherman Act criminal enforcement. Only private actions under the Clayton Act are barred in this context. The Act limits the DOJ's jurisdiction, but its enforcement of antitrust law remains for unfiled agreements. 46 U.S. Code § 40307(d). The Shipping Act does not immunize loyalty agreements at all. 46 U.S. Code § 40307(b)(4). The Act has become less comprehensive, in that – in contrast, *e.g.*, to FERC—the Commission no longer sets rates. The Act's scheme is an adjunct even at the level of federal antitrust enforcement. There is no reason to think that any of these changes were intended to displace state damage remedies for unfiled and prohibited bid-rigging agreements.

---

[38] *See*, S. Scott Parel, *Removing the Illinois Brick Standing Barrier from the Texas Free Enterprise & Antitrust Act—A Matter of Choice*, 50 SMU L. Rev. 409, 419 n. 59 (1996).
[39] *See, e.g.* Minn. Stat. §325D.57.
[40] Defendants' reliance on a press release by the Secretary of the FMC as to the disposition of an enforcement action as support for preemption misses the mark, Def. MTD at 59, because it does not address either indirect purchaser remedies or state competition law.

### (c)   State Antitrust Laws Do Not Undermine the Shipping Act's Aims

Defendants erroneously contend that state antitrust laws conflict with the purposes of the Act. This is not so. *E.g.* 46 U.S.C.A. § 40101 (stating the purposes of the Act to include: "an efficient and economic transportation system . . . competitive and efficient ocean transportation and by placing a greater reliance on the marketplace."). State competition laws serve the purposes of the Act by promoting efficient markets. "[S]tate and federal antitrust and fair competition laws complement rather than undermine such a goal because they support fair competition." *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1046 (9th Cir. 2007) (internal quotations and citations omitted); *see also, Carnation Co. v. Pac. Westbound Conference*, 383 U.S. 213, 218 (1966) ("We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry.").

Defendants argue, without citation, that allowing state remedies here would conflict with the Act's purpose of "uniformity." Def. MTD at 56.[41] Defendants cannot explain how state remedial action against the same conduct disturbs uniformity. There is no conflict between state *remedies* and the federal regulatory framework because both condemn the same conduct: price fixing, bid-rigging and customer allocation.[42] The imposition of an additional remedy does not

---

[41] Defendants' reading of the Act's aim of "reducing government interference" as reducing all enforcement is a misunderstanding of the Act's deregulatory aims vis-à-vis the reduction to the FMC's authority. Def. MTD at 56.

[42] For this reason, most of Defendants' field preemption cases are readily distinguishable. *See* Def. MTD at 54.

conflict with FMC's authority any more than when the DOJ indicts and fines non-filing cartel members for antitrust violations.

>   **(d)     CSAV and "K" Line—at a Minimum—Should Be Estopped
>            from Invoking Preemption**

Federal courts possess inherent equitable authority to punish malfeasance. One such sanction is judicial estoppel. *See Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir.1999). Judicial estoppel bars a litigant from asserting a position that is inconsistent with one it previously took before a court or agency.

Three requirements must be met before a district court may properly apply judicial estoppel. First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. *See Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.1996). Second, judicial estoppel is unwarranted unless the party changed his or her position "in bad faith—i.e., with intent to play fast and loose with the court." *Id.* Finally, judicial estoppel must be "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. *Klein*, 185 F.3d at 108 (quotation marks and citation omitted).

In this case, Defendants CSAV and "K" Line should be estopped from asserting a preemption defense, having taken an inconsistent position when they pleaded guilty. In this Court, Defendants CSAV and "K" Line seek dismissal of all claims against them. But when these Defendants stood before another federal court in connection with their sentencing for criminal violations of the federal antitrust laws, they relied upon the pendency of these civil actions as the basis for avoiding payment of any restitution to the victims of their illegal activity. *See* Request For Judicial Notice (filed concurrently), Ex. D, CSAV Criminal Action Sentencing Transcript

(THE COURT:  "Further, although restitution is not being ordered directly, based upon the representations of the parties, there are numerous civil cases related to the same conduct, and that the disposition of those civil cases is being handled appropriately, without the necessity for a specific order of restitution."); Ex. G, "K" Line Criminal Action Plea Agreement ("In light of the civil cases filed against the defendant, which potentially provide for a recovery of a multiple of actual damages, the recommended sentence does not include a restitution order for the offense charged in the Information.").

