IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE

|  |  |
|---|---|
| IN RE VEHICLE CARRIER SERVICES ANTITRUST LITIGATION : <br><br> *This document relates to* : <br> *All Direct Purchaser Actions* : | **Master Docket No.: 13-cv-3306** <br> (MDL No. 2471) |

## CONSOLIDATED BRIEF OF DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS THE DIRECT PURCHASERS' COMPLAINT

BALLARD SPAHR LLP
 - AND -
HOGAN LOVELLS US LLP

*Attorneys for the*
*WWL/EUKOR defendants*

BAKER & HOSTETLER LLP

*Attorneys for the*
*NYK defendants*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*Attorneys for the*
*K-Line defendants*

WILMER, CUTLER, PICKERING, HALE &
DORR LLP

*Attorneys for the*
*CSAV defendants*

COZEN O'CONNOR PC

*Attorneys for the*
*Hoegh defendants*

ARNOLD & PORTER LLP

*Attorneys for the*
*MOL defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..............................................ii

I.   PRELIMINARY STATEMENT ......................................... 1

II.  STATEMENT OF RELEVANT FACTS ................................. 1

III. ARGUMENT ..................................................... 3

     A.   THE DPPS' CLAYTON ACT CLAIMS FOR DAMAGES AND
          INJUNCTIVE RELIEF ARE BARRED BY THE SHIPPING ACT
          AND MUST BE DISMISSED ................................. 3

          1.   The Shipping Act's bar on private antitrust
               actions mandates dismissal of the DPPs'
               claims. ........................................ 4

          2.   The DPPs allege conduct prohibited by the
               Shipping Act. .................................. 8

     B.   THE DPPS LACK STANDING ............................... 11

          1.   The DPPs fail to allege facts establishing
               standing. ..................................... 11

          2.   The DPPs do not plausibly allege that they
               purchased vehicle carrier services. ........... 13

          3.   The DPPs have failed to allege that they were
               harmed by the alleged conspiracy. ............. 18

     C.   THE DPPS' CLAIMS MUST BE DISMISSED PURSUANT TO THE
          FILED RATE DOCTRINE .................................. 21

IV.  CONCLUSION ................................................. 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

A&E Pacific Construction Co. v. Saipan Stevedore Co.,
    888 F.2d 68 (9th Cir. 1989)............................. 4, 8

Am. Ass'n of Cruise Passengers, Inc. v. Carnival
    Cruise Lines, Inc.,911 F.2d 786 (D.C.Cir. 1990).... 4, 7, 8, 11

Am. Ass'n of Cruise Passengers v. Carnival Cruise
    Lines, Inc.,CIV. A. 86-0571 NHJ, 1995 WL 125842
    (D.D.C. Mar. 10, 1995)....................................... 8

Arista Records, LLC v. Lime Group LLC,
    532 F. Supp. 2d 556 (S.D.N.Y. 2007)........................ 20

Ashcroft v. Iqbal,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868
    (2009).................................................... 13

Bell Atl. Corp. v. Twombly,
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929
    (2007).................................................... 13

de Atucha v. Commodity Exch., Inc.,
    608 F. Supp. 510 (S.D.N.Y. 1985).......................... 20

Ethypharm S.A. France v. Abbott Laboratories,
    707 F.3d 223 (3d Cir. 2013)............................... 11

Farrell Lines Inc. v. Titan Indus. Corp.,
    306 F. Supp. 1348 (S.D.N.Y.), aff'd, 419 F.2d 835
    (2d Cir. 1969)............................................ 17

G. & T. Terminal Packaging Co. v. Consolidated Rail
    Corp.,830 F.2d 1230 (3d Cir. 1987)..................... 23, 24

Hawkspere Shipping Co., Ltd. v. Intamex, S.A.,
    330 F.3d 225 (4th Cir. 2003).............................. 16

Illinois Brick Co. v. Illinois,
    431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707
    (1977).................................................... 14

Keogh v. Chicago & N.W. Ry. Co.,
    260 U.S. 156, 43 S. Ct. 47, 67 L. Ed. 183 (1922)........... 22

Limited Brands, Inc. v. F.C. (Flying Cargo) Int'l
    Transp. Ltd.,545 F. Supp. 2d 692 (S.D. Ohio 2008).......... 15

Lujan v. Defenders of Wildlife,
    504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351
    (1992)..................................................... 12

McCray v. Fid. Nat'l Title Ins. Co.,
    682 F.3d 229 (3d Cir. 2012)....................... 22, 23, 26

Nat'l Shipping Co. of Saudi Arabia v. Omni Lines,
    Inc.,106 F.3d 1544 (11th Cir. 1997)....................... 16

In re New Jersey Title Ins. Litigation,
    683 F.3d 451 (3d Cir. 2012)........................... 23, 26

Oak Harbor Freight Lines, Inc. v. Sears Roebuck, &
    Co.,513 F.3d 949 (9th Cir. 2008).......................... 16

In re Ocean Shipping Antitrust Litigation,
    500 F. Supp. 1235 (S.D.N.Y. 1980)..................... 25, 26

Precision Associates, Inc. v. Panalpina World
    Transport (Holding) Ltd.,
    No. 08-CV-42, 2011 WL 7053807 (E.D.N.Y. Jan. 4,
    2011)............................................. 19, 20, 21

Prima U.S. Inc. v. Panalpina, Inc.,
    223 F.3d 126 (2d Cir. 2000)............................... 15

Ross v. Bank of America,
    524 F.3d 217 (2d Cir. 2008)............................... 12

Seawinds Ltd. v. Nedlloyd Lines, B.V.,
    80 B.R. 181 (N.D. Cal. 1987), aff'd, 846 F.2d 586
    (9th Cir. 1988)......................................... 4, 7

Simon v. E. Ky. Welfare Rights Org.,
    426 U.S. 26, 96 S. Ct. 1917, 48 L. Ed. 2d 450.............. 12

Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,
    476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986)........ 25

Strachan Shipping Co. v. Dresser Indus., Inc.,
    701 F.2d 483 (5th Cir. 1983).............................. 17

605225506 v2

Texas Commercial Energy v. TXU Energy, Inc.,
   413 F.3d 503 (5th Cir. 2005) .............................. 24

U.S. Navigation Co. v. Cunard S.S. Co.,
   284 U.S. 474, 52 S. Ct. 247, 76 L. Ed. 408 (1932) .......... 22

Utilimax.com, Inc. v. PPL Energy Plus, LLC,
   378 F.3d 303 (3d Cir. 2004) ............................... 24

Warren Gen. Hosp. v. Amgen, Inc.,
   643 F.3d 77 (3d Cir. 2011) ................................ 14

