UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE VEHICLE CARRIER SERVICES
ANTITRUST LITIGATION

*This Document Relates To All Actions*

Master Docket No.: 13-3306 (ES)
(MDL No. 2471)

OPINION

SALAS, DISTRICT JUDGE

## I.    INTRODUCTION

In this multidistrict litigation ("MDL"), purchasers of vehicle carrier services allege a conspiracy among ocean shipping companies to fix prices, allocate customers and routes, and restrict capacity. Direct Purchaser Plaintiffs ("DPPs") filed a consolidated class action complaint against Defendants[1] seeking treble damages and costs of suit under section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of section 1 of the Sherman Act, 15 U.S.C. § 1. (D.E. No. 142, Direct Purchaser Plaintiff Consolidated Amended Class Action Complaint ("DPP Compl.") ¶ 4). Indirect Purchaser Plaintiffs ("IPPs") collectively include End-Payors, Automobile Dealers ("Auto Dealers"), and Truck & Equipment Dealers, each of whom filed consolidated class action complaints against Defendants seeking equitable and injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, for violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and treble damages and costs of suit under various state antitrust, consumer protection, and unjust

---

[1] "Defendants" collectively include: Nippon Yusen Kabushiki Kaisha and NYK Line North America Inc. ("NYK Defendants"); Kawasaki Kisen Kaisha, Ltd. and "K" Line America, Inc. ("K-Line Defendants"); Wallenius Wilhelmsen Logistics AS, Wallenius Wilhelmsen Logistics America LLC, and EUKOR Car Carriers, Inc. ("WWL/EUKOR Defendants"); Compañía Sud Americana de Vapores, S.A. and CSAV Agency, LLC ("CSAV Defendants"); Höegh Autoliners AS and Höegh Autoliners, Inc. ("Höegh Defendants"); and Mitsui O.S.K. Lines, Ltd., Mitsui O.S.K. Bulk Shipping (U.S.A.), Inc., and World Logistics Service (U.S.A.) Inc. ("MOL Defendants"). The Court notes that a "settlement in principal" was reached between certain IPPs and the K-Line Defendants, (July 23, 2015 Transcript ("Tr.") at 11), and additionally notes that a "settlement agreement" was reached between IPPs and the MOL Defendants, for which the parties "request that the Court stay all proceedings as they relate to [the MOL Defendants]." (D.E. No. 272 at 1). The Court nevertheless must necessarily address the consolidated motions, which include the K-Line Defendants and the MOL Defendants.

enrichment laws. (D.E. No. 183, End-Payor Plaintiff Second Consolidated Amended Class Action Complaint ("End-Payor Compl.") ¶¶ 11, 213–85; D.E. No. 199, Automobile Dealer Second Consolidated Amended Class Action Complaint ("Auto Dealer Compl.") ¶¶ 11, 213–60; No. 14-4469, D.E. No. 1, Truck and Equipment Dealer Class Action Complaint ("Truck Center Compl.") ¶¶ 12, 197–242).[2]

Before the Court are the following motions: Defendants' Consolidated Motion to Dismiss the Indirect Purchasers' Complaints, (D.E. No. 209); End-Payor Plaintiffs' Request for Judicial Notice in Support of Response to Defendants' Motion to Dismiss Indirect Purchaser Actions, (D.E. No. 212); Defendants' Consolidated Motion to Dismiss the Direct Purchasers' Complaint, (D.E. No. 218); Defendant EUKOR Car Carriers, Inc.'s Motion to Dismiss All Complaints, (D.E. No. 214); Höegh Defendants' Motion to Dismiss the Direct Purchasers' Complaint, (D.E. No. 227); and Höegh Defendants' Motion to Dismiss the Indirect Purchasers' Complaints, (D.E. No. 230). The Court heard oral argument on July 23, 2015. (Tr.). Because the Shipping Act of

---

[2] End-Payors allege violations of the antitrust statutes of the District of Columbia and the following states: Arizona, California, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Utah, Vermont, West Virginia, Wisconsin, (End-Payor Compl. ¶¶ 213–53; *see also* Tr. at 107 (withdrawing Tennessee antitrust claim)); and they allege violation of the consumer protection laws of the District of Columbia and the following states: Arkansas, California, Florida, Hawaii, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Vermont. (End-Payor Compl. ¶¶ 254–85).

Auto Dealers allege violations of the antitrust statutes of the District of Columbia and the following states: Arizona, California, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Utah, Vermont, West Virginia, Wisconsin, (Auto Dealer Compl. ¶¶ 213–46); they allege violation the following state consumer protection laws: Arkansas, California, Florida, Massachusetts, Montana, New Mexico, New York, North Carolina, South Carolina, (Auto Dealer Compl. ¶¶ 247–58; *see also* Tr. at 107 (withdrawing Vermont consumer protection claim)); and they allege claims of unjust enrichment "under the laws of all states listed in the Second [state antitrust] and Third [state consumer protection] Claims." (Auto Dealer Compl. ¶ 260).

Truck and Equipment Dealers allege violations of the antitrust statutes of the District of Columbia and the following states: Arizona, California, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Utah, Vermont, West Virginia, Wisconsin, (Truck Center Compl. ¶¶ 197–228); they allege violation of the following state consumer protection laws: Arkansas, California, Florida, Massachusetts, Montana, New Mexico, New York, North Carolina, South Carolina, (Truck Center Compl. ¶¶ 229–40; *see also* Tr. at 107 (withdrawing Vermont consumer protection claim)); and they allege claims of unjust enrichment "under the laws of all states listed in the Second [state antitrust] and Third [state consumer protection] Claims." (Truck Center Compl. ¶ 242).

1984 bars Clayton Act claims and preempts state law claims under the theory of conflict preemption, the motions to dismiss are granted.

## II.     FACTUAL BACKGROUND

Defendants are ocean shipping companies engaged in the transportation of large numbers of cars, trucks, and other vehicles, including agricultural and construction equipment, between foreign countries and the United States using Roll On/Roll Off ("RO/RO") or specialized car carrier vessels.  (DPP Compl. ¶¶ 16–22, 25–28; End-Payor Compl. ¶¶ 2, 59–72; Auto Dealer Compl. ¶¶ 2, 44–57; Truck Center Compl. ¶¶ 3, 45–47).  As alleged in the complaints, "vehicle carrier services" refer to the paid ocean transportation of new, assembled motor vehicles by RO/RO or specialized vehicle carrier vessels.  (End-Payor Compl. ¶ 2; Auto Dealer Compl. ¶ 2; Truck Center Compl. ¶ 3).

Defendants sell vehicle carrier services to original equipment manufacturers ("OEMs")—mostly large automotive, construction and agricultural manufacturers such as Honda, Volkswagen, Mitsubishi, Toyota, Nissan, and Subaru—which purchase vehicle carrier services from Defendants to transport vehicles manufactured by the OEMs outside of the United States to purchasers in the United States.  (End-Payor Compl. ¶ 82; Auto Dealer Compl. ¶¶ 21, 23, 27, 33, 37, 39, 41; Truck Center Compl. ¶¶ 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43).

