# Ballard Spahr
### LLP

--------------------

210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
TEL 856.761.3400
FAX 856.761.1020
www.ballardspahr.com

Roberto A. Rivera-Soto
Direct: 856.761.3416
riverasotor@ballardspahr.com

*VIA CM/ECF*

November 24, 2015

The Honorable Esther Salas
U.S. District Judge
MLK, Jr. Federal Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

Re:  *IN RE VEHICLE CARRIER SERVICES ANTITRUST LITIG.*
     Master Docket No.: 13-cv-3306 (MDL No. 2471)
     (This filing relates to *General Motors LLC v. Nippon Yusen Kabushiki Kaisha, et al.*,
     Case No. 2:15-cv-04739)

Dear Judge Salas:

      This office represents defendants Wallenius Wilhelmsen Logistics AS, Wallenius

Wilhelmsen Logistics Americas LLC, and EUKOR Car Carriers Inc. (collectively,

"WWL/EUKOR").  In addition, we have been authorized to submit this letter on behalf of

defendants Nippon Yusen Kabushiki Kaisha and NYK Line (North America) Inc. (collectively,

"NYK") (NYK, WWL and EUKOR collectively are referred to as "defendants").

      Kindly accept this letter brief in lieu of a more formal brief in response to the

October 23, 2015 letter brief filed by plaintiff General Motors LLC ("GM").  In this letter brief,

defendants address the reasons the Court's August 28, 2015 opinion and order [No. 2:13-cv-

03306, D.E. Nos. 275 and 276 (the "Opinion")] dismissing each of the class action complaints in

*In Re Vehicle Carrier Services Antitrust Litigation* likewise compels the dismissal of GM's

separate and related complaint.  [D.E. No. 1. ("*Compl.* ¶__").]

A PA Limited Liability Partnership | John B. Kearney, Managing Partner

For the reasons that follow, defendants respectfully submit that GM has failed to present any good or proper reasons that bar the application of the Opinion to GM's complaint; as a result, its complaint too should be dismissed with prejudice, and GM should prosecute the complaint it already filed before the Federal Maritime Commission ("FMC").[1]

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................ 3

II.    CONCISE STATEMENT OF FACTUAL AND PROCEDURAL HISTORY ................. 3

III.   ARGUMENT ........................................................................ 5

       A.    The Opinion is unambiguous ............................................ 6

       B.    GM's federal antitrust claims fit squarely within the Opinion ................ 8

       C.    The Chapter of the Shipping Act governing service contracts is irrelevant .......... 9

       D.    GM's additional arguments should be rejected and its remaining state law
             claims dismissed for want of subject matter jurisdiction ...................... 16

       E.    If the Court considers GM's state law claims, they should be dismissed
             on substantive grounds .................................................. 17

             1.    Counts Two (Donnelly Act) and Six (unjust enrichment) must be
                   dismissed under the Opinion ...................................... 17

             2.    GM's breach of contract claims (Counts Three, Four and Five)
                   should be dismissed for failure to state a claim ...................... 17

IV.    CONCLUSION ...................................................................... 20

---

[1]   On September 2, 2015, GM filed a complaint with the FMC alleging that the same agreements set forth in GM's complaint here constitute violations of the Shipping Act (the "FMC complaint"); a true and correct copy of the FMC complaint is attached hereto as **Exhibit "A"** and is made a part hereof by reference.  The Court may take judicial notice of GM's FMC complaint.  Wiatt v. Winston & Strawn, LLP, 838 F. Supp. 2d 296, 312 (D.N.J. 2012).

## I.    PRELIMINARY STATEMENT.

GM's letter brief is an exercise in misdirection.  Rather than focusing on the Chapter of the Shipping Act at issue in the Opinion, GM instead focuses on a separate, wholly inapplicable Chapter of the Shipping Act.  This is a ruse.  GM's antitrust claims are based on exactly the same alleged "conspiracy … to rig bids, allocate markets, restrain capacity, and to otherwise fix, raise, stabilize, and maintain prices of Vehicular Carrier Services" [*Compl.* ¶ 1] as alleged by the class action plaintiffs.  GM's alleged damages, too, are identical to those sought by the class plaintiffs.  [*See ibid.* ("GM paid higher prices for Vehicle Carrier Services than it would have paid in a competitive market[.]").]  It necessarily follows, then, that the Court's conclusion should remain as before:  "Because the Shipping Act of 1984 bars Clayton Act claims and preempts state law claims under the theory of conflict preemption," GM's complaint should be dismissed. *Opinion* at 2-3.

The other arguments advanced by GM are straw men.  Although GM asserts breach of contract claims based on the service contracts it entered into with defendants, dismissal nevertheless is appropriate; upon dismissal of the federal antitrust claim,[2] the Court should dismiss GM's state law claims for lack of federal jurisdiction.  And, even if the Court exercises its jurisdiction over GM's state law breach of contract claims, they too should be dismissed for failure to state a claim.