The three requirements for judicial estoppel are met here. Defendants CSAV and "K" Line should not be permitted to represent to their criminal sentencing court that restitution will be accomplished through the civil actions pending against them, and then argue in this Court that any such civil actions are preempted. Such tactics smack of gamesmanship, and these two Defendants should not be permitted to take directly conflicting positions concerning the remedies available to those injured by their criminal activity.

### F.    The IPPs' State Claims Under Certain State Antitrust and Consumer Protection Acts Should Not Be Dismissed

#### 1.    State Regulatory Antitrust Exemptions Do Not Bar IPPs' Claims under Iowa, Michigan, Minnesota, Nevada, and New Hampshire Antitrust Law and the Unfair Trade Practices Act of Massachusetts

Defendants assert that, simply because shipping is regulated generally by the Federal Maritime Commission, such regulation confers blanket immunity to Defendants for violations of antitrust laws in states that have a regulatory exception. Regulatory exceptions are not to be construed so broadly. There is hardly an industry in this country that is not subject to regulatory oversight. Following Defendants' reasoning, practically every industry would fall into the regulatory exception. For this reason, courts in states that provide for such statutory exemptions

64

have limited their application.

The Iowa Supreme Court has held that the immunity for regulated activity afforded under Iowa Code §553.6(4) only applies to anti-competitive conduct that the regulatory body has expressed as a policy and actively supervised.  *Mueller v. Wellmark, Inc.*, 2012, 818 N.W.2d 244, 260 (Iowa 2012). There is no argument in this case that Defendants' unlawful activity constitutes an express of federal maritime policy or is actively supervised.

Similarly, the Minnesota Supreme Court has limited the exemption to activities that are "required or specifically permitted" by the regulatory authority. *Minnesota–Iowa Television v. Watonwan Television Improvement Ass'n*, 294 N.W.2d 297, 306 (Minn.1980). Again, Defendants' collusion is neither "required or specifically permitted" by the FMC or the Shipping Act.

Defendants point to N.H. Rev. Stat. § 356:8-a in support of this meritless argument. Consistent with the limited application of statutory exemptions elsewhere, the New Hampshire statute provides: "Activities of and arrangements between persons shall be exempt from this chapter if such are permitted, authorized, approved, required, or regulated by a regulatory body acting under a federal or state statutory scheme or otherwise actively supervised by a regulatory agency."  On its face, this statute cannot apply to Defendants' unlawful and undisclosed conspiratorial conduct that is not "permitted, authorized, approved, required, or regulated … or otherwise actively supervised" by the FMC. To this point, the one New Hampshire case on which Defendants rely took pains to note that state insurance law specifically contemplated the activity in question in the case—a point that is conspicuously absent from Defendants' briefing. *Ben's Auto Body v. Teitelbaum*, 2008 WL 5224420, at *6 (D. N.H. Dec. 15, 2008).

Nor does Mich. Comp. Laws § 445.774(5) support defendants' argument. That statute states:  "A transaction or conduct made unlawful by this act shall not be construed to violate this

act where <u>it is the subject</u> of a legislatively mandated pervasive regulatory scheme … which <u>confers exclusive jurisdiction</u> on a regulatory board or officer to authorize, prohibit or regulate the transaction or conduct."  Here, there is no credible allegation that the Shipping Act confers exclusive jurisdiction on the FMC, as evidenced by the DOJ's successful prosecution of Defendants' in this matter and as explained more fully in section __, *infra.*

Nevada Revised Statute § 598A.040(3)(a) only exempts conduct that is "expressly authorized, regulated or approved" by a federal or state statute. Again, on its face, the statute is inapplicable to Defendants' unlawful conduct that is not "authorized, regulated or approved" by any federal statute.

Finally, Massachusetts General Law chapter 93A § 3 only applies to "to transactions or actions <u>otherwise permitted</u> under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States."  Defendants' reliance on this statute—without even quoting its actual terms—is plainly unwarranted.

> ### 2. Under *Shady Grove*, the Consumer Protection Acts of Montana and South Carolina Do Not Bar Class Action Suits

In 2010, the Supreme Court expressly held that New York's class action bar did not preclude plaintiffs, proceeding in diversity, from bringing a class action lawsuit under Rule 23. *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), Justice Scalia explained:

> A class action no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of separate suits. And like traditional joinder it leaves the parties' legal rights and duties intact and the rules of decision unchanged.