**Statutes**

15 U.S.C. § 1 ................................................ 3

15 U.S.C. § 15 ........................................... 3, 11

15 U.S.C. § 26 .............................................. 3

46 U.S.C. § 40102(6) ....................................... 14

46 U.S.C. § 40102(16) ...................................... 15

46 U.S.C. § 40102(17) ...................................... 14

46 U.S.C. § 40102(18) ...................................... 15

46 U.S.C. § 40102(19) ...................................... 15

46 U.S.C. § 40102(22) ...................................... 14

46 U.S.C. § 40301(a) ........................................ 9

46 U.S.C. § 40302(a) ........................................ 9

46 U.S.C. § 40307(a) ..................................... 5, 6

46 U.S.C. § 40307(d) ..................................... 3, 6

46 U.S.C. § 40501(a)(b) .................................... 25

46 U.S.C. § 41102(b) ........................................ 9

46 U.S.C. § 41103(a) ....................................... 10

46 U.S.C. § 41104(1) ....................................... 24

46 U.S.C. § 41104(2)(A) ................................ 23, 24

46 U.S.C. § 41104(4) ........................................... 24

46 U.S.C. § 41104(8) ........................................... 24

46 U.S.C. § 41104(10) .......................................... 10

46 U.S.C. § 41105(6) ............................................ 9

46 U.S.C. § 41108 .............................................. 25

46 U.S.C. § 41109 .............................................. 25

46 U.S.C. § 41301(a) ........................................... 25

46 U.S.C. § 41302 .............................................. 25

46 U.S.C. § 41305 ........................................... 11, 25

46 U.S.C. § 41306 .............................................. 11

46 U.S.C. § 41309 .............................................. 11

**Other Authorities**

46 C.F.R. §515.42(c) ........................................... 16

144 Cong. Rec. S11297-03, 1998 WL 673033 ...................... 23

Report of the House Committee on Merchant Marine and
   Fisheries, H.R. Rep. No. 98-53 (1983)..................... 4, 5

IA AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 247a
   (4th ed. 2013) ............................................ 23

605225506 v2

## I.   PRELIMINARY STATEMENT.

Defendants Nippon Yusen Kabushiki Kaisha, NYK Line North America, Höegh Autoliners AS, Höegh Autoliners, Inc., Kawasaki Kisen Kaisha, Ltd., K Line America, Inc., Wallenius Wilhelmsen Logistics as, Wallenius Wilhelmsen Logistics America LLC, Compania Sud Americana De Vapores, S.A. CSAV Agency North America, LLC, Eukor Car Carriers, Inc., Mitsui O.S.K. Lines, Mitsui O.S.K. Bulk Shipping (U.S.A.), Inc., Nissan Motor Carrier Co., Ltd., and World Logistics Service (U.S.A.), Inc. (collectively, "defendants") respectfully submit this consolidated brief in support of their motion to dismiss the consolidated amended class action complaint filed by self-claimed direct purchaser plaintiffs Cargo Agents, Inc., International Transport Management, Corp., and Manaco International Forwarders, Inc. (collectively, the "DPPs").

## II.   STATEMENT OF RELEVANT FACTS.

Defendants are ocean shipping companies engaged in the transportation of large numbers of cars, trucks, and other vehicles including agricultural and construction equipment between foreign countries and the United States.  Compl. ¶¶ 16-22.  Defendants' vehicle carrier services are provided via Roll On/Roll Off ("RO/RO") or specialized car carrier vessels

specifically designed to carry motor vehicles, ranging from passenger cars to trucks.  Compl. ¶¶ 26-27.

The DPPs allege they have directly purchased vehicle carrier services into the United States from defendants, and were directly injured as a result.  Compl. ¶¶ 13-15, 91.  The DPPs also allegedly "include companies that arrange for the international ocean transportation of vehicles." Compl. ¶ 30. The DPPs provide no further allegations concerning what it means to "arrange" such services, nor any supporting facts as to whether and how the DPPs themselves paid for shipping services as part of said arrangement.

The DPPs allege that the defendants entered into various collusive agreements to fix and increase the prices for vehicle carrier services to and from the United States.  These include:  (i) coordination of price increases, Compl. ¶¶ 62-63; (ii) agreements not to compete and allocation of customers and routes, Compl. ¶¶ 64-65; and (iii) agreements to restrict capacity by means of agreed upon fleet reductions.  Compl. ¶¶ 55-61.  The DPPs allege that those anticompetitive agreements inflated the prices paid by the DPPs to defendants for vehicle transportation.  Compl. ¶¶ 75-82.  They also allege that such anticompetitive agreements were not filed with the Federal Maritime Commission ("FMC"), Compl. ¶ 72, and that the FMC did

- 2 -

not approve, modify, or amend the related shipping rates.
Compl. ¶ 74.

The DPPs seek treble damages, under § 4 of the Clayton
Act, 15 U.S.C. §  15, allegedly incurred as a result of
violation of § 1 of the Sherman Act, 15 U.S.C. § 1, for entering
into and engaging in a conspiracy in unreasonable restraint of
trade.  Compl. ¶¶ 98-107.  They also seek injunctive relief
under § 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting
future violations.

The DPPs' claims should be dismissed because:  (1) the
claims are expressly barred by the Federal Shipping Act of 1984,
46 U.S.C. § 40307(d) (the "Shipping Act"); (2) the DPPs  lack
standing to bring the claims; and (3) if the DPPs purchased
vehicle carrier services at all, they did so under tariff rates
– therefore their claims are barred by the filed rate doctrine.


III. ARGUMENT.

    A.   THE DPPS' CLAYTON ACT CLAIMS FOR DAMAGES AND INJUNCTIVE RELIEF
         ARE BARRED BY THE SHIPPING ACT AND MUST BE DISMISSED.

The DPPs "may not recover damages under section 4 of
the Clayton Act . . . or obtain injunctive relief under section
16 of that Act ... for conduct prohibited by" the Shipping Act.
46 U.S.C. § 40307(d).  This provision "bars private antitrust
lawsuits, providing instead for an administrative Complaint and

- 3 -

review process" before the FMC.  A&E Pacific Construction Co. v. Saipan Stevedore Co., 888 F.2d 68, 71 (9th Cir. 1989).  The Shipping Act also sets out the relief available to an injured party through the FMC administrative review process.  Ibid. (stating that "while no private party may sue for damages or for injunctive relief under the antitrust laws for conduct" prohibited by Shipping Act, FMC is "empowered" to sanction prohibited conduct).  In short, the DPPs' allegations arise from conduct prohibited by the Shipping Act.  Thus, their antitrust claims for damages and injunctive relief under the Clayton Act must be dismissed for failure to state a claim upon which relief can be granted.