Both DPPs and IPPs allege that Defendants entered into various collusive, secret agreements to fix and increase the prices for vehicle carrier services to and from the United States.  These include:

(i)      coordination of price increases, (DPP Compl. ¶¶ 62, 63; End-Payor Compl. ¶¶ 125–30; Auto Dealer Compl. ¶¶ 113–18; Truck Center Compl. ¶¶ 108–18);

(ii)    agreements not to compete, including coordination of responses to price reduction requests made by the OEMs and allocation of customers and routes, (DPP Compl. ¶¶ 64, 65; End-Payor Compl. ¶¶ 131–45; Auto Dealer Compl. ¶¶ 119–32; Truck Center Compl. ¶¶ 119–32); and

(iii)   agreements to restrict capacity by means of agreed upon fleet reductions, (DPP Compl. ¶¶ 55–61; End-Payor Compl. ¶¶ 146–48; Auto Dealer Compl. ¶¶ 133–40; Truck Center Compl. ¶¶ 133–35).

DPPs allege they have directly purchased vehicle carrier services from Defendants, and were directly injured as a result.  (DPP Compl. ¶¶ 13–15, 91).  DPPs also "include companies that arrange for the international ocean transportation of vehicles."  (*Id.* ¶ 30).

As mentioned above, IPPs include Auto Dealers, Truck & Equipment Dealers, and End-Payors. The Auto Dealers and the Truck & Equipment Dealers are automobile dealers and truck & equipment dealers, respectively, in the United States that allege that they purchased automobiles or trucks & equipment from the OEMs that were transported to the United States in Defendants' RO/RO or specialized vehicle carrier vessels.  (Auto Dealer Compl. ¶¶ 21–43; Truck Center Compl. ¶¶ 21–44).  The End-Payors are individuals who allege that they purchased or leased automobiles from Auto Dealers in the United States.  (End-Payor Compl. ¶¶ 20–58). Each of the IPPs alleges that they are "indirect purchasers" of vehicle carrier services because, purportedly, the cost paid by the OEMs for vehicle carrier services was passed on to them as part of the purchase or lease price they paid for the automobiles or trucks.  (End-Payor Compl. ¶¶ 10, 182, 183; Auto Dealer Compl. ¶¶ 10, 172–76; Truck Center Compl. ¶¶ 10, 157–62).

## III.   PROCEDURAL BACKGROUND

These civil antitrust actions were precipitated by the disclosure in September 2012 of raids upon certain Defendants' offices by governmental agencies in connection with antitrust investigations.  (*See* DPP Compl. ¶¶ 66–71; End-Payor Compl. ¶¶ 6–8, 190–92; Auto Dealer Compl. ¶¶ 6–8, 184–86; Truck Center Compl. ¶¶ 4, 5, 7, 169–71).  On May 24, 2013, the first of the cases that comprise this MDL was filed in this Court.  (*See* D.E. No. 1).  On October 8, 2013, the Judicial Panel on Multi-District Litigation selected this Court as the transferee court in this MDL for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407.  (D.E. No. 21).[3]

On June 13, 2014, United States Magistrate Judge Joseph A. Dickson issued MDL Order Number 4, which set a global briefing schedule for the pending motions to dismiss.  (D.E. No. 156).  The motions were fully briefed and filed on January 26, 2015.  The Court heard oral argument on July 23, 2015 and thereafter received supplemental briefing on the issue of conflict preemption.[4]  The motions are now ripe for resolution.

## IV.   LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[3] A review of the docket as of this writing indicates that this MDL currently consists of thirty-one member cases. (*See* No. 13-3306 docket sheet).

[4] The Court has reviewed and considered the following written submissions: End-Payor Plaintiff's Request for Judicial Notice (D.E. No. 212), and Defendants' Consolidated Brief in Opposition (D.E. No. 213); Defendants' Consolidated Motion to Dismiss the IPP Complaints (D.E. No. 209), IPP Opposition Brief (D.E. No. 210), Defendants' Consolidated Reply Brief (D.E. No. 211), End-Payor Letter Brief RE: *Oneok* (D.E. No. 251), Defendants' Consolidated Letter Brief in Response (D.E. No 252), Defendants' Consolidated Supplemental Brief RE: Conflict Preemption (D.E. No. 269), and IPP Supplemental Brief RE: Conflict Preemption (D.E. No. 270); Defendants' Consolidated Motion to Dismiss the DPP Complaint  (D.E. No. 218), DPP Opposition Brief (D.E. No. 219), and Defendants' Consolidated Reply Brief (D.E. No. 220); EUKOR's Motion to Dismiss All Complaints (D.E. No. 214), DPP Opposition Brief (D.E. No. 215), IPP Opposition Brief (D.E. No. 216), and EUKOR Reply Brief (D.E. No. 217); Höegh's Motion to Dismiss the DPP Complaint (D.E. No. 227), DPP Opposition Brief (D.E. No. 228), and Höegh's Reply Brief (D.E. No. 229); Höegh's Motion to Dismiss the IPP Complaints (D.E. No. 230), IPP Opposition Brief (D.E. No. 231), and Höegh's Reply Brief (D.E. No. 232).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.  *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).  Among the public records a court may examine in order to resolve a motion to dismiss is a judicial proceeding from a different court or case, but a court must be mindful of the distinction between the existence of a fact and its truth.  *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426, 427 n.7 (3d Cir. 1999).

V.     **ANALYSIS**

   **A. Clayton Act Claims for Damages and Injunctive Relief are Barred by the Shipping Act[5]**

Defendants argue that claims for damages and injunctive relief under the Clayton Act are barred by the Shipping Act of 1984 (the "Shipping Act").  (D.E. No. 209-1 at 71; D.E. No. 218-1 at 3–11; D.E. No. 220 at 1–11; Tr. at 112–37, 156–62).  The Shipping Act states that "[a] person may not recover damages under section 4 of the Clayton Act (15 U.S.C. 15), or obtain injunctive relief under section 16 of that Act (15 U.S.C. 26), for conduct prohibited by [the Shipping Act]."  46 U.S.C. § 40307(d).  Defendants assert that the conduct alleged in the complaints by DPPs and IPPs—namely agreements to fix prices, allocate customers and routes, and restrict capacity—are "prohibited by" the Shipping Act, thus triggering the statutory bar against private antitrust actions under section 40307(d).

DPPs contend that agreements to restrict capacity are not prohibited by the Shipping Act and are therefore subject to private antitrust suits.  First, DPPs argue that agreements to restrict capacity are outside of the purview of the Shipping Act and they point to the lack of explicit reference to "capacity restriction" in the Shipping Act and comments made by a former Commissioner of the Federal Maritime Commission ("FMC") in support.  (D.E. No. 219 at 4–7).  Second, they argue that even if agreements to restrict capacity were covered, they are not "prohibited acts" sufficient to trigger the bar against Clayton Act claims.  (*Id.*).