## II.    CONCISE STATEMENT OF FACTUAL AND PROCEDURAL HISTORY.

On May 24, 2013, the first of what later would become a number of cases was filed in this Court, alleging that ultimately six sets of ocean carriers had combined and conspired

---

[2]    Based on implied preemption, the Opinion also compels the dismissal of GM's state antitrust claim under New York's Donnelly Act and its state law unjust enrichment claim. *Opinion* at 2-3.  As explained below, the Court need not reach that issue: once the federal claims are dismissed, the Court should dismiss each of the state law claims for want of jurisdiction.

to artificially inflate the cost of the ocean carriage of vehicles.  [MDL D.E. No. 1.]  Given the

number and similarity of the actions filed, on October 23, 2013, the Judicial Panel on Multi-

District Litigation ("JPML") ordered that all matters on this subject be consolidated into MDL

No. 2471, assigned to your Honor.  [MDL D.E. No. 21.]  By an order dated December 27, 2015,

your Honor (a) ordered consolidation of the matters referred by the JPML (the "MDL"), (b)

established a Master Docket Number for the consolidated cases, and (c) set the date for an initial

case management conference. [MDL D.E. No. 48.]

       As directed at the case management conference, on January 26, 2015, complete

motion packages were filed seeking to dismiss all complaints then filed in the MDL.  [MDL D.E.

Nos. 218, 219 and 220 (direct purchasers' complaint) and D.E. Nos. 209, 210, 211, 251 and 252

(indirect purchasers' complaints).]  The Court entertained argument on those motions on July 23,

2015 and, in the Opinion, the Court dismissed with prejudice the direct purchasers' consolidated

amended complaint and all three of the indirect purchasers' consolidated amended complaints,

ruling that any claims asserted in those actions had to be presented to the FMC for resolution

under the Shipping Act.  [MDL D.E. Nos. 275 and 276.]

       In the interim, on June 15, 2015, GM filed its action against defendants in the

United States District Court for the Eastern District of New York.  [E.D.N.Y. Docket No. 1-15-

cv-3451, D.E. No. 1.]  On June 19, 2015, and in compliance with the JPML's earlier order

consolidating these matters before your Honor, GM filed its notice of "tag-along."  [E.D.N.Y.

Docket No. 1-15-cv-3451, D.E. No. 5.]  On June 29, 2015, the JPML issued its transfer order,

consolidating GM's complaint into the consolidated matters pending before your Honor.  [MDL

D.E. No. 166.]  Some motion practice concerning GM's complaint ensued, but the Court's

primary focus was on the then pending motions to dismiss.

As a direct result of the Opinion, on September 2, 2015 -- all of five days later -- GM filed its FMC complaint. [FMC Docket No. 15-08.] Because the Opinion did not directly dismiss GM's complaint, on September 22, 2015, a conference was conducted before the Hon. Joseph Dickson, U.S. Magistrate Judge, "to discuss the status of the claims at issue in Civil Action No. 15-4739 following the [Opinion] in these consolidated matters." [MDL D.E. No. 279.] That conference resulted in the setting of a briefing schedule to address the issue presented, that is, the status of the claims at issue in GM's complaint under the Opinion. [MDL D.E. No. 20.] On October 23, 2015, GM filed its letter brief. [D.E. No. 21.]

Defendants' letter brief followed.

## III.   ARGUMENT.

The principal question before the Court is whether the Shipping Act covers the conduct challenged by GM under the federal antitrust laws and state competition laws. The Opinion answered this precise question with a resounding "yes." In its effort to somehow distinguish its complaint, GM now contends that, because the Shipping Act's filing requirements do not apply to "service contracts regarding 'new assembled vehicles,'" its claims should go forward in this Court. [D.E. No. 21 at 2.] GM's argument is both ill-advised and ill-conceived.

GM's argument is nothing more than a disingenuous sleight-of-hand: by waving about a different but irrelevant provision of the Shipping Act, GM hopes that (a) the Court will focus on a wholly inapplicable Chapter of the Shipping Act, (b) ignore the express limitations of that Chapter, and (c) incomprehensibly narrow the scope of the Shipping Act's bar on antitrust claims. Stated differently, GM impermissibly conflates (1) the provisions in Chapter 403 of the Shipping Act concerning the filing of agreements between and among carriers[3] -- which are the

---

[3]    These agreements are filed with the FMC and are made available to the public. *See* 46 *U.S.C.* § 40304(a); 46 *C.F.R.* § 535.602(a)(5).

very agreements among competitors that GM alleges are unlawful -- with (2) the provisions in Chapter 405 of the Shipping Act that require the filing of "service contracts" between shippers (that is, the customers of the carriers and generally the entity owning the goods shipped) and the carriers (the entities actually providing the Vehicle Carrier Services) and a related provision exempting certain "service contracts" from that requirement.[4]

GM's arguments should be rejected. The Court's prior analysis compels the conclusion that the Shipping Act completely bars GM's claims. Like all other plaintiffs in this MDL, GM must pursue whatever claims it has before the FMC, a process GM admittedly already has begun.