*Id.* at 408. Since then, multiple courts have applied *Shady Grove*'s reasoning to other states' class action bars, including those promulgated by South Carolina and Montana. *See In re Hydroxycut*

*Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 654 (S.D. Cal. 2014) (applying *Shady Grove* to South Carolina and Montana's class action bars); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012). Defendants have only cited cases which predate, and have been abrogated by, *Shady Grove.* Therefore, they do not justify dismissal of IPPs' Montana or South Carolina class action claims. In any event, the Court need not reach this issue now as it is more appropriately considered at class certification.

        3.      **The IPPs' Complaints Comply with the Requirements of the Massachusetts Consumer Protection Act**

                (a)    **Under the Massachusetts Consumer Protection Act, Defendants Are Not Entitled to a Pre-suit Letter Because They Do Not Maintain Places of Business or Keep Assets Within Massachusetts**

"The demand requirements of [Section 93A] shall not apply . . . if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth." Mich. Gen. Law ch. 93A § 9(3). *See also, Williams v. Perrault*, 2011 Mass. App. Div. 180 (Dist. Ct. 2011) *aff'd,* 82 Mass. App. Ct. 1117, 976 N.E.2d 214 (2012). Here, the IPPs' complaints "plainly do[] not recite any factual allegations that the Defendants' places of business or assets are located in Massachusetts." *In re Processed Egg Products Antitrust Litig.*, 851 F. Supp. 2d at 903 (quoting M.G.L. 93A § 9(3)). Rather, they are alleged to be foreign corporations located in Japan, Norway, Chile, and South Korea and American subsidiaries with headquarters outside the Commonwealth of Massachusetts. *See* AD-CAC ¶¶ 44-57; EP-CAC ¶¶ 59-72; TD-CAC ¶¶ 45-57. "Accordingly, pleading pre-suit notification is not required." *Id. See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2013 WL 4505701, *11 (N.D. Cal. Aug. 21, 2013).

**(b)   Massachusetts Consumer Protection Act Allows Indirect Purchaser Claims like Those Advanced by Auto Dealer and Truck Equipment Dealer Plaintiffs**

Defendants incorrectly argue that ADPs and TDPs cannot maintain claims under the Massachusetts Consumer Protection Act (MCPA. The Supreme Judicial Court of Massachusetts concluded that Section 9 of the MCPA, governing claims brought by individuals, unquestionably extends to indirect purchasers. *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 66-67 (2002) ("We read the language of [the Consumer Protection Act] as a clear statement of legislative policy to protect Massachusetts consumers through the authorization of . . . indirect purchaser actions."). ADPs and TDPs proceed under Section 11 of the same Act, providing "for a claim for 'unfair' or 'deceptive' trade practices as between businesses." *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 495 (1st Cir. 2009). That section should be construed to permit claims by indirect purchasers. Sections 9 and 11 are part of the same consumer protection law, and "[s]tatutes addressing the same subject matter clearly are to be construed harmoniously so as to . . . give rise to a consistent body of law." *Ciardi*, 436 Mass. at 62.

It would be "absurd" and "unreasonable" to interpret sections 9 and 11 inconsistently with respect to indirect purchaser claims. *Id.* at 68 (Sosman, J., dissenting). This Court should join other federal district courts addressing consolidated antitrust actions and hold that "Massachusetts does not bar indirect purchaser standing under its consumer protection act." *Flonase*, 692 F. Supp. 2d at 545 (claims of union health and welfare plans alleging damages for reimbursement of plan members who purchased Flonase at inflated prices upheld); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 n.12 (S.D.N.Y. 2011) ("[B]oth direct and indirect purchasers may maintain a cause of action under the [Massachusetts] consumer protection act.").

68

### 4.    Price-Fixing Gives Rise to a Consumer Protection Claim in Arkansas, Hawaii, New York, and Rhode Island

"The Arkansas Deceptive Trade Practices Act [Ark. Code Ann. § 4–88–107(a)(10)] makes illegal any trade practice which is unconscionable." *Baptist Health v. Murphy*, 365 Ark. 115, 128 (2006). The Arkansas Supreme Court defines "unconscionable" to mean "an act that affronts the sense of justice, decency, or reasonableness," *Id.* at 128 n.6 (internal quotation marks omitted), including conduct "violative of public policy or a statute." *Id.* at 128. Arkansas courts have held that, "[f]ollowing . . . precedent and well-grounded analysis and reasoning, this Court concludes that price fixing is an unfair trade practice actionable under ADTAP." *Burton v. Micron Tech., Inc.*, No. CV 2004-226-1, at 3 (Ark. Cir. Ct. 1st Div. Nov. 6, 2009). Moreover, numerous federal courts have also recognized that a claim for price-fixing is actionable under the Arkansas Deceptive Trade Practices Act (ADTPA). Nor can Defendants direct this Court to an Arkansas case to the contrary. [43] Instead, Defendants cite federal holdings mistakenly relying on a perceived absence of authority "interpreting the [ADTPA] to apply to price-fixing." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1124 (N.D. Cal. 2008).[44]