### 1.   The Shipping Act's bar on private antitrust actions mandates dismissal of the DPPs' claims.

With the Shipping Act, "Congress removed the private right of action for antitrust violations based on conduct prohibited in the Act."  Seawinds Ltd. v. Nedlloyd Lines, B.V., 80 B.R. 181, 184 (N.D. Cal. 1987), aff'd, 846 F.2d 586 (9th Cir. 1988).  In doing so, Congress intended to prevent common carriers, such as defendants, from being subject to "remedies and sanctions for the same conduct made unlawful by both the Shipping Act and the antitrust laws."  Am. Ass'n of Cruise Passengers, Inc. v. Carnival Cruise Lines, Inc., 911 F.2d 786, 792 (D.C.Cir. 1990) (citing Report of the House Committee on

- 4 -

Merchant Marine and Fisheries, H.R. Rep. No. 98-53, pt. 1, at 12
(1983), reprinted in 1984 U.S.C.C.A.N. 167, 177 (hereinafter,
"House Report")). Congress thus designed the Shipping Act to
provide the exclusive civil remedy for conduct that violates the
Shipping Act.  Ibid. (citing House Report at 12, 177); see also
House Report at 33, 198 ("[The Shipping Act] also makes a major
change in existing law by prohibiting recovery for damages and
injunctive relief under the Clayton Act for any conduct
prohibited by this Shipping Act.").  Under the Shipping Act,
antitrust exposure for "secret" unfiled agreements "is limited
to injunctive and criminal prosecution by the Attorney General,
and does not carry with it any private right of action otherwise
available under the antitrust laws."  House Report at 12, 177.

     In an apparent effort to sidestep the express
antitrust immunity conferred by the Shipping Act, the DPPs
allege that defendants' agreements were not filed with the FMC
and were not in effect during the Class Period.  Compl. ¶¶ 72-
74.[1]  These allegations simply are beside the point.  Even

---

[1]     These allegations are relevant only to the question of
whether defendants are entitled to immunity from DOJ
prosecution, an issue not presented here.  If defendants'
alleged agreements were filed and in effect with the FMC or if
defendants had a "reasonable basis to conclude" that the alleged
conduct was authorized by agreements filed and in effect with
the FMC, then the conduct would be entitled to the full
antitrust exemption, including immunity from DOJ prosecution.
See 46 U.S.C. § 40307(a) (outlining statutory requirements for
full antitrust exemption).  Defendants reserve the right to
Continued on Next Page

- 5 -

accepting the DPPs assertions as true, at most the allegations are relevant only to whether the conduct at issue is permitted or prohibited by the Shipping Act.  That distinction may be relevant for outright antitrust immunity under 46 U.S.C. § 40307(a) (i.e., immunity from all claims, criminal or civil) -- which defendants are not asserting here -- it is irrelevant to the application of 46 U.S.C. § 40307(d), which expressly precludes private rights of action for conduct "prohibited by" the Shipping Act.  Indeed, the DPPs' allegations that defendants' agreements were not filed with the FMC acknowledges the insurmountable obstacle DPPs confront:  DPPs allege conduct prohibited by the Shipping Act and, hence, they are barred from seeking relief under the Clayton Act.

Although the plain language of the statute governs, it also is consistent with the legislative history, which makes clear that the statutory bar against private antitrust actions applies with equal force to both filed and unfiled agreements. 46 U.S.C. § 40307(d); House Report at 12, 177.[2]  Thus,

---

dispute the truth of DPPs' allegations, including in respect of whether defendants were operating under tariffs that were publicly available or service contracts "filed" with the FMC, and reserve all rights concerning any actions asserting violations of the Shipping Act.

[2]     "If parties who could avail themselves of antitrust immunity by submitting to regulation under the terms of the Shipping Act of 1983 fail to do so, then their knowing conduct, undertaken without the benefit of an agreement being filed and
Continued on Next Page

- 6 -

irrespective of whether defendants' allegedly anticompetitive agreements were public, filed, and effective, to the extent those alleged agreements constitute conduct prohibited by the Shipping Act, the DPPs' claims for damages and injunctive relief under the Clayton Act are barred.  Am. Ass'n of Cruise Passengers, supra, 911 F.2d at 792 (dismissing antitrust claims based on alleged concerted refusal to deal, holding that alleged boycott agreement was subject to "the prohibitions and procedures of the Shipping Act, rather than to those of the Clayton Act").

In bringing their claims, the DPPs contravene the language and purpose of the Shipping Act, Am. Ass'n of Cruise Passengers, supra, 911 F.2d at 792 (citing House Report at 12, 177),[3] which exempts defendants from private antitrust actions for the alleged conduct at issue here.

---

in effect, will subject them to limited antitrust exposure.  The antitrust exposure for these so-called 'secret' agreements is limited to injunctive and criminal prosecution by the Attorney General, and does not carry with it any private right of action otherwise available under the antitrust laws."  House Report at 12, 177.

[3]    See also Seawinds, supra, 80 B.R. at 184–85 ("It thus appears that Congress intended to clarify shippers' potential liability for conduct previously covered by the antitrust laws, to restrict remedies and sanctions therefor to those enumerated in the 1984 Act....  By removing the courts from this regulatory process, Congress removed the potential for continuing regulatory uncertainty.") (citing House Report).

- 7 -

2.   **The DPPs allege conduct prohibited by the Shipping Act.**

Federal courts consistently have dismissed antitrust claims where the alleged conduct is prohibited by the Shipping Act.   In Am. Ass'n of Cruise Passengers, supra, the D.C. Circuit addressed a travel agency's claim that a group of cruise lines and trade associations violated federal antitrust laws by engaging in a concerted refusal to deal.   911 F.2d at 787.   The court held that the alleged boycott agreement was subject to "the prohibitions and procedures of the Shipping Act, rather than to those of the Clayton Act."   Id. at 792.   Applying the D.C. Circuit's holding on remand, the district court dismissed all of the plaintiff's antitrust claims regarding defendants' common carriage activities.   Am. Ass'n of Cruise Passengers v. Carnival Cruise Lines, Inc., CIV. A. 86-0571 NHJ, 1995 WL 125842, at *3-4 (D.D.C. Mar. 10, 1995); see also A&E Pacific Construction Co., 888 F.2d at 72 (affirming dismissal of federal antitrust claims where alleged conduct was subject to Shipping Act).

The DPPs' allegations, if true, describe conduct prohibited by the Shipping Act.[4]   The DPPs allege that defendants "conspired to allocate customers and markets, to rig bids, to

---

[4]   Defendants make no admissions regarding the truth of the DPPs allegations and reserve all rights in respect of any actions asserting violations of the Shipping Act.

- 8 -

restrict supply, and otherwise to raise, fix, stabilize, or maintain prices for Vehicle Carrier Services" through several agreements.  Compl. ¶¶ 1, 52.  These agreements allegedly "restrained, suppressed, or eliminated" competition.  Id. at ¶ 79.  The DPPs allege that defendants' "anticompetitive agreements . . . were not filed with the Federal Maritime Commission."  Id. at ¶ 72.  According to the DPPs, defendants' implementation of these alleged unfiled agreements would be in violation of the Shipping Act, which mandates that "an agreement between or among ocean common carriers" to "discuss, fix, or regulate transportation rates" or "control, regulate, or prevent competition in international ocean transportation," 46 U.S.C. § 40301(a), "shall be filed with the Federal Maritime Commission." 46 U.S.C. § 40302(a) (emphasis supplied).  Indeed, § 10 of the Shipping Act, titled "Prohibited Acts," prohibits a common carrier from "operat[ing] under" or implementing an agreement to fix transportation rates or prevent competition if the agreement has not been filed with the FMC.  46 U.S.C. § 41102(b) ("A person may not operate under an agreement required to be filed under section 40302 ... if ... the agreement has not become effective[.]").