DPPs concede that claims relating to price fixing and market allocation are prohibited by the Shipping Act and are thus non-actionable under section 40307(d)'s Clayton Act bar.  (Tr. at 156).  Thus, the precise issue before the Court is whether capacity restrictions, as alleged in the

---

[5] Although this point was addressed directly by DPPs for their claims for damages under the Clayton Act, IPPs incorporated and adopted DPPs' arguments with respect to their claims for injunctive relief under the Clayton Act. (D.E. No. 210 at 72–73).

7

complaints, are covered by the Shipping Act and subject to section 40307(d)'s statutory bar against private antitrust actions.

In the Third Circuit, "the first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  When the statutory language has a clear meaning, [the court] need not look further." *Valansi v. Ashcroft*, 278 F.3d 203, 209 (3d Cir. 2002) (internal citation and quotation omitted). "However, if the language of the statute is unclear, [the court] attempt[s] to discern Congress'[s] intent using the canons of statutory construction.  If the tools of statutory construction reveal Congress'[s] intent, that ends the inquiry." *United States v. Cooper*, 396 F.3d 308, 310 (3d Cir. 2005), as amended (Feb. 15, 2005) (internal citations omitted).  "If, on the other hand, [the court is] unable to discern Congress'[s] intent using tools of statutory construction, [the court] generally defer[s] to the governmental agency's reasonable interpretation." *Id.* at 310–11.

The Court finds that a plain reading of the Shipping Act reveals that capacity restrictions are prohibited by the Shipping Act and that DPPs' and IPPs' claims for damages and injunctive relief under Clayton Act are forbidden under section 40307(d).  First, capacity restrictions are covered in the "Application" section of the Shipping Act, and so agreements among ocean common carriers (*i.e.*, Defendants) to restrict capacity are required to be filed with the FMC. Second, because ocean common carriers are prohibited from operating under an unfiled agreement that is required to be filed with the FMC, the Shipping Act provides an exemption for claims under the Clayton Act under section 40307(d).  The Court discusses each in further detail below.

> i. <u>Agreements to Reduce Capacity Fall Within the Shipping Act Purview and Must be Filed with the FMC</u>

The Shipping Act states that agreements between ocean common carriers falling within certain enumerated categories, 46 U.S.C. § 40301(a), "shall be filed" with the FMC, *id.* § 40302(a).   Defendants argue that agreements to restrict capacity are covered by the Shipping Act, specifically section 40301(a), which states as follows:

> § 40301. Application
> (a) OCEAN COMMON CARRIER AGREEMENTS.—This part applies to an agreement between or among ocean common carriers to—
>   (1) discuss, fix, or regulate transportation rates, including through rates, cargo space accommodations, and other conditions of service;
>   (2) pool or apportion traffic, revenues, earnings, or losses;
>   (3) allot ports or regulate the number and character of voyages between ports;
>   (4) regulate the volume or character of cargo or passenger traffic to be carried;
>   (5) engage in an exclusive, preferential, or cooperative working arrangement between themselves or with a marine terminal operator;
>   (6) control, regulate, or prevent competition in international ocean transportation; or
>   (7) discuss and agree on any matter related to a service contract.

46 U.S.C. § 40301(a).   (D.E. No. 218-1 at 9–11; D.E. No. 220 at 3–5).   DPPs argue that agreements to restrict capacity are not covered by the Shipping Act, as demonstrated by lack of explicit reference and the comments of a former Commissioner of the FMC.   (D.E. No. 219 at 4–7).

The Court holds that a plain reading of the statutory language demonstrates that capacity restrictions, as alleged in the complaints, are covered by the Shipping Act.   The complaints allege that Defendants reduced capacity by agreeing to "scrap" (*i.e.*, render non-usable) and "layup" (*i.e.*, take out of commission but not scrap) vessels.   (DPP Compl. ¶ 56; End-Payor Compl. ¶ 123; Auto Dealer Compl. ¶ 111; Truck Center Compl. ¶ 106).   DPPs allege that the capacity reductions were the result of a "conspiracy and were not caused by natural market

9

forces" and "resulted in artificially inflated prices for Vehicle Carrier Services." (DPP Compl. ¶¶ 55, 57). Similarly, IPPs allege that the capacity reductions were the result of "concerted, collusive efforts" and "caused prices to artificially rise." (End-Payor Compl. ¶ 124; Auto Dealer Compl. ¶ 112; Truck Center Compl. ¶ 107). These allegations plainly and unambiguously fit within the Shipping Act's parameters, specifically section 40301(a), as set forth above.

When "interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions . . . ." *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (quoting *Brown v. Duchesne*, 19 How. 183, 194, 15 L.Ed. 595 (1857)); *see also Cooper*, 396 F.3d at 313 ("The Whole Act Rule instructs that subsections of a statute must be interpreted in the context of the whole enactment.") (citation omitted).

The Court reads section 40301(a) as a whole to cover the type of capacity restrictions alleged by Plaintiffs. Most on point is subpart 6: allegations that Defendants conspired to reduce capacity is clearly an agreement to "control, regulate, or prevent competition." *Id.* § 40301(a)(6). Similarly, the allegations in the complaint also speak to an agreement to "regulate the number and character of voyages between ports," *id.* § 40301(a)(3), and an agreement to "regulate the volume or character of cargo or passenger traffic to be carried," *id.* § 40301(a)(4). More generally, the allegations suggest a "cooperative working arrangement." *Id.* § 40301(a)(5). Thus, the Court is satisfied that capacity reductions are covered by a plain reading of the Shipping Act's text. In addition, the regulations promulgated by the FMC further support the conclusion that capacity reductions are within the Shipping Act's purview. For example, 46 C.F.R. § 535.104(e) defines "capacity rationalization" as "a concerted reduction, stabilization, withholding, or other limitation in any manner whatsoever by ocean common carriers on the size

or number of vessels or available space offered collectively or individually to shippers in any trade or service." *Id.* The regulations further state that an "agreement that contains the authority to discuss or agree on capacity rationalization" is subject to the Monitoring Report requirements, *id.* § 535.702(a)(1), and also indicate a requirement for a "narrative statement on any significant reductions in vessel capacity," *id.* § 535.703(c).

The personal remarks of FMC Commissioner Michael A. Khouri relied on by DPPs are not persuasive. (*See* D.E. No. 219 at 6–7, Ex. C.) On May 13, 2010, Mr. Khouri made the following statement as part of a panel discussion at the "International Trade Symposium: Charting New Horizons":

> One final comment—recent reports of increases in annual transpacific contract rates have heightened shipper concerns that these rate hikes are facilitated by carriers using, first, their legal authority to discuss voluntary general rate guidelines with, second, discussions to agree on capacity restriction. The first discussion would be legal under the Shipping Act. The second discussions—if they occurred—would be outside of the Shipping Act purview and would therefore be a violation of the Sherman Act.