A.    **The Opinion is unambiguous.**

In the Opinion, the Court analyzed in detail the allegations in the class action complaints. It explained that "Defendants sell vehicle carrier services to original equipment manufacturers ('OEMs')" and that "'vehicle carrier services,'" as used in the class action complaints, "refer to the paid ocean transportation of new assembled motor vehicles by RO/RO [Roll ON/Roll Off] or specialized vehicle carrier services." *Opinion* at 3. It further explained that the class action plaintiffs "allege[d] that Defendants entered into various collusive, secret agreements to fix and increase the prices for vehicle carrier services to and from the United States" and that the agreements "include:

    (i)    coordination of price increases,

    (ii)   agreements not to compete, including coordination of responses to price reduction requests made by the OEMs and allocation of customers and routes, and

---

[4]    Unlike agreements between or among carriers, which are filed and available to the public, service contracts -- which are governed by Chapter 405 -- are filed confidentially and are not available to the public. 46 *U.S.C.* § 40502(b)(1).

(iii)   agreements to restrict capacity by means of agreed upon fleet reductions.

[Opinion at 4 (citations to the class action complaints omitted).]

The Opinion also determined that "[t]he Shipping Act states that '[a] person may not recover damages under section 4 of the Clayton Act (15 *U.S.C.* § 15), or obtain injunctive relief under section 16 of the Act (15 *U.S.C.* § 26), for conduct prohibited by [the Shipping Act]'" under section 40507(d) of the Act, and, in turn, framed the principal question as whether "agreements to fix prices, allocate customers and routes, and restrict capacity" among common carriers -- that is, defendants -- "are 'prohibited by' the Shipping Act, thus triggering the statutory bar against private actions under section 40507(d)." *Opinion* at 7 (referring to 46 *U.S.C.* § 40507(d)). Because there can be no dispute that § 40507(d) of the Shipping Act bars claims of price fixing and market allocation, the Court narrowed the issue to whether § 40507(d) also bars federal antitrust claims based on "capacity restrictions." *Ibid.* And, holding that the Shipping Act prohibited capacity restrictions and that section 40507(d) therefore barred the federal antitrust claims in their entirety, the Court reasoned that (i) the plain language of the Shipping Act, specifically the "Application" section, covered the conduct, and (ii) the Shipping Act prohibits common carriers from operating under unfiled agreements, that is, the type of secret agreement alleged in every one of the complaints. *Id.* at 8.

The parallel conclusion that the Shipping Act impliedly preempted state antitrust and consumer protection claims and related unjust enrichment claims was based on the following reasoning: "the state laws at issue conflict with the Shipping Act" because "the Shipping Act's express purpose" is "minimizing government intervention and regulatory costs coupled with exemptions from private antitrust actions under the Clayton Act and the ability of any person to bring claims before the FMC." *Opinion* at 20.

The Opinion's effect on GM's complaint could not be clearer: because GM's complaint draws its genesis from an alleged illegal agreement among carriers -- one that had to be filed with the FMC – GM's complaint is subject to the Opinion and it too should be dismissed with prejudice.

**B.    GM's federal antitrust claims fit squarely within the Opinion.**

Faced with the resounding mandate of the Opinion, GM, in a whiplash change of heart, now attempts to recast its entire complaint as one based on the individual service contracts it entered into with defendants, rather than one focused on the alleged agreement among defendants and the other common carriers,[5] referred to by GM as "co-conspirators." *Compl.* ¶ 1. That is sophistry.  GM's complaint states that it "brings this action to recover treble damages under Section 4 of the Clayton Act … for Defendants' and their co-conspirators' violation of Section 1 of the Sherman Act[.]" *Compl.* ¶ 5.  GM describes the "[n]ature" of its claims -- in the very first paragraph of its complaint -- as defendants and their co-conspirators' alleged "conspir[acy] to overcharge their customers for Vehicle Carrier Services" [*id.*], which is precisely what the class action plaintiffs alleged. *Opinion* at 3.  GM alleges that defendants conspired "to rig bids, allocate markets, restrain capacity, and to otherwise fix, raise, stabilize, and maintain prices for Vehicle Carrier Services[,]" *Compl.* ¶ 1, again, precisely as the class action plaintiffs alleged. *Opinion* at 3.  GM also contends that "this conspiracy affected the market for all Vehicle Carrier Services," rather than just those purchased by GM. *Compl.* ¶ 1.