---

[43] *Auto Parts-Wire Harness*, 2013 WL 2456612, at *27; *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-cv-852-LA, 2012 WL 3841397, at *6 (E.D. Wis. Sept. 5, 2012); *In re Aftermarket Filters Antitrust Litig.*, Case No. 08-C-4883, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5, 2009); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1157 (N.D. Cal. 2009); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 583 (M.D. Pa. 2009); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig,* 516 F. Supp. 2d 1072, 1108-09 (N.D. Cal. 2007); *Cal. v. Cal. v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1143-44 (N.D. Cal. 2007); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 178-79 (D. Me. 2004).

[44] *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036, 1042 (N.D. Cal. 2011) (decided on the basis of a "lack of any cases from Arkansas state or federal courts" on price fixing claims under the ADTPA); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819, 2010 WL 5094289, at *8 (N.D. Cal. Dec. 8, 2010) ("The Court has found no Arkansas case law indicating that the ADTPA reaches price-fixing conduct of the nature presented in this lawsuit."); *cf. In re Graphics Processing Units Antitrust Litig.*, 527 F.

Other federal courts have held that antitrust violations just like Defendants' give rise to a justiciable cause of action under the Hawaii Unfair Trade Practices Act. *See DRAM*, 516 F. Supp. 2d at 1109-10; *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1158 (N.D. Cal. 2009). Defendants cite only one case to the contrary.  But that case construes the Act too narrowly, and this Court should decline to follow it. *Compare In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 787 (N.D. Ohio 2011), *with Soule v. Hilton Worldwide, Inc.,* No. CIV. 13-00652 ACK-RL, 2014 WL 794801 at *8 (D. Haw. Feb. 26, 2014) ("Hawaii's consumer protection laws are also intended to preserve competition…") (quoting *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 445(2010)).

The court in *Auto Parts-Wire Harness* held that New York's consumer protection statute permits antitrust claims. Thus, he plaintiffs' allegation that "New York consumers paid inflated prices, that Defendants took efforts to conceal their agreement from New York plaintiffs and the indirect class," stated a claim under Gen. Bus. L.§ 349. No. 2:12-cv-101, 2013 WL 2456612, at *28 (E.D. Mich. June 6, 2013) (noting that "authority exists demonstrating that an antitrust claim may be viable under [New York's] consumer protection statute" and rejecting the defendants' argument to the contrary).  Numerous other courts have upheld indirect purchaser antitrust claims under Gen. Bus. Law § 349. *See*, *e.g.*, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1143-44 (N.D. Cal. 2008); *In re TFT-LCD*, 586 F. Supp. 2d at 1128 (denying defendants' motion to dismiss because "[p]laintiffs have alleged at least in a conclusory fashion that defendants have engaged. . . in deceptive acts to conceal the alleged agreement to fix prices"); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (N.Y. App. Div. 2004).

---

Supp. 2d 1011, 1030 (N.D. Cal. 2007) (concluding erroneously that price fixing is "not the kind of conduct prohibited under the[ ADTPA].").

70

IPPs here allege that purchasers in New York paid inflated prices due to Defendants' illegal price fixing agreement, that Defendants took efforts to conceal their illegal Vehicle Carrier Services pricing agreement, and that IPPs were victims of Defendants' deceptive acts in New York. *See* SAC ¶¶ 189-93, 234, 255. Therefore, IPPs have alleged a deceptive act or practice under Section 349.

Courts have also "determined that price-fixing injuries fall within the scope of the statute and have allowed consumers alleging a price-fixing claim to proceed under" the Rhode Island Unfair Trade Practices and Consumer Protection Act (RIUTPCPA).[45]   EPPs have pleaded precisely what is required and more. Rhode Island consumers suffered "an ascertainable loss of money or property" as a result of "Defendants' deception[, which] likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Vehicle Carrier Services at prices set by a free and fair market." EPP SAC ¶ 279(e)-(f). This is sufficient to state a claim under the RIUTPCPA.