The DPPs also allege that defendants engaged in bid rigging and customer allocation (Compl. ¶¶ 1, 64), which is conduct prohibited under § 10(c) of the Shipping Act.  46 U.S.C.

- 9 -

§ 41105(6) (prohibiting group of two or more common carriers from, among other things, "allocat[ing] shippers among specific carriers that are parties to the agreement or prohibit[ing] a carrier that is a party to the agreement from soliciting cargo from a particular shipper").  Finally, the DPPs allege that defendants discussed vehicle shipping routes and rates to the detriment of purchasers, who allegedly were forced to pay inflated, supra-competitive prices for vehicle carrier services. Compl. ¶¶ 78, 79(b), 79(d).  Section 10(b) of the Shipping Act prohibits such discussions.  46 U.S.C. §§ 41103(a), 41104(10) (prohibiting common carrier from "knowingly disclos[ing], offer[ing], solicit[ing], or receiv[ing] any information concerning the nature" of shipment if information may be used to detriment of shipper and from "unreasonably refus[ing] to deal or negotiate").

Because the conduct the DPPs allege is prohibited by the Shipping Act, that act provides the exclusive set of remedies for the alleged wrongdoing, and commits jurisdiction over remedies to the FMC.  The FMC already has exercised its regulatory authority under the Shipping Act to settle alleged violations of the Shipping Act with certain of the defendants, and has collected civil penalties for alleged violations of the Shipping Act, including violations of § 10(a) that took place

- 10 -

over a period of several years.[5]  Specifically, the FMC has the
authority to hear private complaints and redress "actual injury"
through reparations and injunctive relief. 46 U.S.C. §§ 41305,
41306, 41309.  Permitting the DPPs to proceed with their claims
creates precisely the sort of duplicative actions that Congress
sought to avoid.  See Am. Ass'n of Cruise Passengers, supra, 911
F.2d at 792 (citing House Report at 12, 177).

        Because defendants' alleged conduct -- including
operating under unfiled agreements to fix transportation rates
and prevent competition in the market for vehicle carrier
services -- is prohibited by the Shipping Act, the DPPs' claims
for damages and injunctive relief under the federal antitrust
laws are barred and must be dismissed.

   B.   THE DPPS LACK STANDING.

        1.   The DPPs fail to allege facts establishing
             standing.

        To have standing to maintain a Sherman Act claim, a
plaintiff must allege facts establishing both standing-in-fact -
- that is, constitutional standing under Article III of the
United States Constitution -- and antitrust standing -- under §4
of the Clayton Act.  15 U.S.C. § 15(a).  Ethypharm S.A. France

---

[5]     In 2013 and 2014, the FMC entered into Compromise
Agreements with defendants "K" Line, CSAV, NYK and MOL that
encompass the conduct at issue in the complaint.  See FMC press
releases, which are attached hereto as **Exhibit "A"** and are made
a part hereof by reference.

v. Abbott Laboratories, 707 F.3d 223, 232-33 (3d Cir. 2013).

Because federal jurisdiction extends only to actual cases and

controversies, U.S. Const. art. III, § 2, "a plaintiff must have

suffered an 'injury in fact' that is 'distinct and palpable';

the injury must be fairly traceable to the challenged action;

and the injury must be likely redressable by a favorable

decision." Ross v. Bank of America, 524 F.3d 217, 222 (2d Cir.

2008); see also Lujan v. Defenders of Wildlife, 504 U.S. 555,

560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351, 364 (1992).

In addition, to establish standing in a class action, "named

plaintiffs who represent a class 'must allege and show that they

personally have been injured, not that injury has been suffered

by other, unidentified members of the class to which they belong

and which they purport to represent.'" Simon v. E. Ky. Welfare

Rights Org., 426 U.S. 26, 40 n.20, 96 S. Ct. 1917, 1925 n.20, 48

L. Ed. 2d 450, 462 n.20 (1976) (quoting Warth v. Seldin, 422

U.S. 490, 502, 95 S. Ct. 2197, 2207, 45 L. Ed. 2d 343, 357

(1975)).

The DPPs fall far short of meeting their burden to

establish standing. They offer only conclusory allegations:

that they purchased vehicle carrier services "directly" from one

or more defendants, and that they were "directly injured as a

result." Compl. ¶¶ 13-15. However, "'naked assertion[s]'

devoid of 'further factual enhancement'" do[] not plausibly

establish entitlement to relief[.]" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 884 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557, 127 S. Ct. 1955, 1965-66, 167 L. Ed. 2d 929, 940-41 (2007)). The paucity of the DPPs' allegations regarding their purchases and injury is underscored by their admission that they are merely freight forwarders who "arrange[d] for the ocean transportation of vehicles." Compl. ¶ 30.

In Twombly, supra, the Supreme Court stated that Rule 8 pleading requirements have particular significance in antitrust cases because of the extraordinary costs of discovery and the concomitant concern that the threat of discovery abuses and expenses would cause cost-conscious defendants to settle even anemic and largely groundless cases in the absence of Rule 8's safeguards. Twombly, supra, 550 U.S. at 557-59, 127 S. Ct. at 1966-67, 167 L. Ed. 2d at 941-43. Denying defendants' motion to dismiss would subject defendants to unwarranted and expensive antitrust discovery from the DPPs Plaintiffs that lack standing and, in any event, have failed to properly allege it.

## 2. The DPPs do not plausibly allege that they purchased vehicle carrier services.

At a minimum, the DPPs lack standing to bring their damage claims. As the DPPs must recognize, only direct purchasers have standing to bring damages claims under the

federal antitrust laws.  <u>Illinois Brick Co. v. Illinois</u>, 431
<u>U.S.</u> 720, 734-35, 97 <u>S. Ct.</u> 2061, 2069-70, 52 <u>L. Ed.</u> 2d 707,
718-19 (1977); <u>see also</u> <u>Warren Gen. Hosp. v. Amgen, Inc.</u>, 643
<u>F.</u>3d 77, 96 (3d Cir. 2011) (affirming dismissal of indirect
purchaser claim).  Although the DPPs offer the conclusory
allegation that they "directly purchased Vehicle Carrier
Services from one or more defendants," Compl. ¶¶ 13-15, their
own contrary admissions and federal law show that the DPPs were
not purchasers at all.