(D.E. No. 219, Ex. C at 2.) The Court agrees with Defendants that: (i) DPPs' interpretation of the statement is inconsistent with the statutory language and regulations, (D.E. No. 220 at 9); (ii) the remarks are not entitled to *Chevron* deference because Mr. Khouri explicitly stated that his remarks were his personal views and were not offered as the official position of the FMC,[6] (*id.* at

---

[6] "*Chevron* deference" refers to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which "directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2701 (2015).

> *Chevron* requires courts to conduct a two-step inquiry. Under the first step, "[w]hen a court reviews an agency's construction of the statute which it administers," it must ask 'whether Congress has directly spoken to the precise question at issue." [*Chevron*, 467 U.S.] at 842. If Congress has resolved the question, the clear intent of Congress binds both the agency and the court." *Id.* . . . Under the second step, if "Congress has not directly addressed the precise question at issue," because "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." [*Id.*] at 843.

*Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 294 (3d Cir. 2012) (parallel citation omitted). Here, even if for argument's sake the first step were satisfied, a clear "guiding principle" from the Third Circuit is that "*Chevron*

10); (iii) the remarks can alternatively be interpreted as simply indicating that unfiled agreements (*i.e.*, agreements that lack "legal authority") are outside of the Shipping Act purview, as opposed to agreements involving capacity reductions, (Tr. at 132–33); and (iv) consistent with the Shipping Act, Mr. Khouri's reference to a Sherman Act violation more likely is in reference to criminal liability as opposed to private antitrust actions, (*id.*).

Thus, the Court finds that agreements to restrict capacity are covered by the Shipping Act.   As a result, agreements to restrict capacity are required to be filed with the FMC. Specifically, section 40302 states that, "[a] true copy of every agreement referred to in section 40301(a) . . . of this title *shall be filed* with the Federal Maritime Commission.   If the agreement is oral, a complete memorandum specifying in detail the substance of the agreement *shall be filed.*"   46 U.S.C. § 40302(a) (emphasis added).   Agreements to restrict capacity are "referred to" in section 40301(a) and thus must be filed under section 40302(a).   Here, DPPs and IPPs allege—and Defendants do not dispute—that the agreements to reduce capacity were not filed with the FMC.   (*See* DPP Compl. ¶ 72; End-Payor Compl. ¶ 195; Auto Dealer Compl. ¶ 189; Truck Center Compl. ¶ 174).

> ii.   The Statutory Bar Against Private Antitrust Actions Applies because Ocean Common Carriers are Prohibited from Operating Under an Unfiled Agreement to Reduce Capacity

Section 40307(d) states that "[a] person may not recover damages under section 4 of the Clayton Act (15 U.S.C. 15), or obtain injunctive relief under section 16 of that Act (15 U.S.C. 26), for conduct prohibited by [the Shipping Act]."   46 U.S.C. § 40307(d).   Defendants argue

---

deference is inappropriate for informal agency interpretations," *id.* at 300 n.14 (citation and internal quotation marks omitted), let alone remarks such as Mr. Khouri's that are expressly disclaimed as personal views.   (*See* D.E. No. 219, Ex. C ("My remarks today reflect my personal views and thoughts and are not offered as the official position of the United States or the Federal Maritime Commission.")).   Thus, Mr. Khouri's remarks are clearly not entitled to *Chevron* deference.

that the statutory bar against Clayton Act claims is triggered because ocean common carriers are prohibited from operating under an unfiled agreement to restrict capacity, under the "general prohibitions" outlined in the Shipping Act.  (D.E. No. 209-1 at 71; D.E. No. 218-1 at 3–11; D.E. No. 220 at 1–11; Tr. at 112–37, 156–62) (citing to 46 U.S.C. § 41102(b)).  DPPs contend that operating under unfiled agreements to restrict capacity are not "prohibited acts" sufficient to trigger the bar against Clayton Act claims.  (D.E. No. 219 at 4–7).  In their briefs, DPPs discussed the lack of reference to capacity restrictions in the "Prohibitions and Penalties" chapter of the Shipping Act.  (*Id.*).  At oral argument, however, DPPs focused on the "general prohibitions" section.[7]  (*See* Tr. at 137–56).

The Court agrees with Defendants and finds that because ocean common carriers are prohibited from operating under an unfiled agreement that is required to be filed with the FMC, the Shipping Act provides an exemption for claims under the Clayton Act.

Chapter 411 of the Shipping Act is entitled "Prohibitions and Penalties" and is comprised of nine sections.  *See* 46 U.S.C. §§ 41101–41109.  Prohibited acts include, for example, certain disclosures of information, *id.* § 41103, unreasonably refusing to deal, *id.* § 41104(10), and concerted action among common carriers to allocate shippers, *id.* § 41105(6).  Although capacity restrictions are not explicitly referenced within the sections of chapter 411, this is not dispositive as DPPs contend, because of the broad scope of the "general prohibitions" section.[8]

Section 41102 of the Shipping Act covers "general prohibitions" and states in relevant part: "[a] person may not operate under an agreement required to be filed under section 40302

---

[7] Although the Court indicated on the record that it might not consider this argument due to waiver resulting from failure to include it in the opposition brief, (*see* Tr. 148), the Court accepts it and takes it under consideration for purposes of deciding the instant motions.

[8] The Court also notes that other activities that are clearly covered by the Shipping Act (*e.g.*, price fixing) likewise are not explicitly included in the "Prohibitions and Penalties" chapter.

. . . if . . . the agreement has not become effective under section 40304 of this title or has been rejected, disapproved, or canceled." 46 U.S.C. § 41102(b)(1). As detailed *supra*, agreements relating to capacity restrictions are required to be filed under section 40302. While Defendants argue that the unfiled agreements to restrict capacity at issue fall within section 41102(b)(1)— *i.e.*, that they are prohibited from operating under unfiled agreements relating to capacity restrictions—DPPs contend that section 41102(b)(1) is triggered only if an agreement is filed under section 40304. In other words, DPPs assert that ocean common carriers are prohibited from operating under an agreement to restrict capacity only if they file the agreement with the FMC and it then does not "become effective." (*See* Tr. at 149–52). Taken to its conclusion, under DPPs' reading, if an agreement to reduce capacity is not filed with the FMC, then the parties to that agreement are subject to private antitrust suits. But the language of section 41102(b)(1) does not plainly and unambiguously necessitate the conclusion advanced by DPPs. The Court disagrees with DPPs' interpretation because it results in surplusage and is inconsistent with the overall statutory scheme and the legislative history.