---

[5]    The latter claim -- one based exclusively on the alleged "secret" agreement among defendants and the other common carriers -- is the precise claim GM has pled in its complaint before the FMC.  *See* Exhibit "A".  When GM's complaint here is read fairly, it also is the claim it advances before this Court.  In other words, the agreements of which GM complains are <u>not</u> the "service contracts" GM now touts; they are the self-same unfiled "agreements to fix prices, allocate customers and routes, and restrict capacity" alleged in both GM's complaint and in the class action complaints, and addressed squarely by the Opinion. *Opinion* at 7.  Any claim to the contrary is simply untrue.

GM's primary claim for relief, in turn, alleges a violation of section 1 of the Sherman Act and seeks damages under section 4 of the Clayton Act based on the agreements among the common carrier defendants and coconspirators. *Compl.* ("First Claim for Relief") ¶¶ 145-51. In support, GM specifically alleges that defendants and the alleged common carrier co-conspirators agreed to fix prices and bids, allocate customers and markets, and restrain capacity. *Compl.* ¶ 147. These alleged agreements are the self-same "agreements to fix prices, allocate customers and routes, and restrict capacity" alleged in the class action complaints and addressed by the Opinion. *See Opinion* at 7. Likewise, the allegations supporting the state antitrust claim under the Donnelly Act and the claim for unjust enrichment are based on the same allegations supporting the very same claims asserted by the class action plaintiffs. *Compl.* ¶¶ 152-159, 187-190.

Because GM's allegations in support of its antitrust claims, and the claims themselves, are materially indistinguishable from, if not identical to, those addressed by the Court in the Opinion, they are doomed to the same fate: like those of the class action plaintiffs, GM's antitrust claims must be dismissed with prejudice under the Shipping Act.

### C.   <u>The Chapter of the Shipping Act governing service contracts is irrelevant.</u>

GM's attempt to avoid the impact of the Opinion hinges on its ability to pull the wool over the Court's eyes: GM somehow must convince the Court that the Opinion either was incorrect or now magically does not apply to GM. According to GM, § 40502 of the Shipping Act does both, albeit only by ignoring clear statutory language. GM is wrong in each respect.

On its face, § 40502 does not apply to agreements among carriers, which agreements are governed by Chapter 403; it applies exclusively to "service contracts" between carriers -- like defendants -- and shippers -- like GM; most decidedly it does not apply to agreements between or among carriers, which is the gravamen of GM's complaint. If, in fact,

GM's reasoning is correct, the result is absurd: the FMC repeatedly has misinterpreted its own

statutory authority, and the millions in fines issued by and paid to the FMC by defendants'

alleged co-conspirators for "operating under unfiled agreements with other carriers" plainly

could not have been within the FMC's authority to collect. For that most obvious reason, it is

not surprising that GM points to no authority supporting its novel and far-too-convenient

interpretation of the Shipping Act. The truth lies elsewhere.

§ 40502 is codified as part of Chapter 405 of the Shipping Act, titled "Tariffs,

Service Contracts, Refunds, and Waivers." The Shipping Act defines "service contract" as

> a written contract … between one or more shippers, on the one
> hand, and an individual ocean common carrier or an agreement
> between or among ocean common carriers, on the other, in which –
>
> (A)    The shipper or shippers commit to providing a certain
> volume or portion of cargo over a fixed time period; and
>
> (B)    The ocean common carrier or the agreement commits to a
> certain rate or rate schedule and a defined service level, such as
> assured space, transit time, port rotation, or similar service
> features.
>
> [46 *U.S.C.* § 40102(20).]

§ 40502 thus applies to "a service contract" entered into by one or more common carriers (such

as defendants), on the one hand, and one or more shippers (such as GM), on the other. 46 *U.S.C.*

§ 40502(a).  § 40502(b) excepts from filing with the FMC those "service contracts" involving

certain products, such as "new assembled motor vehicles." 46 *U.S.C.* § 40502((b)(2).

GM's efforts to grossly expand the exceptions in § 40502(b) to each and every

agreement of any kind covered by the Shipping Act -- including those in Chapter 403 -- that may

involve new assembled motor vehicles simply has no support in the text of the statute or in

common sense. In particular, § 40502 specifically refers to an "agreement between or among

ocean common carriers" which then may enter into a contract with a shipper; nowhere does it alter the requirement that agreements between or among common carriers must be filed with the FMC, regardless of their subject. 46 *U.S.C.* § 40502(a).[6]

As the Court has recognized, the requirements to file agreements between or among ocean common carriers with the FMC are set forth in Chapter 403 of the Shipping Act, titled "Agreements." Its first section -- § 40301 ("Application") -- makes clear that the filing requirement of Chapter 403 "applies to an agreement between or among ocean common carriers to -- (7) discuss and agree on any matter related to a service contract." *Ibid.* Indeed, as the Court earlier made clear, the Shipping Act allows carriers to engage in certain specified conduct that otherwise may be considered a violation of the antitrust laws. *Opinion* at 9-10. In this context, the filing requirement is even broader for agreements among carriers involving service contracts: filing is required for agreements on "any matter related to a service contract" and not just agreements that otherwise would violate the antitrust laws.[7] In short, the Shipping Act is and is