### 5.   IPPs Have Alleged Sufficient In-State Injury to Sustain Claims under the North Carolina Consumer Protection Act

Defendants contend that IPPs' have failed to state claims under the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, because there is no "substantial" in-state injury in North Carolina. That is not the case. The North Carolina Act requires some in-state effect of out-of-state activities. So long as there is a substantial effect on the plaintiff's in-state business, the North Carolina Act will apply to a defendant's out-of-state anticompetitive activities. *The 'In'*

---

[45] *Auto Parts*, 2013 WL 2456612, at *27-28 (citing *Chocolate*, 602 F. Supp. 2d at 586); *see also Flat Panel*, 586 F. Supp. 2d at 1129-30; *In re DRAM*, 536 F. Supp. 2d at 1144-45; *In re Static Random Access Memory Antitrust Litig.*, No. 07-md-1819-CW, 2008 WL 2610549, at *4 (N.D. Cal. Feb. 14, 2008).

*Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494,  501-02 (M.D.N.C. 1987).[46]  The test is not, as Defendants suggest, how large the effect in North Carolina might be relative to the overall scheme, but whether the plaintiff  suffered a substantial injury within the state. *Id.*

Here, the Defendants conspired to raise prices for Vehicle Carrier Services and it was either known by Defendants or reasonably foreseeable that in the ordinary course of commerce that those motor vehicles would ultimately be transported to and sold in North Carolina. The North plaintiffs suffered a substantial injury in North Carolina through paying higher prices for motor vehicles they purchased. As a result, they can assert claims under the North Carolina Act.

### 6. The Shipping Act Does Not Bar IPPs' Injunctive and Damages Claims

#### (a) The Shipping Act Does Not Bar Injunctive Claims under the Sherman and Clayton Act

IPPs incorporate and adopt by reference Direct Purchaser Plaintiffs' arguments demonstrating that the Shipping Act does not address Defendants' agreements to restrict capacity as alleged in the IPPs' complaints.  See Direct Purchaser Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Direct Purchasers' Complaint, § III.A. Because capacity restriction agreements are not prohibited by the Shipping Act—and remain subject to private antitrust claims—section 40307(d) of the Shipping Act does not bar IPPs' claim for injunctive relief under the Clayton Act, 15 U.S.C. § 26.

---

[46] *In re Refrigerant Compressors Antitrust Litigation*, 2013 WL 1431756, at *18  (E.D.Mich. April 9, 2013), cited by Defendants at Def. Mem. 70, misapplied applicable law. The focus is properly on whether the North Carolina plaintiff suffered an injury within North Carolina. In the cases cited in *Refrigerant Compressors*, the plaintiff's North Carolina business was not affected. In *In Porters*, *supra.*, the plaintiff was a French company, with no North Carolina business operations. In *Merck & Co., Inc. v. Lyon*, 941 F.Supp. 1443 (M.D.N.C. 1996), the defendant was a former employee with the plaintiff's Canadian operations and had allegedly misappropriated trade secrets. Again, the plaintiff's North Carolina operations were not affected. Here, by contrast, IPPs either live or do business in North Carolina and paid higher prices for motor vehicles in North Carolina as a result of Defendants' price fixing.

**(b)     IPPs' State Law Damages Claims Are Not Barred by the Shipping Act**

Even if the Shipping Act somehow barred IPPs injunctive claims under federal antitrust law—it does not—the Shipping Act in no way references, let alone bars, the application of state antitrust laws and the award of damages under those laws. Defendants' recourse to state "harmonization" provisions is unavailing. State "harmonization" provisions generally compel recognition of interpretations of federal antitrust law, not the Shipping Act.[47] Even for federal antitrust law, the purpose of harmonization provisions is to "apply a uniform standard of conduct, not to require the state to define who may sue in state courts the same way federal courts decided who could bring an action in federal courts." *e.g., Sherwood v. Microsoft Corp.*, 2003 WL 21780975, *28 (Tenn. Ct. App. 2003). Defendants only cite one state, Michigan, which even references "exemptions" to federal antitrust law, Def. Mem. at 71-72. But Defendants cites no authority from Michigan extending a state-law exemption to matters exempted under the Shipping Act. In any case, there is no immunity or exception for unfiled cartels, like the Defendants', from indirect purchaser claims.