     The DPPs do not allege that they are cargo owners that
shipped their own vehicles; they acknowledge that they merely
"arrange for the ocean transportation of vehicles." Compl. ¶ 30.
To understand the legal significance of this admission, and why
it is fatal to the DPPs standing, it is necessary to understand
the three relevant categories of entities involved in the ocean
transportation industry.  **First**, there are "carriers" -- such as
defendants – which operate ships to provide transport services
for cargo.  46 <u>U.S.C.</u> §§ 40102(6) and 40102(17).  **Then** there are
"shippers" – cargo owners that engage the services of carriers
to transport their cargo.  46 <u>U.S.C.</u> § 40102(22).  **Finally**,
there are "ocean transportation intermediaries," which are
divided into two-subcategories:  non-vessel operating common
carriers ("NVOCCs"), which act as carriers even though they do

- 14 -

not operate vessels,[6] and freight forwarders, which dispatch shipments and arrange for space for such shipments on behalf of shippers.  46 U.S.C. §§40102(19), 40102(16), and 40102(18).  By admitting that they arrange for transport, the DPPs also perforce have admitted that they are merely agents of the shippers who actually make the purchases, and are not themselves purchasers of vehicle transportation services at all.

No doubt aware of this fatal flaw, the DPPs make no allegations about the nature of their purported purchases or how they paid for them.  Indeed, they make no allegation that they acted as anything other than agents for shippers to which defendants issued bills of lading.  Tellingly, the DPPs do not allege that they -- as opposed to their clients -- actually paid for the vehicle transportation they "arranged."

Freight forwarders are not purchasers of ocean transportation services.  Instead, as explained above and as well-recognized by our courts, freight forwarders serve solely as intermediaries.  See, e.g., Prima U.S. Inc. v. Panalpina, Inc., 223 F.3d 126, 129 (2d Cir. 2000) (defining freight forwarder as "travel agent" for cargo); Limited Brands, Inc. v. F.C. (Flying Cargo) Int'l Transp. Ltd., 545 F. Supp. 2d 692, 698 (S.D. Ohio 2008) (holding that entity that acts as agent of shipper in procuring transport by carrier and handling details

---

[6]     None of the the DPPs claims NVOCC status.

of shipment for fees which shipper paid in addition to freight charges of the carrier is a freight forwarder).  As a matter of federal law, freight forwarders are prohibited from owning any interest in the cargo shipped.  46 C.F.R. §515.42(c).  As an intermediary, the freight forwarder is paid a fee for arranging a shipment, but the cargo owner for which the freight forwarder arranges the transport remains the purchaser of the transport services.

The fact that freight forwarders are merely intermediaries, not the actual purchasers of ocean transportation, has long been recognized by our courts, which consistently have held that the shipper -- again, the cargo owner on behalf of which the forwarder arranges the transportation -- is directly liable to the ocean carrier for payment of freight charges regardless of whether the transportation was arranged by a freight forwarder.  For example, when a freight forwarder fails to remit to the carrier monies it has received from its shipper for the purpose of paying freight charges, the shipper nevertheless remains liable to the ocean carrier, and must pay the ocean carrier for the transportation services it agreed to purchase.  See, e.g., Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co., 513 F.3d 949, 959-60 (9th Cir. 2008); Hawkspere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 236-37 (4th Cir.  2003); Nat'l

- 16 -

Shipping Co. of Saudi Arabia v. Omni Lines, Inc., 106 F.3d 1544, 1546 (11th Cir. 1997).[7]  As one court succinctly noted, "[c]arriers must expect payment will come from the shipper, although it may pass through the forwarder's hands."  Strachan Shipping Co. v. Dresser Indus., Inc., 701 F.2d 483, 490 (5th Cir. 1983) (concluding that fact that carrier billed forwarder did not relieve shipper of liability).

The applicable legal paradigm is clear:  (a) the ocean carrier is the provider of the ocean transportation services, (b) the shipper is the purchaser of those services with attendant exposure to liability for failure to pay the ocean carrier, and (c) a shipper's decision to employ a freight forwarder does not in any way alter the carrier-shipper relationship.  The freight forwarder is nothing more than a mere intermediary between the two principals.  Thus, in conceding the obvious -- that they are only arrangers of transportation, that is, freight forwarders -- the DPPs have admitted they are not

---

[7]     Under a variety of theories, other courts have held that the ocean carrier, rather than the shipper, bears the risk of loss when the freight forwarder fails to remit to the carrier freight monies the forwarder has received from the shipper. See, e.g., Farrell Lines Inc. v. Titan Indus. Corp., 306 F. Supp. 1348, 1351 (S.D.N.Y.), aff'd, 419 F.2d 835 (2d Cir. 1969) (holding that carrier is estopped from seeking payment from shipper based on default by freight forwarder or other third party when bill of lading is marked "prepaid").  The salient point is that, no matter where the default in payment for shipping services occurs, the freight forwarder is not held liable to the carrier, demonstrating plainly that a freight forwarder is not a purchaser of ocean transportation services.

direct purchasers, indirect purchasers or, for that matter, purchasers of any kind, thereby fatally undermining their standing in this case.

### 3. The DPPs have failed to allege that they were harmed by the alleged conspiracy.

Even if the DPPs did purchase vehicle transportation from one or more defendants -- and, as shown, they have not alleged that they did -- the DPPs nevertheless also fail to plead sufficient facts to link their claimed purchases with the anticompetitive conduct alleged in the complaint. Compl. ¶ 30. There is no allegation in the complaint that the DPPs arranged for the shipment of any vehicles that were the subject of the alleged price fixing, customer allocation or route allocation, much less that any of the alleged anticompetitive acts affected vehicles for which the DPPs arranged shipment or paid for vehicle transportation. Compl. ¶¶ 62-65.

Notably, the allegations of anticompetitive conduct in the complaint refer largely if not entirely to the transportation of original equipment manufacturer or "OEM" vehicles, i.e., newly manufactured vehicles shipped by manufacturers such as Ford, General Motors, Chrysler, Honda, Toyota, etc. Compl. ¶¶ 62-64. These manufacturers ship large volumes of cargo and have considerable expertise in transportation issues. Accordingly, they deal directly with the

- 18 -

ocean carrier(s) of their choosing.  Freight forwarders in the
RO/Ro or specialized car carrier industry usually arrange for
the transportation of commodities shipped in smaller volumes by
smaller customers, such as used or privately owned autos, or
used high and heavy cargo such as front-end loaders.  The DPPs
have consciously avoided alleging (1) whether the companies for
which they arranged shipping were OEMs; (2) whether the vehicles
they arranged to ship were new or used; or (3) on what routes
the shipping they allegedly arranged took place.  The absence of
those core allegations underscores the DPPs' failure to
adequately allege that they have standing.

In Precision Associates, Inc. v. Panalpina World
Transport (Holding) Ltd., No. 08-CV-42, 2011 WL 7053807
(E.D.N.Y. Jan. 4, 2011), adopted, 2012 WL 3307486 (E.D.N.Y. Aug.
13, 2012), shippers of goods alleged that freight forwarders
colluded in fixing the amount of surcharges assessed on "United
States Freight Forwarding Services" on routes to and from and
within the United States.  The complaint alleged that the
plaintiffs had purchased United States Freight Forwarding
Services from one or more of the defendants and had been injured
by reason of the antitrust violations by paying inflated prices
for such services.