First, DPPs' reading appears to result in surplusage. Under section 40304, a filed agreement that is not rejected becomes effective after forty-five days. *See* 46 U.S.C. § 40304(c) ("Unless rejected . . . an agreement . . . is effective on the 45th day after filing . . . .") (internal punctuation and subdivision omitted). Thus, under DPPs' reading of section 41102(b)(1), the phrase "or has been rejected" would be surplusage because if an agreement "has not become effective under section 40304," it necessarily must have been rejected according to section 40304. Therefore, the fact that "or has been rejected" is in the statute cuts against DPPs interpretation. *See Ki Se Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (recognizing "the goal of avoiding surplusage in construing a statute").

14

Second, section 41102(b)(1) can just as easily be read to support Defendants' position. For example, the section can be interpreted to prohibit ocean common carriers from operating under an agreement required to be filed simply *if* it has not been filed.  In other words, whereas DPPs' interpretation reads the "if" as a prerequisite to filing with the FMC, the "if" can also be read to explain that ocean common carriers are prohibited from operating under "secret" agreements that did not "become effective" because they were never filed in the first place. Where there is more than one reasonable reading of the statute, the Court is guided by the canons of statutory construction.  *See Cooper*, 396 F.3d at 310.  "When the language of a statute is ambiguous, [courts] look to its legislative history to deduce its purpose."  *United States v. Hodge*, 321 F.3d 429, 437 (3d Cir. 2003); *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000) ("Where the statutory language does not express Congress's intent unequivocally, a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose.").

The legislative history directly supports Defendants' interpretation of section 41102(b)(1).  *See* Report of the House Committee on Merchant Marine and Fisheries, H.R. Rep. No. 98-53, pt. 1, at 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 167, 177 (hereinafter "House Report").[9]  The House Report explicitly discusses antitrust immunity:

> [I]f parties who could avail themselves of antitrust immunity by submitting to regulation under the terms of the Shipping Act of [1984] fail to do so, then their knowing conduct, undertaken without the benefit of an agreement being filed and in effect, will subject them to limited antitrust exposure.  The antitrust exposure for these so-called "secret" agreements is limited to injunctive and criminal prosecution by the Attorney General, and does not carry with it any private right of action otherwise available under the antitrust laws.

---

[9] *See* D.E. No. 209-13, Ex. K to Defendants' Brief in Support of their Motion to Dismiss IPPs Complaints.

House Report at 12, 177.  As an initial matter, the legislative history specifically references "secret" agreements as opening the door to antitrust exposure.  *Id.*  But an agreement filed with the FMC under section 40304—as DPPs contend is required under section 41102—could not realistically be considered "secret."  *See* Black's Law Dictionary 1556 (10th ed. 2014) (defining "secret" as "[s]omething that is kept from the knowledge of others or shared only with those concerned; something that is studiously concealed").  More to the point, the legislative history specifically states that a "secret" agreement was not intended to give rise to private antitrust actions.  As a whole, the legislative history clearly supports Defendants' interpretation of section 41102(b)(1): if an ocean common carrier enters into an agreement to reduce capacity, and that agreement is not filed with the FMC under section 40304, then the carrier will be subject to injunctive and criminal prosecution by the Attorney General, but not private antitrust actions. House Report at 12, 177 ("The antitrust exposure for . . . so-called 'secret' agreements is limited to injunctive and criminal prosecution by the Attorney General, and does not carry with it any private right of action otherwise available under the antitrust laws.").

The Court therefore finds that the most natural reading of section 41102(b)(1) is that it prohibits ocean common carriers from operating under an unfiled agreement to reduce capacity. Here, as noted *supra*, DPPs and IPPs allege—and Defendants do not dispute—that the agreements to reduce capacity were not filed with the FMC.  (*See* DPP Compl. ¶ 72; End-Payor Compl. ¶ 195; Auto Dealer Compl. ¶ 189; Truck Center Compl. ¶ 174).  Thus, DPPs and IPPs allege that Defendants engaged in conduct prohibited by the Shipping Act.  Accordingly, because "[a] person may not recover damages under section 4 of the Clayton Act (15 U.S.C. 15), or obtain injunctive relief under section 16 of that Act (15 U.S.C. 26), for conduct prohibited by

[the Shipping Act]," 46 U.S.C. § 40307(d), DPPs' claim under section 4 of the Clayton Act and IPPs' claims under section 16 of the Clayton Act will be dismissed with prejudice.[10]

### B.   The State Law Claims At Issue are Conflict Preempted by the Shipping Act

Defendants argue that IPPs' state antitrust and consumer protection claims are impliedly preempted by the Shipping Act and within the exclusive federal jurisdiction of the FMC.  First, Defendants argue that Congress intended for the Shipping Act to occupy the field and to displace state law relating to international maritime commerce.  (*See* D.E. No. 209 at 52–61; D.E. No. 211 at 36–40).  In the alternative, Defendants argue that state laws conflict with the Shipping Act because they stand as an obstacle to Congress's underlying objectives.  (D.E. No. 211 at 40–44; D.E. No. 269 at 2–18).

IPPs contend that Defendants have not met their high burden in showing that preemption applies.  IPPs argue that there is no indication that Congress intended for the Shipping Act to occupy the entire field with respect to international maritime commerce.  (D.E. No. 210 at 53–64).  In a supplemental filing, IPPs argue that conflict preemption is a narrow doctrine that does not apply here because there is no actual conflict between state laws and the Shipping Act, (D.E. No. 270 at 7–12); Congress chose not to limit state antitrust laws when it passed the Shipping Act, (*id.* at 12–14); every court to address whether the Shipping Act preempts state law has held

---

[10] DPPs argue that the Court should "discount" arguments made by CSAV and K-Line with respect to the statutory bar against private antitrust actions.  (*See* D.E. No. 219 at 7–10).  DPPs contend that it would be "manifestly unjust" to permit them to raise such arguments when the sentencing Judge in the related criminal actions referenced pending civil actions when ordering no restitution.   (*Id.*).   The Court agrees with Defendants that merely acknowledging the existence of civil claims during the plea agreement does not preclude the arguments here, especially because: (i) the Shipping Act was not addressed as part of the criminal proceedings; (ii) CSAV and K-Line did not waive any arguments with respect to the Shipping Act; (iii) even if they had waived a Shipping Act argument, it would not permit a cause of action that is otherwise prohibited by the statute; (iv) there is no indication that approval of the guilty pleas was predicated on civil damages recovery; and (v) plaintiffs can seek reparations through the FMC via 46 U.S.C. § 41305.  Thus, the Court finds that DPPs have not established that CSAV and K-Line should be precluded from making arguments with respect to the statutory bar against private antitrust actions. The Court's ruling with respect to section 40307(d) applies to CSAV and K-Line.

that it does not, (*id.* at 14–16); and Defendants' reliance on an isolated excerpt from the legislative history is misleading, (*id.* at 16–20).