---

[6]     GM's argument that its antitrust claims are not barred because it "is bringing claims related to non-common-carriage aspects of an agreement—that is, conduct related to its private service contracts for new assembled motor vehicles," [D.E. No. 21 at 6], reflects fundamentally flawed logic. The antitrust allegations in GM's complaint could only be "non-common-carriage" if the Shipping Act excepts from its purview the agreements among the common carriers related to new assembled motor vehicles, which plainly is not the case. Therefore, that argument and the case law on which GM purports to rely are irrelevant.

    That said, GM's reliance on *American Association of Cruise Passengers*, 911 F.2d 786, 792 (D.C. Cir. 1990), is especially curious. [D.E. No. 21 at 6.] In that case, the court dismissed antitrust claims based on an alleged boycott agreement among common carriers, holding that the agreement was subject to "the prohibitions and procedures of the Shipping Act, rather than to those of the Clayton Act." *Id.* at F.2d at 792.

[7]     And, the FMC and the parties subject to the Shipping Act understand that their filing extends much further than GM -- a stranger to this process -- asserts. *See, e.g.*, 68 *Fed. Reg.* 17397 (Apr. 9, 2003) (Agreement No. 011848 - filing of agreement authorizing space sharing by one carrier on another carrier's ship and "limited range of cooperative activities between the parties related to the space chartering"); 67 *Fed. Reg.* 61884 (Oct. 2, 2002) (Agreement No. 011820 - authorizing space charter between carriers on specified trade routes); 71 *Fed. Reg.*

intended to be all-encompassing in requiring that agreements among carriers relating to service contracts are to be filed with the FMC.

In the end, Chapter 403 of the Shipping Act itself specifies the exceptions to the filing requirement. None of these exceptions includes agreements among common carriers related to new assembled motor vehicles. 46 U.S.C. §§ 40302(b),[8] 40307(b).

The governing notion is clear: if Congress intended to exclude agreements among common carriers pertaining to new assembled motor vehicles from Chapter 403's scope, it would have included them within the defined exceptions.[9] All evidence is to the contrary: where Congress wanted to apply an exception to the filing requirements for "new assembled motor vehicles," it specifically wrote it into the statute: for example, in § 40501, in addition to § 40502. *See* 46 *U.S.C.* § 40501(a)(2) ("Exceptions"). *See also Transamerica Mortg. Advisors, Inc. v. Lewis*, 44 U.S. 11, 21 (1979) (holding that "[w]hen Congress wished to provide a private damages remedy, it knew how to do so and did so expressly"); *United States v. Algon Chem., Inc.*, 879 F.2d 1154, 1163 (3d Cir. 1989) ("These exemptions indicate that when Congress intended to exempt medical practitioners it knew how to do so.").

---

11658 (Mar. 8, 2006)(Agreement No. 011949 – authorizing carriers to "discuss and voluntarily adhere to the schedule of their sailings between [listed ports").

[8]     Only two types of agreements among ocean carriers are excepted by statute from the filing requirements; they are: agreements among ocean carriers related to transportation within or between foreign countries; and agreements among ocean carriers to establish, operate, or maintain a marine terminal in the United States. 46 *U.S.C.* § 40302(b).

[9]     The logic cannot be contested: if common carriers of new assembled motor vehicles, such as defendants, were not subject to the Shipping Act as a whole, there would be no need to exempt the filing of "service contracts" for new assembled motor vehicles. Under GM's untethered reasoning, the Shipping Act would not reach such "service contracts" in the first place. And, that reasoning must be wrong.

Not surprisingly, GM ignores not only the clear import of the Shipping Act, but also any FMC action, regulation, or decision on point. That is understandable: the FMC's conduct runs directly contrary to GM's argument. The FMC has collected millions in fines from carriers for not filing agreements governing the very alleged agreements at issue in GM's complaint.[10] Likewise, the FMC regularly accepts for filing space charter agreements among common carriers that involve new assembled motor vehicles, something that would be impermissible under GM's interpretation of the Shipping Act.[11]

Nor do any of the FMC regulations implementing the Shipping Act exempt "new assembled motor vehicles" in respect of common carrier agreements. The FMC's regulations list those types of agreements that are not subject to the Shipping Act, 46 *C.F.R.* § 535.202, and those that, although subject to the Shipping Act, are exempt from filing, 46 *C.F.R.* §§ 535.303 to