**7.     IPPs Withdraw their Tennessee Antitrust Act Claim**

IPPs hereby withdraw their Tennessee antitrust claim.

**8.     The Oregon and South Carolina Laws Permit End-Payors' Claims**

The Oregon legislature has rejected *Illinois Brick* and allows IPPs to recover under state law. Oregon Revised Statute § 646.780 provides that "[a]n action authorized by this paragraph may be brought regardless of whether the plaintiff dealt *directly or indirectly* with the adverse

---

[47] *E.g.* Mich. Comp. Laws. Ann § 445.784(2) ("comparable antitrust statutes"); Haw. Rev. Stat. Ann. § 480-3 ("similar federal antitrust statutes"); Ill. Comp. Stat. 10/11 ("identical or similar … federal antitrust law"); *Black v. Kirwan*, 703, P2.d 58, 63 (Cal. 1985) ("the Sherman Act").

party." O.R.S. § 646.780(1)(a) (emphasis added). In other words, the statute contemplates that the indirect purchasers can bring suit under the state antitrust statute. Defendants sole authority is an Oregon case decided before the statute was amended to allow these claims. Accordingly, this Court should deny the Defendants motion to dismiss.

Defendants argue that the IPPs' claims under South Carolina's antitrust laws should be dismissed. However, this point is moot as the IPPs are not making claims under the South Carolina's antitrust laws, rather they are making claims pursuant to South Carolina's Unfair Trade Practices Act which allows for indirect purchasers to recover.

Under the UPTA, "[p]ersons or any legal entity suffering an ascertainable loss of money or real or personal property '*as a result of* the use or employment by another person of an unfair or deceptive method, act or practice" may bring an action to recover actual damages.'" *Colleton Prep. Academy, Inc., v. Hoover Universal, Inc.*, 666 S.E2d 247 (2008), *overruled in part by Sapp v. Ford Motor Co.*, 687 S.E.2d 47 (2009) (citing S.C.Code Ann. § 39–5–140(a))(emphasis in original). On a certified question to the South Carolina Supreme Court, the Court concluded that privity is not a requirement to recover under the UPTA and "remote purchasers may maintain an UPTA suit." *Id.*

Accordingly, because the IPPs are not making a claim under South Carolina's antitrust laws but are instead making a claim under South Carolina's UPTA which allows for indirect purchasers to recover, this Court should deny Defendants motion as moot.

## G.    IPPs Have Properly Alleged Facts Supporting Injunctive Relief

Defendants finally argue that IPPs' request for injunctive relief should be denied because of a prior cease-and-desist order issued by the Japan Fair Trade Commission ("JFTC") on March 18, 2014, and because IPPs have failed to plead that Defendants' price fixing scheme is still

ongoing. That contention fails.

As the Supreme Court aptly noted in *Hawaii v. Standard Oil Co. of California*¸ 405 U.S. 251, 261 (1972), "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one."  But that observation is not applicable here, because the JFTC cease-and-desist order does not cover all of the Defendants. The JFTC's order issued against NYK Line, "K" Line, Wallenius Wilhelmsen Logistics ("WWL"), Nissan Motor Carrier Co ("NMCC") and Mitsui OSK Lines ("MOL"). The JFTC order was not directed against the Hoegh, Eukor or CSAV Defendants.[48]  Thus, even if the injunctive relief provided by the JFTC were duplicative of the injunctive relief sought here, the Hoegh, Eukor and CSAV Defendants cannot rely upon an injunction issued against their co-conspirators in another jurisdiction to escape injunctive relief from this Court.

Defendants are also incorrect that IPPs have failed to allege any anticompetitive activities after the raids on September 6, 2012. IPPs allege that Defendants' anticompetitive activities are ongoing and the Class Period is defined "from January 2, 2002 through such time as the anticompetitive effects of Defendants' conduct ceased."

To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). IPPs have properly alleged that Defendants'

---

[48] Also, the JFTC Order appears to be directed only at the parent corporations for each of these lines. Unless NYK Line, "K" Line, WWL, NMCC and MOL concede that the JFTC Order likewise binds their respective U.S. subsidiaries, then injunctive relief from this Court against their U.S. subsidiaries would be entirely appropriate. Indeed, the JFTC Order would have no teeth if these companies' U.S. subsidiaries were able to continue the conspiracy.

price-fixing scheme is ongoing. As a result, IPPs are under a threat of an injury-in-fact that is concrete and particularized, is actual and imminent, is fairly traceable to Defendants' actions and a favorable judicial decision, *i.e.,* an injunction from this Court, will put the price fixing scheme to an end, once and for all.