The complaint failed to allege, however, that the
plaintiffs purchased United States Freight Forwarding Services

- 19 -

from the defendants on the routes to which the surcharges

pertained, or that the plaintiffs actually paid any of the

collusively fixed surcharges.  The court dismissed the

plaintiffs' claims for lack of standing, reasoning that:

> The basis for the plaintiffs' claim of injury to their "business and property" in all of their claims, ... is not that they paid the fixed surcharges, but that the imposition of those surcharges on some air cargo routes somehow resulted in inflated prices for all "U.S. Freight Forwarding Services." ....  The Complaint, however, includes no allegations to support or lead to the conclusion that the imposition of surcharges on specific routes had such a dramatic effect on the broad and diverse market for U.S. Freight Forwarding Services. Even if harm to the United States market generally could be the kind of injury the antitrust laws were intended to address, the plaintiffs' failure to "specifically articulate any of the links in this causal chain" is fatal to their standing argument.

Precision Associates, 2011 WL 7053807 at *13.  See also Arista

Records, LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 567–71

(S.D.N.Y. 2007); de Atucha v. Commodity Exch., Inc., 608 F.

Supp. 510, 516 (S.D.N.Y. 1985).

Precision Associates is on "all fours" with this case.

As in Precision Associates, the DPPs here do not allege that

they purchased vehicle carrier services on routes that were the

subject of the collusive agreements alleged in the complaint, or

that the DPPs were among the customers to which the collusive

agreements pertained, or that the DPPs arranged to ship the

- 20 -

vehicles which were the subject of the alleged collusive conduct.  Instead, repeating the flaw deemed fatal in Precision Associates, the complaint alleges only that defendants allocated customers and routes and fixed prices.  Compl. ¶¶ 62-65.  Absent some plausible, specific allegation of a link between defendants' alleged conduct and the DPPs' purported injury, the complaint fails for lack of standing.

C.   THE DPPs' CLAIMS MUST BE DISMISSED PURSUANT TO THE FILED RATE DOCTRINE.

As set forth above, the Shipping Act prohibits the DPPs from maintaining this private federal antitrust action for damages and injunctive relief.  On this ground alone, the DPPs' complaint must be dismissed.  Even assuming, contrary to law, that the Shipping Act does not bar this action, then the filed rate doctrine bars the DPPs' action because the filed rate doctrine bars private antitrust actions from being maintained to overturn or otherwise challenge, filed rates within the purview of a regulatory agency, even if those rates resulted from alleged collusive agreements.

The gravamen of the DPPs' claims is that they paid a conspiratorially inflated price as alleged direct purchasers of vehicle carrier services.  Compl. ¶ 11.  Even assuming arguendo that the DPPs have sufficiently pled they purchased ocean shipping services -- those "purchases" were at published tariff

- 21 -

rates, and the DPPs claims are barred by the filed rate doctrine. Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 43 S. Ct. 47, 67 L. Ed. 183 (1922).[8]

In Keogh, the plaintiff/shipper alleged that the railroad defendants formed an unlawful price-fixing conspiracy in filing railway tariff rates with the Interstate Commerce Commission ("ICC").[9] The Supreme Court held that no antitrust remedy could be imposed against a carrier who charged its filed rates, even if those rates were arrived at via an illegal price-fixing conspiracy. Keogh, 260 U.S. at 163.

The Third Circuit recently recognized that the filed rate doctrine applies whenever tariffs have been filed and has endorsed the First Circuit's holding that "the filed rate doctrine only requires rates to be filed, not affirmatively approved or scrutinized. See Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 419 (1st Cir. 2000)." McCray v. Fid. Nat'l Title Ins. Co., 682 F.3d 229, 238-39 (3d Cir. 2012). The Third

---

[8] In addition to published tariff rates, the Shipping Act authorizes individual rates in service contracts and unpublished tariffs for exempt cargo. This motion does not address the applicability of the filed rate doctrine to these other types of rates because it is believed that the three named DPPs could only have purchased vehicle carrier services pursuant to published tariff rates.

[9] The Shipping Act was modeled after the Interstate Commerce Act, and courts have given the two acts "like interpretation, application and effect." U.S. Navigation Co. v. Cunard S.S. Co., 284 U.S. 474, 481, 52 S. Ct. 247, 249, 76 L. Ed. 408, 412 (1932).

Circuit has also made clear that the application of the filed
rate doctrine applies broadly to filed rates within an agency's
regulatory purview and does not require that the agency engage
in a meaningful review or approval of the rates.  McCray, supra,
682 F.2d at 238; accord In re New Jersey Title Ins. Litigation,
683 F.3d 451, 459 (3d Cir. 2012).  See also IA AREEDA &
HOVENKAMP, ANTITRUST LAW ¶ 247a, at 443 (4th ed. 2013) ("[The
rate] need not have been actively reviewed for accuracy or
public interest considerations – indeed, it need not have been
reviewed at all in any meaningful sense.").

As ocean common carriers subject to the Shipping Act,
defendants are required since the 1998 Ocean Shipping Reform Act
("OSRA") to publish their tariffs electronically, and to adhere
to the terms of those tariffs; and the FMC retains the same
regulatory and enforcement authority over the published tariffs.
144 Cong. Rec. S11297-03, 1998 WL 673033 (indicating that OSRA
will "retain common carrier tariff publication and enforcement
while eliminating the requirement to file tariffs with the
government"); 46 U.S.C. § 41104(2)(A).  In an analogous case G.
& T. Terminal Packaging Co. v. Consolidated Rail Corp., 830 F.2d
1230, 1234, 1235 (3d Cir. 1987), the Third Circuit rejected the
argument that an exemption from filing deprived the rates
established by railroads of their efficacy and opened the rates
to be challenged or set aside on common law, constitutional, or

- 23 -

other grounds.  Id. at 1234-35.  Numerous precedent have applied the filed rate doctrine to unfiled rates.  See, e.g., Texas Commercial Energy v. TXU Energy, Inc., 413 F.3d 503, 509-10 (5th Cir. 2005) (barring claims where rates were not technically "filed," because "FERC had waived many [rate-filing] requirements" over rates in question); Utilimax.com, Inc. v. PPL Energy Plus, LLC, 378 F.3d 303, 306 (3d Cir. 2004) (affirming application of filed rate doctrine to utility without strict rate filing requirement).[10]

Moreover, although the Third Circuit does not require meaningful agency regulation of rates for the filed rate doctrine to apply, the FMC in fact does exercise meaningful regulation of published tariff rates.  The statutory tariff provisions direct the FMC to enforce and regulate published tariffs, including:  prohibitions against charging less than the tariff rate (§ 41104(1)); prohibitions against providing service not in accordance with the rates, charges, rules, and practices contained in the tariffs (§§ 41104(2)(a)); prohibitions on anticompetitive actions, including service which is "unfair or unjustly discriminatory" or otherwise "unreasonable" for service pursuant to a tariff (§§ 41104(4,8)); and FMC review of

---

[10] The DPPs make no allegations that the Defendants failed to publish their tariffs as required by the Shipping Act.  Instead, the DPPs allege that allegedly collusive agreements were not filed with the FMC which allegations are irrelevant to the applicability of the filed rate doctrine [Compl. ¶¶ 72-74].

published tariffs and the contents thereof (§ 40501(a)(b)).   The
FMC has the authority, upon its own initiative, to investigate
violations, receive complaints, direct the payment of
reparations, and assess civil penalties (§§ 41301(a), 41302,
41305, 41109), and may suspend tariffs (§ 41108).