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, under the doctrine of preemption, "any state law, however clearly within a State's acknowledged power, must yield if it interferes with or is contrary to federal law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 89 (1992). "Preemption can apply to all forms of state law, including civil actions based on state law." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010). "For the purposes of preemption analysis, it is the cause of action, and not the specific relief requested, that matters. Preemption speaks in terms of claims, not in terms of forms of relief." *Id.* at 133.

"'Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws . . . .'" *Delaware & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*, 781 F.3d 656, 661 (3d Cir. 2015), *pet. for cert. docketed*, No. 14-1359 (May 14, 2015) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). "When that is the case, 'courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'" *Id.* In other words, state law can be impliedly preempted under the doctrines of field preemption and conflict preemption.

Under field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).

> The intent to displace state law altogether can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  "To determine the boundaries that Congress sought to occupy within the field, [courts] look to the federal statute itself, read in the light of its constitutional setting and its legislative history."  *Lozano v. City of Hazleton*, 724 F.3d 297, 303 (3d Cir. 2013) *cert. denied sub nom. City of Hazleton, Pa. v. Lozano*, 134 S. Ct. 1491 (2014) (internal quotation and citation omitted).

By contrast, "[c]onflict pre-emption can occur in one of two ways: where 'compliance with both federal and state regulations is a physical impossibility,' or 'where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Lozano*, 724 F.3d at 303 (quoting *Arizona*, 132 S. Ct. at 2501).  "Courts must utilize their judgment to determine what constitutes an unconstitutional impediment to federal law, and that judgment is 'informed by examining the federal statute as a whole and identifying its purpose and intended effects.'"  *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).  But mere "tension" between federal and state law is "generally not enough" to show an obstacle supporting preemption; rather the "repugnance or conflict" must be "so direct and positive that the two acts cannot be reconciled or consistently stand together."  *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013), *as amended* (May 30, 2013), *cert. denied*, 134 S. Ct. 905 (2014) (citation and internal quotation marks omitted).

Two overarching principles guide the analysis.  *See Farina*, 625 F.3d at 115.  First, congressional intent is the "ultimate touchstone" in preemption analysis.  *Cipollone v. Liggett*

*Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation and citation omitted).  Second, courts generally apply a presumption against preemption, *see id.*, but the presumption is not absolute. *See United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."); *cf. Wyeth v. Levine,* 555 U.S. 555, 565 n.3 (2009) (noting that the presumption against preemption "accounts for the historic presence of state law but does not rely on the absence of federal regulation").  In other words, "[t]he presumption [against preemption] applies with particular force in fields within the police power of the state, but does not apply where state regulation has traditionally been absent."  *Farina*, 625 F.3d at 116 (internal citations omitted).

Here, the Court finds that the state laws at issue conflict with the Shipping Act and are therefore preempted because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  Paramount to the Court is the Shipping Act's express purpose of minimizing government intervention and regulatory costs coupled with exemptions from private antitrust actions under the Clayton Act and the ability of any person to bring claims before the FMC.

i. The Court Does Not Address Whether the Presumption Against Preemption Applies

Several public policy concerns are implicated in the determination of whether a presumption against preemption applies.  On the one hand, "monopolies and unfair business practices" are "area[s] traditionally regulated by the States."  *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); *see also Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011) (applying the presumption against preemption in maritime-related action,

20

"[g]iven the 'historic presence of state law' in the area of air pollution").  "In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted).

On the other hand, the field of national and international maritime commerce is a field "where the federal interest has been manifest since the beginning of the Republic and is now well established." *Locke*, 529 U.S. at 90.  Where state laws "bear upon national and international maritime commerce, . . . there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers.  Rather, [courts] must ask whether the local laws in question are consistent with the federal statutory structure . . . ." *Id.* at 108.

The Court is thus confronted with a scenario where laws within areas of traditional state regulation (monopolies and unfair business practices) touch upon a field where state regulation has traditionally been absent (international maritime commerce).  However, the Court declines to reach a conclusion as to whether a presumption against preemption applies in this context because it finds that the state laws at issue present a sufficient obstacle to the objectives of Congress.  *Crosby*, 530 U.S. at 374 n.8 ("We leave for another day a consideration in this context of a presumption against preemption.  Assuming, *arguendo*, that some presumption against preemption is appropriate, we conclude, based on our analysis below, that the state Act presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act to find it preempted.").

ii.   The State Laws are an Obstacle to the Accomplishment of Congress's
Objective of Minimal Government Intervention and Regulatory Costs

The Shipping Act has four stated purposes, two of which are pertinent here:

(1) establish a nondiscriminatory regulatory process for the common carriage of goods by
water in the foreign commerce of the United States with a minimum of government
intervention and regulatory costs; . . . [and]

(4) promote the growth and development of United States exports through competitive
and efficient ocean transportation and by placing a greater reliance on the
marketplace.

46 U.S.C. § 40101.

Defendants argue that IPPs' proposed application of state law stands as an obstacle to the

first purpose.  (*See* D.E. No. 269 at 4–5).  In short, Defendants contend that Congress intended to

create an "exclusive system of redress" through the FMC for violations of the Shipping Act and

that subjecting the ocean shipping industry to the laws of fifty separate states for the same

conduct conflicts with Congress's purpose.  (*Id.*).[11]

IPPs argue that their proposed application of state law does not conflict with the purposes

of Congress and that the first purpose relied on by Defendants is "not implicate[d] . . . in a

material way."  (D.E. No. 270 at 10–11).  Instead, IPPs focus on the fourth purpose—

competitive and efficient ocean transportation—and contend that private actions under state law

merely complement the FMC and DOJ's enforcement of federal law.  (*Id.*).

---

[11] IPPs argue that CSAV and K-Line should be judicially estopped from invoking preemption because they took an
"inconsistent position" when they pleaded guilty to the criminal charges.  (*See* D.E. No. 210 at 63–64).  The Court
does not agree.  Judicial estoppel applies only if the "(1) the party to be estopped is asserting a position that is
irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position
in bad faith, *i.e.*, in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial
estoppel is tailored to address the affront to the court's authority or integrity."  *Montrose Med. Group Participating
Sav. Plan v. Bulger*, 243 F.3d 773, 777–78 (3d Cir. 2001).  Judicial estoppel is a narrow doctrine because it is "an
extraordinary remedy that should be employed only when a party's inconsistent behavior would otherwise result in a
miscarriage of justice."  *Id.* at 784 (citation and internal quotation marks omitted).  For the reasons stated in footnote
10, *supra*, IPPs have not demonstrated that judicial estoppel applies.  Thus, the Court's holding with respect to
preemption applies to CSAV and K-Line.

Although the Court agrees with IPPs that the state laws at issue may complement the fourth purpose of the Shipping Act—a point not contested by Defendants—the Court cannot simply disregard the Act's *first* stated purpose.  Instead, the Court agrees with Defendants that the state laws at issue conflict with the Act's first purpose of minimizing government intervention and regulatory costs.  Accordingly, the state law claims shall be dismissed as preempted.