---

[10]    *See, e.g.*, FMC press releases at http://www.fmc.gov/NR14-02/ (" Under the compromise agreement, CSAV agreed to pay a $625,000 civil penalty to resolve allegations that it violated the Shipping Act by acting in concert with other ocean common carriers under unfiled agreements involving shipments of automobiles and other motorized vehicles on RO/RO or specialized car carrier vessels in various U.S. import and export trades."); http://www.fmc.gov/NR14-01/ ("The compromise agreement resolved allegations that MOL and NMCC violated section 10(a) of the Shipping Act, 46 U.S.C. § 41102(b), by acting in concert with other ocean common carriers with respect to the shipment of automobiles and other motorized vehicles by RO/RO or specialized car carrier vessels, where such agreement(s) had not been filed with the Commission or become effective under the Shipping Act."): http://www.fmc.gov/NR13-19/ ("The compromise agreements resolved allegations that K Line and NYK Line violated provisions of the Shipping Act, including section 10(a) of the Shipping Act, 46 U.S.C. § 41102(b), by acting in concert with other ocean common carriers with respect to the shipment of automobiles and other motorized vehicles by RO/RO or specialized car carrier vessels, where such agreement(s) had not been filed with the Commission or become effective under the Shipping Act.").

[11]    Attached here to as **Exhibit "B"** and made a part hereof by reference is a copy of Agreement 0011848, a space charter agreement between defendant WWL and Kawasaki Kisen Kaisha, Ltd. ("K-Line") (one of the alleged coconspirators), filed with the FMC on March 3, 2003. Page 3 permits K-Line to put "new assembled cars and high sided vehicles" on WWL vessels in the North Atlantic trade between the U.S. Atlantic Coast and Europe. The space charter was filed on March 3, 2003, and -- according to the FMC -- became effective on May 15, 2003.

535.307, and § 535.312.  Agreements among common carriers relating to new, assembled motor vehicles are not included in either list:  they are subject to the Shipping Act and are required to be filed.

This is made clear by the disparate treatment of new assembled motor vehicles in the agreement regulations as well as the FMC's regulations governing service contracts.  *See* 46 *C.F.R.* 530.13 ("Exemptions and exceptions") (specifically restricting exception for new assembled motor vehicles in § 40502 to that section of Shipping Act).[12]  In adopting its regulations, the FMC was aware of the statutory exemption for the filing of service contracts covering the carriage of new assembled motor vehicles, and the FMC took pains to reflect the structure of the statute in its regulations:  it exempted from filing the service contracts between carriers and shippers, but it did <u>not</u> exempt from filing any agreements between or among carriers.

---

[12]     46 *C.F.R.* § 530.13 states:

(a)     *Statutory exceptions.*  Service contracts for the movement of the following, as defined in section 3 of the Act (46 U.S.C. 40102), § 530.3 or § 520.2 of this chapter, <u>are excepted by section 8(c) of the Act (46 U.S.C. 40502) from the requirements of that section</u>, and are therefore not subject to the requirements of this part:

(1) Bulk cargo;
(2) Forest products;
(3) Recycled metal scrap;
(4) New assembled motor vehicles; and
(5) Waste paper or paper waste.

[(emphasis supplied).]

To the extent the statute could be considered ambiguous -- which it is not -- the FMC's regulatory interpretation firmly supports defendants' interpretation.  *See Opinion* at 11 n.6 (discussing "'*Chevron* deference'").  And, contrary to what GM repeatedly implies, there is nothing in the legislative history relied upon by GM to support its newly-minted interpretation of the statute.

Finally, FMC's own June 2000 report, titled the "Ocean Shipping Reform Act: An Interim Status Report" ("the FMC report") on which GM strongly relies fatally undermines its argument. That report explains that the Ocean Shipping Reform Act of 1998 ("OSRA"), which resulted in the amendments to the Shipping Act addressing service contracts, deals with "service contacts between shippers and ocean common carriers and the inability of carrier conferences to prevent conference members from entering into individual service contracts." [D.E. No. 21, Ex. C at 2.] According to the FMC, OSRA's impact on antitrust immunity under the Shipping Act is as follows:

> With respect to agreements, OSRA has maintained antitrust immunity for concerted carrier actions, but has limited the permissible activities to which such immunity attaches. Agreements no longer may limit or prohibit service contracting by their members. Moreover, agreements are precluded from requiring members to disclose their service contract negotiations or the details of any contracts into which they have entered. An agreement may publish general guidelines applicable to members' individual contracting practices, but these guidelines must be voluntary and non-enforceable by the agreement and filed confidentially with the Commission.

> [*Id.* at 3.]