Indeed, Defendants' own logic cuts against them here. If the price fixing scheme ended on or about September 6, 2012, as Defendants argue, then it would have been unnecessary for the JFTC to issue the cease-and-desist Order in March 2014 to stop a price fixing conspiracy that no longer existed. Plainly, the Japanese authorities felt that the conspiracy was sufficiently still in place to issue a cease-and-desist order 18 months after the September 2012 raids. However, as is explained above, while that Order was directed at some of the major conspirators, it did not apply to *all* of the conspirators. Thus, IPPs have alleged sufficient facts to support a claim for injunctive relief, so that this Court may finish the job begun by the JFTC.

### III.   CONCLUSION

For all the reasons stated above, this Court should deny Defendants' Motion to Dismiss the Indirect Purchasers' Complaints.

Dated:  December 12, 2014                    Respectfully submitted,

                                            By: */s/ Warren T. Burns*

76

Hollis Salzman
Meegan Hollywood
**ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
hsalzman@rkmc.com
mfhollywood@rkmc.com

Warren T. Burns
Terrell W. Oxford
Daniel H. Charest
Omar Ochoa
**SUSMAN GODFREY LLP**
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Telephone:  (214) 754-1900
Facsimile:  (214) 754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com
dcharest@susmangodfrey.com
oochoa@susmangodfrey.com

Joseph W. Cotchett
Steven N. Williams
Alexander E. Barnett
Elizabeth Tran
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
abarnett@cpmlegal.com
etran@cpmlegal.com

*Proposed Interim Co-Lead Counsel for
End-Payor Plaintiff*

James E. Cecchi
**CARELLA BYRNE CECCHI
OLSTEIN BRODY &
AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone:  (973) 994-1700
Facsimile:  (973) 994-1744
jcecchi@carellabyrne.com

*Proposed Interim Liaison Counsel for
End-Payor Plaintiffs*

Jonathan W. Cuneo
Joel Davidow
Katherine Van Dyck
Daniel Cohen
**CUNEO GILBERT & LADUCA, LLP**
507 C Street NE
Washington, D.C. 20002
Telephone: (202) 789-3960
jcuneo@cuneolaw.com
joel@cuneolaw.com
kvandyck@cuneolaw.com
danielc@cuneolaw.com

Benjamin D. Elga
**CUNEO GILBERT & LADUCA, LLP**
16 Court Street, Suite 1012
Brooklyn, NY 11241
Telephone: (202) 789-3960
belga@cuneolaw.com

Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, Mississippi 39095
Telephone:      (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
**LARSON • KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota  55101
Telephone:      (651) 312-6500
sraiter@larsonking.com

***Automobile Dealer Interim Co-Lead
Counsel***

Dewitt Lovelace

Peter S. Pearlman
**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
Park 80 Plaza West-One
250 Pehle Ave., Suite 401
Saddle Brook, NJ 07663
Telephone:      (201) 845-9600
psp@njlawfirm.com

***Automobile Dealer Liaison Counsel***

78

Valerie Nettles
**LOVELACE & ASSOCIATES, P.A.**
12870 US Hwy 98 West, Suite 200
Miramar Beach, Florida  32550
Telephone:    (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Gerard V. Mantese
David Hansma
Brendan Frey
**MANTESE HONIGMAN ROSSMAN &
WILLIAMSON, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com

Ben F. Pierce Gore
**PRATT & ASSOCIATES**
1871 The Alameda, Suite 425
San Jose, California 95126
Telephone: (408) 369-0800
gore@prattattorneys.com
*Additional Automobile Dealer Counsel*

Eric R. Breslin
**DUANE MORRIS LLP**
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, New Jersey 07102
Telephone: (973) 424-2063
erbreslin@duanemorris.com

Wayne A. Mack
J. Manly Parks
Andrew Sperl
**DUANE MORRIS LLP**
30 S. 17th Street
Philadelphia, Pennsylvania 19103
wamack@duanemorris.com
jmparks@duanemorris.com
arsperl@duanemorris.com
*Truck and Equipment Dealer Plaintiff Counsel*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 12, 2014, a true and correct copy of the foregoing instrument was electronically served upon all counsel of record.

*/s/ Warren T. Burns*
Warren T. Burns