In re Ocean Shipping Antitrust Litigation, 500 F.
Supp. 1235 (S.D.N.Y. 1980), a 1980 case applying the Southern
District's then view of the filed rate doctrine, erroneously
treats the filed rate doctrine as part of antitrust immunity,
and holds that the filing of tariff rates under the Shipping Act
did not create antitrust immunity for the tariff rates.   As the
Supreme Court explained in its subsequent Square D decision:

> We disagree, however, with petitioners'
> view that the issue in *Keogh* and in this
> case is properly characterized as an
> "immunity" question.   The alleged collective
> activities of the defendants in both cases
> were subject to scrutiny under the antitrust
> laws by the Government and to possible
> criminal sanctions or equitable relief.
> *Keogh* simply held that an award of treble
> damages is not an available remedy for a
> private shipper claiming that the rate
> submitted to, and approved by, the ICC was
> the product of an antitrust violation.   Such
> a holding is far different from the creation
> of an antitrust immunity, and makes the
> challenge to *Keogh*'s role in the settled law
> of this area still more doubtful.

Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S.
409, 422, 106 S.Ct. 1922, 1929-30, 90 L.Ed.2d 413, 425 (1986).

- 25 -

In any event, Ocean Shipping's apparent requirement of aggressive agency exercise of review power conflicts with the filed rate doctrine established in more recent Third Circuit decisions under which meaningful agency review is not required. See McCray, supra; In re New Jersey Title Ins. Litig., supra. Additionally, Ocean Shipping recognized that the FMC exerts some authority over tariffs, which clearly meets the requirements for application of the filed rate doctrine in the Third Circuit. Ibid.

The filed rate doctrine bars the DPPs' claims arising from purchases of vehicle carrier services under published tariff rates. Because the DPPs did not and could not purchase any vehicle carrier services other than through published tariffs -- which then triggers the filed rate doctrine -- the complaint should be dismissed.

## IV.   CONCLUSION.

For the aforementioned reasons, the complaint should be dismissed.

Dated:   October 13, 2014        Respectfully submitted,

                                 /s/ John R. Fornaciari
                                 John R. Fornaciari
                                 Erik J. Raven-Hansen
                                 BAKER & HOSTETLER LLP
                                 1050 Connecticut Ave., NW
                                 Suite 1100
                                 Washington, D.C. 20036
                                 Telephone:  202-861-1612

- 26 -

jfornaciari@bakerlaw.com
eravenhansen@bakerlaw.com

*Attorneys for Defendants*
*Nippon Yusen Kabushiki Kaisha and*
*NYK Line North America Inc.*

/s/ Roberto A. Rivera-Soto
Roberto A. Rivera-Soto
Stephen J. Kastenberg
Jason A. Leckerman
**BALLARD SPAHR LLP**
**A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP**
210 Lake Drive East – Suite 200
Cherry Hill, New Jersey 08002-1163
Telephone:  (856) 761-3400
riverasotor@ballardspahr.com
kastenberg@ballardspahr.com
leckermanj@ballardspahr.com

Benjamin Holt
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth St., N.W.
Washington, D.C. 20004
Telephone:  (202) 637-5600
benjamin.holt@hoganlovells.com

*Attorneys for Defendants*
*Wallenius Wilhelmsen Logistics AS,*
*Wallenius Wilhelmsen Logistics*
*America LLC, and EUKOR Car*
*Carriers, Inc.*

/s/ Melissa H. Maxman
Melissa H. Maxman
**COZEN O'CONNOR PC**
1627 I Street, NW - Suite 1100
Washington, D.C. 20006
Telephone:  202-912-4873
mmaxman@cozen.com

Kevin M. Kelly
**COZEN O'CONNOR PC**
1900 Market Street

- 27 -

Philadelphia, PA 19103
Telephone:  215-665-5570
kmkelly@cozen.com

*Attorneys for Defendants
Höegh Autoliners AS and
Höegh Autoliners, Inc.*


/s/ Mark W. Nelson
Mark W. Nelson
Jeremy J. Calsyn
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 974-1522
mnelson@cgsh.com
jcalsyn@cgsh.com

Attorneys for Defendants
Kawasaki Kisen Kaisha, Ltd.
and "K" Line America, Inc.


/s/ James L. Cooper
James L. Cooper
Anne P. Davis
Danielle M. Garten
Adam M. Pergament
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
Telephone:  (202) 942-5000
james.cooper@aporter.com
danielle.garten@aporter.com
adam.pergament@aporter.com

*Attorneys for Defendants
Mitsui O.S.K. Lines, Ltd., Mitsui
O.S.K. Bulk Shipping (U.S.A.),
Inc., Nissan Motor Car Carrier
Co., Ltd., and World Logistics
Service (U.S.A.) Inc.*

- 28 -

/s/ Steven F. Cherry
Steven F. Cherry
Todd F. Braunstein
John A. Hare
**WILMER, CUTLER, PICKERING, HALE & DORR LLP**
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:   (202) 663-6000
Steven.Cherry@wilmerhale.com
Todd.Braunstein@wilmerhale.com
John.Hare@wilmerhale.com

*Attorneys for Defendants*
*Compañía Sud Americana de Vapores,*
*S.A. and CSAV Agency, LLC*

– 29 –

# EXHIBIT "A"



# FEDERAL MARITIME COMMISSION
Regulating the nation's international ocean transportation for
the benefit of exporters, importers, and the American consumer.

## The Federal Maritime Commission Newsroom

### Two Car Carriers Pay $2.3 Million in Penalties

December 23, 2013

NR 13-19

Contact: Karen V. Gregory, Secretary (202) 523-5725

The Federal Maritime Commission announced compromise agreements reached with two common carriers operating pure car carriers (PCCs) and roll on/roll off (RO/RO) vessels in U.S. inbound and outbound trades. Under these separate agreements, Kawasaki Kisen Kaisha Ltd. (K Line), paid $1,100,000 in civil penalties and Nippon Yusen Kaisha (NYK Line), paid $1,225,000 in penalties. Both carriers are headquartered in Tokyo, Japan, and operate diverse fleets trading in the U.S.-foreign trades and globally.

The compromise agreements resolved allegations that K Line and NYK Line violated provisions of the Shipping Act, including section 10(a) of the Shipping Act, 46 U.S.C. § 41102(b), by acting in concert with other ocean common carriers with respect to the shipment of automobiles and other motorized vehicles by RO/RO or specialized car carrier vessels, where such agreement(s) had not been filed with the Commission or become effective under the Shipping Act. The compromise agreements also addressed related activities and violations. Commission staff alleged that these practices persisted over a period of several years and involved numerous U.S. trade lanes, including from and/or to the Far East, Europe, the Middle East and South America.