The Shipping Act states that agreements between ocean common carriers falling within certain enumerated categories, 46 U.S.C. § 40301(a), "shall be filed" with the FMC, *id.* § 40302(a).  If such agreements are filed and become effective, the "antitrust laws do not apply" and the carrier is immune from criminal and civil liability under the Sherman Act and Clayton Act, respectively.  46 U.S.C. § 40307(a); *see also id.* § 40102(2) (defining "antitrust laws" to include the Sherman Act and Clayton Act).  On the other hand, if such agreements are not filed with the FMC, then the carrier is subject to criminal liability under the Sherman Act and to sanctions and penalties by the FMC, but private antitrust actions under the Clayton Act remain barred.  46 U.S.C. §§ 41102(b)(1); 40307(d); *see also* Part V.A, *supra*.

Any person may file a complaint with the FMC for violations of the Shipping Act, and may seek reparations for injury if the complaint is filed within three years of the date of accrual.  46 U.S.C. § 41301; *see also* 46 C.F.R. § 502.62 (outlining FMC complaint process).  The FMC may award reparations up to double actual damages, *id.* § 41305, and the person to whom the award was made can seek enforcement of the award in a district court, *id.* § 41309.  The FMC has broad investigatory powers, including the ability to subpoena witnesses and evidence, *id.* § 41303(a)(1), and issue sanctions for delay, *id.* § 41302(d), which can be enforced via application to a district court, *id.* § 41308.  In other words, the FMC possesses power not unlike a district

court.  *Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 759 (2002) ("[T]he similarities between FMC proceedings and civil litigation are overwhelming.").  Thus, "while no private party may sue for damages or for injunctive relief under the antitrust laws for conduct [prohibited by the Shipping Act], the FMC is empowered to order reparations, including double damages, to impose sanctions and penalties for prohibited conduct, and to file suit in federal district court against the offending party."  *A & E Pac. Const. Co. v. Saipan Stevedore Co.*, 888 F.2d 68, 71 (9th Cir. 1989).

The Shipping Act is undeniably silent on the availability of private remedies under state law.  The Shipping Act defines "antitrust laws" solely by reference to federal antitrust laws, 46 U.S.C. § 40102(2), and specifically bars actions under the Clayton Act for unfiled agreements, *see* 46 U.S.C. §§ 40307(d), 41102(b)(1), but makes no mention of state law remedies.  IPPs argue that it can be implied that Congress chose not to preempt state laws.  (*See* D.E. Nos. 210 at 57–61, 270 at 12–14).  Defendants counter that the lack of reference to state laws is irrelevant. (*See* D.E. No. 269 at 16–17).   The Court agrees with Defendants that the Shipping Act's silence on the availability of private remedies under state law does not necessitate a finding of no preemption.

First, the Court does not find that silence weighs against preemption here.  If silence with respect to state laws was dispositive, then the Shipping Act's grant of immunity from the "antitrust laws" for filed and effective agreements would apply only to federal laws, given the explicit statutory definition in 46 U.S.C. § 40102(2).  Thus, under a plain reading of the statute, if an agreement is filed and effective and an ocean common carrier is entitled to full immunity from antitrust liability under the Sherman Act and Clayton Act, a state attorney general or consumer could nevertheless pursue antitrust claims against the carrier for the same agreement

under state law.[12]  Although this scenario is admittedly hypothetical (since the facts before the

Court involve an unfiled, secret agreement), it demonstrates that the Shipping Act's silence with

respect to state law is not dispositive, because such a result is borderline absurd and is clearly at

odds with Congress's intent.

Second, the Court is not convinced that specific reference to the Clayton Act in the

context of unfiled agreements necessarily implies that state law claims are permitted.  Given the

outsized federal role in the area of national and international maritime commerce as compared to

the states, *see Locke*, 529 U.S. at 99, 108, it does not follow that Congress ever envisaged that

myriad state laws would be applied to regulate international maritime commerce.  Accordingly,

the Court is not persuaded by IPPs' arguments that cases such as *Wyeth* are on point here.  (*See*

D.E. No. 210 at 59–60; D.E. No. 270 at 12).  *Wyeth* stands in part for the proposition that silence

on the issue of preemption coupled with awareness of state causes of action in that particular

field is evidence that Congress did not intend to preempt state law claims.  *Wyeth v. Levine*, 555

U.S. at 575 ("'The case for federal pre-emption is particularly weak where Congress has

indicated its awareness of the operation of state law in a field of federal interest, and has

nonetheless decided to stand by both concepts and to tolerate whatever tension there is between

them.'") (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989)).

There is nothing in the Shipping Act which suggests that Congress ever indicated its awareness

of the operation of state law in the field of national and international maritime commerce when it

explicitly carved out causes of action under federal antitrust law.  To the contrary, as IPPs

themselves point out, the legislative history is "bereft of meaningful discussion of state antitrust

laws."  (D.E. No. 270 at 16–17).  This lack of discussion makes sense given the dearth of state

---

[12] Notwithstanding IPPs' conclusory position that state antitrust laws would not apply to a filed and effective agreement.  (D.E. No. 270 at 7).

tort litigation in the field of national and international maritime commerce when Congress passed the Shipping Act.  Indeed, as IPPs note, "in the [Shipping] Act's decades long history, *this* action is the first to present the question of state antitrust law's applicability."  (D.E. No. 270 at 6 n.1) (emphasis in original).  In contrast, when Congress passed federal drug labeling laws it was "certain[ly] aware[]" of the "prevalence of state tort litigation" related to pharmaceuticals. *Wyeth*, 555 U.S. at 575.  Thus, cases such as *Wyeth* are distinguishable

In any event, "neither an express pre-emption provision nor a saving clause bars the ordinary working of conflict pre-emption principles."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001) (citation and internal quotation marks omitted).  In other words, even if the Shipping Act were not silent and had indicated approval of state law claims, they could still be subject to conflict preemption.

The legislative history further supports a finding of conflict preemption.  "The Shipping Act of 1984 was intended to clarify and broaden the antitrust immunity provided by the previous Shipping Act of 1916."  *Seawinds Ltd. v. Nedlloyd Lines, B.V.*, 80 B.R. 181, 184 (N.D. Cal. 1987) *aff'd*, 846 F.2d 586 (9th Cir. 1988).  Judicial interpretations had narrowed the scope of antitrust immunity provided by the Shipping Act of 1916 and created parallel jurisdiction between the regulatory agency and the federal courts in certain cases.  *Id.* (citation omitted). Ameliorating the regulatory uncertainty caused by erosion of the protections of the Shipping Act of 1916 was a key concern of at least the Committee on Merchant Marine and Fisheries in crafting the remedial scheme provided in the Shipping Act of 1984:

> To avoid the uncertainty created by the vagueness of the 1916 Shipping Act, the Committee intends that violations of this Act not result in the creation of parallel jurisdiction over persons or matters which are subject to the Shipping Act of [1984]; the remedies and sanctions provided in the Shipping Act of [1984] will be the exclusive remedies and sanctions for violations of the Act.