Nothing in the FMC report supports GM's interpretation of the Shipping Act. Indeed, the FMC report does not even mention agreements among carriers save to explain that OSRA "has maintained antitrust immunity for concerted carrier action." *Ibid.*

In short, GM's argument that 'the Court never considered the new assembled motor vehicle service contract exemption[sic]" is a red herring. Even if the Court did not consider that argument,[13] there simply is no such exception to consider. The Opinion rests on firmly solid ground and applies with equal force to GM's federal antitrust claims. The inevitable

---

[13]    GM's position is directly at odds with the Opinion, which explicitly acknowledged that the claims at issue involved "new assembled motor vehicles." *Opinion* at 3.

cannot be avoided:  GM must pursue its claims before the FMC, where it already has sought

relief.

      **D.**      **GM's additional arguments should be rejected and its remaining**
              **<u>state law claims dismissed for want of subject matter jurisdiction.</u>**

      Given the application of the Shipping Act's bar to GM's sole federal claim, GM's

remaining arguments are readily set aside.

      GM also argues that (i) it may properly assert breach of contract claims in this

Court, based on the service contracts it separately entered into with defendants, citing to 46

*U.S.C.* § 40502(f) (pertaining to claims for breach of service contract) [D.E. No. 21 at 9]; (ii) that

the Court "should not apply the primary-jurisdiction doctrine to GM's breach of contract claims"

[D.E. No. 21 at 10]; and (iii) that the filed rate doctrine does not bar its claims based on the

services contracts.  [D.E. No. 21 at 12-15].  For the avoidance of doubt, defendants are not now

asserting primary jurisdiction or filed rate defenses against GM.  Instead, although there are

many reasons for the Court to reject GM state law claims, defendants respectfully submit that the

threshold bar to GM's state law claims is jurisdictional.

      By its own admission, GM asserts only supplemental jurisdiction, under 28 *U.S.C.*

§ 1367, as a basis for this Court to hear its breach of contract claims.  *Compl.* ¶ 10.  Without a

viable federal claim -- and GM has none -- the Court lacks independent jurisdiction over GM's

breach of contract claims, *Compl.* pp. 45-50, as well as its claim under the Donnelly Act, *Compl.*

pp. 43-45, and its related claim for unjust enrichment, *Compl.* p. 50.  Courts regularly decline to

exercise supplemental jurisdiction over state law claims under 28 *U.S.C.* § 1367(c)(3) where, as

here, the sole federal claim has been dismissed and there is no independent basis for the Court to

exercise jurisdiction over the state law claims.  *See Celestial Community Development Corp.,*

*Inc. v. City of Philadelphia*, 901 F. Supp. 2d 566, 582 (E.D. Pa. 2012) (dismissing all claims).

Declining to exercise jurisdiction is particularly appropriate where, also as here, the case is in the early stages of litigation, and considerations of judicial economy, convenience, and fairness do not justify the exercise of supplemental jurisdiction. *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 189 (D.N.J. 2012) (dismissing all claims).[14]

> **E.     If the Court considers GM's state law claims, they should be dismissed on substantive grounds.**

>> **1.     Counts Two (Donnelly Act) and Six (unjust enrichment) must be dismissed under the Opinion.**

Precisely as the indirect purchaser plaintiffs asserted in their class action complaints, in Counts Two and Six, respectively, GM included a state law claim under the New York Donnelly Act, *N.Y. Gen. Bus. Law* §§ 340, *et seq.*, and a common law unjust enrichment claim. As noted earlier, the basis for those claims is indistinguishable from the allegations relied on by the class action plaintiffs in their now-dismissed complaints. Therefore, for the reasons set forth in the Opinion, GM's state law claims in Counts Two and Six should be dismissed on conflict preemption grounds. *Opinion* at 17-29.

>> **2.     GM's breach of contract claims (Counts Three, Four and Five) should be dismissed for failure to state a claim.**

In Counts Three, Four and Five, GM alleges that NYK, WWL and EUKOR breached the following "provisions" of their service contracts with GM:

>> (1)     the provision requiring compliance with all applicable laws of the countries where services under these contracts are provided;

>> (2)     the representation that it would not engage in corrupt business practices in providing Vehicle Carrier Services;

---

[14]     GM's argument that the filed rate doctrine does not apply also ignores a salient fact: defendants are not asserting that doctrine. Defendants did raise the filed rate doctrine in their motion to dismiss the direct purchaser plaintiffs' complaint for a specific reason: those plaintiffs were freight forwarders that claimed they purchased Vehicle Carrier Services at filed tariff rates.

(3)     the provision requiring it to keep confidential and not to disclose confidential information to any present or future competitor; and

(4)     the provision requiring it to provide Vehicle Carrier Services in an economic manner.

[*Compl.* ¶ 167 (formatting altered); *Compl.* ¶¶ 3, 171-174, 180-184.]

GM mischaracterizes the service contracts:  the alleged antitrust violations do not constitute a breach of those service contracts.