Chairman Mario Cordero stated: "These penalties underscore the seriousness with which the Commission views the carriers' obligation to file with the Commission any agreement with other carriers affecting working relationships in the U.S. trades, both for import and export traffic. The shipping public has a right to know the subject matter and scope of any such agreement, and the Commission is charged by Congress to oversee the parties' operations and conduct under such agreements. Investigations by our Bureau of Enforcement as to additional carriers implicated in similar agreement activities are continuing at this time."

In concluding the compromise agreements, K Line and NYK Line agreed to provide ongoing cooperation with other Commission investigations or enforcement actions with respect to these types of activities. The carriers did not admit to violations of the Act or the Commission's regulations. Staff attorneys with the Commission's Bureau of Enforcement negotiated the compromise agreements.

*The Federal Maritime Commission (FMC) is the independent federal agency responsible for regulating the nation's international ocean transportation for the benefit of exporters, importers, and the American consumer. The FMC's mission is to foster a fair, efficient, and reliable international ocean transportation system while protecting the public from unfair and deceptive practices.*

**Back to News**

# FEDERAL MARITIME COMMISSION

Regulating the nation's international ocean transportation for
the benefit of exporters, importers, and the American consumer.

---

## The Federal Maritime Commission Newsroom

---

## Mitsui O.S.K. Lines and Affiliate Pay $1.275 Million Penalty

February 12, 2014

NR 14-01

Contact: Karen V. Gregory, Secretary (202) 523-5725

The Federal Maritime Commission announced a compromise agreement reached with Mitsui O.S.K. Lines Ltd. (MOL) and its corporate affiliate, Nissan Motor Car Carrier Co. (NMCC). Mitsui O.S.K. Lines Ltd., is a vessel-operating common carrier based in Japan. As a separate line of commerce, MOL and NMCC operate pure car carriers (PCCs) and roll on/roll off (RO/RO) vessels in U.S. inbound and outbound trades. Under the agreement, MOL agreed to pay $1,275,000 in penalties.

The compromise agreement resolved allegations that MOL and NMCC violated section 10(a) of the Shipping Act, 46 U.S.C. § 41102(b), by acting in concert with other ocean common carriers with respect to the shipment of automobiles and other motorized vehicles by RO/RO or specialized car carrier vessels, where such agreement(s) had not been filed with the Commission or become effective under the Shipping Act. The compromise also addressed related activities and violations arising under such carrier agreements. Commission staff alleged that these practices persisted over a period of several years and involved numerous U.S. trade lanes.

Federal Maritime Commission Chairman Mario Cordero stated: "This is the second public announcement in recent months of Commission enforcement action against parties who fail to file carrier agreements. We take seriously our statutory responsibility under the Shipping Act to protect the shipping public and to ensure that agreements affecting carrier working relationships in the U.S. trades are properly filed and reviewed by the Commission."

In concluding the compromise, MOL and NMCC agreed to provide ongoing cooperation with other Commission investigations or enforcement actions with respect to these activities. The carriers did not admit to violations of the Shipping Act. Staff attorneys with the Commission's Bureau of Enforcement negotiated the compromise agreement.

*The Federal Maritime Commission (FMC) is the independent federal agency responsible for regulating the nation's international ocean transportation for the benefit of exporters, importers, and the American consumer. The FMC's mission is to foster a fair, efficient, and reliable international ocean transportation system while protecting the public from unfair and deceptive practices.*

**Back to News**

---

# FEDERAL MARITIME COMMISSION

Regulating the nation's international ocean transportation for
the benefit of exporters, importers, and the American consumer.

---

## The Federal Maritime Commission Newsroom

---

### CSAV Pays $625,000 Civil Penalty

March 5, 2014

NR 14-02

Contact: Karen V. Gregory, Secretary (202-523-5725)

The Federal Maritime Commission announced a compromise agreement reached with Compania Sud Americana de Vapores S.A. (CSAV). CSAV is a vessel-operating common carrier based in Valparaiso, Chile. As a separate line of business, CSAV operates roll on/roll off (RO/RO) vessels in U.S. inbound and outbound trades.

Under the compromise agreement, CSAV agreed to pay a $625,000 civil penalty to resolve allegations that it violated the Shipping Act by acting in concert with other ocean common carriers under unfiled agreements involving shipments of automobiles and other motorized vehicles on RO/RO or specialized car carrier vessels in various U.S. import and export trades. These agreements had not been filed with the Commission or become effective under the Shipping Act in violation of Section 10(a) of the Shipping Act, 46 U.S.C. § 41102(b). The compromise also addressed related activities and violations arising under such carrier agreements. Commission staff alleged that these practices persisted over a period of several years and involved numerous U.S. trade lanes.

In concluding the compromise, CSAV agreed to provide ongoing cooperation with other Commission investigations or enforcement actions with respect to these activities. CSAV did not admit to violations of the Shipping Act.

Federal Maritime Commission Chairman Mario Cordero stated: "The Shipping Act mandates that the Commission take responsible actions to protect the shipping public. Carriers who fail to properly file with the Commission their agreements affecting carrier working relationships in the U.S. trades are made liable for significant civil penalties, no matter the size of the trade or the market share of the carrier involved."

*The Federal Maritime Commission (FMC) is the independent federal agency responsible for regulating the nation's international ocean transportation for the benefit of exporters, importers, and the American consumer. The FMC's mission is to foster a fair, efficient, and reliable international ocean transportation system while protecting the public from unfair and deceptive practices.*

**Back to News**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2014, the foregoing Defendants' Notice of Motion to Dismiss Direct Purchaser Consolidated Amended Class Action Complaint, accompanying Brief in Support and Proposed Order was served by electronic mail upon the Direct Purchaser Interim Co-Lead Counsel:

> Kit A. Pierson
> David A. Young
> COHEN MILSTEIN SELLERS & TOLL PLLC
> 1100 New York Ave NW
> Suite 500
> Washington, DC 20005
> kpierson@cohenmilstein.com
> dyoung@cohenmilstein.com
>
> Robert N. Kaplan
> Richard J. Kilsheimer
> Gregory K. Arenson
> Lauren I. Dubick
> KAPLAN FOX & KILSHEIMER LLP
> 850 Third Avenue, 14th Floor
> New York, NY 10022
> rkaplan@kaplanfox.com
> rkilsheimer@kaplanfox.com
> garenson@kaplanfox.com
> ldubick@kaplanfox.com
>
> Steven A. Kanner
> Michael J. Freed
> Michael E. Moskovitz
> FREED KANNER LONDON & MILLEN LLC
> 2201 Waukegan Road, Suite 130
> Bannockburn, IL 60015
> skanner@fklmlaw.com
> mfreed@fklmlaw.com
> mmoskovitz@fklmlaw.com

/s/ John R. Fornaciari
John R. Fornaciari

- 30 -