House Report at 12, 177; *see also Am. Ass'n of Cruise Passengers, Inc. v. Carnival Cruise Lines, Inc.*, 911 F.2d 786, 792 (D.C. Cir. 1990) ("Congress was concerned about a carrier being subject to 'parallel jurisdiction,' *i.e.* remedies and sanctions for the same conduct made unlawful by both the Shipping Act and the antitrust laws."). Furthermore, it was intended that the FMC be "provided exclusive jurisdiction in administering all of the provisions of the Shipping Act as they relate to international liner shipping regulations." House Report at 3, 168.[13]

Thus, "[t]he Shipping Act of 1984 was designed in part to clarify the remedies available and the proper forum for pursuing them." *Seawinds*, 80 B.R. at 184. As noted above, any person may file a complaint with the FMC for alleged violations of the Shipping Act, and a complainant may receive up to double damages as reparations. 46 U.S.C. §§ 41301, 41305. This remedial scheme was created "[i]n order to counterbalance the elimination of the deterrent force of antitrust laws . . . ." *Seawinds*, 80 B.R. at 184.

In sum, "[a]mong the major purposes to be accomplished by the Shipping Act of 1984 were clarification of antitrust immunity for international ocean carriers, vesting in the Federal Maritime Commission of exclusive jurisdiction over administration of the Shipping Act's provisions, and minimizing government involvement in regulation of shipping operations." *Id.* (citing House Report at 3–4, 168–69). "By limiting jurisdiction to the FMC, and restricting that Commission's regulatory scope, Congress implemented the goal of reducing government

---

[13] IPPs argue that legislative history which addresses the exclusivity of civil remedies under the Shipping Act should be characterized as "misleading." (*See* D.E. No. 270 at 16–20). IPPs contend that such comments are ambiguous, and that the Court should focus primarily on the statutory text and discount "cherry-picked" legislative history because the final statutory text was the result of hard-won compromise. (*Id.*). Although it is true that statements of a particular committee cannot be said to stand for the view of Congress more generally, so long as these statements are read as a part of the statute and Congress's intent as a whole, the Court does not think it improper to consider these portions of the legislative history. "Courts must utilize their judgment to determine what constitutes an unconstitutional impediment to federal law, and that judgment is 'informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Lozano*, 724 F.3d at 303 (quoting *Crosby*, 530 U.S. at 373 (2000)).

involvement in shipping operations.  By removing the courts from this regulatory process, Congress removed the potential for continuing regulatory uncertainty." *Id.* at 184–85.

Despite the persuasive legislative history and caselaw in support, it is true that Defendants did not provide—and the Court could not locate—a case explicitly holding that the Shipping Act impliedly preempts state law claims.  Nevertheless, the Court is not otherwise persuaded by the cases cited by IPPs.  For example, although *Oneok, Inc. v. Learjet, Inc.* stands for the proposition that the "broad applicability of state antitrust law supports a finding of no [field] pre-emption," 135 S. Ct. 1591, 1601 (2015), the *Oneok* Court expressly declined to engage in conflict preemption analysis, *see id.* at 1595, 1602.  Similarly, in *Aubry* and *Wylie*, reference to the "Shipping Act" is to a different statute than the one before the Court here,[14] and the facts are readily distinguishable since the issue was whether additional employee-related requirements under state law, such as the payment of a higher rate of wages or hiring of additional crew members, conflicted with the statute.  *See Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409 (9th Cir. 1990) (holding that California overtime pay laws not preempted by 46 U.S.C. § 8104(b)); *Wylie v. Foss Mar. Co.*, No. 06-7228, 2008 WL 4104304 (N.D. Cal. Sept. 4, 2008) (relying on *Aubry* to conclude that California labor statutes not preempted by 46 U.S.C. § 8104(b)).  And although the Texas Court of Appeals held in *Zachry-Dillingham v. American President Lines, Ltd.* that conflict preemption did not operate to bar a claim relating to tariff rates under the Texas Deceptive Trade Practices Act ("DTPA"), that decision is entirely devoid of analysis with respect to Congress's purposes of minimizing government intervention and regulatory costs.  *See* 739 S.W.2d 420, 423 (Tex. App. 1987), *writ denied* (Jan. 27, 1988) ("The

---

[14] *Compare* 46 U.S.C. §§ 2101–14701 (Subtitle II – Vessels and Seamen), *with* 46 U.S.C. §§ 40101–41309 (Subtitle IV – Regulation of Ocean Shipping).  Indeed, Subtitle II does not mention the FMC, and instead references the Department of Homeland Security.  *See, e.g.*, 46 U.S.C. § 2104 note.

grant of immunity from the Texas DTPA would provide carriers with a shield whose existence is not directly related to the accomplishment or the purpose of the tariff filing requirements. Immunity . . . is not necessary to the accomplishment of any congressional objective expressed by the Shipping Act.").  These cases are thus distinguishable from the Court's analysis.

With this history and caselaw in mind, the Court concludes that IPPs' proposed application of state law conflicts with the congressional purpose of minimizing government intervention and regulatory costs.  46 U.S.C. § 40101(1).  Permitting private actions under a patchwork of state laws for the same exact conduct that is exempt from federal antitrust law, 46 U.S.C. § 40307(d), and within the purview of the FMC complaint process, *id.* § 41301, directly undermines the "certainty and predictability" Congress sought to achieve in passing the Shipping Act of 1984.  *See* House Report at 4, 169; *see also id.* at 25, 190 ("[T]o the greatest extent possible, members of the ocean liner industry should be . . . free of . . . vague standards, or threatened penalties under changing interpretations of antitrust laws.").  The state laws at issue cannot consistently stand together with the statutory scheme and Congress's stated purposes in passing the Shipping Act of 1984 and are therefore preempted.[15]  In reaching this holding the Court emphasizes that the putative class members can seek relief before the FMC, 46 U.S.C. § 41301(a), and then bring actions in district court as appropriate and consistent with Congress's full intent, *see* 46 U.S.C. § 41306 (after filing complaint with FMC, complainant may bring civil action in a district court for injunctive relief); *id.* § 41309 (injured party who is awarded reparations by the FMC may seek enforcement of the order in a district court).

---

[15] Because the Court concludes that the state laws at issue conflict with the federal law, it does not address whether field preemption applies.  *See Crosby*, 530 U.S. at 374 n.8 (declining to address field preemption after finding of conflict preemption).

## VI.    CONCLUSION

For the reasons above, the motions to dismiss are granted.   An appropriate Order accompanies this Opinion.

s/ *Esther Salas*
**Esther Salas, U.S.D.J.**