The service contracts contain a "compliance with law" provision that states, in part, as follows:

COMPLIANCE WITH LAWS; FORCED LABOR

Provider, and any Services supplied by Provider, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) where Services are provided or that relate to the provision, licensing, approval, or certification of the Services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.[15]

Tellingly, this "compliance with law" provision only pertains to the carrier/defendant's performance of the services under the contracts in the countries to which the carrier/defendant transports GM's vehicles and, more specifically, do not pertain to the alleged antitrust violations of defendants in obtaining the service contracts in the first place.  A substantively similar provision was addressed in *In re TFT-LCD (Flat Panel) Antitrust*

---

[15]     This language is excerpted from ¶ 23 of a NYK 2011-2012 Redacted Service Contract, a true and correct copy of which is attached hereto as **Exhibit "C"** and is made a part hereof by reference.  Although outside the pleadings, the Court properly may consider this service contract. *In re Rockefeller Center Props., Inc. Securities Litig.*, 184 F. 3d 280, 287 (3d Cir. 1999) (holding that court may consider, on motion to dismiss, documents explicitly relied on or mentioned in complaint).

*Litigation*, No. M-07-1827, 2012 U.S. Dist. LEXIS 160337 (N.D. Cal. Nov. 6, 2012), where

Motorola instituted an antitrust suit against Samsung for conspiring to fix the price of LCD

panels.  Motorola included a claim for breach of contract based on the following "compliance

with laws" provision of its contract with Samsung:

> COMPLIANCE WITH LAWS:  Seller [Samsung] warrants that
> the goods and services supplied pursuant to this order will have
> been performed, produced and supplied in compliance all
> applicable laws, orders, rules and regulations of [Singapore/PRC]
> including but not limited to all applicable jurisdictions' rules and
> regulations concerning freedom of association, wages and working
> hours, safety and health, anti-discrimination and humane treatment
> of workers.  Seller shall indemnify Motorola against any liability
> caused by any non-compliance with this provision.

> [*Id.* at *55.]

The court agreed with Samsung that the "compliance with laws" provision only required that

Samsung comply with applicable law in connection with Samsung's performance of services and

furnishing of goods under the contract, reasoning that "[a] review of the plain language of the

compliance with laws provision compels the conclusion that it does not apply to antitrust laws,"

and noting that the provision plainly states that it applies to "'goods and services supplied

pursuant to this order'" and mandates they be "'performed, produced and supplied in

compliance[.]'" *Id.* at *56.

As in *Flat Panel*, the plain language of GM's service contracts establishes that the

"compliance with law" provision requires that defendants comply with the applicable laws of the

countries where the services are provided in furnishing the transportation services under the

contracts; it does not apply to alleged antitrust violations committed outside the context of the

service contracts.

The service contracts also provide that carriers will not engage in "corrupt business practices" in terms of using forced labor in the provision of services under the contract:

> Provider represents that neither it nor any of its subcontractors will utilize, child, slave, prisoner or any other form of forced or involuntary labor or engage in abusive employment practices or corrupt business practices in the provision of Services.
>
> [NYK 2011-2012 Redacted Service Contract, **Exhibit "C"** at ¶ 23.]

The corrupt "business practice" provision, like the "compliance with law" provision, governs the manner in which services are to be performed under the contracts; it too does not apply to antitrust violations.

The other service contract provisions on which GM relies also fail to provide any basis to assert a claim: there is no factual allegation supporting GM's assertion that the confidentiality provision of the contracts was breached; the service contracts contain no provision that suppliers will provide services "in an economic manner," as alleged in GM's complaint; and GM has not pled a breach of contract claim because the alleged "economic manner" provision does not appear in the contract. In the end, any such provisions apply only to the provision of services under the contract, and decidedly not to alleged antitrust violations.

## IV.   CONCLUSION.

GM's primary feint is unmasked: its claim that it relies on its service contracts with defendants and that those contracts are exempt from the Shipping Act is, at best, disingenuous. No matter how hard it may try -- and, here, GM's reach far exceeds its grasp -- GM cannot escape the reality it pled in its own complaint: the unlawful agreement that forms the basis of GM's claims is not that of the service contracts, but of the alleged agreement among defendants and their alleged co-conspirators to fix prices. That agreement among carriers is

plainly subject to the Shipping Act, a point that not even GM could credibly argue differently. Once GM's illusion is shattered, the remainder of its claims fall of their own weight.  In the end, GM's complaint is subject to the reasoning and holdings of the Opinion and, like its predecessor plaintiffs, its complaint too should be dismissed with prejudice.

WHEREFORE, for the foregoing authority, arguments and reasons, defendants respectfully request that the Court dismiss GM's complaint with prejudice, thereby remanding GM to the forum it already voluntarily chose once the Opinion issued:  the FMC.

Respectfully yours,

BALLARD SPAHR LLP

By: _____

Roberto A. Rivera-Soto

cc:   All Counsel of Record (*VIA CM/ECF*)